NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 16-7025

# In the United States Court of Appeals for the District of Columbia Circuit

_____

BRIAN WRENN, JOSHUA AKERY, TYLER WHIDBY, AND SECOND AMENDMENT FOUNDATION, INC.,

Plaintiffs-Appellants,

v.

DISTRICT OF COLUMBIA AND CATHY LANIER,

Defendants-Appellees.

_____

Appeal from an Order of the
United States District Court for the District of Columbia
The Hon. Colleen Kollar-Kotelly, District Judge
(Dist. Ct. No. 1:15-cv-162-CKK)

_____

APPELLANTS' BRIEF

_____

Alan Gura
GURA & POSSESSKY, PLLC
916 Prince Street
Suite 107
Alexandria, VA 22314
703.835.9085/703.997.7665

June 13, 2016                    Counsel for Appellants

# CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

## A.    PARTIES AND AMICI

Plaintiffs below were Brian Wrenn, Joshua Akery, Tyler Whidby, and Second Amendment Foundation, Inc. All plaintiffs are Appellants before this Court.

Defendants below were Cathy Lanier and the District of Columbia. All Defendants are Appellees before this Court.

Amici in the District Court were Everytown for Gun Safety and Brady Center to Prevent Gun Violence.

## B.    RULINGS UNDER REVIEW

The ruling under review is the Memorandum Decision and Order of the United States District Court for the District of Columbia, per the Hon. Colleen Kollar-Kotelly, Dist. Ct. Dkt. 54, entered March 7, 2016, denying Plaintiffs-Appellants' motion for preliminary injunction. The decision is not yet reported, but is available at 2016 U.S. Dist. LEXIS 28362. The ruling under review is printed at Joint Appendix ("JA") 379.

C.    RELATED CASES

This case has been before this Court, No. 15-7057. A related case is pending in the District Court, and before this Court: *Grace* v. *District of Columbia*, D.D.C. No. 15-CV-2234-RJL, D.C. Cir. No. 16-7067.

This case was also related to *Palmer* v. *District of Columbia*, U.S. Dist. Ct., D.D.C. No. 09-1482-FJS. In *Palmer*, which involved the same Defendants, Plaintiff SAF, and Plaintiff SAF's members, the District Court held that individuals have a Second Amendment right to carry handguns in public, in Washington, D.C., for self-defense. *Palmer* v. *District of Columbia*, 59 F. Supp. 3d 173 (D.D.C. 2014). The District Court enjoined the City's handgun carrying prohibition pending adoption of a constitutional licensing system. Defendants appealed from that judgment to this Court, No. 14-7180, but dismissed their appeal.

## CORPORATE DISCLOSURE STATEMENT

Plaintiff-Appellant Second Amendment Foundation, Inc., ("SAF") has no parent corporations. No publicly traded company owns 10% or more of its stock.

SAF, a tax-exempt organization under § 501(c)(3) of the Internal Revenue Code, is a non-profit educational foundation incorporated in 1974 under the laws of the State of Washington. SAF seeks to preserve the effectiveness of the Second Amendment through educational and legal action programs. SAF has over 650,000 members and supporters residing throughout the United States.

# TABLE OF CONTENTS

Certificate as to Parties, Rulings, and Related Cases. . . . . . . . . . . . . . . i

Corporate Disclosure Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

Glossary. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xix

Jurisdictional Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Issues. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statutes and Regulations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

       1.    Regulatory History. . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

       2.    Present Regulatory Landscape. . . . . . . . . . . . . . . . . . 6

       3.    The Regulatory Scheme's Application Against
             Plaintiffs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

       4.    Procedural History. . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Summary of Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

I. Requiring A "Good" or "Other Proper" Reason to Exercise
the Right to Bear Arms is Unconstitutional. . . . . . . . . . . . . . . . . 13

A.      The Second Amendment Secures the Right to Carry Handguns in Washington, D.C. for Self-Defense. . . . . . . . . 13

    1.     Res Judicata Cements the Essential Predicate of Plaintiffs' Claim—the Fundamental Right to Carry Handguns for Self-Defense, in Public, in the District of Columbia. . . . . . 13

    2.     The Supreme Court Has Confirmed Plaintiffs' Right to Carry Arms for Self-Defense. . . . . . . . . . . . . . . . . . . . . . . . 16

    3.     Post-*Heller* Courts Largely Confirm That the Second Amendment Extends Beyond the Home. . . . . . . . . 26

    4.     History Confirms *Heller*'s Holding That the Second Amendment Codified the Right to Carry Arms for Self-Defense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

        a.     The Statute of Northampton. . . . . . . . . . . . . . . 31

        b.     American Gun Carrying Regulations. . . . . . . . . 37

B.      "Good" or "Proper" Reason Requirements Destroy Rights.  42

C.      Defendants' Licensing Scheme Fails Any Level of Means-Ends Scrutiny. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

D.      Lanier's Generalized Discretion to Deny Carry Licenses, and the "Good Reason"/"Other Proper Reason" Standard, Both Constitute Unlawful Prior Restraints. . . . . . . . . . . . . 55

III.   Defendants' Licensing Scheme Irreparably Harms Plaintiffs. . . 59

IV.   The Balance of Equities Favors Granting Injunctive Relief. . . . 60

V.   The Public Interest Warrants Injunctive Relief. . . . . . . . . . . . . 64

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  64

T<small>ABLE OF</small> A<small>UTHORITIES</small>

Cases

*Aamer* v. *Obama*,
   742 F.3d 1023 (D.C. Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Abdullah* v. *Obama*,
   753 F.3d 193 (D.C. Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Andrews* v. *State*,
   50 Tenn. 165 (1871). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 39

*Bateman* v. *Perdue*,
   881 F. Supp. 2d 709 (E.D.N.C. 2012) . . . . . . . . . . . . . . . . . . . . . 28, 52

*Bd. of Trs.* v. *Fox*,
   492 U.S. 469 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Beal* v. *Stern*,
   184 F.3d 117 (2d Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Bliss* v. *Commonwealth*,
   12 Ky. 90 (1822). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Bonidy* v. *United States Postal Serv.*,
   790 F.3d 1121 (10th Cir. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Bsharah* v. *United States*,
   646 A.2d 993 (D.C. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Canonsburg Gen. Hosp.* v. *Sebelius*,
   989 F. Supp. 2d 8 (D.D.C. 2013) . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

\*Authorities upon which we chiefly rely are marked with asterisks.

vi

*City of Lakewood* v. *Plain Dealer Publishing Co.*,
486 U.S. 750 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57, 58

*City of Las Vegas* v. *Moberg*,
82 N.M. 626, 485 P.2d 737 (N.M. Ct. App. 1971). . . . . . . . . . . . . . 22

*\*City of Los Angeles* v. *Alameda Books, Inc.*,
535 U.S. 425 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Clark* v. *Jeter*,
486 U.S. 456 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 50

*Coalition to End Permanent Congress* v. *Runyon*,
979 F.2d 219 (D.C. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Commonwealth* v. *Gouse*,
461 Mass. 787, 965 N.E.2d 774 (2012). . . . . . . . . . . . . . . . . . . . 27

*Consol. Edison Co. of N.Y.* v. *Bodman*,
449 F.3d 1254 (D.C. Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . 14

*Dickens* v. *Ryan*,
688 F.3d 1054 (9th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . 60, 61

*\*District of Columbia* v. *Heller*,
554 U.S. 570 (2008). . . 2, 16-27, 29, 30, 32, 34, 36-39, 42-44, 49, 55,
56

*Drake* v. *Filko*,
724 F.3d 426 (3d Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . 19, 30

*Dred Scott* v. *Sandford*,
60 U.S. (19 How.) 393 (1857) . . . . . . . . . . . . . . . . . . . . . . . . . 24

*English* v. *State*,
35 Tex. 473 (1871) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Ex parte Thomas,*
 21 Okla. 770, 97 P. 260 (1908) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Ezell* v. *City of Chicago,*
 651 F.3d 684 (7th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . 23, 56, 60

*Fife* v. *State,*
 31 Ark. 455 (1876) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Fletcher* v. *Haas,*
 851 F. Supp. 2d 287 (D. Mass. 2012). . . . . . . . . . . . . . . . . . . . . . . 52

*Gadomski* v. *Tavares,*
 113 A.3d 387 (R.I. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 48

*GeorgiaCarry.Org, Inc* v. *Georgia,*
 687 F.3d 1244 (11th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*GeorgiaCarry.Org, Inc.* v. *U.S. Army Corps of Eng'rs,*
 788 F.3d 1318 (11th Cir. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Gillis* v. *United States,*
 400 A.2d 311 (D.C.1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Gordon* v. *Holder,*
 721 F.3d 638 (D.C. Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

\*Grace v. District of Columbia, No. 15-2234,
 2016 U.S. Dist. LEXIS 64681 (D.D.C. May 17, 2016). .  14, 15, 39, 41,
 50, 52

\*Heller v. District of Columbia,
 670 F.3d 1244 (D.C. Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . 49, 51

\*Heller v. District of Columbia,
 801 F.3d 264 (D.C. Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . 4, 53, 54

*Hertz* v. *Bennett*,
    294 Ga. 62, 751 S.E.2d 90 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*In re Application of McIntyre*,
    552 A.2d 500 (Del. Super. 1988).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*In re Brickey*,
    8 Idaho 597, 70 P. 609 (1902).. . . . . . . . . . . . . . . . . . . . . . . . . . 22, 26

*\*Isaacson* v. *Horne*,
    716 F.3d 1213 (9th Cir. 2013).. . . . . . . . . . . . . . . . . . . . . . . . . . 47, 48

*Johnson* v. *Eisentrager*,
    339 U.S. 763 (1950). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Kachalsky* v. *Cnty. of Westchester*,
    701 F.3d 81 (2d. Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 56

*Kuck* v. *Danaher*,
    822 F. Supp. 2d 109 (D. Conn. 2011). . . . . . . . . . . . . . . . . . . . . . . 49

*Largent* v. *Texas*,
    318 U.S. 418 (1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Little* v. *United States*,
    989 A.2d 1096 (D.C. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Marbury* v. *Madison*,
    5 U.S. (1 Cranch) 137 (1803). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Martin* v. *Dep't of Justice*,
    488 F.3d 446 (D.C. Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*McCullen* v. *Coakley*,
    134 S. Ct. 2518 (2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*McDonald* v. *City of Chicago*,
561 U.S. 790 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 19, 23, 26

*Mills* v. *District of Columbia*,
571 F.3d 1304 (D.C. Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*\*Moore* v. *Madigan*,
702 F.3d 933 (7th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . 17, 26, 31

*Morris* v. *United States Army Corps of Eng'rs*,
60 F. Supp. 3d 1120 (D. Idaho 2014) . . . . . . . . . . . . . . . . . . . . . . . . 28

*Mosby* v. *Devine*,
851 A.2d 1031 (R.I. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Muscarello* v. *United States*,
524 U.S. 125 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Myers* v. *United States*,
272 U.S. 52 (1926). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Nat'l Rifle Ass'n of Am., Inc.* v. *McCraw*,
719 F.3d 338 (5th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*New Hampshire* v. *Maine*,
532 U.S. 742 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Nunn* v. *State*,
1 Ga. 243 (1846) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Owen* v. *State*,
31 Ala. 387 (1858). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*O'Neill* v. *State*,
16 Ala. 65 (1849) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Palmer v. District of Columbia,
  59 F. Supp. 3d 173 (D.D.C. 2014)........................ 6, 13, 15

Parker v. District of Columbia,
  478 F.3d 370 (D.C. Cir. 2007)...................... 18, 42, 54, 56

People v. Aguilar,
  2013 IL 112116.......................................... 26

People v. Zerillo,
  219 Mich. 635, 189 N.W. 927 (1922). ...................... 46

*Peruta v. Cnt'y of San Diego,
  742 F.3d 1144 (9th Cir. 2014)...................... 15, 44, 52

Peruta v. Cnt'y of San Diego, No. 10-56971,
  2016 U.S. App. LEXIS 10436 (9th Cir. June 9, 2016) (en banc).... 29

Rex v. Knight,
  38 Comb., 90 Eng. Rep. 330 (K.B. 1686) ...................... 32

*Schubert v. De Bard,
  398 N.E.2d 1339 (Ind. App. 1980). ...................... 22, 45, 46

Simpson v. State,
  13 Tenn. 356 (1833) ...................................... 21, 36

Sir John Knight's Case,
  87 Eng. Rep. 75 (K.B. 1686).............................. 32

Speiser v. Randall,
  357 U.S. 513 (1958) ...................................... 42

State ex rel. City of Princeton v. Buckner,
  180 W. Va. 457, 377 S.E.2d 139 (1988). ...................... 22

*State* v. *Bailey*,
    209 Conn. 322, 551 A.2d 1206 (1988) . . . . . . . . . . . . . . . . . . . . . . . . 21

*State* v. *Blocker*,
    291 Or. 255, 630 P.2d 824 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*State* v. *Chandler*,
    5 La. Ann. 489 (1850). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*State* v. *Christian*,
    354 Or. 22, 307 P.3d 429 (2013). . . . . . . . . . . . . . . . . . . . . . . . . 19, 26

*State* v. *Hogan*,
    63 Ohio St. 202, 58 N.E. 572 (1900). . . . . . . . . . . . . . . . . . . . . . . 22, 35

*State* v. *Huntly*,
    25 N.C. (3 Ired.) 418 (1843) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 35

*State* v. *Jumel*,
    13 La. Ann. 399 (1858) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*State* v. *Kessler*,
    289 Or. 359, 614 P.2d 94 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*State* v. *Langford*,
    10 N.C. (3 Hawks) 381 (1824) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*State* v. *Lanier*,
    71 N.C. 288 (1874) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*State* v. *Reid*,
    1 Ala. 612 (1840) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 38, 44

*State* v. *Rosenthal*,
    55 A. 610 (Vt. 1903) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*State* v. *Schoultz,*
  25 Mo. 128 (1857) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

\*Staub v. *City of Baxley,*
  355 U.S. 313 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56, 57

*United States* v. *Chester,*
  628 F.3d 673 (4th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*United States* v. *Cruikshank,*
  92 U.S. 542 (1876). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States* v. *Marzzarella,*
  614 U.S. 85 (3d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States* v. *Miller,*
  307 U.S. 174 (1939). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States* v. *Skoien,*
  614 F.3d 638 (7th Cir. 2010) (en banc) . . . . . . . . . . . . . . . . . . . 18

*United States* v. *Weaver,* No. 2:09-CR-00222,
  2012 U.S. Dist. LEXIS 29613 (S.D. W. Va. Mar. 7, 2012). . . . . . . . 28

*Williams* v. *State,*
  417 Md. 479, 10 A.3d 1167 (2010). . . . . . . . . . . . . . . . . . . . . . . . 27

*Wilson* v. *State,*
  33 Ark. 557 (1878). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Woollard* v. *Gallagher,*
  712 F.3d 865 (4th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Wrenn* v. *District of Columbia,*
  107 F. Supp. 3d 1 (D.D.C. 2015). . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Wrenn* v. *District of Columbia*,
808 F.3d 81 (D.C. Cir. 2015)..................................... 10

*Yamaha Corp. of America* v. *United States*,
961 F.2d 245 (D.C. Cir. 1992) ................................. 14

Constitutional Provisions

U.S. Const. amend. I ........................................ 43

*U.S. Const. amend. II............................................ 15, 43

U.S. Const. amend. IV ........................................ 43

U.S. Const. amend. VI........................................... 15

U.S. Const. amend. IX ........................................ 43

Ala. Const. of 1819, art. I, § 27.................................. 21

Conn. Const. art. I, § 15 (1819)................................. 21

Ky. Const. of 1799, art. XII, cl. 23. ............................. 21

Mo. Const. of 1820, art. XIII, § 3. .............................. 21

N.C. Declaration of Rights § 17 (1776)........................... 21

Tenn. Const. of 1796, art. XI, § 26. ............................. 22

Vt. Const. c. 1, art. 16 (1777) .................................. 22

Statutes and Rules

1 W. & M., Sess. 2, c.2, § 1 (1689)..................................... 33

24 D.C.M.R. § 2333.1........................................ 1, 7, 9

24 D.C.M.R. § 2333.2........................................... 1, 7

24 D.C.M.R. § 2333.3............................................... 1

24 D.C.M.R. § 2333.4........................................... 1, 7

24 D.C.M.R. § 2334.1........................................ 1, 8, 9

28 U.S.C. § 1292(a)(1)............................................. 1

28 U.S.C. § 1331................................................... 1

28 U.S.C. § 2201................................................... 1

42 U.S.C. § 1983.................................................. 1

Ariz. H.B. 2036 § 9(B)(1), (2012), available at http://www.azleg.gov/
legtext/50leg/2r/bills/hb2036s.pdf (last visited June 11, 2016)...... 47

D.C. Act 17-690, 56 D.C. Reg. 1162 (Jan. 16, 2009)................. 6

D.C. Act 19-366, 59 D.C. Reg. 5691, 5697 (May 25, 2012). ......... 6

D.C. Code of 1819, Act for the Punishment of Certain
Crimes and Offences, Sec. 40.................................. 1, 4

D.C. Code § 22-4504......................................... 1, 5, 6, 29

D.C. Code § 22-4504(a) (2008). .................................. 18

D.C. Code § 22-4506.......................................... 1, 5, 6, 9

D.C. Code § 22-4506(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57, 58

D.C. Code § 7-2509.11. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 6, 7, 57

D.C. Code § 7-2509.11(1)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Other Authorities

Alexi Mostrous, "White House Backs Right To Arms Outside
    Obama Events," *Washington Post*, Aug. 19, 2009,
    available at http://www.washingtonpost.com/wp-
    dyn/content/article/2009/08/18/AR2009081803
    416.html (last visited June 11, 2016).. . . . . . . . . . . . . . . . . . . . . . . . . 55

BLACK'S LAW DICTIONARY (6th Ed. 1998). . . . . . . . . . . . . . . . . . . . . . 16

Charles Humphreys, A COMPENDIUM OF THE COMMON LAW
    IN FORCE IN KENTUCKY (1822).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Clayton E. Cramer, *The Statute of Northampton (1328) and
    Prohibitions on the Carrying of Arms* (Sept. 19, 2015),
    available at SSRN: http://ssrn.com/abstract= 2662910
    or http://dx.doi.org/10.2139/ssrn.2662910 . . . . . . . . . . . . . . . . . . 33, 34

COLLECTED WORKS OF JAMES WILSON
    (K. Hall & M. Hall eds., 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Current Valid Tennessee Handgun Permits by County*, available at
    https://www.tn.gov/assets/entities/safety/attachments/
    Current_HG_PermitHolders.pdf (last visited June 11, 2016).. . . . . . 62

Eugene Volokh, *State Constitutional Rights to Keep and
    Bear Arms*,11 TEX. REV. LAW & POL. 191 (2006). . . . . . . . . . . . . . . . 21

FBI, *Uniform Crime Reports: Crime in the United States 2013*, Table 4, available at http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2013/crime-in-the-u.s.-2013/tables/4tabledatadecoverviewpdf/table_4_crime_in_the_united_states_by_region_geographic_division_and_state_2012-2013.xls (last visited June 11, 2016). . . . . . . . . . . . . . . . 61

Florida Department of Agriculture and Consumer Services Division of Licensing, *Concealed Weapon or Firearm License Summary Report October 1, 1987 - May 31, 2016*, available at http://www.freshfromflorida.com/content/download/7499/118851/cw_monthly.pdf (last visited June 11, 2016). . . . . . . . 63

Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self- Defense with a Gun*, 86 J. CRIM. L. & CRIMINOLOGY 150 (1995). . . . . . . . . . . . . . . . . . . . . . 59

Henry Campbell Black, A Dictionary of Law (1891). . . . . . . . . . . . . . . 42

John A. Dunlap, THE NEW-YORK JUSTICE (1815) . . . . . . . . . . . . . . . . . 34

Joyce Lee Malcolm, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT (1994). . . . . . . . . . . . . 33

L.A. Powe, Jr., *Guns, Words, and Constitutional Interpretation*, 38 Wm. & Mary L. Rev. 1311 (1997). . . . . . . . . . . . . . . . . . . . . . . . . 56

Michigan State Police Criminal Justice Information Center, *Concealed Pistol License Annual Report, October 1, 2014 to September 30, 2015*, available at http://www.michigan.gov/documents/msp/ CPL_515521_7.pdf (last visited June 11, 2016). . . 62

Michigan State Police Criminal Justice Information Center, *Concealed Pistol License Annual Report, July 1, 2012 to June 30, 2013*, available at http://www.michigan.gov/documents/msp/CPLAnnual_Report2013_463317_7.pdf (last visited Feb. 27, 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Mike DeBonis, "Security, not street crime, at risk after
    gun ruling, D.C. Police Chief Cathy Lanier says,"
    *Washington Post*, July 30, 2014, available at
    http://www.washingtonpost.com/local/dc-politics/
    security-not-street-crime-at-risk-after-gun-ruling-
    dc-police-chief-cathy- lanier-says/2014/07/30/f8b17e1c-
    1808-11e4-9e3b-7f2f110c6265_story.html
    (last visited June 11, 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

PAPERS OF JAMES MADISON (Robert Ruthland &
    Charles Hobson eds. 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

PAPERS OF THOMAS JEFFERSON (J. Boyd ed., 1950) . . . . . . . . . . . . . . . 20

Robert J. Cottrol and Raymond T. Diamond,
    *"Never Intended to be Applied to the White Population":*
    *Firearms Regulation and Racial Disparity—the*
    *Redeemed South's Legacy to a National Jurisprudence?*,
    70 CHI.-KENT L. REV. 1307 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . 40

Tennessee Dep't of Safety & Homeland Security, *Handgun Carry*
    *Permit Statistics Calendar Year 2015*, at 4, available at
    https://www.tn.gov/assets/entities/safety/attachments/
    HandgunReport2015Full.pdf (last visited June 11, 2016). . . . . . . . 62

*Who Are American Citizens?*,
    THE LIBERATOR, Jan. 21, 1859, at 10, col. 2 . . . . . . . . . . . . . . . . . . . 24

William Blackstone, COMMENTARIES ON THE
    LAWS OF ENGLAND (1769) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

William Hawkins, TREATISE OF THE PLEAS OF THE CROWN (1716). . . . 32,
    33

WORKS OF THE HONOURABLE JAMES WILSON
    (Bird Wilson ed., 1804). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

JA — Joint Appendix

SAF — Second Amendment Foundation, Inc.

JURISDICTIONAL STATEMENT

Plaintiffs-Appellants Brian Wrenn, Joshua Akery, Tyler Whidby, and Second Amendment Foundation, Inc. ("SAF") seek relief from District of Columbia ordinances. The District Court had subject matter jurisdiction over this case under 28 U.S.C. §§ 1331 and 2201, and 42 U.S.C. § 1983. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1). On March 7, 2016, the District Court denied Plaintiffs' motion for preliminary injunction. Plaintiffs noticed their appeal the same day.

STATEMENT OF ISSUES

1. Does the Second Amendment secure a fundamental right to carry handguns in public for self-defense?

2. May the city condition the issuance of handgun carry permits on proof of one's "good" or "proper" reason, beyond the constitutional self-defense interest, for exercising the fundamental right to bear arms?

STATUTES AND REGULATIONS

D.C. Code §§ 7-2509.11, 22-4504, 22-4506; 24 D.C.M.R. §§ 2333.1, 2333.2, 2333.3, 2333.4, 2334.1; D.C. Code of 1819, Act for the Punishment of Certain Crimes and Offences, Sec. 40. *See* addendum.

The District of Columbia would doubtless prefer to ban handguns again. But the city is not free to "balance" the right to keep handguns against its distaste for that right by rationing handgun possession—and thus, handgun possession's alleged risks—to a few people selected at the police chief's discretion. After *District of Columbia* v. *Heller*, 554 U.S. 570 (2008), the city could not replace its 100% handgun ban with a 99% ban, a 50% ban, or even a 5% ban. *Heller* did not invite a negotiation between the city council and itself over how much gun possession it feels like tolerating. The city can regulate the right's exercise, but it must provide a constitutionally-adequate reason to disarm individuals.

Of course, the Second Amendment secures not only the right to "keep" handguns, but also to "bear" them. That renders Washington a "right-to-carry" jurisdiction, a status the city wishes to avoid. *See, e.g.* Motion for Stay, No. 15-7057, June 11, 2015, at 17 ("Without this [regulation], the District becomes a 'right-to-carry' regime."). Yet Defendants demand that individuals wishing to exercise this fundamental right prove to the police chief's satisfaction a "good" or

"proper" reason for doing so. Indeed, Defendants present the "good reason" requirement as a sort of favor, because "the Council concluded [that] *any* increase in public carrying increases the risk of public harm, regardless of whether the licensee can satisfy the 'good reason' standard." Appellants' Br., No. 15-7057, at 12. By this logic, the city can ban all handgun carrying. Indeed, Defendants claim the power "to exercise some control over the quantity of handguns carried in public." Motion for Stay, No. 15-7057, June 11, 2015, at 19. For virtually everyone, that quantity is zero.

Defendants err. They cannot ration a fundamental right—not even in reliance on "experts" who "prove" that the right's exercise is harmful.

To be sure, Defendants retain the power to regulate the carrying of handguns in the interest of public safety. Plaintiffs do not challenge the city's myriad laws governing registration, training, background checks, sensitive places, or restrictions on the types of guns that may be carried and the manner in which they are carried. But no "balancing test" allows Defendants to declare a constitutional right a social evil, assign themselves an interest in suppressing the right, and then demand deference to their self-serving conclusion that the right's severe

rationing has proper constitutional "fit." "[I]ntermediate scrutiny" is not a talismanic incantation that saves gun-rationing schemes by demanding deference not only to the city's "factual" findings regarding handgun's evils, but also to the city's *legal* conclusion that its rationing interest outweighs the individual interest in a fundamental right. *Heller* v. *District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015) ("*Heller III*"). Where fundamental rights are concerned, *judges*, not the legislators themselves, decide whether legislation has gone too far. Defendants' rights-rationing program must be enjoined.

1.  *Regulatory History*.

Before 1943, Americans were free to carry handguns in Washington, D.C. for self-defense without a license.

An 1819 codification of District law reflected the common law crime of affray, which targeted menacing conduct by forbidding the carrying of weapons "in terror of the country." *See* attached statutory addendum at 9-10. An 1855 codification provided that one going armed with, inter alia, a pistol,

> without reasonable cause to fear an assault or other injury or violence to his person, or to his family or property . . . *may*, on complaint of any person having *reasonable cause* to fear an injury or

breach of the peace, be required to find sureties for keeping the peace for a term not exceeding six months. . . .

JA 367 (emphasis added). A November 4, 1857 enactment barred the carrying of all dangerous weapons, including handguns, JA 369, but was replaced in 1858 by a narrower prohibition addressing only the concealed carrying of arms, JA 370.

An 1892 enactment continued the concealed carry prohibition, adding a prohibition on openly carrying arms "with intent to unlawfully use the same." JA 371. But "any judge of the police court" could exempt a person from the operation of these restrictions upon the showing of "necessity" and the provision of a bond. JA 371-72.

In 1932, Congress prohibited only the public carrying of concealed handguns, but provided that the District's police chief "may" license concealed handgun carrying by "suitable" individuals showing "good reason to fear injury to [one's] person or property or . . . other proper reason." JA 374, later codified at D.C. Code § 22-4506.[1] In 1943, the licensing requirement, later codified at Section 22-4504, was extended to require a license whether "carry[ing] openly or concealed." JA 378.

_____

[1]All statutory references are to the D.C. Code unless otherwise noted.

The licensing regime fell into desuetude by 1994, when the D.C. Court of Appeals could hold that possessing a handgun in public constituted criminal probable cause because "[i]t is common knowledge . . . that with very rare exceptions licenses to carry pistols have not been issued in the District of Columbia for many years and are virtually unobtainable." *Bsharah* v. *United States*, 646 A.2d 993, 996 n.12 (D.C. 1994). Section 22-4506, containing the Police Chief's authority to license handgun carrying, was repealed, effective May 20, 2009. *See* D.C. Act 17-690, 56 D.C. Reg. 1162, 1165 (Jan. 16, 2009). Section 22-4504 subsequently lost its reference to a license, becoming a *de jure* prohibition on all handgun carriage in 2012. *See* D.C. Act 19-366, 59 D.C. Reg. 5691, 5697 (May 25, 2012).

2.          *Present Regulatory Landscape*

Responding to a judgment striking down its handgun carry prohibition, *Palmer* v. *District of Columbia*, 59 F. Supp. 3d 173 (D.D.C. 2014), the City revived Section 22-4506 in largely the same form that had existed from 1932 to 2009, and restored Section 22-4504's allowance for licensed handgun carriage. New Section 7-2509.11 provides that the police chief "shall issue rules . . . including rules:

(1) To establish criteria for determining when an applicant has, pursuant to [Section 22-4506]:

> "(A) Demonstrated a good reason to fear injury to his or her person, which shall at a minimum require a showing of a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks that demonstrate a special danger to the applicant's life;

> "(B) Demonstrated any other proper reason for carrying a concealed pistol, which shall at a minimum include types of employment that require the handling of cash or other valuable objects that may be transported upon the applicant's person;

Defendant Police Chief Lanier accordingly adopted regulations

regarding the licensing of individuals to carry handguns, including:

- "A person shall demonstrate a good reason to fear injury to his or her person by showing a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks which demonstrate a special danger to the applicant's life." 24 D.C.M.R. § 2333.1;

- "For the purposes of satisfying the specifications of § 2333.1, a person shall allege, in writing, serious threats of death or serious bodily harm, any attacks on his or her person, or any theft of property from his or her person. The person shall also allege that the threats are of a nature that the legal possession of a pistol is necessary as a reasonable precaution against the apprehended danger." 24 D.C.M.R. § 2333.2;

- "The fact that a person resides in or is employed in a high crime area shall not by itself establish a good reason to fear injury to person or property for the issuance of a concealed carry license." 24 D.C.M.R. § 2333.4; and

- "A person may allege any other proper reason that the Chief may accept . . . which may include: (a) Employment of a type that requires the handling of large amounts of cash or other highly valuable objects that must be transported upon the applicant's person; or (b) The need for [an adult, immediate family member] to provide protection of a family member who . . . cannot act in defense of himself or herself, and the [incapacitated] family member . . . can demonstrate a good reason to fear injury to his or her person by showing a special need for self- protection distinguishable from the general community as supported by evidence of specific threats or previous attacks which demonstrate a special danger to the applicant's life in the manner described in § 2333." 24 D.C.M.R. § 2334.1.

3. *The Regulatory Scheme's Application Against Plaintiffs*

Brian Wrenn and Joshua Akery each possess registered handguns within the District of Columbia. JA 28, 30. Akery is licensed by Pennsylvania and Utah to carry a concealed handgun for self-defense. JA 30. Tyler Whidby possesses a handgun that is registerable in the District of Columbia for carriage by non-residents, and holds a Florida license to carry a concealed handgun for self-defense. JA 32. These three individuals are members of Plaintiff-Appellant Second Amendment Foundation, Inc. ("SAF"), a non-profit membership organization dedicated to advancing Second Amendment rights. JA 45.

Like other SAF members, Wrenn, Akery, and Whidby each qualify for a Washington, D.C. handgun carry license but for the "good reason"

or "other proper reason" requirement, which they cannot satisfy. JA 28-31, 33, 35-37. Nonetheless, they each applied to Defendant Lanier for a handgun carry license. JA 29, 31, 33. Wrenn and Akery could not show a "good reason" or "other proper reason." JA 29, 31. Whidby did not assert a "good reason," but believed he had "other proper reasons." JA 33.[2] Lanier denied each application for lack of "good" or "other proper" reason. JA 35-37.

4.     *Procedural History.*

Plaintiffs brought suit on February 3, 2015, challenging Section 22-4506's grant of discretion to deny qualified applicants licenses, its requirement of a "good reason" or "other proper reason," and the various provisions further enabling and defining these requirements, for violating their Second Amendment rights. On February 6, 2015, Plaintiffs moved for a preliminary injunction, which the District Court entered on May 18, 2015. *Wrenn* v. *District of Columbia*, 107 F. Supp.

---

[2]Whidby transports firearms and related inventory through the District in connection with his business as a federal firearms licensee; he wished to be able to defend his young children (at the time of his application, 24 D.C.M.R. § 2334.1 did not require that the family member to be protected demonstrate a special need under 24 D.C.M.R. § 2333.1); and he asserted self-defense as a "proper reason."

3d 1 (D.D.C. 2015). On appeal, this Court vacated the injunction upon determining that the judge to whom the case was assigned lacked jurisdiction to hear it. *Wrenn* v. *District of Columbia*, 808 F.3d 81 (D.C. Cir. 2015). On remand, a newly-assigned district judge denied Plaintiffs' motion.

The lower court "assume[d] . . . that the Second Amendment protects a right to carry arms publicly in the District of Columbia." JA 389. It then claimed to apply "intermediate scrutiny" to the challenged provisions. JA 390-93. But under its formulation of "intermediate scrutiny," the lower court imposed the burden on *Plaintiffs* to "show that it is not likely that *Defendants* will be able to present evidence that will allow the *Court* to find that the *District* could have reasonably concluded that the chosen means serve the identified ends 'in a direct and material way.'" JA 399-400 (citation omitted).

> For present purposes, it is enough to say that Defendants have identified what appears to be substantial evidence of connections between public carrying of guns—and associated regulations on public carrying—and impacts on crime and public safety.

JA 400.

The city had indeed marshaled "evidence" that carrying guns—a fundamental right, or so the lower court assumed—is harmful. And because Plaintiffs did not specifically challenge this evidence, the lower court held that Plaintiffs did not establish a likelihood of success. The lower court did not consider whether "the licensing scheme is sufficiently destructive of Plaintiffs' Second Amendment rights that it cannot be countenanced at any level of scrutiny," JA 401, and denied that the District rations handgun carrying because the regulation strikes "an appropriate balance," JA 396 (quotation omitted). Under the lower court's conception of "intermediate scrutiny," the government need only prove that a fundamental constitutional right is socially harmful—or rather, the Plaintiffs need disprove the government's claim of harm to prevail.

The lower court found that Plaintiffs established irreparable harm, though it assigned that finding relatively little weight. JA 405-06. It readily accepted Defendants' claim that the alleged harms of carrying guns outweighed Plaintiffs' interest in their fundamental right, JA 406-07, and that an injunction would not be in the public interest, JA 408.

Plaintiffs appealed. JA 410.

It simply does not matter whether Defendants can "prove" that the carrying of handguns for self-defense by responsible, law-abiding citizens is socially harmful. If there is a *right* to bear arms—and assuredly, that right is constitutionally codified—that right might only be regulated, not rationed or destroyed. The Second Amendment would be meaningless if it merely required deference to the government's policies, or worse—if it required the Court to uphold or strike down whichever policies it believes advisable or unwise, as the case may be.

Individuals are constitutionally entitled to carry handguns in public for self-defense. That right is as valid in the Nation's capital as it is anywhere else. Rationing a fundamental right to a tiny subset of privileged individuals suspected by the police chief of having a sufficiently good "reason" to enjoy their *right* fails any constitutional test—as a flat destruction of the right, under means-ends scrutiny (including intermediate scrutiny), or as a prior restraint. Given the irreparable nature of Plaintiffs' harm, the balance of the equities, and the strong public interest in safeguarding fundamental rights, the District Court's order denying injunctive relief should be reversed.

STANDARD OF REVIEW

"We review the district court's balancing of the preliminary injunction factors for abuse of discretion and review questions of law underlying the district court's decision de novo." *Abdullah* v. *Obama*, 753 F.3d 193, 197-98 (D.C. Cir. 2014).

ARGUMENT

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Aamer* v. *Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (quotations omitted).

I. REQUIRING A "GOOD" OR "OTHER PROPER" REASON TO EXERCISE THE RIGHT TO BEAR ARMS IS UNCONSTITUTIONAL.

   A.   The Second Amendment Secures the Right to Carry Handguns in Washington, D.C. for Self-Defense.

      1.   Res Judicata Cements the Essential Predicate of Plaintiffs' Claim—the Fundamental Right to Carry Handguns for Self-Defense, in Public, in the District of Columbia.

*Palmer*, featuring the same litigants on both sides (SAF on behalf of its membership v. the city and its police chief), settled the existence of a

right to carry handguns in Washington. Defendants' denial of this right "flies in the face of prior litigation." *Grace* v. *District of Columbia*, No. 15-2234, 2016 U.S. Dist. LEXIS 64681, at \*30 (D.D.C. May 17, 2016).

Issue preclusion, an aspect of res judicata, "bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim.'" *Canonsburg Gen. Hosp.* v. *Sebelius*, 989 F. Supp. 2d 8, 16 (D.D.C. 2013) (quoting *New Hampshire* v. *Maine*, 532 U.S. 742, 892 & n.5 (2001)). "A court conducting an issue preclusion analysis does not review the merits of the determinations in the earlier litigation." *Consol. Edison Co. of N.Y.* v. *Bodman*, 449 F.3d 1254, 1257 (D.C. Cir. 2006). And "once an *issue* is raised and determined, it is the entire *issue* that is precluded, not just the particular arguments raised in support of it in the first case." *Yamaha Corp. of America* v. *United States*, 961 F.2d 245, 254 (D.C. Cir. 1992) (citations omitted). Defendants' attack on the existence of a core right to carry handguns for self-defense in the District of Columbia plainly meets all three issue preclusion elements:

[1], the same issue now being raised must have been contested by the parties and submitted for judicial determination in the prior case[; 2] the issue must have been actually and necessarily determined by a court of competent jurisdiction in that prior case[; and] [3] preclusion in the second case must not work a basic unfairness to the party bound by the first determination.

*Canonsburg*, 989 F. Supp. 2d at 16-17 (quoting *Martin* v. *Dep't of Justice*, 488 F.3d 446, 454 (D.C. Cir. 2007)). All of Defendants' arguments raised below as to why gun carrying cannot be tolerated in Washington, they raised and lost in *Palmer*, to SAF and its members.

Nonetheless, "[u]nderstanding the scope of the right is not just necessary, it is key" to evaluating the challenged provisions. *Peruta* v. *Cnt'y of San Diego*, 742 F.3d 1144, 1167 (9th Cir. 2014), *vacated*, 781 F.3d 1106 (9th Cir. 2015).[3] The right's scope thus merits review.

"[K]eep and bear," U.S. Const. amend. II, describes two distinct concepts. *Cf.* U.S. Const. amend. VI ("speedy and public trial"). "It cannot be presumed that any clause in the constitution is intended to

---

[3]While a different view en banc displaced Judge O'Scannlain's *Peruta* panel opinion, the *Peruta* panel opinion drew support from four Ninth Circuit judges, Judge Scullin earlier in this case, and Judge Leon in *Grace.* "[E]ven a vacated opinion, while no longer the law of the case, still may carry persuasive authority." *Coalition to End Permanent Congress* v. *Runyon*, 979 F.2d 219, 221 n.2 (D.C. Cir. 1992) (Silberman, J., dissenting) (quotation omitted).

be without effect; and therefore such construction is inadmissible, unless the words require it." *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137, 174 (1803). "[T]he usual canon of [constitutional] interpretation . . . requires that real effect should be given to all the words it uses." *Myers* v. *United States*, 272 U.S. 52, 151 (1926) (citations omitted).

> 2.    The Supreme Court Has Confirmed Plaintiffs' Right to Carry Arms for Self-Defense.

In *Heller*, the City's theory of the Second Amendment as securing collective rather than individual action relied on reading the term "bear arms" as having a militaristic idiomatic meaning. The Supreme Court was thus called upon to define that term—and held that "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'" *Heller*, 554 U.S. at 584 (citations omitted).

"[T]he natural meaning of 'bear arms'" as used in the Second Amendment is to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person," *id.* (quoting *Muscarello* v. *United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting); BLACK'S LAW DICTIONARY 214 (6th Ed.

1998)). Accordingly, the Court repeatedly referred to "the Second Amendment right, protecting only individuals' liberty to keep *and carry* arms." *Heller*, 554 U.S. at 604 (emphasis added); *see also id.* at 626.

Although "the need for defense of self, family, and property is most acute" in the home, *Heller*, 554 U.S. at 628, and the right to arms is secured "most notably for self-defense within the home," *McDonald* v. *City of Chicago*, 561 U.S. 790, 780 (2010) (plurality opinion), "that doesn't mean [the need] is not acute outside the home." *Moore* v. *Madigan*, 702 F.3d 933, 935 (7th Cir. 2012). The Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592. "Confrontations are not limited to the home," *Moore*, 702 F.3d at 936. "[G]iven the presumption that most citizens are law abiding, and the reality that the need to defend oneself may suddenly arise in a host of locations outside the home," carrying bans should be the next "domino[] to be knocked off the table." *Heller*, 554 U.S. at 679-80 (Stevens, J., dissenting).

Although *Heller* involved a challenge to home handgun possession, the Supreme Court noted that its holding was not fact-bound. The

"policy choices [taken] off the table . . . *include* the absolute prohibition of handguns held and used for self-defense in the home," *Heller*, 554 U.S. at 636 (emphasis added), but "since this case represents this Court's first in-depth examination of the Second Amendment, one should not expect it to clarify the entire field . . . ." *Id.* at 635. "[T]he Second Amendment creates individual rights, one of which is keeping operable handguns at home for self-defense. What other entitlements the Second Amendment creates . . . were left open." *United States* v. *Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc); *cf. United States* v. *Marzzarella*, 614 U.S. 85, 92 (3d Cir. 2010) ("*Heller* delineates some" of the Second Amendment's "boundaries," which include a right "to possess non-dangerous weapons for self-defense in the home" and "to possess firearms for other, as-yet-undefined, lawful purposes.").[4]

---

[4]Some misinterpret the direction that the District of Columbia "must issue [Heller] a license to carry [his handgun] in the home." *Heller*, 554 U.S. at 635. Heller challenged, among other provisions, former Section 22-4504(a) (2008), which had provided that carrying handguns *inside one's home* without a permit was a misdemeanor offense, in contrast to the felony offense of carrying a gun in public. Heller did *not* seek a permit to publicly carry a handgun. *Parker* v. *District of Columbia*, 478 F.3d 370, 400 (D.C. 2007). The Court's reference to an in-home carry permit merely tracked Heller's prayer for relief. *See Heller*, 554 U.S. at 630-31.

> [I]n [*Heller*], we held that the Second Amendment protects the right
> to keep and bear arms for the purpose of self-defense, *and* we struck
> down a District of Columbia law that banned the possession of
> handguns in the home.

*McDonald*, 561 U.S. at 749-50 (emphasis added). The syntax is clear:

*Heller* applied its holding of a right rooted in self-defense in the specific

context of a home possession ban, but that application does not limit or

define the holding. *See Drake* v. *Filko*, 724 F.3d 426, 445 (3d Cir. 2013)

(Hardiman, J., dissenting); *accord State* v. *Blocker*, 291 Or. 255, 630

P.2d 824 (1981), *overruled in part on other grounds*, *State* v. *Christian*,

354 Or. 22, 307 P.3d 429 (2013).[5]

Had *Heller* intended to limit "bear arms" to the home, it would have

been most natural to do so when explaining "that 'bear arms' did not

refer only to carrying a weapon in an organized military unit." *Heller*,

---

[5]In *Blocker*, Oregon's Supreme Court rejected the argument that
its earlier decision securing the right to possess arms did not extend
beyond the home. "In [*State* v. *Kessler*, 289 Or. 359, 614 P.2d 94 (1980)]
we started from the premise that under [Oregon's Second Amendment
analog] a person has a right to bear arms for defense of self . . . We
then moved from that general proposition to the more particular one
that a person had the constitutional right to have a billy in his home
for defense." *Blocker*, 291 Or. at 259, 630 P.2d at 825-26 (citation and
footnote omitted).

554 U.S. at 585. Instead, the Court offered that

> Justice James Wilson interpreted the Pennsylvania Constitution's arms-bearing right . . . as a recognition of the natural right of defense "of one's person *or* house" — what he called the law of "self preservation."

*Id.* (emphasis added) (quoting 2 COLLECTED WORKS OF JAMES WILSON 1142, and n.x (K. Hall & M. Hall eds., 2007)) (other citations omitted).

Indeed, *Heller* endorsed various sources that clearly saw a dimension to the right to bear arms distinct from home defense. *See Heller*, 554 U.S. at 615 ("[a]ll men, without distinction of color, have the right to keep and bear arms to defend their homes, families or themselves") (quotation omitted); *id.* at 616 ("right to bear arms for the defense of himself and family and his homestead") (quotation omitted); *id.* at 625 ("weapons used by militiamen and weapons used in defense of person and home were one and the same") (quotation omitted).[6]

---

[6]*Heller*'s understanding of "bear" comports with original meaning. For example, in 1785, Second Amendment author James Madison introduced in Virginia's legislature a hunting bill drafted by Thomas Jefferson. The bill provided that an offender would breach his recognizance "if, within twelve months . . . he shall *bear a gun* out of his inclosed ground, unless whilst performing military duty . . . ." *A Bill for Preservation of Deer* (1785), in 2 PAPERS OF THOMAS JEFFERSON 443-44 (J. Boyd ed., 1950) (emphasis added).

And "[i]n numerous instances, 'bear arms' was unambiguously used to refer to the carrying of weapons outside of an organized militia." *Heller*, 554 U.S. at 584. "The most prominent examples" of "bear arms" referring to individuals carrying "are those most relevant to the Second Amendment: Nine state constitutional provisions written in the 18th century or the first two decades of the 19th . . . ." *Id.* (footnote omitted).

As *Heller* noted, none of the early state constitutional arms-bearing provisions have been interpreted as relating solely to the home. Most, in addition to Pennsylvania's provision as noted by *Heller*, were held to secure the public carrying of arms in at least some manner. *State* v. *Reid*, 1 Ala. 612 (1840) (interpreting Ala. Const. of 1819, art. I, § 27); *State* v. *Bailey*, 209 Conn. 322, 346, 551 A.2d 1206, 1218 (1988) (Conn. Const. art. I, § 15 (1819));[7] *Bliss* v. *Commonwealth*, 12 Ky. 90 (1822) (Ky. Const. of 1799, art. XII, cl. 23); *State* v. *Schoultz*, 25 Mo. 128, 155 (1857) (Mo. Const. of 1820, art. XIII, § 3); *State* v. *Huntly*, 25 N.C. (3 Ired.) 418, 423 (1843) (N.C. Declaration of Rights § 17 (1776)); *Simpson*

---

[7]Revised in 1956 to change "defence" to "defense." Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 TEX. REV. LAW & POL. 191, 194 n.10 (2006).

v. *State*, 13 Tenn. 356 (1833) (Tenn. Const. of 1796, art. XI, § 26); *State v. Rosenthal*, 55 A. 610 (Vt. 1903) (Vt. Const. c. 1, art. 16 (1777)).

The same conclusion—that people enjoy a right to publicly carry arms for self-defense—was also reached interpreting state constitutional arms-bearing provisions with predecessors dating to the early republic. *See State* v. *Hogan*, 63 Ohio St. 202, 219, 58 N.E. 572, 575 (1900); *Schubert* v. *De Bard*, 398 N.E.2d 1339, 1341 (Ind. App. 1980). Later state constitutional "bear arms" provisions are likewise understood. *See*, *e.g.*, *State ex rel. City of Princeton* v. *Buckner*, 180 W. Va. 457, 462, 377 S.E.2d 139, 144 (1988); *City of Las Vegas* v. *Moberg*, 82 N.M. 626, 627-28, 485 P.2d 737, 738-39 (N.M. Ct. App. 1971); *In re Brickey*, 8 Idaho 597, 599, 70 P. 609, 609 (1902).

Apart from defining "bear arms," the Supreme Court described the right in terms that would make no sense were the right confined to one's home. Stating that the right is "not unlimited," in that there is no right to "carry any weapon whatsoever in any manner whatsoever and for whatever purpose," *Heller*, 554 U.S. at 626 (citations omitted), the Court thus confirmed a right to carry some weapons, in some manner, for some purpose. The Court listed as "presumptively lawful," *id.* at 627

n.26, "laws forbidding the carrying of firearms in sensitive places," *id.*, at 626, such sensitive places presumably located outside the home, thus supplying an exception proving the rule allowing handgun carrying in non-sensitive places.

Moreover, quite apart from carrying guns for self-defense, the Supreme Court has extolled some essential corollary Second Amendment rights that are difficult if not impossible to exercise inside the home. Owning a gun, even if only for home defense, inherently requires obtaining and maintaining proficiency in its use. "No doubt, a citizen who . . . practices in safe places the use of [his pistol] and in due time teaches his sons to do the same, exercises his individual right [to bear arms]." *Heller*, 554 U.S. at 619 (quotation omitted); *cf. Ezell* v. *City of Chicago*, 651 F.3d 684, 708 (7th Cir. 2011) ("the right to maintain proficiency in firearm use [is] an important corollary to the meaningful exercise of the core right to possess firearms for self-defense."). "The settlers' dependence on game for food and economic livelihood, moreover, undoubtedly undergirded . . . state constitutional guarantees [of the right to arms]." *McDonald*, 561 U.S. at 777 n.27 (citing *Heller*, 554 U.S. at 599)); *Heller*, 554 U.S. at 677 n.38 (majority

secures right to arms for "self-defense, recreation, and other lawful purposes") (Stevens, J., dissenting). People do not typically hunt game or practice shooting in their homes.

*Heller*'s definition of "bear arms," and its recognition of the Second Amendment's application beyond the home, broke no new ground. The Supreme Court has long recognized the Second Amendment's public application. *Dred Scott* infamously reasoned that no Southern state would have adopted a constitution obligating it to respect "the full liberty" of African-Americans "to keep and carry arms wherever they went." *Dred Scott* v. *Sandford*, 60 U.S. (19 How.) 393, 417 (1857).[8]

While *Dred Scott*'s odious holding as to citizenship was never correct, its recognition of citizens' right to publicly carry arms was no aberration. Reviewing an indictment for violating the Second Amendment rights of individuals disarmed and murdered while

---

[8]Abolitionists found *Dred Scott*'s enumeration of rights ironically underscored slavery's essential injustice. "[I]t is of these privileges and rights that the colored man is deprived, and it is of that deprivation he complains. I could find, sir, in that very *Dred Scott* decision, an enumeration, by the Supreme Court itself, of the rights guaranteed by the Constitution of the United States . . . Those rights are to bear arms . . . Of all these, in the express terms of the decision, the colored man is deprived . . ." *Who Are American Citizens?*, THE LIBERATOR, Jan. 21, 1859, at 10, col. 2 (quoting Massachusetts State Rep. Wells).

guarding a courthouse, "[w]e described the right protected by the Second Amendment as 'bearing arms for a lawful purpose.'" *Heller*, 554 U.S. at 620 (quoting *United States* v. *Cruikshank*, 92 U.S. 542, 553 (1876)) (footnotes omitted). Seventy-five years later, the Court observed that "during military occupation irreconcilable enem[ies] could [not] require the American Judiciary to assure them . . . [the] right to bear arms as in the Second [Amendment] . . . ." *Johnson* v. *Eisentrager*, 339 U.S. 763, 784 (1950). The reference was not limited to home self-defense.

Indeed, the Supreme Court's first direct foray into Second Amendment law arose on an interstate highway. *United States* v. *Miller*, 307 U.S. 174, 175 (1939). The case was not dismissed for implicating conduct outside the home, but remanded for evidence as to whether the firearm merited constitutional protection. *Id.* at 178. *Heller* is merely the latest in a long line of Supreme Court decisions acknowledging the Second Amendment's plain original meaning: the right to bear arms is the right to carry arms for self-defense, in public.

3.    Post-*Heller* Courts Largely Confirm That the
      Second Amendment Extends Beyond the Home.

The Seventh Circuit struck down Illinois's total ban on the carrying

of handguns for self-defense. "The Supreme Court has decided that the

amendment confers a right to bear arms for self-defense, which is as

important outside the home as inside." *Moore*, 702 F.3d at 942. "To

confine the right to be armed to the home is to divorce the Second

Amendment from the right of self-defense described in *Heller* and

*McDonald*." *Id.* at 937. As the Seventh Circuit explained,

> The right to "bear" as distinct from the right to "keep" arms is
> unlikely to refer to the home. To speak of "bearing" arms within
> one's home would at all times have been an awkward usage. A right
> to bear arms thus implies a right to carry a loaded gun outside the
> home. And one doesn't have to be a historian to realize that a right
> to keep and bear arms for personal self-defense in the eighteenth
> century could not rationally have been limited to the home.

*Moore*, 702 F.3d at 936.

Even circuits adopting the most parsimonious view of the right to

bear arms acknowledge or assume that the Second Amendment

extends beyond the home.[9] Taking a more deferential attitude toward

---

[9]State high courts are split 4-3 in favor of acknowledging the right outside the home. *Compare People* v. *Aguilar*, 2013 IL 112116, ¶ 20; *Brickey*, 8 Idaho 597, 70 P. 609; *Christian*, 354 Or. at 44 n.11, 307 P.3d at 443 n.11; *Hertz* v. *Bennett*, 294 Ga. 62, 65-66, 751 S.E.2d 90, 94

the right outside the home, the Second and Fourth Circuits upheld laws barring the carrying of handguns by anyone lacking "proper cause" and "good and substantial reason" to do so, respectively. *Kachalsky* v. *Cnty. of Westchester*, 701 F.3d 81 (2d. Cir. 2012); *Woollard* v. *Gallagher*, 712 F.3d 865, 876 (4th Cir. 2013). Yet both courts insisted that their conclusions assumed that the right extends beyond the home.

> Although the Supreme Court's cases applying the Second Amendment have arisen only in connection with prohibitions on the possession of firearms in the home, the Court's analysis suggests, as Justice Stevens's dissent in *Heller* and Defendants in this case before us acknowledge, that the Amendment must have *some* application in the very different context of the public possession of firearms. Our analysis proceeds on this assumption.

*Kachalsky*, 701 F.3d at 89 (footnote omitted). The Fourth Circuit did not go quite this far, but for argument's sake "merely assume[d] that the *Heller* right exists outside the home and that such right of Appellee Woollard has been infringed." *Woollard*, 712 F.3d at 876.

The Fifth Circuit likewise apparently assumed a right to carry handguns exists, upholding a prohibition on its exercise by adults aged

---

(2013) with *Commonwealth* v. *Gouse*, 461 Mass. 787, 802, 965 N.E.2d 774, 786 (2012); *Williams* v. *State*, 417 Md. 479, 496, 10 A.3d 1167, 1177 (2010); *Little* v. *United States*, 989 A.2d 1096, 1101 (D.C. 2010).

18-20 on account of their youth. *Nat'l Rifle Ass'n of Am., Inc.* v.

*McCraw*, 719 F.3d 338 (5th Cir. 2013). The Tenth Circuit termed the

Second Amendment's application outside the home "a reasonable

assumption." *Bonidy* v. *United States Postal Serv.*, 790 F.3d 1121, 1125

(10th Cir. 2015). "'[B]ear' certainly implies the possibility and even the

likelihood that the arms will be carried outside the home," and "[t]he

need for self-defense" upon which the right is predicated, "albeit less

acute, certainly exists outside the home as well." *Id.* (citations omitted).

The Eleventh Circuit has twice upheld carrying restrictions as properly

targeting specific places, rather than by denying the right's existence.

*GeorgiaCarry.Org, Inc.* v. *U.S. Army Corps of Eng'rs*, 788 F.3d 1318

(11th Cir. 2015); *GeorgiaCarry.Org, Inc* v. *Georgia*, 687 F.3d 1244 (11th

Cir. 2012).[10]

---

[10]*See also Morris* v. *United States Army Corps of Eng'rs*, 60 F.
Supp. 3d 1120 (D. Idaho 2014) (striking down gun carry ban); *Bateman*
v. *Perdue*, 881 F. Supp. 2d 709, 714 (E.D.N.C. 2012) (striking down gun
carry ban during emergencies, Second Amendment "undoubtedly is not
limited to the confines of the home"). "The fact that courts may be
reluctant to recognize the protection of the Second Amendment outside
the home says more about the courts than the Second Amendment."
*United States* v. *Weaver*, No. 2:09-CR-00222, 2012 U.S. Dist. LEXIS
29613, at *14 n.7 (S.D. W. Va. Mar. 7, 2012).

The Ninth Circuit recently refused to address the issue altogether. Reviewing a challenge to discretionary licensing practices adopted pursuant to California's licensed handgun carry regime, that court found only that there is no right to carry a gun in, particularly, a concealed manner. *Peruta* v. *Cnt'y of San Diego*, No. 10-56971, 2016 U.S. App. LEXIS 10436, at *10 (9th Cir. June 9, 2016) (en banc). To be sure, while there is no right to carry, specifically, *concealed* handguns, carrying a concealed handgun *is* a form of exercising the Second Amendment right. The *Peruta* en banc majority failed to cite, let alone explain away, *Heller*'s definition of "bear arms" as extending to carrying a gun "in the clothing or in a pocket." *Heller*, 554 U.S. at 584. And precedent makes clear enough that the government may prohibit concealed *or* open carrying, as that would be a manner-regulation. *See infra*, at 37-39.[11]

---

[11]Plaintiffs claim only a right to carry handguns, period, in whatever form the city would prefer, and they do not challenge the city's ability to license the right. The city forbids carrying a pistol "either openly or concealed . . . without a license," D.C. Code § 22-4504(a), and the only existing license is one allowing concealed carry. It would not at all be a fair reading of Plaintiffs' complaint to construe this case as a demand to conceal handguns, just because the city exercises its prerogative to ban the open carrying of handguns.

Alone among the federal courts, a Third Circuit panel majority found that a law demanding "justifiable need" to carry a handgun "regulates conduct falling outside the Second Amendment's guarantee." *Drake*, 724 F.3d at 434. The majority "recognize[d] that the Second Amendment's individual right to bear arms *may* have some application beyond the home." *Id.* at 431. But notwithstanding its "assum[ption] that the Second Amendment confers upon individuals some right to carry arms outside the home," and its assumption that the "justifiable need" prerequisite is incompatible with a right, the majority offered that enactment of the twentieth century regulation requiring "justifiable need" informed (and thus limited) the right's scope.

4. History Confirms *Heller*'s Holding That the Second Amendment Codified the Right to Carry Arms for Self-Defense.

Defendants and their amici deny the right to bear arms' historical pedigree by citing to the unremarkable fact that the carrying of weapons has long been regulated. They rely heavily on ancient codes, such as the 1328 Statute of Northampton and its progeny; and various state and local regulations, largely those prohibiting the concealment of carried weapons.

But the Bill of Rights was a reaction to English practices. It did not ratify the King's understanding of any particular right. Rather, it reflects the Framers' concept of individual freedom, which was not necessarily prevalent in Edwardian England any more than it might be found in today's City Council. To understand the Second Amendment's scope, one must look to American tradition and understanding at and around the time of the Amendment's ratification. Helpfully, the Supreme Court has already done the heavy lifting. *See Moore*, 702 F.3d at 941 ("we regard the historical issues as settled by *Heller*"); *id.* at 942 (court "disinclined to engage in another round of historical analysis to determine whether eighteenth-century America understood the Second Amendment to include a right to bear guns outside the home."). The relevant historical sources confirm what the constitutional text should make obvious: Americans have a right to carry guns for self-defense.

a. The Statute of Northampton

Referencing the Statute of Northampton, Blackstone offered that "[t]he offence of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, *by terrifying the good people of the land*." 4 William Blackstone, Commentaries on the Laws

OF ENGLAND 148 (1769) (emphasis added). It was this offense, affray, that *Heller* spoke of in referencing "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,'" *Heller*, 554 U.S. at 627 (citations omitted), as opposed to "bearing arms for a lawful purpose," *id.* at 620.

By the time of the American Revolution, affray's prohibition on the carrying of weapons applied only when done with evil intent. Sir John Knight, charged with entering a church "in the time of divine service, with a gun, to terrify the King's subjects," *Sir John Knight's Case*, 87 Eng. Rep. 75, 76 (K.B. 1686), was notably acquitted. *Knight* held that Northampton's "meaning" was "to punish people who go armed to terrify the king's subjects." *Id.* The statute was "almost gone in desuetudinem" but "where the crime shall appear to be malo animo, it will come within the Act (tho' now there be a general connivance to gentlemen to ride armed for their security)." *Rex* v. *Knight*, 38 Comb., 90 Eng. Rep. 330 (K.B. 1686) (different reporter).

As the leading early-eighteenth century treatise explained,

[N]o wearing of Arms is within the meaning of this Statute, unless it be accompanied with such circumstances as are apt to terrify the People; from whence it seems clearly to follow, that Persons of

32

> Quality are in no Danger of Offending against this Statute by
> wearing common Weapons . . . for their Ornament or Defence, in
> such Places, and upon such Occasions, in which it is the common
> Fashion to make use of them, without causing the least Suspicion of
> an intention to commit any Act of Violence or Disturbance of the
> Peace . . . .

William Hawkins, 1 TREATISE OF THE PLEAS OF THE CROWN, ch. 63, § 9 (1716); *see* Joyce Lee Malcolm, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT 104-05 (1994). To the extent that the wearing of "arms" could in and of itself be considered alarming, the reference here might well have been to armor. *See* Clayton E. Cramer, *The Statute of Northampton (1328) and Prohibitions on the Carrying of Arms* (Sept. 19, 2015) at 2, available at SSRN: http://ssrn.com/abstract =2662910 or http://dx.doi.org/10.2139/ssrn.2662910 ("Cramer").

Another hurdle stood to Northampton's application, apart from its narrowing interpretation by English courts: the 1689 Declaration of Rights, which provided "[t]hat the Subjects which are Protestants may have Arms for their Defence suitable to their Conditions and as allowed by Law." 1 W. & M., Sess. 2, c.2, § 1 (1689). To avoid constitutional infirmity, military orders to disarm the citizens of London in response

to the Gordon Riots of 1780 were construed narrowly to apply only to law-breakers. *See* Cramer, at 3-4.

Americans, too, accepted that menacing conduct was a necessary element of affray. Multiple sources that *Heller* referenced in discussing the doctrine make this clear. "[T]here may be an affray, where there is no actual violence; as where a man arms himself with dangerous and unusual weapons, *in such a manner, as will naturally diffuse a terrour among the people*." 3 WORKS OF THE HONOURABLE JAMES WILSON 79 (Bird Wilson ed., 1804) (footnote omitted) (emphasis added). "It is likewise said to be an affray, at common law, for a man to arm himself with dangerous and unusual weapons, *in such manner as will naturally cause terror to the people*." John A. Dunlap, THE NEW-YORK JUSTICE 8 (1815) (emphasis added); *O'Neill* v. *State*, 16 Ala. 65, 67 (1849) (affray "probable" "if persons arm themselves with deadly or unusual weapons for the purpose of an affray, *and in such manner as to strike terror to the people*") (emphasis added); *State* v. *Lanier*, 71 N.C. 288, 290 (1874) (riding horse through courthouse, unarmed, is "very bad behavior" but "may be criminal or innocent" depending on whether people alarmed);

*State* v. *Langford*, 10 N.C. (3 Hawks) 381 (1824) (affray when men fired guns at home of elderly widow, killing her dog).

Other opinions reflect that settled view. "A man may carry a gun for any lawful purpose, for business or amusement, but he cannot go about with that or any other dangerous weapon to terrify and alarm a peaceful people." *Hogan*, 63 Ohio St. at 219, 58 N.E. at 575-76.

> [T]he carrying of a gun per se constitutes no offence. For any lawful purpose—either of business or amusement—the citizen is at perfect liberty to carry his gun. It is the wicked purpose—and the mischievous result—which essentially constitute the crime. He shall not carry about this or any other weapon of death to terrify and alarm, and in such manner as naturally will terrify and alarm, a peaceful people.

*Huntly*, 25 N.C. (3 Ired.) at 422-23.

Indeed, without viewing menacing conduct as an element of the crime, there is no way to reconcile affray's early American codification with the contemporaneous adoption of constitutional provisions securing the right to carry arms. *Heller*'s sources made this point, rejecting claims that the Statute of Northampton and its progeny can be read to limit the constitutional right to bear arms.

> Riding or going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the people of the land . . . . *But here it should be remembered, that in this country the*

*constitution guarranties [sic] to all persons the right to bear arms*;
then it can only be a crime to exercise this right in such a manner,
as to terrify the people unnecessarily.

Charles Humphreys, A COMPENDIUM OF THE COMMON LAW IN FORCE IN

KENTUCKY 482 (1822) (emphasis added); *Heller*, 554 U.S. at 588 n.10

(quoting same).

Tennessee's Supreme Court took the same view, reading the

constitutional right to bear arms as limiting Northampton, and not the

other way around. "[S]uppose it to be assumed on any ground, that our

ancestors adopted and brought over with them, this English statute, or

portion of the common law, our constitution has completely abrogated

it." *Simpson*, 13 Tenn. at 359-60. Reciting Tennessee's Second

Amendment analog, the state's high court continued:

> [N]either, after so solemn an instrument hath said the people may
> carry arms, can we be permitted to impute to the acts thus licensed,
> such a necessarily consequent operation as terror to the people to be
> incurred thereby.

*Id.* at 360.

The same logic holds true for the Second Amendment. Madison's

notes for introducing the Bill of Rights referenced various English

Declaration deficiencies upon which his proposed amendments would

improve, including "arms to protestts," 12 PAPERS OF JAMES MADISON 193 (Robert Ruthland & Charles Hobson eds. 1977), the English arms-right's limitation to Protestants absent from his proposed version. Madison viewed the Bill of Rights as an improvement on their 1689 English counterpart, not as a reversion to 1328.

  b. *American Gun Carrying Regulations*

Apart from Northampton's progeny, which like the original could not be violated absent menacing conduct, and which Americans understood to be abrogated or limited by the Second Amendment and its analogs, other gun-carrying regulations historically existed. But none of these support Defendants' proposition that the right to bear arms somehow failed to guarantee a right to . . . bear arms.

Precedent upon which *Heller* relied confirms that the authority to regulate the carrying of weapons allows the government to prohibit concealment, but does not allow for the right's complete destruction. Upholding one concealed carry prohibition, Alabama's high court cautioned:

> We do not desire to be understood as maintaining, that in regulating the manner of bearing arms, the authority of the Legislature has no other limit than its own discretion. A statute which, under the pretence of regulating, amounts to a destruction of the right, or

which requires arms to be so borne as to render them wholly useless for the purpose of defense, would be clearly unconstitutional.

*Reid*, 1 Ala. at 616-17.

Georgia's Supreme Court followed *Reid*, quashing an indictment for

publicly carrying a pistol that failed to specify how the gun was carried:

> so far as the act . . . seeks to suppress the practice of carrying certain weapons *secretly*, that it is valid, inasmuch as it does not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms. But that so much of it, as contains a prohibition against bearing arms *openly*, is in conflict with the Constitution, and *void*.

*Nunn* v. *State*, 1 Ga. 243, 251 (1846).

Tennessee's Supreme Court held unconstitutional the application of

a weapons carrying ban to a man carrying a revolver, declaring:

> If the Legislature think proper, they may by a proper law regulate the carrying of this weapon publicly, or abroad, in such a manner as may be deemed most conducive to the public peace, and the protection and safety of the community from lawless violence. We only hold that, as to this weapon, the prohibition is too broad to be sustained.

*Andrews* v. *State*, 50 Tenn. 165, 187-88 (1871). And as *Heller* observed,

> the Louisiana Supreme Court held that citizens had a right to carry arms openly: "This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassinations."

*Heller*, 554 U.S. at 613 (quoting *State* v. *Chandler*, 5 La. Ann. 489, 490 (1850)).

The rule was clear: concealed-carry prohibitions validly regulated the manner of carrying guns. *See*, *e.g.*, *State* v. *Jumel*, 13 La. Ann. 399, 400 (1858) ("a measure of police, prohibiting only a *particular mode* of bearing arms which is found dangerous to the peace of society") (emphasis original); *Owen* v. *State*, 31 Ala. 387, 388 (1858) ("a mere regulation of the manner in which certain weapons are to be borne"); *Grace*, 2016 U.S. Dist. LEXIS 64681, at *26 ("In the early nineteenth century, several jurisdictions enacted laws that regulated the manner in which firearms could be carried in public by prohibiting the carrying of concealed weapons") (citation omitted).

Some jurisdictions enacted prohibitions against the carrying of particular handguns, but these laws did not reach all pistols. *See, e.g. English* v. *State*, 35 Tex. 473, 476 (1871) (Second Amendment protects "holster pistols" and "side arms"); *see also Fife* v. *State*, 31 Ark. 455, 460-61 (1876) (distinguishing "army and navy repeaters" from prohibited "pistol"); *Andrews*, 50 Tenn. at 188 (carry ban fails "as to this weapon"); *Ex parte Thomas*, 21 Okla. 770, 777-78, 97 P. 260, 263

(1908) ("horseman's pistols" among protected "arms"). Such laws "render[ed] safe the high quality, expensive, military issue handguns that many former Confederate soldiers still maintained but that were often out of financial reach for cash poor freedmen." Robert J. Cottrol and Raymond T. Diamond, *"Never Intended to be Applied to the White Population": Firearms Regulation and Racial Disparity—the Redeemed South's Legacy to a National Jurisprudence?*, 70 CHI.-KENT L. REV. 1307, 1333 (1995) (footnote omitted).

To the extent that concepts like "good reason" played a role in restricting the right to carry handguns, they operated in precisely the opposite manner employed by the challenged regulations. Defendants demand "good reason" to carry guns, but laws such as the city's 1855 enactment, JA 367, demanded proof that an individual was potentially dangerous before that person could be required to post a surety as a condition of going armed. And as Judge Leon recounted, "in the Colonial Period, carrying arms publicly was not only permitted—it was often *required*," and luminaries including George Washington, Thomas Jefferson, Patrick Henry and John Adams all publically carried or at

least advocated the public carrying of firearms. *Grace*, 2016 U.S. Dist. LEXIS 64681, at *23-*25 (citations omited).

Arkansas's Supreme Court summed up the general rule. Reciting approval of time (no hunting or amusement on the Sabbath), place (church, elections), and manner regulations (concealment), it added:

> But to prohibit the citizen from wearing or carrying a war arm [with exceptions] is an unwarranted restriction upon his constitutional right to keep and bear arms. If cowardly and dishonorable men sometimes shoot unarmed men with army pistols or guns, the evil must be prevented by the penitentiary and gallows, and not by a general deprivation of a constitutional privilege.

*Wilson* v. *State*, 33 Ark. 557, 560 (1878).

To be sure, not every historical arms-bearing restriction or regulation was tested in court. And one can always find an ancient law that conflicts with how a fundamental right is understood today. But as discussed *supra*, numerous precedents limited the extent to which the carrying of arms was reached by various laws or constitutionally subject to restriction.

Defendants and amici will present this Court with a survey of ancient laws, overwhelmingly establishing the obvious and uncontested fact that the right to carry arms has always been subject to regulation. But Plaintiffs do not challenge the concept of regulation. They

challenge a complete prohibition on the carrying of handguns, absent the police chief's special dispensation reserved for exceptional cases. That type of law lacks Framing Era precedent, and lies well beyond accepted American understanding of the Second Amendment right.

B.  "Good" or "Proper" Reason Requirements Destroy Rights.

As *Parker* and *Heller* demonstrated, balancing tests are not always required to evaluate a law's constitutionality. Laws directly contradicting a constitutional guarantee simply cannot stand.

"Rights" have long been "defined generally as 'powers of free action.'" Henry Campbell Black, A DICTIONARY OF LAW 1044 (1891). A "right" to do something only when the police determine one has "good" or "proper" reason to do it is not much of a right. People would scoff at "rights" to due process, or against unreasonable searches and seizures, provided the police chief agrees that one has an unusually "good" or "proper" reason for their exercise. The right to bear arms is no different.

"[A] constitutional prohibition cannot be transgressed indirectly by the creation of a statutory presumption any more than it can be violated by direct enactment. The power to create presumptions is not a means of escape from constitutional restrictions." *Speiser* v. *Randall*,

357 U.S. 513, 526 (1958) (citation omitted). So long as no reason exists to bar someone from carrying a handgun, Defendants' opinion about the right's wisdom is unimportant. Restricting the right to carry handguns only to those with a "good" or "proper" reason destroys any right to that conduct.

Moreover, constitutional rights are enjoyed by "the people." *See* U.S. Const. amend. II ("right of the people); U.S. Const. amend. I (same); U.S. Const. amend. IV (same); U.S. Const. amend. IX ("rights . . . retained by the people"). "[T]he term ['the people'] unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at, 580. Rights cannot be enjoyed only by those with a "special need . . . distinguishable from the general community." Section 7-2509.11(1)(A). Nor is the right purchased with the carriage of cash or valuables. The interest in self-defense is, after all, primarily an interest in defending human life, not material wealth.

Denying that the regulation, on its face, prohibits the "general community" from carrying handguns, *id.*, Defendants recast the law as a *time* restriction; it purportedly "speaks not to *who* may carry a handgun, but *when* a handgun may be carried: after the applicant

develops a non-speculative need for armed self-defense." Appellants' Br., No. 15-7057, at 50. In other words, the law imposes a time restriction, allowing everyone to carry guns *after* obtaining a license, and for as long as the police chief allows. Alas, the Constitution secures a right to "carry weapons in case of confrontation," *Heller*, 554 U.S. at 592, not in case the police chief issues a license. It guarantees the right to "be armed and ready for offensive or defensive conduct in a case of conflict with another person," *id.* at 584 (quotation omitted), not the right to fill forms when violently attacked.

*Peruta*'s original panel opinion remains persuasive. The Second Amendment "is, in effect, destroyed when exercise of the right [to bear arms] is limited to a few people, in a few places, at a few times." *Peruta*, 742 F.3d at 1170. "A statute which, under the pretence of regulating, amounts to a destruction of the right . . . would be clearly unconstitutional." *Id.* (quoting *Heller*, 554 U.S. at 629); *Reid*, 1 Ala. at 616-17. "*Heller* teaches that a near-total prohibition on keeping arms (*Heller*) is hardly better than a near-total prohibition on bearing them (this case), and vice versa. Both go too far." *Peruta*, 742 F.3d at 1170.

Rhode Island's Supreme Court "will not countenance any system of permitting under the Firearms Act that would be committed to the unfettered discretion of an executive agency." *Gadomski* v. *Tavares*, 113 A.3d 387, 390 (R.I. 2015) (quotation omitted). Thus, an official was barred from applying a "good reason"/"proper reason" requirement to review an applicant's "need" for a handgun carry license. *Id*. at 392. Authorities must offer reasons for denying a license. "One does not need to be an expert in American history to understand the fault inherent in a gun-permitting system that would allow a licensing body carte blanche authority to decide who is worthy of carrying a concealed weapon." *Mosby* v. *Devine*, 851 A.2d 1031, 1050 (R.I. 2004).

Indiana's Court of Appeals rejected a licensing official's claim that a "proper reason" requirement allowed him to reject handgun carry license applications for an applicant's insufficient self-defense interest. The official lacked "the power and duty to subjectively evaluate an assignment of 'self-defense' as a reason for desiring a license and the ability to grant or deny the license upon the basis of whether the applicant 'needed' to defend himself." *Schubert*, 398 N.E.2d at 1341.

Such an approach contravenes the essential nature of the constitutional guarantee. It would supplant a right with a mere administrative privilege which might be withheld simply on the basis that such matters as the use of firearms are better left to the organized military and police forces even where defense of the individual citizen is involved.

*Id.* (footnote omitted).

Finally, Michigan's Supreme Court struck down a statute prohibiting aliens from possessing revolvers without their Sheriff's consent. There, too, the licensing discretion was viewed as a destruction of a constitutional right to bear arms. "The exercise of a right guaranteed by the Constitution cannot be made subject to the will of the sheriff. The part of the act under which the prosecution was planted is not one of regulation but is one of prohibition and confiscation." *People* v. *Zerillo*, 219 Mich. 635, 639, 189 N.W. 927, 928 (1922). "The [provision] making it a crime for an unnaturalized, foreign-born resident to possess a revolver, unless so permitted by the sheriff, contravenes the guaranty of such right in the Constitution of the State and is void." *Id.* at 642, 928.

The notion that a right is destroyed, and thus violated, by schemes that allow authorities the discretion to determine whether an individual is entitled to exercise the right, is hardly limited to the

Second Amendment. Arizona barred abortion at 20 weeks of gestation absent a doctor's certificate of "medical emergency," invoking "documented risks to women's health and the strong medical evidence that unborn children feel pain during an abortion at that gestational age." Ariz. H.B. 2036 § 9(B)(1), (2012), available at http://www.azleg. gov/legtext/50leg/2r/bills/hb2036s.pdf (last visited June 11, 2016). The Ninth Circuit did not defer to the legislature's oversight of the medical profession, or to the expert medical judgment of each doctor under the circumstances of each case.

> Allowing a *physician* to decide if abortion is medically necessary is not the same as allowing a *woman* to decide whether to carry her own pregnancy to term. Moreover, regulations involve limitations as to the mode and manner of abortion, not preclusion of the choice to terminate a pregnancy altogether.

*Isaacson* v. *Horne*, 716 F.3d 1213, 1217 (9th Cir. 2013).

> Adapted to present circumstances, the holding would read:

> Allowing *Defendant Lanier* to decide if carrying a handgun is necessary for self-defense is not the same as allowing *Brian Wrenn* to decide whether to carry his handgun. Moreover, regulations involve limitations as to the mode and manner of carrying handguns, not preclusion of the choice to carry a handgun altogether.

The Ninth Circuit explained that "[t]he presence of a medical exception does not make an otherwise impermissible prohibition

constitutional. The adequacy of the medical exception has no bearing on whether the prohibition is permissible in the first place." *Id.* at 1227. Likewise, here, the presence of a "good reason" exception does not make constitutional the prohibition on bearing arms for the core purpose of self-defense. In *Isaacson*, a woman may not have had grounds for a medical exception, but she had Supreme Court precedent securing post-20 week abortions. Plaintiffs lack police-approved reasons to carry guns, but they have a right to carry handguns for self-defense.

C.      Defendants' Licensing Scheme Fails Any Level of Means-Ends Scrutiny.

While the two-step process is not mandatory in every case, it could not help Defendants here. Considering the history of the right to bear arms and of carrying regulations, and the overwhelming prevalence of "shall issue" laws today, including in urban areas, Plaintiffs' challenge easily passes step one of the two-step method.[12]

_____

[12]May-issue laws restrict the totality of the right to bear arms in only six states: California, Hawaii, Maryland, Massachusetts, New Jersey and New York. Delaware allows for unlicensed open carrying. *In re Application of McIntyre*, 552 A.2d 500, 501 n.1 (Del. Super. 1988). Rhode Island's license is may-issue if sought from the Attorney General, but effectively shall-issue if sought from local authorities. *Gadomski*, 113 A.3d at 392. Connecticut's discretionary regime is likewise shall-issue in practice because the state bears the burden of

Even were the challenged provision "longstanding," that inquiry is irrelevant, because "[a] plaintiff may rebut this presumption [of longstanding lawfulness] by showing the regulation does have more than a de minimis effect upon his right." *Heller* v. *District of Columbia*, 670 F.3d 1244, 1253 (D.C. Cir. 2011) ("*Heller II*"). The "good reason" requirement completely bars the right's exercise, at all times and places and in any manner, without exception.

As for the second step, "classifications affecting fundamental rights are given the most exacting scrutiny." *Clark* v. *Jeter*, 486 U.S. 456, 461 (1988) (citation omitted). And the challenged laws indeed impact the Second Amendment at its core. *Heller*, 554 U.S. at 630 (the Second Amendment's "core lawful purpose [is] self-defense"); *id.* at 599 ("Individual self-defense . . . was the *central component* of the right itself"); *id.* at 628 ("the inherent right of self-defense has been central to the Second Amendment right").

---

showing a reason to reject applications, based on the applicant's demonstrated conduct. *Kuck* v. *Danaher*, 822 F. Supp. 2d 109, 128-29 (D. Conn. 2011).

But in the end, the particular standard of review is unimportant. Balancing tests balance rights against governmental interests, not considerations as to whether the right ought to exist. The government cannot assign itself an interest in suppressing a right by "proving" that the right is inherently harmful. As the Supreme Court held in the speech context, "the inference may be inexorable that a city could reduce secondary effects by reducing speech, [but] this is not a permissible strategy." *City of Los Angeles* v. *Alameda Books, Inc.*, 535 U.S. 425, 445 (2002) (Kennedy, J., concurring in judgment) (controlling opinion). Rather, "[t]he purpose and effect of a [regulation] must be to reduce secondary effects and not to reduce speech." *Id.*; *Grace*, 2016 U.S. Dist. LEXIS 64681, at *57.

Accordingly, "intermediate" scrutiny does not help Defendants. While not as rigorous as strict scrutiny, intermediate scrutiny is nonetheless an exacting test that requires the government to show the challenged action is "'substantially related to an important governmental objective.'" *Clark*, 486 U.S. at 461. "[A] tight fit" between the regulation and the important or substantial governmental interest must be established—one "that employs not necessarily the least

restrictive means but . . . a means narrowly tailored to achieve the desired objective." *Bd. of Trs.* v. *Fox*, 492 U.S. 469, 480 (1989); *McCullen* v. *Coakley*, 134 S. Ct. 2518, 2535 (2014) (intermediate scrutiny requires that regulations be "narrowly tailored").

And "[s]ignificantly, intermediate scrutiny places the burden of establishing the required fit squarely upon the government." *United States* v. *Chester*, 628 F.3d 673, 683 (4th Cir. 2010) (citing *Fox*, 492 U.S. at 480-81). Intermediate scrutiny requires *actual scrutiny*:

> [T]he District must establish a tight 'fit' between the registration requirements and an important or substantial governmental interest, a fit that employs not necessarily the least restrictive means but . . . a means narrowly tailored to achieve the desired objective . . . the means chosen [may] not [be] substantially broader than necessary to achieve that interest.

*Heller II*, 670 F.3d at 1258 (quotations omitted).

When this Court explained that the city "must establish a tight 'fit'" between its laws and valid interests, it did not mean that the city council must satisfy *itself* of this fit; it meant, the city must prove this fit *in court*, with *judges* deciding whether the fit meets constitutional standards. Defendants, however, seizing on the fact that courts defer to legislative findings, jump to the conclusion that courts must also defer

to legislative assessments of constitutionality—and what legislature would admit to enacting an unconstitutional law?

And when the city chooses extreme methods, going so far as to target the right itself, the result is unsurprising. "Good/proper reason" is not directed at dangerous people, nor does it regulate the manner of carrying handguns, nor does it impose any place restrictions. As Defendants freely admitted, it amounts to nothing more than a rationing system. *Accord Peruta*, 742 F.3d at 1177-78. But firearms laws that focus on the alleged dangerousness inherent in the right's existence, rather than on some particular abuse or manifestation of that right, cannot pass intermediate scrutiny. *Fletcher* v. *Haas*, 851 F. Supp. 2d 287, 303 (D. Mass. 2012); *Bateman*, 881 F. Supp. 2d at 716.

> Although the District's "good reason" requirement likely does keep guns out of the hands of *some* people likely to misuse them, it does so only by keeping guns out of the hands of *most* people . . . most people will not qualify. But the fact that a person can demonstrate a heightened need for self-defense says nothing about whether he or she is more or less likely to misuse a gun.

*Grace*, 2016 U.S. Dist. LEXIS 64681, at *59 (citations omitted).

Because barring the community at large from exercising a fundamental right cannot be a narrowly-tailored way of addressing

misuse of that right, the extent of the record's development, now or later, is irrelevant. The courts cannot convene a constitutional convention to evaluate the Second Amendment's merits under the guise of an "intermediate scrutiny" trial. Whether the District's law makes for good or bad policy is irrelevant. Even were Plaintiffs to stipulate that carrying handguns for self-defense is net negative for society, so what? Like many controversial policies, the right to carry handguns for self-defense is enshrined in the Constitution—regardless of whether the Framers erred in placing it there.

At bottom, the city's arguments here are indistinguishable from those it unsuccessfully asserted in *Heller III* in support of a different gun-rationing scheme. There, the city wished to limit consumers to one gun per month, in part on the theory that doing so

> would further promote public safety by limiting the number of guns
> in circulation, as the District "could reasonably conclude that more
> guns lead to more gun theft, more gun accidents, more gun suicides,
> and more gun crimes."

*Heller III*, 801 F.3d at 280. Its expert testified that "the most effective method of limiting misuse of firearms, including homicide, suicide, and accidental injuries, is to limit the number of firearms present in a home," *id.*, which sounds a great deal like the city's arguments here for

reducing the presence of guns in public (something might happen).

This Court rejected the rationing argument:

> Accepting that as true, however, it does not justify restricting an individual's undoubted constitutional right to keep arms (plural) in his or her home, whether for self-defense or hunting or just collecting, because, taken to its logical conclusion, that reasoning would justify a total ban on firearms kept in the home.

*Id.* (citation omitted).

Likewise, if a right to carry arms exists—and it does—limiting the number of firearms being carried in public as a means of limiting their misuse, even if effective, cannot be justified. This Court does not sit to "prove" that a constitutional provision is or is not desirable.[13] *Heller III* is dispositive.

Nor does the District's status as the seat of government change the analysis. "[T]he Supreme Court has unambiguously held that the Constitution and Bill of Rights are in effect in the District." *Parker*, 478 F.3d at 395 (citations omitted). Of course Defendants may prohibit the carrying of handguns in "government buildings" and other "sensitive

---

[13]"Proof" here would be a figurative term, as Defendants concede that "it is not possible to determine that there is a causal link between the passage of right-to-carry laws and crime rates." Appellants' Br., No. 15-7057, at 25 (quoting Defendants' leading expert).

places," *Heller*, 554 U.S. at 626, but that does not mean that they might prohibit carrying guns in a *city* containing government buildings.

None of the District's allegedly unique features justify erasing the Second Amendment wholesale throughout the entire city. If historical regulations are important, it must be remembered that Congress allowed unlicensed open handgun carrying here as late as 1943. Moreover, government facilities, Presidents, important sites, and foreign dignitaries are found nationwide—and deranged or politically motivated assassins are unlikely to be influenced by gun regulations. As a White House Press Secretary once offered, state and local gun laws "don't change when the president comes to your state or locality."[14]

D.  Lanier's Generalized Discretion to Deny Carry Licenses, and the "Good Reason"/"Other Proper Reason" Standard, Both Constitute Unlawful Prior Restraints.

The common-sense proposition that a right becomes something else, of lesser stature, if it exists only at the government's pleasure, has an established legal definition:

---

[14]Alexi Mostrous, "White House Backs Right To Arms Outside Obama Events," *Washington Post*, Aug. 19, 2009, available at http://www.washingtonpost.com/wp-dyn/content/article/2009/08/18/AR2009081803416.html (last visited June 11, 2016).

It is settled by a long line of recent decisions of this Court that an ordinance which . . . makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms.

*Staub* v. *City of Baxley*, 355 U.S. 313, 322 (1958) (citations omitted).

Indeed, long before *Heller*, Prof. Powe reasoned that "[p]ossibly the Second Amendment can best be understood to incorporate a common law rule against prior restraints." L.A. Powe, Jr., *Guns, Words, and Constitutional Interpretation*, 38 Wm. & Mary L. Rev. 1311, 1384 (1997); *id.* at 1402 ("the rule against prior restraints offers a sound meaning [for the Second Amendment]").

Some authorities have erroneously asserted that prior restraint is exclusively a First Amendment doctrine, and on that ground hesitated to extend it to the Second Amendment context. *See, e.g., Kachalsky*, 701 F.3d at 91-92. But courts "have already begun to adapt First Amendment doctrine to the Second Amendment context." *Ezell*, 651 F.3d at 706-07 (citations omitted); *see also Parker*, 478 F.3d at 399. And as the right to bear arms stands among "the freedoms which the

Constitution guarantees," *Staub*, 355 U.S. at 322, Defendants' licensing regime constitutes an unlawful prior restraint in two respects.

First, Defendant Lanier enjoys wholly unbridled discretion to grant or deny applications, even when they satisfy all licensing criteria, including "good reason." The police chief *"may . . .* issue" a license to qualified applicants. Section 22-4506(a) (emphasis added). Nothing actually requires her to do so, and no rule purports to limit this ultimate level of discretion. The City Council understands the difference between "may" and "shall." While Lanier "may" issue licenses, she "shall" adopt a restrictive definition of "good reason" and "other proper reason." Section 7-2509.11.

Lanier may counter that she would, in fact, issue licenses to all fully qualified applicants, but "[t]his presumes the [Chief] will act in good faith and adhere to standards absent from the ordinance's face . . . the very presumption that the doctrine forbidding unbridled discretion disallows." *City of Lakewood* v. *Plain Dealer Publishing Co.*, 486 U.S. 750, 770 (1988) (citations omitted). Even were there limits to Section 22-4506(a)'s absolute "may . . . issue" discretion, they are not "made explicit by textual incorporation, binding judicial or administrative

construction, or well-established practice." *Id.* (citations omitted). And "we have never held that a federal litigant must await a state-court construction or the development of an established practice before bringing the federal suit." *Id.* at 770 n.11 (citation omitted).

Second, nothing bars Lanier from exercising the type of unbridled discretion sanctioned by Section 22-4506(a)'s absolute "may" issue" language by simply claiming that an applicant failed to establish a "good" or "other proper reason" for the license. This requirement is among the impermissible "illusory 'constraints'" on licensing discretion amounting to "little more than a high-sounding ideal." *City of Lakewood*, 486 U.S. at 769-70; see, *e.g. Largent* v. *Texas*, 318 U.S. 418, 422 (1943) (striking down ordinance allowing speech permit where mayor "deems it proper or advisable"). It is not that Plaintiffs merely dislike the "standard." Plaintiffs dislike the "standard" because it is meaningless, and effectively supplants their *entitlement* to exercise a fundamental right for the purpose of self-defense with an administrative privilege dispensed at the chief's boundless discretion.

> The existence of standards does not in itself preclude a finding of unbridled discretion, for the existence of discretion may turn on the looseness of the standards or the existence of a condition that

effectively renders the standards meaningless as to some or all persons subject to the prior restraint.

*Beal* v. *Stern*, 184 F.3d 117, 126 n.6 (2d Cir. 1999).

As a destruction of the right, as a prior restraint, and under any level of scrutiny, the "good/proper reason" requirement is unconstitutional.

III.  DEFENDANTS' LICENSING SCHEME IRREPARABLY HARMS PLAINTIFFS.

"[T]he loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills* v. *District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quotation omitted). Though Defendants refuse to acknowledge any positive social value to carrying guns, "there seems little legitimate scholarly reason to doubt that defensive gun use is very common in the U.S., and that it probably is substantially more common than criminal gun use." Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self- Defense with a Gun*, 86 J. CRIM. L. & CRIMINOLOGY 150, 180 (1995). Every American legal system recognizes a right to use handguns in self-defense outside the home—including the District's. *Gillis* v. *United States*, 400 A.2d 311, 313 (D.C.1979).

Inability to access constitutionally-protected arms impacts one's sense of security—to say nothing of the irreparable harm resulting from a successful criminal attack that might have been averted with access to defensive arms. "The Second Amendment protects . . . intangible and unquantifiable interests . . . Infringements of this right cannot be compensated by damages." *Ezell*, 651 F.3d at 699 (citations and footnote omitted).

## IV. THE BALANCE OF EQUITIES FAVORS GRANTING INJUNCTIVE RELIEF.

While Plaintiffs suffer irreparable harm by having their rights violated, enjoining that violation does not harm Defendants at all. Responding to *Palmer*'s elimination of the City's carry ban, Lanier offered, "Law-abiding citizens that register firearms, that follow the rules, are not our worry."[15]

Hard data confirms Lanier's "not our worry" position, as well as Judge Reinhardt's observation that "[c]arrying a gun, which is a Second

---

[15]Mike DeBonis, "Security, not street crime, at risk after gun ruling, D.C. Police Chief Cathy Lanier says," *Washington Post*, July 30, 2014, available at http://www.washingtonpost.com/local/dc-politics/ security-not-street-crime-at-risk-after-gun-ruling-dc-police-chief-cathy-lanier-says/2014/07/30/f8b17e1c-1808-11e4-9e3b-7f2f110c6265_story.ht ml (last visited June 11, 2016).

Amendment right . . . cannot legally lead to a finding that the individual is likely to murder someone; if it could, half or even more of the people in some of our states would qualify as likely murderers."

*Dickens* v. *Ryan*, 688 F.3d 1054, 1085 (9th Cir. 2012) (Reinhardt, J., dissenting). For example, were Defendants correct about defensive handgun carrying, they would have perhaps shown a positive correlation between that activity and violent crime. But the relationship is inverse. In 2013, the United States experienced 367.9 violent crimes per 100,000 people.[16] Jurisdictions forbidding handgun carrying, or entirely restricting it on a "may issue" basis averaged 456.46 violent crimes per 100,000 people.[17]

---

[16]*See* FBI, *Uniform Crime Reports: Crime in the United States 2013*, Table 4, available at http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2013/crime-in-the.u.s.-2013/tables/4tabledatadecoverviewpdf/table_4_crime_in_the_united_states_by_region_geographic_division_and_state_2012-2013.xls (last visited June 11, 2016).

[17]*Id.* (averaging Massachusetts, 404.0; New Jersey, 285.6; New York, 389.8; Illinois, 372.5 [Illinois began issuing permits on a shall-issue basis in 2014]; **District of Columbia, 1289.1**; Maryland, 467.8; California, 396.2; Hawaii, 245.3; and Puerto Rico, 257.8).

No wonder Defendants concede, per their leading expert, that "it is not possible to determine that there is a causal link between the passage of right-to-carry laws and crime rates." *Supra*, n.13.

More critically, Defendants fail to show that law-abiding individuals licensed for defensive handgun carrying are for that reason more dangerous than others in the general community, an unlikely scenario considering licensing standards and the nature of people who would approach the police for a handgun license. Indeed, data tracking handgun licensees does not suggest that they pose any sort of meaningful public safety hazard. Through September 30, 2015, Michigan has issued 120,548 handgun carry licenses and revoked only 1801, barely over 1%, for any reason.[18] Tennessee, which currently has 560,933 handgun carry permits, revoked just 291 last year for any reason.[19] These revocations did not necessarily involve firearm misuse.

---

[18]Michigan State Police Criminal Justice Information Center, *Concealed Pistol License Annual Report, October 1, 2014 to September 30, 2015*, available at http://www.michigan.gov/documents/msp/ CPL_515521_7.pdf (last visited June 11, 2016).

[19]*Current Valid Tennessee Handgun Permits by County*, available at https://www.tn.gov/assets/entities/safety/attachments/ Current_HG_PermitHolders.pdf (last visited June 11, 2016); Tennessee Dep't of Safety & Homeland Security, *Handgun Carry Permit Statistics*

Texas and Florida, highly populated states with significant urban populations, who have issued handgun carry licenses for many years, are in accord. For 2015, of 43,924 total serious criminal convictions in Texas, only 108—or 0.2459%—involved individuals licensed to carry defensive handguns, though even these did not necessarily have anything to do with handguns or their public carriage.[20]

Since 1987, Florida has issued 3,136,627 handgun carry licenses, and has revoked only 10,878 for any reason—barely over a third of one percent—of which at least 1,011 were later reinstated. Through 2010, only 168 revocations in that state involved the use of a firearm, though not necessarily in a public setting or involving violence.[21]

---

*Calendar Year 2015*, at 4, available at https://www.tn.gov/assets/ entities/safety/attachments/HandgunReport2015Full.pdf (last visited June 11, 2016).

[20]Texas Dep't of Public Safety, *Conviction Rates for Concealed Handgun License Holders, Reporting Period 1/1/2015-12/31/2015*, available at http://www.txdps.state.tx.us/RSD/CHL/Reports/Conviction RatesReport2015.pdf (last visited June 11, 2016).

[21]Florida Department of Agriculture and Consumer Services Division of Licensing, *Concealed Weapon or Firearm License Summary Report October 1, 1987 - May 31, 2016*, available at http://www.fresh from florida.com/content/download/7499/118851/cw_monthly.pdf (last visited June 11, 2016).

Individuals licensed to carry handguns in the States are routinely found to have inadvertently carried their arms in the District. The number of violent crimes they have committed or accidents they have caused while visiting the city is unknown.

V.    THE PUBLIC INTEREST WARRANTS INJUNCTIVE RELIEF.

It is "obvious" that "enforcement of an unconstitutional law is always contrary to the public interest." *Gordon* v. *Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (citations omitted).

CONCLUSION

The District Court's order should be reversed, and the case remanded with instructions to grant Plaintiffs the preliminary injunction to which they are entitled.

Dated:   June 13, 2016          Respectfully submitted,

                                 /s/ Alan Gura
                                Alan Gura
                                GURA & POSSESSKY, PLLC
                                916 Prince Street, Suite 107
                                Alexandria, VA 22314
                                703.835.9085/703.997.7665

                                Counsel for Appellants

CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 13,301 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Corel Wordperfect in 14-point Century Schoolbook font.

/s/ Alan Gura
Alan Gura

CERTIFICATE OF SERVICE

I certify that on this 13th day of June, 2016, I filed the foregoing Brief electronically with the Clerk of the Court using the CM/ECF System. I further certify that I will submit the required paper copies to the Court. I further certify that counsel for Defendant-Appellees is a registered CM/ECF user and will be served via the CM/ECF system.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this the 13th day of June, 2016.


/s/ Alan Gura
Alan Gura

Counsel for Appellants

# Addendum

## Addendum Table of Contents

D.C. Code § 7-2509.11. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

D.C. Code § 22-4504. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

D.C. Code § 22-4506. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

24 D.C.M.R. § 2333.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

24 D.C.M.R. § 2333.2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

24 D.C.M.R. § 2333.3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

24 D.C.M.R. § 2333.4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

24 D.C.M.R. § 2334.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

D.C. Code of 1819, Act for the Punishment of Certain Crimes
  and Offences, Sec. 40. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

# D.C. Code § 7-2509.11

The Chief of the MPD, pursuant to subchapter I of Chapter 5 of Title 2 [§2-501 et seq.], shall issue rules to implement the provisions of D.C. Law 20-279, including rules:

(1) To establish criteria for determining when an applicant has, pursuant to section 6 of the Pistols and Other Dangerous Weapons Act [§ 22-4506]:

  (A) Demonstrated a good reason to fear injury to his or her person, which shall at a minimum require a showing of a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks that demonstrate a special danger to the applicant's life;

  (B) Demonstrated any other proper reason for carrying a concealed pistol, which shall at a minimum include types of employment that require the handling of cash or other valuable objects that may be transported upon the applicant's person; and

  (C) Demonstrated the applicant's suitability to carry a concealed pistol, which shall at a minimum include evidence that the applicant meets the requirements of § 7-2509.02;

(2) To establish the type and amount of ammunition that may be carried concealed by a licensee;

(3) To establish the methods by which a pistol may be carried, including any standards for safe holstering;

(4) To establish all application forms, investigation procedures, background checks, and fees necessary to process an application for a license to carry a concealed pistol;

(5)     To specify any procedures or requirements specific to
        non-residents who apply to carry a concealed pistol pursuant
        to § 22-4506, with regard to the registration requirements in
        this unit;

(6)     To specify requirements for signage on any private premises
        where the owner or person in control of the premises
        prohibits the carrying of a concealed pistol pursuant to §
        7-2509.07(b); and

(7)     To establish procedures for the renewal of licenses.


## D.C. Code § 22-4504

(a)     No person shall carry within the District of Columbia either
        openly or concealed on or about their person, a pistol,
        without a license issued pursuant to District of Columbia
        law, or any deadly or dangerous weapon. Whoever violates
        this section shall be punished as provided in § 22-4515,
        except that:

(1)     A person who violates this section by carrying a pistol,
        without a license issued pursuant to District of
        Columbia law, or any deadly or dangerous weapon, in
        a place other than the person's dwelling place, place of
        business, or on other land possessed by the person,
        shall be fined not more than the amount set forth in §
        22-3571.01 or imprisoned for not more than 5 years, or
        both; or

(2)     If the violation of this section occurs after a person has
        been convicted in the District of Columbia of a
        violation of this section or of a felony, either in the
        District of Columbia or another jurisdiction, the person
        shall be fined not more than the amount set forth in §
        22-3571.01 or imprisoned for not more than 10 years,
        or both.

(a-1)   Except as otherwise permitted by law, no person shall carry within the District of Columbia a rifle or shotgun. A person who violates this subsection shall be subject to the criminal penalties set forth in subsection (a)(1) and (2) of this section.

(b)     No person shall within the District of Columbia possess a pistol, machine gun, shotgun, rifle, or any other firearm or imitation firearm while committing a crime of violence or dangerous crime as defined in § 22-4501. Upon conviction of a violation of this subsection, the person may be sentenced to imprisonment for a term not to exceed 15 years and shall be sentenced to imprisonment for a mandatory-minimum term of not less than 5 years and shall not be released on parole, or granted probation or suspension of sentence, prior to serving the mandatory-minimum sentence.

(c)     In addition to any other penalty provided under this section, a person may be fined an amount not more than the amount set forth in § 22-3571.01.

## D.C. Code § 22-4506

(a)     The Chief of the Metropolitan Police Department ("Chief") may, upon the application of a person having a bona fide residence or place of business within the District of Columbia, or of a person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his or her person issued by the lawful authorities of any State or subdivision of the United States, issue a license to such person to carry a pistol concealed upon his or her person within the District of Columbia for not more than 2 years from the date of issue, if it appears that the applicant has good reason to fear injury to his or her person or property or has any other proper reason for carrying a pistol, and that he or she is a suitable person to be so licensed.

(b)     A non-resident who lives in a state that does not require a license to carry a concealed pistol may apply to the Chief for a license to carry a pistol concealed upon his or her person within the District of Columbia for not more than 2 years from the date of issue; provided, that he or she meets the same reasons and requirements set forth in subsection (a) of this section.

(c)     For any person issued a license pursuant to this section, or renewed pursuant to § 7-2509.03, the Chief may limit the geographic area, circumstances, or times of the day, week, month, or year in which the license is effective, and may subsequently limit, suspend, or revoke the license as provided under § 7-2509.05.

(d)     The application for a license to carry shall be on a form prescribed by the Chief and shall bear the name, address, description, photograph, and signature of the licensee.

(e)     Except as provided in § 7-2509.05(b), any person whose application has been denied or whose license has been limited or revoked may, within 15 days after the date of the notice of denial or notice of intent, appeal to the Concealed Pistol Licensing Review Board established pursuant to § 7-2509.08.

**24 D.C.M.R. § 2333.1**

A person shall demonstrate a good reason to fear injury to his or her person by showing a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks which demonstrate a special danger to the applicant's life.

**24 D.C.M.R. § 2333.2**

For the purposes of satisfying the specifications of § 2333.1, a person shall allege, in writing, serious threats of death or serious bodily harm, any attacks on his or her person, or any theft of property from his or her person. The person shall also allege that the threats are of a nature that the legal possession of a pistol is necessary as a reasonable precaution against the apprehended danger.

**24 D.C.M.R. § 2333.3**

The person shall provide all evidence of contemporaneous reports to the police of such threats or attacks, and disclose whether or not the applicant has made a sworn complaint to the police or the courts of the District of Columbia concerning any threat or attack.

**24 D.C.M.R. § 2333.4**

The fact that a person resides in or is employed in a high crime area shall not by itself establish a good reason to fear injury to person or property for the issuance of a concealed carry license.

**24 D.C.M.R. § 2334.1**

A person may allege any other proper reason that the Chief may accept for obtaining a concealed carry license which may include:

    (a)    Employment of a type that requires the handling of large amounts of cash or other highly valuable objects that must be transported upon the applicant's person; or

    (b)    The need for a parent, son, daughter, sibling, or other adult member of the immediate family to provide protection of a family member who is physically or mentally incapacitated to a point where he or she cannot act in defense of himself or herself, and the family member who is physically or mentally incapacitated can demonstrate a good reason to fear injury to his or her person by showing a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks which demonstrate a special danger to the applicant's life in the manner described in § 2333.

# CODE OF LAWS

FOR THE

# DISTRICT OF COLUMBIA:

PREPARED

UNDER THE AUTHORITY

OF

## THE ACT OF CONGRESS

OF

THE 29TH OF APRIL, 1816.

ENTITLED

" An act authorizing the Judges of the Circuit Court, and the
Attorney for the District of Columbia, to prepare a
Code of Jurisprudence for the said District."

❖

WASHINGTON:

PRINTED BY DAVIS & FORCE, PENNSYLVANIA AVENUE.

1819.

Statutory Addendum 7

Digitized by Google

# AN ACT

*For the Punishment of certain Crimes and Offences,*
*within the District of Columbia.*

**Sec. 1.** *Be it enacted,* &c. that no crime committed within the District of Columbia, and no crime of which any person shall be convicted within the said District, shall be punished with death.

**Sec. 2.** If any free person shall, in the District of Columbia, be convicted of treason against the United States, or of murder, or of rape, or of sodomy, or of burglary, or of robbery, or of voluntary manslaughter, or of horse-stealing, or of piracy upon the high seas, or of any act in any river, harbour, bay or basin, inlet or creek, which if done upon the high seas would be piracy; or of any other crime or offence which, by any statute of the United States, is or shall be punishable by death, without benefit of clergy; or of knowingly and willfully, either upon the land or seas, aiding, procuring, commanding, counselling, or advising, the commission of any one of the crimes aforesaid, and if such crime shall thereupon be actually committed; every such person shall, in lieu of all other punishment, be sentenced to confinement at hard labour, or in solitude, for a period of not less than two, nor more than twenty years, according to the nature, degree, and aggravation of the offence, and may be fined, not exceeding five thousand dollars.

**Sec. 3.** Every free person having knowledge of the commission of any one of the crimes aforesaid, who shall, within the said District, conceal, and not, as soon as may be, disclose, the same to some person in civil or military authority under the United States, or who shall knowingly and wittingly receive, entertain, or conceal any such offender as aforesaid, or who shall receive or take into custody any ship, vessel,

*Marginal notes:*

Punishment of Crimes.

No crime shall be punished with death.

Treason, murder, rape, sodomy, burglary, robbery, manslaughter, horse-stealing, piracy, and other capital offences, and aiding, advising. &c. punishable by confinement at hard labour or in solitude, not less than two nor more than 20 years, and fine not exceeding 5000 dollars.

Concealment of any of those crimes, or of the offenders, receiving goods piratically or feloniously taken, punishable by confinement, &c. not exceeding seven years, and fined, not exceeding 1000 dollars.

Digitized by Google

which such offender may be, upon complaint made to him upon oath that such crime or offence hath been committed, or upon receiving a copy of the indictment or other process, if any, which shall have been found or issued in the said District of Columbia against such offender, to issue his warrant to apprehend such offender, and to cause him, at the expense of the United States, to be arrested and imprisoned or bailed (as the case may require) for trial before such court in the District of Columbia, as may have jurisdiction of the offence; and copies of the process shall be returned as speedily as may be into the clerk's office of such court, together with the recognizance of bail, and the recognizances of the witnesses for their appearance to testify in the case, if any such shall have been taken: which recognizances the said judge may require on pain of imprisonment; and the said judge, if bail shall not have been given, shall seasonably issue and the marshal of his district shall execute a warrant for the removal of the offender and the witnesses (in case they shall be in prison) or either of them, (as the case may be) to the said District of Columbia: and the expenses of such arrest, commitment, and removal being ascertained and certified by the judge of the district in which the offender shall have been so arrested, shall be charged by the marshal of the said district in his account with the United States, and shall be allowed by the proper accounting officers of the treasury. And in case such recognizance of bail, or the recognizances of the witnesses should be forfeited, *scire facias* and execution may issue upon a certified copy thereof in any judicial district within the jurisdiction of the United States in which the respective recognitors may reside or may be found.

Sec. 40. No man, great nor small, of what condition soever he be, except the ministers of justice in executing the precepts of the courts of justice, or in executing their office, and such as may be in their

Punishment of Crimes.

Recognizance.

2 E. 3. c. 3.
2 R. 2. c. 13.
20 R. 2. c. 1.
V.L. 30. c. 21.
Punishing affrays.

Statutory Addendum 9

Digitized by Google

**Punishment of crimes.**

**No person to come before the court with force and arms; nor to go about armed, to the terror of the country.**

company assisting them, shall be so hardy as to come with force and arms before the justices or judges of any court within the District of Columbia, or either of their ministers of justice, doing their office, on pain to forfeit his armour to the United States, and his body to prison, at the pleasure of such court; nor go, nor ride armed by night nor by day, in fairs, or markets, or in other places, in terror of the country, upon pain of being arrested and committed to prison by any justice or judge on his own view, or proof by others, and of forfeiture of his armour to the United States; but no person shall be imprisoned for any offence against this act, by a longer space of time than one month.

**1. C. 1. st. 2, c. 5. § 1. Riots, &c.**

**Penalty for not dispersing when ordered.**

Sec. 11. If any persons, to the number of twelve or more, being unlawfully, riotously, and tumultuously assembled together, to the disturbance of the public peace in the District of Columbia, and being required or commanded by any one or more justice or justices of the peace, or by the marshal of the said District, or his deputy, or by the mayor, or other chief officer of any city or town corporate in the said District, where such an assembly shall be, by proclamation, to be made in the name of the United States, in the form or to the effect herein after directed, to disperse themselves, and peaceably to depart to their habitations, or to their lawful business, shall, (notwithstanding such proclamation made) to the number of twelve or more, unlawfully, riotously, and tumultuously remain or continue together by the space of one hour after such request or command made by proclamation, as aforesaid, then such continuing together, to the number of twelve or more, after such request or demand made by proclamation, as aforesaid, shall be adjudged a high misdemeanor, and the offenders therein not being slaves, shall, upon conviction, be confined at hard labour, or in solitude, not exceeding ten years, and may be fined not exceeding one thousand dollars.

Digitized by Google