No. 16-7025

# In the
# United States Court of Appeals
# for the District of Columbia Circuit

BRIAN WRENN, *ET AL.*,
*Plaintiffs-Appellants*,
v.

DISTRICT OF COLUMBIA, *ET AL.*,
*Defendants-Appellees.*

## On Appeal from the
## United States District Court for
## the District of Columbia

## Brief *Amicus Curiae* of Gun Owners of America, Inc., Gun Owners Foundation, U.S. Justice Foundation, Conservative Legal Defense and Education Fund, and Heller Foundation in Support of Appellants and Reversal

MICHAEL CONNELLY
  U.S. JUSTICE FOUNDATION
  932 D Street, Suite 2
  Ramona, California 92065
Counsel for *Amicus Curiae*
  U.S. Justice Foundation

HERBERT W. TITUS*
ROBERT J. OLSON
WILLIAM J. OLSON
JEREMIAH L. MORGAN
JOHN S. MILES
  WILLIAM J. OLSON, P.C.
  370 Maple Avenue W., Suite 4
  Vienna, Virginia 22180-5615
  (703) 356-5070
Counsel for *Amici Curiae*

*Attorney of Record
June 20, 2016

# CERTIFICATE AS TO
## PARTIES, RULINGS, AND RELATED CASES

### Parties and *Amici*

Except for the following, all parties, intervenors, and *amici curiae* appearing before the district court below and this Court are listed in the Brief for Appellant: *amici* Gun Owners of America, Inc., Gun Owners Foundation, U.S. Justice Foundation, Conservative Legal Defense and Education Fund, and Heller Foundation.

### Ruling under Review

References to the ruling at issue appear in the Appellants' Brief.

### Related Cases

Counsel adopt and incorporate by reference Appellants' statement with respect to related cases.

### Statutes and Regulations

All applicable constitutional provisions, statutes, and regulations are set forth in the Addendum to the Appellants' Brief.

## CORPORATE DISCLOSURE STATEMENT

The *amici curiae* herein, Gun Owners of America, Inc., Gun Owners Foundation, U.S. Justice Foundation, Conservative Legal Defense and Education Fund, and Heller Foundation through their undersigned counsel, submit this Corporate Disclosure Statement pursuant to Rules 26.1(b) and 29(c) of the Federal Rules of Appellate Procedure, and Rule 26.1 of the Rules of the United States Court of Appeals for the District of Columbia Circuit.

These *amici curiae* are non-stock, nonprofit corporations, none of which has any parent company, and no person or entity owns them or any part of them.

These *amici curiae* are represented herein by Herbert W. Titus, counsel of record, Robert J. Olson, William J. Olson, John S. Miles, and Jeremiah L. Morgan, of William J. Olson, P.C., 370 Maple Avenue West, Suite 4, Vienna, Virginia 22180-5615. Michael Connelly, U.S. Justice Foundation, 932 D Street, Suite 2, Ramona, California 92065 is co-counsel for *amicus curiae* U.S. Justice Foundation.

 */s/ Herbert W. Titus* 
Herbert W. Titus

# TABLE OF CONTENTS

Page

Certificate as to Parties, Rulings, and Related Cases. . . . . . . . . . . . . . . . . . i

Corporate Disclosure Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

Glossary of Abbreviations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

Interest of *Amici Curiae*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT

I.   THE D.C. LICENSING LAW VIOLATES THE SUPREME LAW OF THE
     LAND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

     A.   The Right to Keep and Bear Arms Belongs to the People,
          Free From the Licensing Power of the State. . . . . . . . . . . . . . 9

II.  THREE DISTRICT COURT OPINIONS DEMONSTRATE THAT THE TWO-
     STEP TEST ADOPTED BY HELLER II AND HELLER III OPERATES TO
     REPLACE THE RULE OF LAW WITH THE RULE OF JUDGES. . . . . . . . . . . 13

     A.   Judge Scullin's Opinion in Wrenn. . . . . . . . . . . . . . . . . . . . 15

     B.   Judge Kollar-Kotelly's Opinion in Wrenn. . . . . . . . . . . . . . . 16

     C.   Judge Leon's Opinion in Grace. . . . . . . . . . . . . . . . . . . . . . 19

     D.   The Decisions Compared and Contrasted. . . . . . . . . . . . . . . . 21

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

Page

**CONSTITUTION**

Article VI. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
* Second Amendment. . . . . . . . . . . . . . . . . . . . . . . 1-12, 14-16, 19-25

**CASES**

Grace v. District of Columbia, 2016 U.S. Dist. LEXIS 28362 (D.D.C.
    2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 13, 19, 22
Harris v. Silvester, 2013 U.S. Dist. LEXIS 172946 (E.D. Cal. 2013) . . . . . . 3
* Heller v. District of Columbia, 554 U.S. 570 (2008).  2-7, 9-11, 14, 21, 24-25
Heller v. District of Columbia, 670 F.3d 1244 (D.C. Cir. 2011)
    (Heller II). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-7
Heller v. District of Columbia, 801 F.3d 264 (D.C. Cir. 2015)
    (Heller III). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
Kolbe v. O'Malley, 42 F. Supp. 3d 768 (D. Md. 2014). . . . . . . . . . . . . 4
Marbury v. Madison, 5 U.S. (1 Cranch) 127 (1803). . . . . . . . . . . . . 8, 14
Moore v. Madigan, 702 F.3d 933 (7th Cir. 2012). . . . . . . . . . . . . . . 16
Peruta v. San Diego, 678 F. Supp. 2d 1046 (S.D. Cal. 2010). . . . . . . . . 4
United States v. Emerson, 270 F.3d 203 (5th Cir. 2001). . . . . . . . . . . . 1
United States v. Miller, 307 U.S. 174 (1939). . . . . . . . . . . . . . . . . . 1

**MISCELLANEOUS**

* IV Blackstone's Commentaries. . . . . . . . . . . . . . . . . . . . . . 11, 12

T.J. Capurso, "How Judges Judge: Theories on Judicial Decision
Making," Law Forum: Vol. 29: No. 1, Article 2 (1998). . . . . . . . . . . . 21

C. Cox, "The Judiciary's Role In Fundamental Transformation,"
The Daily Caller, Nov. 26, 2014. . . . . . . . . . . . . . . . . . . . . . . 3

S. Levinson, "The Embarrassing Second Amendment," 99 YALE L. J. 637
(1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

* Authorities upon which we chiefly rely are marked with asterisks.

G. Reynolds & B. Denning, "*Heller*'s Future in the Lower Courts,"
102 NORTHWESTERN UNIV. L. REV. 2035, 2036 (2008). . . . . . . . . . . . . . 1, 2

 "Only 33% think most judges follow the law in their rulings."
Rasmussen Reports (Nov. 7, 2013). . . . . . . . . . . . . . . . . . . . . . . .  2

N. Totenberg, "How Women Changed The High Court …
And Didn't," National Public Radio, June 24, 2010. . . . . . . . . . . . . . . . 14

H. Willis, "The Doctrine of the Supremacy of the Supreme Court,"
6 INDIANA L. J. 241 (1931). . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

## INTEREST OF *AMICI CURIAE*[1]

The *amici curiae* are nonprofit organizations, exempt from federal taxation under sections 501(c)(3) or 501(c)(4) of the Internal Revenue Code, and each is dedicated, *inter alia*, to the correct construction, interpretation, and application of the law. These *amici* have filed numerous *amicus curiae* briefs in Second Amendment cases including: District of Columbia v. Heller, McDonald v. City of Chicago, and Heller v. District of Columbia (Heller III).

## STATEMENT

For decades following United States v. Miller, 307 U.S. 174 (1939),[2] federal courts championed the pretense that the Second Amendment protected only a collective right to firearms. Widely disparaged in the legal literature by both pro-gun and anti-gun scholars, this collective rights idea was initially critically examined and rejected by the Fifth Circuit in United States v. Emerson, 270 F.3d 203 (5th Cir. 2001). Seven years later, relying on the Constitution's

---

[1] All parties have consented to the filing of this brief *amicus curiae*. No party's counsel authored the brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than these *amici curiae*, their members or their counsel contributed money that was intended to fund preparing or submitting this brief.

[2] *See* G. Reynolds & B. Denning, "*Heller*'s Future in the Lower Courts," 102 NORTHWESTERN UNIV. L. REV. 2035, 2036 (2008) http://scholarlycommons. law.northwestern.edu/nulr_online/122/.

text in its historical context, the Supreme Court ultimately refuted and rejected

the collective rights approach. In <u>Heller</u> v. <u>District of Columbia</u>, 554 U.S. 570

(2008) ("<u>Heller</u>"), the collective rights theory was exposed for what it really

was:

> a mixture of sheer opposition to the idea of private ownership of
> guns and the perhaps subconscious fear that altogether plausible,
> perhaps even "winning," interpretations of the Second Amendment
> would present real hurdles to those of us supporting prohibitory
> regulation. [S. Levinson, "The Embarrassing Second Amendment,"
> 99 YALE L. J. 637, 642 (1989).]

In the eight years since <u>Heller</u>, the federal judiciary has coalesced around

yet another construct to empower government to "infringe" a right that the

Constitution says "shall not be infringed." *See, e.g., <u>Heller's</u> Future*, at 2036

("the courts of appeals have a history of more-or-less open hostility to claims of

a private right to arms").

The American people have come to believe that the decisions rendered by

judges more often reflect more of their personal political viewpoints and less of

any principled legal reasoning.[3]  And there appears to be empirical support for

---

[3]  *See, e.g.,* "Only 33% Think Most Judges Follow the Law in Their
Rulings." Rasmussen Reports (Nov. 7, 2013).

the people's opinion.[4]  Today, "[n]ine of the 13 federal courts of appeal now

have a majority of judges who were appointed by anti-gun presidents."[5]

Uncomfortable with the <u>Heller</u> decision and its implications, the lower

courts have developed an atextual test — the "two-step approach."[6]  This test has

allowed the courts to give the public the illusion of compliance with the Second

Amendment and <u>Heller</u>, before tossing them aside in favor of a judge

empowering interest-balancing test — of the exact sort rejected in <u>Heller</u>.[7]

---

[4]  *See, e.g.*, H. Willis, "The Doctrine of the Supremacy of the Supreme Court," 6 INDIANA L. J. 241 (1931) ("more frequently … a change in the position of the United States Supreme Court has been due to … a change in the personnel of the Bench").

[5]  C. Cox, "The Judiciary's Role In Fundamental Transformation," <u>The Daily Caller</u>, Nov. 26, 2014, <u>http://dailycaller.com/2014/11/26/the-judiciarys-role-in-fundamental- transformation/</u>.

[6]  *See* <u>Heller</u> v. <u>District of Columbia</u>, 670 F.3d 1244 (D.C. Cir. 2011) ("<u>Heller II</u>") at 1252-53.  In <u>Heller II</u>, this Court adopted the "two-step approach" to sanction the infringement of rights that "shall not be infringed."  In step one of this test, a court is to determine whether a particular regulation "impinges" (infringes) conduct that the Second Amendment protects.  *Id.* at 1252.  In step two, the Court then "determine[s] whether the provision passes muster under the appropriate level of constitutional scrutiny."  *Id.*  Of course, the text of the Second Amendment states that the rights it protects "shall not be infringed" at all — not that it shall not be infringed unless the judge believes the law to be more important than the Constitution.

[7]  This Court is not the only one to have sanctioned violations of the Second Amendment's plain text.  *See also* <u>Harris</u> v. <u>Silvester</u>, 2013 U.S. Dist. LEXIS 172946 at *8-9 (E.D. Cal. 2013) (noting that Defendant "at a minimum

In <u>Heller</u>, the Supreme Court specifically rejected the use of what were termed "judge-empowering 'interest-balancing inquir[ies]'" that override the Second Amendment's protections, "'ask[ing] whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests.'" *Id.* at 634. Yet that is exactly what the test embraced by the lower courts does, balancing (i) how severely a statute burdens Second Amendment rights, against (ii) the importance of the governmental interests at stake. *See*, *e.g.*, <u>Heller II</u> at 1254-55, 1258.

In <u>Heller II</u>, this Court was quick to make use of the Supreme Court's <u>Heller</u> language that "'the right secured by the Second Amendment is **not**

---

concedes that [the law] is a burden **and/or infringement** on the right to keep and bear arms," but then conducting an intermediate scrutiny analysis before deciding that the law infringed too much) (emphasis added); <u>Peruta</u> v. <u>San Diego</u>, 678 F. Supp. 2d 1046, 1055 (S.D. Cal. 2010) (noting that, "by imposing a 'good cause' requirement before a concealed weapon's [sic] permit can be issued, the State **undoubtedly infringes** Plaintiff's right to 'possess and carry weapons in case of confrontation,'" but then stating that "[f]or such infringement to pass constitutional muster, Defendant must at the very least demonstrate that it is necessary....") (emphasis added); <u>Kolbe</u> v. <u>O'Malley</u>, 42 F. Supp. 3d 768, 789 (D. Md. 2014) (after "assum[ing] the Firearm Safety Act **infringes** on the Second Amendment," ruling that its infringement upon the right to keep and bear arms could be justified under intermediate scrutiny as a means to better ensure Maryland's public safety ends). In admitting that the laws being upheld infringe on the right to keep and bear arms, these courts actually demonstrate that they believe their opinions to be above the constitutional text.

**unlimited**.'" *Id.* at 1252 (emphasis added). Although it is true that the right is not "unlimited," its limitations to be found in the text of the Amendment, not in the subjective minds of modern federal judges and what they believe to be "reasonable." This Court, however, has allowed the "not unlimited" caution contained in <u>Heller</u> to swallow the entire Amendment, making every aspect of gun ownership subject to "reasonable" regulation. Such a reading of <u>Heller</u> strains credulity. The better reading of "not unlimited," supported by <u>Heller</u>'s rejection of interest-balancing, is only that the Second Amendment does not extend: (i) to all people (such as illegal aliens); (ii) to all weaponry (such as tanks); (iii) to all places (such as courthouses over which the government has proprietary control); and (iv) to all activities with a firearm (such as shooting across a highway).

These are the only types of permissible limitations derived from the text — not made-up restrictions based on what seems reasonable to modern federal judges. As the Second Amendment's plain text demonstrates, such rights as the Amendment does protect (including the right of law-abiding citizens to keep handguns in their homes for self-defense), it **protects absolutely**.[8] As <u>Heller</u>

---

[8] Plaintiffs' theory of the case apparently is that "there is no right to carry, specifically, *concealed* handguns" and that "the government may prohibit

noted specifically, "[a] constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all." *Id.* at 634-35.

Writing in dissent in Heller II, Judge Kavanaugh correctly explained that standards of scrutiny were rejected in Heller because they permit judges to "re-calibrate the scope of the Second Amendment right based on judicial assessment of whether the law advances a sufficiently compelling or important government interest to override the individual right…." *Id.* at 1271. Instead, Judge Kavanaugh recognized that the Heller test was one of "text, history, and tradition." *Id.* at 1275.

This Circuit's misguided two-step test was the starting point for the two opinions in the district court below, and for Judge Leon's opinion in Grace v. District of Columbia, 2016 U.S. Dist. LEXIS 28362 (D.D.C. 2016). All three opinions demonstrate why the judicial two-step test is just as flawed as the now-

---

concealed *or* open carrying," but just not all forms of carrying (Plaintiffs' Br. at 29). These *amici* do not agree. Such statements are impossible to reconcile with the Second Amendment right to "bear" as well as Heller's explanation that to "bear" means to "wear, bear, or carry . . . upon the person or **in the clothing or in a pocket**…" *Id.* at 584 (internal quotation marks omitted) (emphasis added). Although a current legislative body might prefer open carry over concealed carry, "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Id.* at 634-35.

discredited collective rights theory. The two-step test is nothing more than a "judge-empowering 'interest-balancing inquiry'" of the sort the Supreme Court rejected in Heller.

## ARGUMENT

### I. THE D.C. LICENSING LAW VIOLATES THE SUPREME LAW OF THE LAND.

Although purporting to apply the D.C. Circuit two-step approach to Second Amendment litigation,[9] Judge Kollar-Kotelly utterly failed to venture even the first step. Instead of answering the first question — "'whether a particular provision impinges upon a right protected by the Second Amendment'" — the court instead asked — "whether a particular regulation is 'longstanding,' [and thus] 'presumed **not** to burden conduct within the scope of the Second Amendment." Wrenn v. District of Columbia, 2016 U.S. Dist. LEXIS 28362 at *17 (D.D.C. 2016) (emphasis added).

By inverting the test's first question, the court turned the constitutional order upside down. Instead of measuring any particular "longstanding" regulation by the Second Amendment text, the court would measure the

---

[9] *See* Heller v. District of Columbia, 670 F.3d 1244, 1252 (D.C. Cir. 2011) (Heller II) and Heller v. District of Columbia, 801 F.3d 264, 272 (D.C. Cir. 2015) (Heller III).

constitutional text by the vintage of the regulation. Under that approach, the older the established regulatory practice, the more likely the presumption that the regulated conduct would fall outside the protective shield of the Second Amendment. Even though Article VI expressly states that "this Constitution … shall be the supreme Law of the Land," under the approach of Judge Kollar-Kotelly, the written document gives way to longevity of practice. If her theory is adopted, as the Supreme Court recognized in Marbury v. Madison, "written constitutions are absurd attempts, on the part of the people, to limit a power, in its own nature illimitable." *Id.*, 5 U.S. (1 Cranch) 127, 177 (1803). Indeed, this lesson from Marbury is completely missed by the court below. "[W]ithout deciding … and without suggesting anything about the underlying merits, that the Second Amendment protects a right to carry arms publicly in the District of Columbia" (Wrenn at *11) the district judge chose to ignore entirely the application of the Second Amendment text. Had she properly conducted judicial review, as was her duty under Marbury, the D.C. licensing system should have been struck down.

**A. The Right to Keep and Bear Arms Belongs to the People, Free From the Licensing Power of the State.**

As stated in the Second Amendment's prefatory clause, the right of the people to keep and bear arms is "necessary" to achieve the Amendment's overarching goal: "the security of a free State." *See* <u>Heller</u> at 597-98. To preserve the nation as a "free State," the Second Amendment right is multi-faceted: to repel invasions from without, to put down insurrections from within, to diminish the need for standing armies, and ultimately to "resist tyranny." *Id.* at 598. As for resisting tyranny, securing the right to keep and bear arms was perceived to be essential "to secure the ideal of a citizen militia, which might be necessary to oppose an oppressive military force if the **constitutional order broke down**." *Id.* at 599 (emphasis added).

Our founders were so persuaded because they knew about the longstanding efforts by "the Stuart kings Charles II and James II … in using select militias loyal to them to suppress political dissidents, in part by disarming their opponents." *Id.* at 592. Indeed, the Catholic Charles II, "[u]nder the auspices of the 1671 Game Act … ordered general disarmaments of regions home to his Protestant enemies." *Id.* at 593. This historical precedent and others "caused Englishmen to be extremely wary of concentrated military forces run by the state

and to be jealous of their arms." *Id.*  So, in the 1689 English Bill of Rights, in

an effort to ensure that "Protestants would never be disarmed," they exacted

from William and Mary the promise — "That the Subjects which are Protestants

may have Arms for their Defence suitable to their Conditions, and as allowed by

Law." *Id.*

Although the text of the English right varies greatly from the Second

Amendment text, <u>Heller</u> nonetheless confidently acknowledged that the English

1689 right to arms "has long been understood to be the predecessor to our

Second Amendment." *Id.* at 593.  Indeed, by the middle of the following

century, "the right to have arms had become fundamental for English [not just

Protestant] subjects." *Id.*  So, when King George III, like the Stuart kings

before him, "began to disarm the inhabitants of the most rebellious" of his

colonies, the American people claimed their rights as Englishmen to have arms.

And, when it came time to write their own Bill of Rights, America's

founders had their own political experience to guide them.  Having in the name

of the People declared their independence from Great Britain and constituted a

new government, the Founders declared in the Second Amendment the right to

keep and bear arms as one belonging to all the People, not to be parceled out

either by group or one-by-one by a government official in charge of the licensing
of firearms — whether that official be the President — or the chief of police in
the nation's capital. Thus, in the Second Amendment the founders substituted
People for Protestants, and by doing so, "unambiguously refer[red] to all
members of the [American] political community, **not** an **unspecified subset**."
*Id.* at 580 (emphasis added).

Additionally, the Second Amendment reads unambiguously as a limit on —
not as a grant of — government power, that "the right of the People to keep and
bear Arms shall not be infringed." That closing negating phrase — in contrast to
the closing permissive phrase, "as allowed by Law," in the earlier English Bill of
Rights — absolutely illegitimates the exercise of government licensing power
over the possession and carrying of Second Amendment protected firearms.
Although the English "allowed by Law" would permit a system of licensure of
firearms administered by the D.C. police chief, the American negative
"infringe" would allow for no such licensing system. Instead, under the Second
Amendment, the People would have the same right to be as free from licensure
as they are under the First Amendment freedom of the press. As Blackstone
affirmed that the liberty of the press was "indeed essential to the nature of a free

state,"[10] so also the Second Amendment's preface affirms that the right to keep and bear arms is "necessary to the security of a free state." *See* Heller at 595-60. According to Blackstone, the liberty of the press prohibited all government licensure:

> To subject the press to the restrictive power of a licenser … is to subject all freedom of sentiment to the prejudices of one man, and make him the arbitrary and infallible judge of all controverted points in learning, religion, and government. But to punish … any dangerous or offensive writings… is necessary for the preservation of peace and good order… Thus the will of individuals is still left free; the abuse only of that free will is the object of legal punishment. [IV Blackstone's Commentaries at 152.]

In like manner, and for like reasons, the Second Amendment relieves the firearms owner from "the restrictive power of a licenser," answerable to the civil authorities only for the misuse of firearms, not for their possession or lawful use. Neither the government of the District of Columbia, nor any state nor federal court, has any authority to override or disregard this founding principle.

---

[10] IV W. Blackstone, Commentaries on the Laws of England at 151 (Univ. of Chi Facsimile ed.: 1765) ("Blackstone's Commentaries").

## II. THREE DISTRICT COURT OPINIONS DEMONSTRATE THAT THE TWO-STEP TEST ADOPTED BY HELLER II AND HELLER III OPERATES TO REPLACE THE RULE OF LAW WITH THE RULE OF JUDGES.

This case comes before this Court in an extremely unusual fashion. Few cases in district court are decided twice on virtually the same record by two different district court judges. In fewer still does a third district court judge decide a nearly identical case at the same time.[11] Comparing and contrasting these three decisions and opinions allows an examination of the extent to which the "two-step" test embraced by this Circuit is functioning to guide judicial decisions. If it were a proper legal test, applied to virtually identical facts,[12] one would surmise that different judges would reach identical — or at least

---

[11]  *See* Grace v. District of Columbia, 2016 U.S. Dist. LEXIS 64681 (D.D.C. May 17, 2016).

[12]  In Wrenn v. District of Columbia, the Plaintiffs claimed that they were otherwise-qualified to receive a concealed carry license under the District's laws, but were denied because they did not meet "the good reason/other proper reason requirement." 2016 U.S. Dist. LEXIS 28362, *9. Likewise, in Grace v. District of Columbia, the Plaintiff, although otherwise-qualified to receive a concealed carry license, "concede[d] he does not face any specific threat," and thus was denied a license on the "sole basis" that he did not meet the "'good reason … or other proper reason'" requirement. 2016 U.S. Dist. LEXIS 64681, *9-10.

harmonious — results.  However, below, all three judges followed the same test to reach very different outcomes.

In certain matters, such as in making an award of money damages under the Federal Tort Claims Act, different district court judges could be expected to reach somewhat different results.  But interpreting and applying the United States Constitution is not one of those types of cases.  Justice Sandra Day O'Connor is famously quoted as having said that a wise old man and a wise old woman should come to the same result in deciding a case.[13]  That aspiration is seriously questioned by an examination of post-<u>Heller</u> Second Amendment litigation.  After <u>Heller</u>, the results of most Second Amendment cases appear to be based more on the predisposition of the judge than the merits of the argument.  In such a world, there are no fixed Constitutional principles — and no exercise of judicial judgment — only the exercise of raw judicial power.[14]

_____

[13]  N. Totenberg, "How Women Changed The High Court … And Didn't," National Public Radio, June 24, 2010, http://www.npr.org/templates/story/story.php?storyId=128079684.

[14]  Plaintiffs stated in their brief that "[w]here fundamental rights are concerned, *judges*, not the legislators themselves, decide whether legislation has gone too far."  Plaintiffs' Br. at 4.  However, in truth, it is the Constitution itself, not judges, that decides whether legislation has gone too far.  It is the role of the judge to discover the law, not to make it.  <u>Marbury</u> at 177 ("It is emphatically the province and duty of the judicial department to say what the law

**A.    Judge Scullin's Opinion in <u>Wrenn</u>.**

In his May 18, 2015 opinion later vacated by this Court on other grounds, Judge Scullin concluded "that the District of Columbia's 'good reason'/'proper reason' requirement impinges on Plaintiffs' Second Amendment right to bear arms." <u>Wrenn</u> v. <u>District of Columbia</u>, 107 F.Supp.3d 1, 8 (D.D.C. 2015). Judge Scullin correctly noted that "there exists a right under the Second Amendment to carry handguns in public for self-defense."[15]  *Id*. at 6.

Starting with the notion that the Second Amendment protects the right to carry a handgun in public, and that D.C.'s ordinance "impinges" (*i.e.*, infringes) on that right, Judge Scullin then determined that under this Circuit's jurisprudence, intermediate scrutiny was the appropriate standard of review.  *Id*. at 9.  Applying intermediate scrutiny, Judge Scullin did not accede the District's claim that the D.C. permit system related in any way to the District's asserted interests of "preventing crime or protecting public safety."  *Id*. at 10.  The

---

is."). And, where constitutionally permitted, legislators, not judges, make public policy.  As <u>Heller</u> cautioned:  "A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all."  <u>Heller</u> at 634.

[15]  (Incorrectly, however, he broadly asserted that this right is "subject to traditional restrictions."  *Id*.)

District argued that requiring applicants to have a "good reason" to carry a firearm reduces the number of handguns in public, which in turn reduces the number of people who are shot with firearms. *Id.* But as Judge Scullin noted, requiring a "good reason" has nothing to do with which people may misuse a firearm, commit violent crimes, etc. *Id.* at 11. Determining that the District's requirement was not a "tight fit" with its claimed interests, Judge Scullin granted the Plaintiffs' application for a preliminary injunction.

Although Judge Scullin reached the correct result, the intermediate scrutiny test he used gave him wide latitude to reach whatever decision he would have preferred. Had he viewed firearms with hostility, using intermediate scrutiny, he could have come to precisely the opposite conclusion — just as Judge Kollar-Kotelly did.

**B.     Judge Kollar-Kotelly's Opinion in <u>Wrenn</u>.**

After this Court ruled that Judge Scullin's assignment to the case was improper, the case was assigned to Judge Kollar-Kotelly. As it turns out, Judge Kollar-Kotelly viewed firearms very differently than Judge Scullin, even though her analysis was not dissimilar. First, she "assum[ed] without deciding … that the Second Amendment includes a right to carry arms publicly in the District of

Columbia."[16]  Second, she assumed (only for purposes of discussion, of course) "that such right of Appellee Woollard **has been infringed**." <u>Wrenn</u>, 2016 U.S. Dist. LEXIS at *19 n.6 (emphasis added).  And as with Judge Scullin, the fact that a right which the Constitution says "shall not be infringed" "was being infringed" was not determinative.

Like Judge Scullin, Judge Kollar-Kotelly "concluded"[17] that the District's "requirements warrant intermediate scrutiny." *Id*. at *19.  Yet her application of intermediate scrutiny focused on completely different factors than did Judge Scullin's, demonstrating the flexibility and latitude afforded judges by the "two step approach."  Judge Kollar-Kotelly first described the District's concealed carry scheme (or lack thereof) as "a licensing scheme that restricts the ability of

---

[16]  Judge Kollar-Kotelly attempted to mesh the Second Amendment right to carry a firearm in public with the District's "good reason" requirement, which prohibits virtually everyone from carrying a firearm in public.  Judge Kollar-Kotelly distinguished the Seventh Circuit's decision in <u>Moore</u> v. <u>Madigan</u>, 702 F.3d 933 (7th Cir. 2012), stating that it is "inapposite as it concerned [a] 'flat ban on carrying ready-to-use guns outside the home,' … whereas this case pertains to a licensing scheme not a 'flat ban.'" <u>Wrenn</u> at *38.

[17]  In fact, Judge Kollar-Kotelly reiterates this conclusion no fewer than four separate times. *See id*. at *19, *20, *22, *24.

people to carry handguns … but is in no way a blanket prohibition on doing so." *Id*. at *21.[18]

When applying intermediate scrutiny, Judge Kollar-Kotelly claimed that "Defendants have identified what appears to be substantial evidence of connections between public carrying of guns — and associated regulations on public carrying — and impacts on crime and public safety." *Id.* at *35. But Judge Kollar-Kotelly never bothered to describe or even summarize this evidence. Instead, she simply faulted Plaintiffs for failing to "address the evidence on which the D.C. Council relied…." *Id*. at 36. Although she acknowledged that "it is necessary to examine the ends identified by Defendants and the fit of the chosen means to those ends," she also said just the opposite, that "the Court need not conduct an in-depth assessment of the evidence…." *Id*. at 35-36. Judge Kollar-Kotelly never actually discussed public safety, crime

---

[18] This statement is at serious odds with the facts. As of September, 2015, the District reported that it had issued a total of 44 concealed carry permits to its more than 672,000 residents — one for every 15,277 persons. By contrast, Maryland (a highly restrictive "may issue" state) has issued over 14,000 permits — one for every 420 persons. And Virginia (a "shall issue" state) has issued over 363,000 permits — one for every 23 persons. Contrary to Judge Kollar-Kotelly's representation of the situation, a jurisdiction that permits only 44 civilians to be armed could be viewed as at least approximating a "blanket prohibition" from the perspective of the 99.993 percent of the population without such permits.

prevention, or how the District's "good reason" requirement furthers those ends. *Id*. And as Judge Scullin correctly noted, there is no connection between requiring a person to have a "good reason" to carry a weapon and whether that person is more or less likely to commit a crime or use his weapon unlawfully. Wrenn, 107 F.Supp.3d at *11.

**C.    Judge Leon's Opinion in Grace.**

Like Judges Scullin and Kollar-Kotelly, Judge Leon also determined that "the Second Amendment's applicability is not limited to the home." Grace at *16. And he determined that "the 'good reason' requirement likely impinges upon a right protected by the Second Amendment." *Id*. at *14. Furthermore, like the others, Judge Leon claimed that "[c]oncluding that there is a right to carry arms in self-defense in public places, of course, does not resolve the *extent* of that right." *Id*. at *29. Although acknowledging that "the 'good reason' requirement covers the precise conduct, carrying arms, for the precise reason, self-defense, that the text and historical record make clear the Second Amendment was intended to protect" (*id*. at *39), and although acknowledging that the requirement "infringes on Second Amendment activity" (*id*. at *43) which "shall not be infringed," Judge Leon (as required by this Court's prior

rulings) nevertheless stated that "I must decide first the appropriate level of constitutional scrutiny to apply to the District's law, and then whether the law passes muster under that framework." *Id*. at *41.

Determining that the District's "good reason" requirement "imposes a *substantial* burden on core Second Amendment conduct" — the right to carry a firearm in public — Judge Leon selected strict scrutiny as his interest-balancing test, unlike Judges Scullin and Kollar-Kotelly, who chose intermediate scrutiny. *Id*. at *49, 55.[19]

Applying strict scrutiny, Judge Leon stated that "*defendants* bear the burden of justifying their policy" (*id*. at *57), in stark contrast to Judge Kollar-Kotelly's placement of the burden on Plaintiffs to refute the Defendants' evidence.  Like Judge Scullin, Judge Leon noted that keeping guns out of the hands of everyone as a general matter is neither "narrowly tailored" to nor even related to achieving the public interest of reducing crime.  *Id*. at *58.  Rather, he

---

[19]  Interestingly, Judge Leon stated that "it is tempting, indeed, to agree with plaintiffs that the 'good reason' requirement is *per se* unconstitutional." *Id*. at *54.  However, Judge Leon stated that "[i]n the interest of judicial restraint … I will leave … the question … for another day." *Id*. at *55 (emphasis added).  If Judge Leon had decided that the District's concealed carry "restriction" (ban) is unconstitutional *per se*, he would not be engaged in judicial overreach — he would be enforcing the Second Amendment.

noted, the District should focus on "keeping guns away from the people who are likely to misuse them or situations where they are likely to be misused." *Id.*

## D.    The Decisions Compared and Contrasted.

The disparate results in these three analyses, choice of balancing tests, and outcomes, should give Americans pause as to whether judges operate under the law, or over the law.

Without doubt, the use of "interest-balancing tests" that are the foundational part of the "two-step approach" permits widely varying results. Such interest balancing is in direct conflict with the <u>Heller</u> decision. Nevertheless, since <u>Heller</u>, interest balancing has enabled the federal judiciary to turn the Second Amendment on its head, authorizing laws that "infringe" a right that "shall not be infringed."[20]

---

[20] The "realist" theory of judicial decision-making teaches that "judges determine the outcome of a lawsuit *before* deciding whether the conclusion is, in fact, based on an established legal principle." T.J. Capurso, "How Judges Judge: Theories on Judicial Decision Making," Univ. of Baltimore Law Forum: Vol. 29: No. 1, Article 2 (1998), p.1 <u>http://scholarworks.law.ubalt.edu/lf/vol29/iss1/2</u>.  Under this school of thought, after deciding which result they would prefer, judges "then look for existing principles in case law or statutory regulations that support the conclusion," and they "'almost always [find] principles suited to [his] view of the case.'" *Id.* at 5-6.  Although legal realism might explain the post-<u>Heller</u> state of affairs in Second Amendment jurisprudence, where judges base their decisions on their "'intuitive sense of what is right or wrong in the particular case,'" (*id.* at 6) thankfully, the Framers

In three distinct respects, the opinions of district Judges Scullin, Kollar-Kotelly, and Leon demonstrate that, whatever the balance of interests, the scrutiny employed is wholly subject to the judge's preferences, not any fixed rule of law.

First, the D.C. Circuit's two-step approach in practice does not even require a court to take the first step. The balance struck depends upon how seriously the judge treats his inquiry in step one, assessing the burden and substantiality of the Second Amendment right that is at stake. Judge Leon spent significant effort examining the D.C. licensing scheme under a textual and historic analysis of the Second Amendment right to "carry." Grace at *10-20. At the end of that analysis, Judge Leon could confidently conclude that the Second Amendment protection of carrying a firearm in public was as vital an element of the right as was possession of a firearm in one's home. Id. at *20. Although Judge Scullin devoted only two paragraphs to step one, he also confidently stated that the Second Amendment interest at stake was "the right … to carry handguns in public for self-defense." Wrenn, 107 F.Supp.3d at 6. In contrast to both, Judge Kollar-Kotelly was content to "assume, without deciding,

---

did not make the Second Amendment so malleable.

solely for the purposes of resolving the pending motion and without suggesting anything about the underlying merits, that the Second Amendment protects a right to carry arms publicly in the District of Columbia." Wrenn, 2016 U.S. Dist. LEXIS at *18. Having invested no judicial capital in the primary question, it would come as no surprise that, in the end, Judge Kollar-Kotelly was unsure whether the D.C. licensing scheme deserved "any level of scrutiny … at all." *Id.* at *22.

Second, there is nothing in the D.C. Circuit's two-step that holds the court to any standard of review. Judge Scullin undertook a *de novo* review as to whether the "good reason" requirement actually supported the District's claim that the law prevented gun violence and promoted gun safety. *See* Wrenn, 107 F.Supp.3d at 9-10. Finding the system's requirement of "good reason/proper reason" broader than necessary, Judge Scullin ruled that the D.C. law did not survive his scrutiny. *Id.* at 11-12. However, Judge Kollar-Kotelly disagreed, not on the ground that she found the permissive standards too broad, but because, deferring to a police report, the "reason" requirements were "reasonable." Wrenn, 2016 U.S. Dist. LEXIS at *20-21. In contrast, Judge Scullin rejected

the District's contention, concluding that the police "have not established that relationship." <u>Wrenn</u>, 107 F.Supp.3d at 11.

Third, Judge Scullin placed the burden upon the District's officials, not on the Second Amendment complainants, concluding:

> that Defendants have failed to demonstrate that there is any relationship, let alone a tight fit, between reducing the risk of other members of the public and/or violent crime and the District of Columbia's "good reason"/"proper reason" requirement. [*Id*. at 11.]

Judge Kollar-Kotelly came to just the opposite conclusion:

> Plaintiffs must show that it is not likely that *Defendants* will be able to present evidence that will allow the *Court* to find that the *District* could have reasonably concluded that the chosen means serve the identified ends "in a direct and material way." [<u>Wrenn</u>, 2016 U.S. Dist. LEXIS at *34-35.]

The conflicting opinions of these three judges conclusively demonstrate the truth of the statement in <u>Heller</u>: "A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Id*. at 634-35. An analysis of these three decisions proves that the post-<u>Heller</u> two-step approach has failed to live up to

the promise that the lower federal courts would make a good faith effort to follow the <u>Heller</u> decision. Such decisions do not reassure the American people that federal judges understand that they are under, not over, the Constitution.

## CONCLUSION

This is an incredibly straightforward case, involving very simple facts, to be decided under the very simple text of the Second Amendment. Instead, through use of this Court's permissive balancing tests, it has been transformed into a complicated case based on all sorts of statistics, possibilities and probabilities, social science evidence, and subjective viewpoints of individual judges. The Second Amendment states that "the right of the People to keep and bear arms shall not be infringed." Plaintiffs are law-abiding American citizens who are clearly part of "the People," and <u>Heller</u> has already said as much. *Id*. at 580. The handguns they would like to bear, as concealed carry, are clearly "arms" protected under the Second Amendment, and <u>Heller</u> has already said as much. *Id*. at 628. And finally, they wish to carry — or "bear" — those arms peacefully in public, a protected activity under the Second Amendment, which <u>Heller</u> has already recognized. *Id*. at 584. Therefore, their right "shall not be infringed." Not a little, not a lot, not at all. If the Constitution is to be

followed, rather than circumvented, it really is as simple as that. The judgment of the district court below should be reversed.

Respectfully submitted,

*/s/ Herbert W. Titus*

_____

| | |
|---|---|
| MICHAEL CONNELLY | HERBERT W. TITUS* |
|    U.S. JUSTICE FOUNDATION | ROBERT J. OLSON |
|    932 D Street, Suite 2 | WILLIAM J. OLSON |
|    Ramona, California 92065 | JEREMIAH L. MORGAN |
| Counsel for *Amicus Curiae* | JOHN S. MILES |
|    U.S. Justice Foundation |    WILLIAM J. OLSON, P.C. |
| |    370 Maple Avenue West, Suite 4 |
| |    Vienna, Virginia 22180-5615 |
| |    (703) 356-5070 |
| | Counsel for *Amici Curiae* |

*Attorney of record
June 20, 2016

# CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

IT IS HEREBY CERTIFIED:

1.      That the foregoing Brief *Amicus Curiae* of Gun Owners of America, Inc., *et al.*, in Support of Appellants and Reversal complies with the type-volume limitation of Rule 32(a)(7)(B), Federal Rules of Appellate Procedure, because this brief contains 5,757 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using WordPerfect version 14.0.0.756 in 14-point CG Times.

*/s/ Herbert W. Titus*
_____
Herbert W. Titus
Attorney for *Amici Curiae*

Dated:  June 20, 2016

**CERTIFICATE OF SERVICE**

IT IS HEREBY CERTIFIED that service of the foregoing Brief *Amicus Curiae* of Gun Owners of America, Inc., *et al.*, in Support of Appellants and Reversal, was made, this 20th day of June 2016, by the Court's Case Management/Electronic Case Files system upon the attorneys for the parties.

*/s/ Herbert W. Titus*

_____

Herbert W. Titus
Attorney for *Amici Curiae*