SCHEDULED FOR ORAL ARGUMENT ON SEPTEMBER 20, 2016

No. 16-7025

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

BRIAN WRENN, *et al.*,
APPELLANTS,

v.

DISTRICT OF COLUMBIA, *et al.*,
APPELLEES.

ON APPEAL FROM AN ORDER OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

**BRIEF FOR THE DISTRICT OF COLUMBIA AND
METROPOLITAN POLICE DEPARTMENT CHIEF CATHY LANIER**

KARL A. RACINE
Attorney General for the District of Columbia

TODD S. KIM
Solicitor General

LOREN L. ALIKHAN
Deputy Solicitor General

HOLLY M. JOHNSON
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
441 4th Street, NW, Suite 600S
Washington, D.C. 20001
(202) 442-9890
holly.johnson@dc.gov

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

A. *Parties and amici*.—Brian Wrenn, Joshua Akery, Tyler Whidby, and the Second Amendment Foundation, Inc., are appellants here and plaintiffs below. The District of Columbia and Metropolitan Police Department Chief Cathy Lanier are appellees here and defendants below. *Amici curiae* for appellants include Brady Center to Prevent Gun Violence, DC Appleseed Center for Law & Justice, and Everytown for Gun Safety. Charles Nichols will participate as *amicus curiae* but does not support either party.

B. *Rulings under review*.—The appellants appeal an order issued on March 7, 2016, by District Court Judge Colleen Kollar-Kotelly, denying their motion for a preliminary injunction barring the District from enforcing D.C. Code § 22-4506(a), which requires that any applicant for a license to publicly carry a handgun demonstrate "good reason" to fear injury to his or her person or property or any other proper reason for carrying a pistol. District Court ECF Record Docket ("RD") 54.

C. *Related cases*.—This is the second appeal to this Court arising out of this lawsuit. In *Wrenn v. District of Columbia*, 808 F.3d 81 (D.C. Cir. 2015), the District appealed an order entering a preliminary injunction barring enforcement of the "good reason" standard. On December 15, 2015, this Court vacated the order because it had been issued by a visiting judge whose designation did not extend to

this case.  *Id.* at 84.  The mandate issued on February 5, 2016, and the case was assigned to Judge Kollar-Kotelly on February 9, 2016.

In the meanwhile, in *Grace v. District of Columbia*, a different group of plaintiffs sued the District, raising the same claim and also seeking preliminary relief.  *Grace* RD 1, 6.  *Grace* was assigned to Judge Richard Leon.

The District and the *Wrenn* plaintiffs notified the judges that *Grace* and *Wrenn* were related.  RD34; *Wrenn* RD42, 43.  The *Grace* plaintiffs objected.  RD35 at 2.  Judge Leon did not transfer the case to Judge Kollar-Kotelly, and the two cases—with their pending motions for preliminary injunction—proceeded on separate tracks.

On May 17, 2016, Judge Leon granted the *Grace* plaintiffs' motion for a preliminary injunction barring the District from enforcing the "good reason" standard.  *Grace* RD45, 46.  The District appealed, and this Court expedited the case and ordered argument to be held in September 2016.  No. 16-7067, 6/8/16 Order.  This Court has ordered that this appeal and the *Grace* appeal be heard on the same date and before the same panel.  6/8/16 Order.

<h1>TABLE OF CONTENTS</h1>

STATEMENT OF THE ISSUES ............................................................. 1

STATEMENT OF THE CASE .............................................................. 1

    1.    The District Of Columbia Enacts A System For Licensing The Public Carrying Of Handguns ............................................. 1

    2.    Two District Court Judges Issue Conflicting Rulings On Motions To Preliminarily Enjoin Enforcement Of The "Good Reason" Standard ............................................................... 4

STANDARD OF REVIEW .................................................................. 6

SUMMARY OF ARGUMENT ............................................................. 6

ARGUMENT ...................................................................................... 11

    I.    Plaintiffs Are Not Likely To Prevail On The Merits Of Their Claim That The Constitution Requires A "Shall-Issue" Nation ........ 11

        A.    Historical analysis demonstrates that the "good reason" standard does not implicate the right codified in the Second Amendment ................................................. 12

            1.    When the Second Amendment was ratified, carrying in the public concourse was generally prohibited ....................................................... 13

            2.    Moreover, the "good reason" standard itself is longstanding and thus presumed constitutional ............. 24

            3.    Issue preclusion is inapplicable ...................................... 27

        B.    Alternatively, the "good reason" standard is likely to survive constitutional scrutiny ................................................. 28

            1.    The "good reason" standard is not categorically unconstitutional ............................................................... 28

2.     Federal appellate courts universally uphold the "good reason" standard ...................................................31

3.     The "good reason" standard should be measured under nothing more rigorous than intermediate scrutiny ..........................................................32

4.     The "good reason" standard survives intermediate scrutiny ..........................................................38

     a.     The Council's evidence .......................................41

     b.     The evidence the District will introduce in the district court....................................................45

     c.     The Council's tailoring of the "good reason" standard to accomplish its objectives ..................48

5.     Prior restraint doctrine is inapplicable............................53

II.    The District Court Properly Balanced The Equities In The District's Favor.....................................................................54

    A.    Plaintiffs have not shown that they will suffer irreparable harm if the "good reason" standard is enforced while litigation is pending................................................................55

    B.    A preliminary injunction will irreparably harm the District and the public ............................................................57

CONCLUSION ........................................................................................61

# TABLE OF AUTHORITIES*

*Cases*

*Baze v. Rees*, 553 U.S. 35 (2008)...........................................................41

*\*Bonidy v. USPS*, 790 F.3d 1121 (10th Cir. 2015)................................34, 35, 50, 51

*Cincinnati v. Discovery Network*, 507 U.S. 410.....................................35

*CFGC v. England*, 454 F.3d 290 (D.C. Cir. 2006).....................................54, 55, 56

*CFGC v. Navy*, 534 F.3d 756 (D.C. Cir. 2008) .......................................55

*CSPI v. Dep't of Treasury*, 797 F.2d 995 (D.C. Cir. 1986)....................................27

*\*District of Columbia v. Heller*, 554 U.S. 570 (2008) ....... 2, 12, 15, 22, 23, 24, 25, 26, 28, 30, 32, 33, 34, 37, 38, 50, 56, 60

*\*Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013) ....................................3, 31, 32, 50, 54

*Frank v. Walker*, 769 F.3d 494 (7th Cir. 2014) ......................................58

*Gadomski v. Tavares*, 113 A.3d 387 (R.I. 2015)......................................32

*Gonzales v. Carhart*, 550 U.S. 124 (2007) ................................... 29, 40-41

*FET v. Heckler*, 756 F.2d 143 (D.C. Cir. 1985) ....................................57

*\*Heller v. District of Columbia*,
670 F.3d 1244 (D.C. Cir. 2011)......................... 5, 25, 26, 32, 38, 39, 40, 45, 48, 52

*Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015)...................45, 52, 53

*Heller v. District of Columbia*, 2016 WL 760940 (D.C. Cir. 2016)........................53

*Hightower v. City of Boston*, 693 F.3d 61 (1st Cir. 2012)................................53, 54

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ....................29, 39, 40, 52

---

\*      Authorities upon which we chiefly rely are marked with asterisks.

*Horsley v. Trame*, 808 F.3d 1126 (7th Cir. 2015) ...................................................30

*In re Brickey*, 8 Idaho 597 (1902) ...........................................................................15

*Kachalsky v. Cty. of Westchester*,
701 F.3d 81 (2d Cir. 2012)......................................................3, 31, 32, 50, 51, 54

*Keystone Bituminous Coal v. DeBenedictis*, 480 U.S. 470 (1987)..........................36

*Lorillard Tobacco v. Reilly*, 533 U.S. 525 (2001) ...................................................41

*Lovell v. City of Griffin*, 303 U.S. 444 (1938) ........................................................34

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ..............................................55

*Maryland v. King*, 133 S. Ct. 1 (2012) ....................................................................58

*Mazurek v. Armstrong*, 520 U.S. 968 (1997)...........................................................12

*McDonald v. City of Chi.*, 561 U.S. 742 (2010) ................................................11, 56

*Mills v. District of Columbia*, 571 F.3d 1304 (D.C. Cir. 2009).............................56

*Montana v. United States*, 440 U.S. 147 (1979) ......................................................27

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ..............................................31, 32

*Nken v. Holder*, 556 U.S. 418 (2009) ......................................................................57

*Noel Canning v. NLRB*, 705 F.3d 490 (D.C. Cir. 2013).........................................35

*O Centro Espirita Beneficente Uniao do Vegetal v. Ashcroft*,
389 F.3d 973 (10th Cir. 2004) ...............................................................................54

*Ohralik v. Ohio State Bar Ass'n*, , 436 U.S. 447, 455-56 (1978) (1978) ...............36

*Palmer v. District of Columbia*, 59 F. Supp. 3d 173 (D.D.C. 2014).............2, 4, 27

*Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979) .............................................27

*Payton v. New York*, 445 U.S. 573 (1980)................................................................20

*People v. Zerillo*, 189 N.W. 927 (Mich. 1922) .........................................................32

*PCMA v. District of Columbia*, 522 F.3d 443 (D.C. Cir. 2008) .............................27

*Peruta v. Cty. of San Diego*,
2016 WL 3194315 (9th Cir. Jun. 9, 2016).............................. 13, 16, 18, 22, 47, 50

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) .............................................31, 32

*Robertson v. Baldwin*, 165 U.S. 275 (1897) .........................................................24

*Schneider v. State*, 308 U.S. 147 (1939) ..............................................................34

*Schrader v. Holder*, 704 F.3d 980 (D.C. Cir. 2013) .....................33, 38, 39, 40, 48

*Schubert v. De Bard*, 398 N.E.2d 1339 (Ind. Ct. App. 1980)..................................32

*Sherbert v. Verner*, 374 U.S. 398 (1963) ..............................................................36

*Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011)..................................................6

*Sir John Knight's Case*, 87 Eng. Rep. 75 (K.B. 1686) ......................................18, 19

*Stanley v. USC*, 13 F.3d 1313 (9th Cir. 1994) .........................................................54

*Turner Broadcasting System v. FCC*, 512 U.S. 622 (1994) .............................38, 45

*Turner Broadcasting System v. FCC*, 520 U.S. 180 (1997) .................38, 39, 40, 51

*United States v. Layeni*, 90 F.3d 514 (1996) .........................................................51

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010).....................................26

*United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011).... 33, 37, 51, 53-54, 60

*United States v. O'Brien*, 391 U.S. 367 (1968) ................................................. 35-36

*United States v. Stauffer Chem.*, 464 U.S. 165 (1984) ...........................................27

*Winter v. NRDC*, 555 U.S. 7 (2008) .........................................................................6

*Wisc. Gas v. FERC*, 758 F.2d 669 (D.C. Cir. 1985)................................................55

*Woollard v. Gallagher,*
712 F.3d 865 (4th Cir. 2013) .......................................... 3, 31, 32, 37, 46, 47, 50, 54

*Wrenn v. District of Columbia*, 808 F.3d 81 (D.C. Cir. 2015) .............................2, 4

### Constitutional Provisions

U.S. Const. Amend. II.......... 1, 2, 5, 6, 7, 8, 9, 11, 12, 13, 15, 22, 23, 24, 25, 26, 28, 29, 31, 32, 33, 34, 35, 37, 38, 51, 54, 55, 56, 60

Md. Const. of 1776, art. III, § 1 .............................................................................14

### Statutes and Regulations

1 W. & M., c. 2, § 7 (1689)......................................................................................22

2 Edw. 3, 258, ch. 3 (1328)......................................................................................13

18 U.S.C. § 926A .....................................................................................................30

18 U.S.C. § 930 ........................................................................................................30

D.C. Code § 7-2502.01 (2001)....................................................................................2

D.C. Code § 7-2502.02 (2001)....................................................................................2

D.C. Code § 7-2502.02 (4)..........................................................................................2

D.C. Code § 7-2509.06 .............................................................................................30

D.C. Code § 7-2509.11 ........................................................................................ 2-3, 54

D.C. Code § 22-4504 (2009).......................................................................................2

D.C. Code § 22-4504.01 ...........................................................................................30

D.C. Code § 22-4506(a)..............................................................................................2

24 DCMR § 1202 ..................................................54

24 DCMR § 1221.6 ...............................................54

24 DCMR § 2333 ..................................................54

## Other

3 *Works of the Honourable James Wilson* (1804) ............................................. 21-22

4 Blackstone, *Commentaries* (1769) ......................................................23

A Bill for the Office of Coroner and Constable (Mar. 1, 1882) .............................14

Ayres & Donohue, *Shooting Down the "More Guns, Less Crime" Hypothesis*, 55 Stan. L. Rev. 1193 (2003) .................................................. 42, 46-47

Blocher, *Firearm Localism*, 123 Yale L.J. 82 (2013) ................................ 14-15, 23

Bond, *A Compleat Guide for Justices of Peace* (1707) ..........................................19

Branas, *et al.*, *Investigating the Link Between Gun Possession and Gun Assault*, 99 Amer. J. Pub. Health 2034 (2009) .......................................................46

Brockmole & Witt, *Action Alters Object Identification*, 38 J. Experimental Psychology 1159 (2012) ..........................................................50

Charles, *The Faces of the Second Amendment Outside the Home*, 60 Clev. St. L. Rev. 1 (2012) ......................................................13, 16, 35

Charles, *The Statute of Northampton by the Late Eighteenth Century*, 41 Fordham Urb. L.J. City Square 10 (2013) ...................................14, 17-18, 23-24

Charles, *The Faces of the Second Amendment Outside the Home, Take Two*, 4 Clev. St. L. Rev. 373 (2016) .................................................. 15, 16, 17, 18-19, 21

Coke, *The Third Part of the Institutes of the Laws of England* (15th ed. 1797). ..........................................................20

*Concealed Carry Killers*, Violence Policy Center .................................................47

Cook, *et al.*, *Criminal Records of Homicide Offenders*,
294 JAMA 598 (2005) ............................................49

Cook, *et al.*, *Gun Control After* Heller, 56 UCLA L. Rev. 1041 (2009)...............47

Cook & Ludwig, *The Social Costs of Gun Ownership*,
90 J. Pub. Econ. 379 (2006) ....................................47

Cornell, *The Right to Carry Firearms Outside of the Home*,
39 Fordham Urb. L.J. 1695 (2012) .........................25

*Crime in the United States*, FBI (2012) ..................59

Dalton, *The Countrey Justice* (1618) ....................17

Dalton, *The Office and Authoritie of Sherifs* (1623)...............17

Davis, *The Office and Authority of a Justice of the Peace* (1774) ..................23, 33

Dezhbakhsh & Rubin, *Lives Saved or Lives Lost? The Effects of Concealed-Handgun Laws on Crime*, 88 Am. Econ. Rev. 468 (1998).....................46

Donohue, *Guns, Crime, and the Impact of State Right-to-Carry Laws*,
73 Fordham L. Rev. 623 (2004)................................42

Donohue, *et al.*, *The Impact of Right to Carry Laws and the NRC Report* (2014) ...............................................42

Dunlap, *The New York Justice* (1815) ...................14, 22

*Federally Mandated Concealed Carry Reciprocity*, Everytown for
Gun Safety (2015)....................................................59

Gardiner, *The Compleat Constable* (1708)..............19

Hawkins, 1 *Treatise of the Pleas of the Crown* (1716)...................20, 21

Henigan, *The* Woollard *Decision and The Lessons of the Trayvon Martin Tragedy*, 71 Md. L. Rev. 1188 (2012) ...........................13, 45

Keble, *An Assistance to the Justices of the Peace for the Easier Performance of their Duty* (1689)........................................................................................19

Lambarde, *Eirenarcha* (1582) ................................................................16

Lambarde, *The Duties of Constables* (1614) ...........................................16

Ludwig, *Concealed-Gun-Carrying Laws and Violent Crime*, 18 Int'l L. Rev. L. & Econ. 239 (1998) ...............................................46

Nat'l Research Council, *Firearms and Violence: A Critical Review* (2004) .........42

Niles, *The Connecticut Civil Officer* (1833)...........................................14

Ruben & Cornell, *Firearm Regionalism and Public Carry*, 125 Yale L.J. F. 121 (2015) ............................................................23, 25

Winkler, *Gunfight: The Battle over the Right to Bear Arms in America* (2011) ................................................................................15

Winkler, *Scrutinizing the Second Amendment*, 105 Mich. L. Rev. 683 (2007) ......35

# GLOSSARY

JA          Joint Appendix

RD          Record Document

SA          Statutory Addendum

## STATEMENT OF THE ISSUES

Plaintiffs appeal an order denying their request for a preliminary injunction to require the District of Columbia to issue licenses to publicly carry handguns to applicants who cannot make the showing of "good reason" that the Council of the District of Columbia has required. The issues are:

1. Whether the court properly found that plaintiffs had not shown a likelihood of success on the merits under the Second Amendment, where history demonstrates that the Amendment did not codify a right to carry handguns in cities without "good reason"; and, alternatively, plaintiffs did not challenge the District's strong evidentiary showing that its law would survive constitutional scrutiny.

2. Whether the district court acted within its discretion when it balanced the equities in the District's favor, where plaintiffs do not claim that they will suffer tangible harm if they cannot publicly carry while litigation is pending, and where the District will be irreparably harmed and the public interest obstructed if it cannot enforce this public-safety provision while it is compiling a full record in the district court.

## STATEMENT OF THE CASE

**1.      The District Of Columbia Enacts A System For Licensing The Public Carrying Of Handguns.**

Ever since its founding, the District has regulated public carrying. *See* Statutory Addendum ("SA") 9-33. For much of that time, some carrying was

allowed under a licensing scheme. *E.g.*, SA26 (1892 statute), 33 (1943 statute). Starting in 1976, however, the District generally banned the possession of handguns. D.C. Code §§ 7-2502.01(a), 7-2502.02(a)(4) (2001).

In *District of Columbia v. Heller*, 554 U.S. 570 (2008) ("*Heller I*"), the Supreme Court held that this ban violated the Second Amendment's command that "the right of the people to keep and bear Arms, shall not be infringed." The Court held that the Amendment codified a pre-existing right and that, "whatever else it leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 592, 635.

In response, the Council amended the law to allow possession for self-defense in the home—the "core" of the Second Amendment. D.C. Code § 7-2502.02(a)(4); *Heller I*, 554 U.S. at 628-30. There remained a complete ban on public carrying, D.C. Code § 22-4504 (2009), until it was struck in *Palmer v. District of Columbia*, 59 F. Supp. 3d 173 (D.D.C. 2014). The Council responded with legislation to permit the issuance of public-carry licenses if, among other qualifications, the applicant has "good reason to fear injury" or "any other proper reason for carrying a pistol." D.C. Code § 22-4506(a). To show "good reason," an applicant must demonstrate "a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous

attacks that demonstrate a special danger to the applicant's life." D.C. Code § 7-2509.11(1)(A). "[O]ther proper reason" "shall at a minimum include types of employment that require the handling of cash or other valuable objects that may be transported upon the applicant's person." D.C. Code § 7-2509.11(1)(B).

The Council based this "good reason" standard on similar provisions in New York, Maryland, and New Jersey, all of which "have withstood constitutional challenges." Joint Appendix ("JA") 51, 58 & n.39 (Committee Report, citing *Kachalsky v. Cty. of Westchester*, 701 F.3d 81 (2d Cir. 2012) , *cert. denied*, 133 S. Ct. 1806 (2013); *Woollard v. Gallagher*, 712 F.3d 865 (4th Cir.), *cert. denied*, 134 S. Ct. 422 (2012); *Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013), *cert. denied*, 134 S. Ct. 2134 (2014)). The Council credited empirical studies demonstrating that "right-to-carry laws" enacted in "shall issue" states "are associated with substantially higher rates of aggravated assault, rape, robbery and murder." JA66. "[I]ntroducing a gun into any conflict can escalate a limited danger into a lethal situation," and this "danger extends to bystanders and the public at large." JA67. Given the "substantial governmental interest in public safety and crime prevention," the Council concluded that the "good reason" standard "offers a reasonable, balanced approach to protecting the public safety and meeting an individual's specific need for self-defense." JA67-68.

The Council explained that the "good reason" standard makes particular sense in the District, because it "is completely contained in a dense urban setting." JA56. And the District has greater "public safety and national security concerns" than other large cities as "the home of the President" and "all high-ranking federal officials and members of Congress," many "under constant protection" by the Secret Service or Capitol Police. JA53, 56.

Moreover, the District is "heavily patrolled and protected by … more than two dozen law enforcement entities," few of which fall under its authority. JA56. Without the licensing regime, these entities would have to account for the increased risk associated with increased carrying—a result that, the Council found, could "turn the District into a semi-police state." JA66.

**2. Two District Court Judges Issue Conflicting Rulings On Motions To Preliminarily Enjoin Enforcement Of The "Good Reason" Standard.**

Plaintiffs brought this action to challenge the District's "good reason" standard in February 2015. JA13-26. They designated the case "related" to *Palmer*, which had been assigned to a visiting judge, and this case was also assigned to him. *See Wrenn v. District of Columbia*, 808 F.3d 81, 83 (D.C. Cir. 2015). In December 2015, this Court vacated the preliminary injunction he entered, returning the case to the district court for reassignment. *Id.* at 84. It was assigned to Judge Colleen Kollar-Kotelly.

One week later, in *Grace v. District of Columbia*, different plaintiffs sued the District, raising the same claim and also seeking preliminary relief. *Grace* ECF Record Document ("RD") 1, 6. *Grace* was assigned to Judge Richard Leon.

On March 7, 2016, Judge Kollar-Kotelly denied plaintiffs' motion for a preliminary injunction. JA379-409. She found them unlikely to prevail on the merits, holding that, even assuming the "good reason" standard implicates a Second Amendment right, it should be measured under intermediate scrutiny. JA390-94. This conclusion was "[g]uided by [this Court's] analysis in [*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ('*Heller II*'),]" and "the thorough analysis of" the Second, Third, and Fourth Circuits—"the *only* Courts of Appeals to have, thus far, addressed and definitively resolved the constitutionality of 'good reason' handgun licensing laws." JA390, 392-93. The evidence the District offered to satisfy this test "[wa]s effectively met with silence," meaning that, "at this step, [p]laintiffs cannot prevail on their claim that the licensing scheme fails to survive intermediate scrutiny." JA401.

Judge Kollar-Kotelly held that plaintiffs "satisfied … irreparable harm" by alleging a constitutional violation, but this was "not determinative of … the balance of the equities." JA405-06. That balance favored the District and the public because "the public carrying of operable handguns … poses a potential risk

5

to others—carriers and non-carriers alike—far greater than the risk of possessing a handgun within the home." JA406-07.

On May 17, 2016, Judge Leon disagreed and enjoined the District from enforcing the "good reason" standard. *Grace* RD46. He decided to apply strict scrutiny, then held that the "good reason" standard was "not … permissible" regardless of its efficacy. RD45 at 28, 38. He found that the equities favor plaintiffs. RD45 at 40, 42.

## STANDARD OF REVIEW

The Court reviews preliminary injunctions for abuse of discretion. *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing [this] extraordinary remedy." *Winter v. NRDC*, 555 U.S. 7, 24 (2008).

## SUMMARY OF ARGUMENT

The Supreme Court has recognized that the Second Amendment preserves, even if it limits, local jurisdictions' ability to craft firearm regulations to suit local needs and values. The Council has done just that in a carefully considered public-carrying law that addresses the District's unique public-safety challenges while preserving an individual's ability to carry a handgun when there is a special self-defense need. Plaintiffs ask the Court to enjoin the District from enforcing a law

the Council and other state legislatures have found necessary to prevent gun violence. To justify this radical change in the status quo, plaintiffs must be extremely likely to prevail on the merits, and the threat of irreparable injury they face must outweigh the interest of the District and the public in enforcing this important public-safety law while this case continues. Judge Kollar-Kotelly was right to find that plaintiffs did not meet this high burden.

1. Plaintiffs are not likely to prevail on their novel constitutional challenge. They take an absolutist view that the Constitution requires every jurisdiction in the nation—regardless of local needs and values—to allow anyone who meets threshold requirements to carry a handgun in populated public places. But they have failed to make either of two necessary showings.

*First*, plaintiffs have not even demonstrated that the District's law implicates the Second Amendment. It codified a pre-existing right, and the people understood in 1791 that carrying could be barred in densely populated areas. Early American laws were largely based on the laws of England, and there the Statute of Northampton banned open and concealed public carrying in fairs, markets, and other populated places. More than half of the original States and the District were bound by Northampton-style laws before or soon after the Second Amendment was ratified, and several more adopted such laws in the mid-1800s. Because Northampton laws explicitly prohibited carrying in populated areas, the ability to

carry in cities could not have been understood as part of the pre-existing right. And because the District's law is less burdensome than widespread Framing-era regulation of public carrying, it does not implicate the Second Amendment.

Moreover, *Heller I* and *II* recognize that longstanding firearm regulations are presumptively lawful. Many states adopted a precursor to the "good reason" standard during the 1800s, allowing public carrying only by people with "reasonable cause" to fear assault. Thus, for almost two centuries, the public has recognized the need for—and accepted as constitutional—laws restricting carrying in the public concourse without a particularized self-defense reason.

*Second*, assuming the "good reason" standard even implicates the Second Amendment, it is likely to pass intermediate scrutiny. No stricter scrutiny would be proper because public carrying in populated areas has been heavily regulated for more than seven centuries, from when firearms first appeared in England through the Second Amendment's ratification. Thus, even assuming the Second Amendment codified some right to publicly carry in cities without "good reason," it was not at the core.

The Council's judgment was supported by more than the substantial evidence needed to survive intermediate scrutiny (and more can be expected on a full record). It relied on empirical studies, expert testimony, anecdotal experience, and common sense, concluding that any increase in handgun carrying in the

District's densely populated public areas would increase the risk of criminal violence and public harm. Plaintiffs did not counter this evidence in any meaningful way.

This same evidence provides substantial support for the Council's conclusion that the "good reason" standard is no broader than reasonably necessary to accomplish its objectives. The Council properly recognized that it is difficult to predict whether a seemingly responsible person will misuse a handgun, much less whether his public carrying will lead to gun-related problems through some other mechanism. So it tailored the law in a different way, crafting a standard ensuring that the public bears the additional risk from public carrying only for individuals with a special need to carry a handgun in public for self-defense. Intermediate scrutiny requires a reasonable fit between a law and its objectives, not a perfect one, and the "good reason" standard satisfies this standard.

2. Judge Kollar-Kotelly properly balanced the equities in favor of the District. A preliminary injunction should issue only to prevent irreparable harm, and plaintiffs concede that they have no particular reason to fear injury if they cannot publicly carry while their lawsuit is pending. Moreover, even assuming plaintiffs' abstract allegation of a Second Amendment violation can itself constitute irreparable harm, precedent instructs that, where the alleged injury is *intangible*, the other preliminary-injunction factors should determine whether this

extraordinary relief is warranted.  And the District has demonstrated that it will be irreparably harmed, and the public interest obstructed, if it cannot enforce the "good reason" standard while the case is pending.  The government suffers irreparable injury whenever it is enjoined from effectuating statutes enacted by the people's representatives.  For a public-safety measure such as this, the injury can be palpable.  Unlike gun possession in the home, public carrying subjects vast numbers of people to safety risks against their will, especially in a crowded city like the District.

Plaintiffs argue that the public has no interest in the enforcement of an unconstitutional law.  But the point of further proceedings is to see whether plaintiffs can prove this law unconstitutional.  The District has yet to conduct discovery, gather evidence, present experts, and submit a full argument to the district court.  And the public has spoken through its elected representatives, who have found the "good reason" standard essential for public safety.  The interests of the public and the District are therefore aligned, and they strongly favor maintaining the status quo at least during litigation.

The "good reason" standard is critically important.  Without this standard, the District becomes a "shall-issue" regime, despite the Council's substantiated prediction that this will increase rates of aggravated assault, rape, robbery and murder.  Judge Kollar-Kotelly was right to find these harms outweigh any "sense

of security" plaintiffs derive from public carrying while litigation is pending.  Her denial of a preliminary injunction should be affirmed.

## ARGUMENT

### I. Plaintiffs Are Not Likely To Prevail On The Merits Of Their Claim That The Constitution Requires A "Shall-Issue" Nation.

The District of Columbia is unique.  Unlike any state, it is entirely urban and densely populated.  Unlike any city, it is filled with thousands of high-ranking federal officials and international diplomats, and it hosts hundreds of heavily attended events each year, including political marches and protests.  The Second Amendment preserves the ability of local jurisdictions "to devise solutions to social problems that suit local needs and values," *McDonald v. City of Chi.*, 561 U.S. 742, 784-85 (2010), and that is precisely what the Council has done through the "good reason" standard.

Against the weight of established precedent and the Council's considered judgment, plaintiffs press the unwavering argument that the Second Amendment requires the District—and, indeed, every jurisdiction in the nation, irrespective of local conditions—to allow carrying of handguns in public spaces without considering any particular license applicant's self-defense needs.  Anything else, they say, "destroys" their Second Amendment right.  Pl.Br.43.  They do not even acknowledge the reasoned analysis of the Second, Third, and Fourth Circuits, which unanimously conclude otherwise.  Instead, they argue that the quarter of the

11

American population in "may-issue" jurisdictions must change to "shall-issue," no matter what they and their elected representatives wish and what the public-safety consequences will be.

This Court should not adopt this absolutist view. And if it does not, plaintiffs concede they are unlikely to prevail. They offered the district court "only a cursory argument as to *why* the scheme cannot survive intermediate scrutiny." JA400. And they have admitted to this Court that its adoption or rejection of their categorical approach "will all but surely resolve the case one way or another," 4/25/16 Mot. 12-13, adding that "[i]t is difficult to see [them] prevailing" under intermediate scrutiny, 5/3/16 Reply 5. They thus do not make the "*clear showing*" needed to justify the "extraordinary and drastic remedy" of a preliminary injunction. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam).

### A. Historical analysis demonstrates that the "good reason" standard does not implicate the right codified in the Second Amendment.

"Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Heller I*, 554 U.S. at 634-35. And history demonstrates that most Framing-era citizens were prohibited, in populated areas, from publicly carrying firearms for self-defense. In many areas this general ban evolved into the less-restrictive "good reason" standard challenged here. Plaintiffs are therefore unlikely to prevail on their claim that the District's law infringes on a pre-existing right to publicly carry in crowded urban areas without good reason.

1. When the Second Amendment was ratified, carrying in the public concourse was generally prohibited.

For as long as citizens have owned firearms, English and American law has restricted any right to carry in populated public places. In 1328, England enacted the Statute of Northampton, which stated that "no Man" shall "go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere." SA36 (2 Edw. 3, 258, ch. 3). The Statute reflected a general rule that, in the public concourse, "the authority to ensure the public peace rested with the local government authorities," not individually armed citizens. Charles, *The Faces of the Second Amendment Outside the Home*, 60 Clev. St. L. Rev. 1, 20 (2012) ("Charles 2012"); *see* SA34-51. It "would become the foundation for firearms regulation in England for the next several centuries" and was "widely enforced." *Peruta v. Cty. of San Diego*, No. 10-56971, 2016 WL 3194315, *7 (9th Cir. Jun. 9, 2016) (en banc) (citing Charles 2012, *supra*, at 36, and historical orders, proclamations, and cases).

This "tradition of restricting both the concealed and the open carry of firearms in public places" was "reflected in various state laws immediately following the ratification of the Constitution." Henigan, *The* Woollard *Decision and The Lessons of the Trayvon Martin Tragedy*, 71 Md. L. Rev. 1188, 1202 (2012). Massachusetts, Virginia, North Carolina, Tennessee, Maine, Delaware, New Mexico, and South Carolina all adopted the Statute's public-carrying ban,

13

SA52-80, 138-40, and it was in effect through common law in New York, Connecticut, New Jersey, and Maryland.[1]

When Congress established the District's judicial systems in 1801, it adopted existing Maryland law. SA9-11. Maryland had adopted the common law of England, Md. Const. of 1776, art. III, § 1, where "the Statute of Northampton … w[as] alive and well." Charles, *The Statute of Northampton by the Late Eighteenth Century*, 41 Fordham Urb. L.J. City Square 10, 20 (2013) ("Charles 2013"). The first codification of the District's common law, in 1818, repeated the Statute's ban on public carrying. SA18-19. By 1857, this ban was tempered by the precursor to the "good reason" standard—allowing public carrying by people with "reasonable cause to fear an assault." SA22 (unratified codification of common law). From then on, the District's laws strictly regulated open and/or concealed carrying, at some points banning public carrying altogether. *See*, *e.g.*, SA24-26.

The District's actions in this compact, urban jurisdiction were consistent with how the Statute of Northampton's public carrying ban was "tailored to public places like 'Fairs' and 'Markets.'" Blocher, *Firearm Localism*, 123 Yale L.J. 82, 113 (2013). London began enacting gun-control laws "[a]s early as the 1300s."

---

[1]     *See* A Bill for the Office of Coroner and Constable (Mar. 1, 1882) (N.J. Constable Oath); Dunlap, *The New York Justice* (1815); Niles, *The Connecticut Civil Officer* (1833); Md. Const. of 1776, art. III, § 1 (adopting English common law).

*Id.* at 112; *see also Heller I*, 554 U.S. at 587 n.10 (citing 1704 treatise). And in America, "[u]rban gun control was … a nationwide phenomenon, reaching from the harbors of Boston to the dusty streets of Tombstone." Blocher, *supra*, at 120. This "urban/rural divide appears to have been even more pronounced out West," where "even the towns most associated with gun violence ... required people to leave their weapons at the city limits when arriving in town." *Id.* at 117 (citing Winkler, *Gunfight: The Battle over the Right to Bear Arms in America* 13 (2011)); *see, e.g.*, SA166 (1876 Dodge City, Kansas law). By the late 1800s, many cities completely banned public carrying. *See, e.g.*, SA149-53, 155-57, 159-63, 166. Many other cities had no reason to do so because longstanding Northampton-style laws at the state level already restricted carrying in populated areas. And the territories of New Mexico, Wyoming, Arizona, and Idaho[2] banned carrying in *all* cities, towns, and settlements. SA135-36, 142, 144-45.

Plaintiffs argue that the Statute of Northampton only prohibited "affray," which they define as public carrying with "menacing conduct" or "evil intent." Pl.Br.32, 34. But the Statute "prohibited *both* bringing force in affray"—which could take place anywhere—"*and* the carrying of dangerous weapons in the public concourse." Charles, *The Faces of the Second Amendment Outside the Home,*

---

[2]    In 1902, the Idaho Supreme Court found this ban inconsistent with the state constitution and the Second Amendment. *In re Brickey*, 8 Idaho 597 (1902).

*Take Two*, 64 Clev. St. L. Rev. 373, 383 (2016) ("Charles 2016") (emphasis added). Plaintiffs' contrary reading creates textual inconsistencies in the Statute, which explicitly excludes from its prohibition "the King's servants," "his Ministers," and citizens summoned to "keep the Peace." SA36. These peacekeeping exclusions would be superfluous if the Statute banned only carrying in a peace-*breaching* manner. Certainly nothing in the Statute itself suggests it was so limited. SA36.

Indeed, two centuries passed before William Lambarde first mentioned public terror in his restatement of the Statute, and he described this as the *result* of public carrying, not an element of the crime. Lambarde, *Eirenarcha* 134-35 (1582). He wrote that public carrying was a type of "affray," which could take place "without word or blow given: as if a man shall sh[o]w himselfe furnished with armour or weapon, which is not usually worne and borne, it will strike a feare into others that be not armed as he is: and therefore the Statute … made against the wearing of Armour and weapon." *Id.*; *see* Lambarde, *The Duties of Constables* 13 (1614) (specifying "Dagges" and "Pistols"). And in 1594, Elizabeth I proclaimed that public carrying in the public concourse—including *concealed* carrying—was "to the terror" of her subjects and banned by the Statute. Charles 2012, *supra*, at 22; *Peruta*, 2016 WL 3194315, *8-9 (quoting Elizabeth I's proclamations that the Statute banned public carrying of "secretly small Dagges" (1594) and "Gunnes ...

16

Pistols, Birding pieces, and other short pieces and small shot" (1600)). She instructed the city constables of Rye to "have a dilligent care" to arrest and seize the arms of any they "shall see to carry any dagges, pistolles, harquebusies, calivers and suche leike in the stretes … (excepte at the days of common musters and to the places of exercise for the shot)." Charles 2016, *supra*, at 384 n.64. "As Ferdinando Pulton, the prominent Elizabethan legal editor put it" in 1609, "'he which in a peaceable time doth ride or goe armed, without sufficient warrant or authoritie so to doe, doth meane to breake the peace'"—the Statute therefore *"*served 'not onely to preserve peace, & to eschew quarrels, but also to take away the instruments of fighting and batterie, and to cut off all meanes that may tend in affray or feare of the people.'" *Id.* at 386.

Michael Dalton likewise saw carrying in the public concourse as a type of affray, writing that "everie sherife … ought to arrest all such persons as goe or ride offensively, either in the presence of the sherife, or in Faires or Markets or elsewhere in affray," but noting the exception that "[t]he Sherife and his officers[] may lawfully beare armour and weapons." Dalton, *The Office and Authoritie of Sherifs* 14 (1623); *see* Dalton, *The Countrey Justice* 129-30 (1618) (explaining that carrying in the public concourse was prohibited because "those persons … might have had the peace against the other persons: and besides, it striketh a feare and terror into the Kings subjects"). "What Dalton and Lambarde's treatises make

abundantly clear is that the act of carrying dangerous weapons was sufficient to amount [to] an affray, … not some … particularized conduct." Charles 2013, *supra*, at 16. And, over the next two centuries, Lambarde's restatements on the Statute "were cited, reprinted, or paraphrased by a number of prominent commentators," none of whom supports plaintiffs' narrow interpretation. *Id.* at 14; *see id.* at 11-22 (analyzing the works of John Layer (1641), Edward Coke (1644), William Sheppard (1657), Richard Crompton (1660), Edmund Wingate (1661), Joseph Keble (1689), George Meriton (1669), Robert Gardiner (1692), Michael Dalton (1705), John Bond (1707), William Forbes (1707), William Hawkins (1716), and William Blackstone (1769)); *see also* Charles 2016, *supra*, at 385-97 (analyzing additional historical material).

Plaintiffs proffer a narrower interpretation based on *Sir John Knight's Case*, 87 Eng. Rep. 75 (K.B. 1686), which noted that the Statute was meant "to punish people who go armed to terrify the King's subjects." Pl.Br.32. But *Knight* confirms that "going armed" *itself* was a "great offence" because it suggested that "the King w[as] not able or willing to protect his subjects." 87 Eng. Rep. at 76. Knight was acquitted "only because, as a government official, he was exempt." *Peruta*, 2016 WL 3194315, *8. He "never rested his innocence or legal defense on preparatory armed self-defense or a legal right to carry." Charles 2016, *supra*, at

396. He "even testified … that he generally did not enter Bristol armed," instead leaving his sword and gun "at the end of Town." *Id.*

*Knight* did not change how English scholars interpreted the Statute. Three years later, Joseph Keble repeated its explicit exceptions for peacekeeping officials and did not mention a "terror" element:

> [I]f any person whatsoever (except the Kings Servants … [,] other Officers, or … upon the Hue-and-cry made to keep the Peace, &c.) … go or ride Armed, by night or by day, in Fairs, Markets, … then any Constable … may take such Armour … and may also commit him to the Gaol.

Keble, *An Assistance to the Justices of the Peace for the Easier Performance of their Duty* 224 (1689). In 1707, James Bond too wrote that "[p]ersons with offensive Weapons—including those 'that carry Guns charged'—in Fairs, Markets or elsewhere in Affray of the King's People, may be arrested," "[a]nd yet the King's servant, … Sheriffs, and other Officers … and all other persons in pursuing Hue and Cry may lawfully bear arms." Bond, *A Compleat Guide for Justices of Peace* 42 (1707). Soon thereafter, Robert Gardiner noted that the Statute barred "wear[ing] or carry[ing] any Daggers, Guns or Pistols Charged." Gardiner, *The Compleat Constable* 18 (1708). He did not include public terror or evil intent as elements for that crime, but explicitly identified them for other offenses. *Id.* at 19-20.

Indeed, the treatise of Lord Coke, who was "widely recognized by the American colonists 'as the greatest authority of his time on the laws of England,'" *Payton v. New York*, 445 U.S. 573, 593-94 (1980), included the peacekeeping exceptions, adding "another exception" for a man "defend[ing] his house," which would make no sense if the law only banned carrying with "evil intent." Coke, *The Third Part of the Institutes of the Laws of England* 159, 161 (15th ed. 1797). It even recited a case where a man violated the Statute even though he wore concealed arms (foreclosing any "menacing conduct" element), and did so for self-defense (foreclosing any "evil intent" element). *Id.* at 161-62.

In 1716, Hawkins rejected a right to carry for preparatory self-defense. 1 *Treatise of the Pleas of the Crown*, ch. 63, §§ 4-10 (1716). Plaintiffs seize on Hawkins's comment that "no wearing of arms is within the meaning of this Statute, unless … accompanied by such circumstances as are apt to terrify the People," *id.* § 9, as imposing an intent requirement. Pl.Br.32-33. But Hawkins recognized that one could not "arm[] himself with dangerous and unusual weapons"—like pistols, *see* pp.16-19—"in such a manner as will naturally cause a terror to the people," and quoted the Statute's prohibition on "rid[ing] armed … in fairs" and "markets." *Hawkins*, *supra*, § 4. Hawkins thus understood that such behavior was itself terrifying. He continued: "a man cannot excuse the wearing of such Armour"—not just "armor" in the modern sense, Pl.Br.33—"in Publick, by alledging that … he

wears it for the Safety of his Person from Assault." Hawkins, *supra*, § 8. And Hawkins too noted that public carrying was expected from the King's servants, noblemen charged with peacekeeping, and citizens responding to a "hue and cry." *Id.* § 4. Such carrying did not cause public terror in the manner of civilians carrying weapons in a public concourse when not charged with keeping the peace. Thus, it similarly made sense for Hawkins to clarify that noblemen ("Persons of Quality") could "wear[] common Weapons … in such Places, and upon such Occupations, in which it is the common Fashion to make use of them, without causing the least suspicion of an Intent to commit any Act of Violence or Disturbance of the Peace." *Id.* § 9.

Early-American recitations also tellingly made exceptions for government-sanctioned peacekeepers. *See*, *e.g.*, SA18 (1818 District law), 55 (1786 Virginia law), 58 (1792 North Carolina law), 78 (1859 New Mexico law). When Thomas Jefferson drafted Virginia's 1779 statute, he "began with the exceptions to the rule," then "stipulat[ed] that no one should bring 'force and arms' to government officials, 'nor go nor ride armed by night nor by day, in fairs or markets, or in other places, in terror of the Country.'" Charles 2016, *supra*, at 381.

Consistently, American scholars James Wilson and John Dunlap both explained that a man can commit affray by "arm[ing] himself with dangerous and unusual weapons, in such a manner[] as will naturally diffuse a terror among the

21

people." 3 *Works of the Honourable James Wilson* 79 (1804); Dunlap, *The New-York Justice* 8 (1815). Neither stated that, to "naturally diffuse a terror" the carrier must have "evil intent," engage in "menacing conduct," or carry in a "terrifying manner." *See id.* Rather, both scholars cite Hawkins, whose treatise cannot be read so narrowly.

In 1689, England's Parliament enacted a Declaration of Rights—described in *Heller I* as "the predecessor to our Second Amendment," 554 U.S. at 593—guaranteeing that Protestants "may have arms for their defense suitable to their conditions, and as allowed by law." 1 W. & M., c. 2, § 7 (1689). Plaintiffs suggest that this replaced or narrowed the scope of the Statute of Northampton. Pl.Br.33. But, as discussed, this argument conflicts with the post-Declaration analyses of numerous scholars, including Dalton, Hawkins, and Blackstone, as well as Framing-era Northampton laws. Rather, as the rich history recounted in *Peruta* demonstrates, the Statute and its progeny "generally prohibited" open *and concealed* carrying even after the American Revolution, foreclosing any possibility that it applied only to "menacing conduct." 2016 WL 3194315, *8.

Nor is a "menacing conduct" or "evil intent" element needed to "reconcile" early American Northampton laws with state constitutional provisions that, in the mid- to late-1800s, were interpreted to preserve a right to publicly carry. Pl.Br.35-39. Post-ratification sources may illuminate the original public meaning of the

Second Amendment but should not be used as "postenactment legislative history." *Heller I*, 554 U.S. at 605. And these Southern Antebellum cases "did not emerge in a vacuum and do not reflect the full range of American legal history." Ruben & Cornell, *Firearm Regionalism and Public Carry*, 125 Yale L.J. F. 121, 125 (2015). "Rather, they come from a time, place, and culture where slavery, honor, violence, and the public carrying of weapons were intertwined." *Id.* "The judges … were thus immersed in a social and legal atmosphere unique to the South," where their "view … was not universally held." *Id.* at 128 (citing Davis, *The Office and Authority of a Justice of the Peace* 13 (1774) (North Carolina treatise)). "No similar judicial record exists in the North," where "public carry restrictions appear to have gone unchallenged." *Id.* at 127.

Moreover, none of these courts addressed the specific regulation challenged here, which applies only in this densely populated urban jurisdiction. Even if some states did not ban public carrying, *cities* historically had broad discretion to limit the practice. Blocher, *supra*, at 112-20. Plaintiffs do not even mention this distinction, which is critical to understanding the historic regulation of public carrying, as Northampton laws themselves make this distinction. Blackstone likened the Statute to the laws of ancient Greece, where "every Athenian was finable who walked about the city in armour." 4 Blackstone, *Commentaries* 148-49 (1769). And Dalton explained that people in the public concourse "could

always seek the assistance of the constable to have 'the Peace against the other persons' enforced." Charles 2013, *supra*, at 21.

These pre-existing laws were not "abrogated or limited by the Second Amendment." Pl.Br.37. The Bill of Rights was crafted "to embody certain guaranties and immunities which we had inherited from our English ancestors, and which had … been subject to certain well-recognized exceptions." *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897). "[T]here was no intention of disregarding the exceptions, which continued to be recognized as if … formally expressed." *Id.* The Second Amendment "codified venerable, widely understood liberties." *Heller I*, 554 U.S. at 605. A huge segment of the Framing-era population was governed by Northampton laws banning carrying in the public concourse because that is where carrying poses the greatest public risk. The "*pre-existing* right" to bear arms codified in the Second Amendment, *id.* at 592, is a right that, history shows, is not implicated by the District's "good reason" law.

> 2. Moreover, the "good reason" standard itself is longstanding and thus presumed constitutional.

In the mid-1800s, many states and territories began to allow public carrying by people with "reasonable cause" to fear assault. *See, e.g.*, SA22. This precursor to the "good reason" standard was adopted in Massachusetts, Wisconsin, Maine, Michigan, Virginia, Minnesota, Oregon, Pennsylvania, Texas, and West Virginia, and was the common law in the District. SA22, 85, 87, 88, 91, 94, 97, 101, 104,

122, 124.  These laws create a rebuttable presumption that the "good reason" standard is beyond the scope of the Second Amendment.  *See Heller I*, 554 U.S. at 626-27 & n.6; *Heller II*, 670 F.3d at 1253 (acknowledging "longstanding" status of laws enacted in the early 20th Century).

Plaintiffs argue that these laws required "proof that an individual was potentially dangerous before that person could be required to post a surety as a condition of going armed."  Pl.Br.40.  But "before the age of police forces or an administrative state, this citizen-complaint process was an efficient way to deal with the danger posed by public carrying."  Ruben & Cornell, *supra*, at 131.  The prohibited conduct was unlawful even if it was not reported, and some states did not even have this enforcement mechanism.  *E.g.*, SA94 (Virginia), 122 (West Virginia).  And nothing in these laws suggests that posting a surety—akin to probation—gave license to continue violating the law.  *See, e.g.*, SA84 (1836 Massachusetts law); *see also* SA90, 93, 96, 100, 123 (similar provisions).  As prominent Massachusetts judge Peter Thacher explained in 1837, the law simply meant that "no person may go armed … without reasonable cause to apprehend an assault or violence to his person, family, or property."  Cornell, *The Right to Carry Firearms Outside of the Home*, 39 Fordham Urb. L.J. 1695, 1720 & n.134 (2012).

Invoking *Heller II*, plaintiffs argue in the alternative that they have rebutted the presumption of constitutionality "by showing the regulation does have more

than a de minimis effect upon [their] right." Pl.Br.49 (quoting 670 F.3d at 1253).

But what is their "right"? It cannot be *any* right—a claimed right beyond the scope

of the Second Amendment cannot justify Second-Amendment scrutiny, no matter

how severely it is burdened. *See United States v. Marzzarella*, 614 F.3d 85, 89 (3d

Cir. 2010). Indeed, the first step of *Heller II*'s "two-step approach" is to ask

"whether a particular provision impinges upon a right *protected by the Second

Amendment*." 670 F.3d at 1252 (emphasis added). And there is no broad,

categorical "right" to carry any time a gun is desired for self-defense—*Heller I*

identified bans on possession for felons and the mentally ill as "presumptively

lawful," despite any self-defense need. 554 U.S. at 626-27. If the District's law

does not implicate a protected right, it must be upheld. That is the whole point of

*Heller II*'s two-step analysis.

Plaintiffs argue that the right to "bear arms" "would make no sense were the

right confined to one's home." Pl.Br.22. The District does not challenge this

assumption here. Instead, the District focuses on the narrow question posed:

whether the right to "bear arms" includes a right to publicly carry a handgun in a

crowded city without a particularized self-defense reason for doing so. And

history demonstrates that this particular conduct was not a "venerable, widely

understood libert[y]" when the Second Amendment was ratified. *Heller I*, 554

U.S. at 605; *see id.* at 634-35.

3.    Issue preclusion is inapplicable.

The Court should undertake this historical analysis despite plaintiffs' claim that the *Palmer* litigation "[c]ements" a right to publicly carry handguns in the District. Pl.Br.13-14. Plaintiffs do not invoke nonmutual issue preclusion, and so the doctrine pertains only to the single overlapping plaintiff.

Issue preclusion does not aid even that plaintiff. *Palmer* dealt with a "total ban," 59 F. Supp. 3d at 182, not a licensing scheme. The district court there thus did not "actually" (let alone "necessarily") determine the "identical" issue of whether the District's "good reason" law implicates the right (let alone its core). *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 & n.5 (1979).

Moreover, the doctrine has an exception "if the issue is one of law and the facts of the cases are substantially unrelated." *PCMA v. District of Columbia*, 522 F.3d 443, 446 (D.C. Cir. 2008). This exception is "particular[ly] importan[t]" in constitutional matters to avoid "freez[ing] doctrine." *Montana v. United States*, 440 U.S. 147, 162-63 (1979). This case challenges a crucially different law passed in *Palmer*'s wake. The cases are unrelated enough "that relitigation … is warranted." *United States v. Stauffer Chem.*, 464 U.S. 165, 171 (1984); *see CSPI v. Dep't of Treasury*, 797 F.2d 995, 999 n.1 (D.C. Cir. 1986) (rejecting issue preclusion where court had to "re-evaluate" earlier conclusions).

**B.      Alternatively, the "good reason" standard is likely to survive constitutional scrutiny.**

1.      The "good reason" standard is not categorically unconstitutional.

*Heller I* found the District's handgun ban categorically unlawful because it "totally ban[ned] handgun possession in the home," "where the need for defense of self, family, and property is most acute." 554 U.S. at 628. Plaintiffs hyperbolize that the "good reason" standard is likewise categorically unlawful because it "eras[es] the Second Amendment wholesale throughout the entire city." Pl.Br.55. But the "good reason" standard is nothing like the handgun ban. "Few laws in the history of our Nation have come close to th[at] severe restriction." *Heller I*, 554 U.S. at 629. The "good reason" standard, in contrast, applies in New York, New Jersey, Maryland, and California—23 percent of the population of the United States.[3]

Plaintiffs devote most of their categorical analysis to defeating a straw man, arguing that the Second Amendment applies outside the home, Pl.Br.16-42, then claiming that the "good reason" standard "destroys" this right, Pl.Br.42-55. What is burdened by the District's law, however, is not any broad right to carry outside the home, but something much narrower: the ability to carry a handgun in this unique, densely populated city without any specific self-defense reason.

_____

[3]      Census data is available at http://quickfacts.census.gov/qfd/index.html.

Plaintiffs' circular reasoning—defining their "right" as precisely what the law precludes, then arguing that the law is categorically unconstitutional—could be used to evade means-ends scrutiny in any situation. A humanitarian organization could claim that, because it has a broad right to "pure political speech," its "right" to provide humanitarian speech to foreign terrorist organizations is "destroyed" by a material-aid ban. *But see Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010). Or a woman could argue that, because she has a broad right to obtain an abortion, her "right" to a partial-birth abortion is "destroyed" by a law banning that procedure. *But see Gonzales v. Carhart*, 550 U.S. 124, 166-67 (2007). This is not how constitutional rights are analyzed.

Even assuming the Second Amendment protects a right to carry outside the home, that right is not at its core and the "good reason" standard does not "destroy" it. The standard applies only in the District, a unique jurisdiction "completely contained in a dense urban setting" filled with "critical official and symbolic buildings, monuments, and events, and high-profile public officials." JA54, 56. Of course the Second Amendment is "in effect in the District," Pl.Br.54, but the rights themselves always have been sensitive to context, like where a gun might be carried. The Supreme Court has made clear that limitations on carrying—even those that limit opportunities for self-defense—do not necessarily destroy a Second Amendment right. "Laws forbidding the carrying of firearms in

sensitive places such as schools and government buildings" are presumptively lawful, *Heller I*, 554 U.S. at 626, which effectively makes public carrying impossible for many people who live and work in the District. *See* 18 U.S.C. § 930 (federal facilities); D.C. Code § 7-2509.06(a) (District buildings). And courts "have affirmed categorical bans on firearm possession in other instances." *Horsley v. Trame*, 808 F.3d 1126, 1132 n.2 (7th Cir. 2015) (citing examples)). The District's status as the densely populated nation's capital means that laws that are a poor fit in rural areas and wilderness may justifiably apply to this entire jurisdiction.

Moreover, the "good reason" standard is not a categorical ban. It speaks not to who may carry a handgun, but *when* a handgun may be carried: after the applicant develops a non-speculative need for armed self-defense. Any person could, at some point in time, find himself particularly threatened. When that happens, the District's law allows him to apply for a carry license—there is no quota or limit to the number of licenses that can be issued. As Judge Kollar-Kotelly explained, the "good reason" standard restricts carrying "within the 68 square miles of the District," but is not "a blanket prohibition."[4] JA391.

---

[4] Contrary to plaintiffs' claim, Pl.Br.23, a public-carry license is not needed to transport a properly secured firearm to a firing range, or outside the District for hunting. D.C. Code § 22-4504.01; 18 U.S.C. § 926A.

2. Federal appellate courts universally uphold the "good reason" standard.

Federal circuits considering the *statewide* application of the "good reason" standard uniformly uphold it. *Drake*, 724 F.3d at 440; *Woollard*, 712 F.3d at 882; *Kachalsky*, 701 F.3d at 101. "The consistency of those results," Judge Kollar-Kotelly noted, "emphasizes the steep hill that [p]laintiffs have to climb at the preliminary injunction stage, where the burden is on them to make a 'clear showing' of the propriety of th[is] 'extraordinary remedy.'" JA 401.

Plaintiffs rely heavily on *Moore v. Madigan*, which held that the "right to bear arms" "implies a right to carry" "outside the home," and that Illinois had not justified its statewide "flat ban" on public carrying. 702 F.3d 933, 936, 940 (7th Cir. 2012). But *Moore* did not hold that the narrower asserted right at issue here—to carry a handgun in a densely populated city without a special self-defense reason—was likewise protected, much less inviolable. *See id.* at 942. And *Moore*'s historical analysis shows the importance of this distinction: it found a general right to carry despite the Statute of Northampton because American settlers had different self-defense needs than citizens in England, where there was "no wilderness" or "hostile Indians." *Id.* at 936. Thus, English law, which limited public carrying in "locations at which going armed was thought dangerous to public safety (such as in fairs or in the presence of judges)," did not establish that the Second Amendment right was limited to the home. *Id.*

Plaintiffs also cite inapposite state-court decisions. Pl.Br.45-46. One reversed a license denial because the police chief wrongly conflated the "good reason" standard with "suitability," remanding for correct application of the (presumably lawful) standard. *Gadomski v. Tavares*, 113 A.3d 387, 388-93 (R.I. 2015). The others interpret *state* constitutions and do not address the "good reason" standard. *Schubert v. De Bard*, 398 N.E.2d 1339, 1341 (Ind. Ct. App. 1980); *People v. Zerillo*, 189 N.W. 927, 928 (Mich. 1922).

And plaintiffs are wrong when they say that *Heller I* itself is "the latest in a long line of Supreme Court decisions acknowledging … the right to carry arms for self-defense, in public." Pl.Br.25. As *Moore* noted, "the Supreme Court has not yet addressed th[at] question." 702 F.3d at 935.

3. The "good reason" standard should be measured under nothing more rigorous than intermediate scrutiny.

The Second, Third, and Fourth Circuits all apply intermediate scrutiny to the "good reason" standard because it does not completely prohibit the exercise of any core Second Amendment right. *Kachalsky*, 701 F.3d at 93 & n.17; *Drake*, 724 F.3d at 430 (applying intermediate scrutiny in the alternative); *Woollard*, 712 F.3d at 876. This Court has applied intermediate scrutiny to gun registration laws because they do "not severely limit" the core right, *Heller II*, 670 F.3d at 1257; a ban on assault weapons because it does not "prevent a person from keeping a suitable and commonly used weapon for protection in the home," *id.* at 1262; and a

ban on firearm possession by convicted criminals because, although the burden "is certainly severe, it falls on individuals who cannot be said to be exercising the core of the Second Amendment right identified in *Heller*, *i.e.*, 'the right of law-abiding, responsible citizens to use arms in defense of hearth and home,'" *Schrader v. Holder*, 704 F.3d 980, 989 (D.C. Cir. 2013).

If the District's "good reason" standard implicates the Second Amendment at all, it too should be measured under this standard. Anything stricter would be inconsistent with the Supreme Court's recognition that "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Heller I*, 554 U.S. at 634-35. When the people adopted the Second Amendment, they understood that public carrying did not take precedence over public safety—this is why carrying was strictly regulated in populated areas. *See* Davis, *supra*, at 13 (1774 treatise: "among any great Concourse of the People"); *e.g.*, SA19, 55, 59 (early-American laws barring carrying in "fairs" and "markets"). Thus, even assuming the Second Amendment codified some right to publicly carry in cities without "good reason," it was not at the right's core, making anything stricter than intermediate scrutiny inappropriate. *Cf. United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011) ("[T]his longstanding out-of-the-home/in-the-home distinction bears directly on the level of scrutiny applicable.").

Plaintiffs argue for "the most exacting scrutiny" because the "good reason" standard impinges on the Second Amendment's "core lawful purpose [of] self-defense." Pl.Br.49. But "prevent[ing] elimination of the militia," not self-defense, was "the purpose for which the right was codified." *Heller I*, 554 U.S. at 599. When a law does not affect the purpose for codification, lesser scrutiny should apply. In considering content-neutral laws restricting leaflet distribution, the Supreme Court has applied heavy scrutiny in part because the Framers codified the free-speech right with this very activity in mind. *Schneider v. State*, 308 U.S. 147, 161-64 (1939); *Lovell v. City of Griffin*, 303 U.S. 444, 451-52 (1938). Here, however, "self-defense had little to do with the right's codification." *Heller I*, 554 U.S. at 599.

Moreover, while *Heller I* holds that "self-defense" (rather than militia participation) is "central to the Second Amendment," *id.* at 628, it plainly does not hold that the core includes *any* conduct related to self-defense. If it did, the Court would not have singled out as "presumptively lawful" "prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places." *Id.* at 626. After all, felons and the mentally ill also may need to defend themselves, and there are certainly some "sensitive places"—which include government-building parking lots, *see Bonidy v.*

*USPS*, 790 F.3d 1121, 1125 (10th Cir. 2015)—where a self-defense need may arise.

Courts must look to how constitutional text "would have been understood at the time of the ratification," *Noel Canning v. NLRB*, 705 F.3d 490, 500 (D.C. Cir. 2013), and public carrying was strictly regulated when the Second Amendment was ratified. The reasons for these historical restrictions apply with even greater force today. *See* Charles 2012, *supra*, at 48 (comparing the Framing-era gunman's ability to inflict "two deaths per minute" with the current "twelve, twenty-four, or … forty-eight"). Intermediate scrutiny honors the Framers' intent by assuring that reasonable gun regulation can continue—that public safety will continue to play a role in legislative decision-making. It "places the burden on the government to justify its restrictions, while also giving governments considerable flexibility to regulate gun safety." *Bonidy*, 790 F.3d at 1126.

Second Amendment rights are "fundamental." Pl.Br.49. But "[m]any, indeed most, of the Bill of Rights guarantees do not trigger strict scrutiny." Winkler, *Scrutinizing the Second Amendment*, 105 Mich. L. Rev. 683, 694 (2007). Even the most burdensome content-based restrictions on commercial speech may be measured under intermediate scrutiny, for instance, because the government's "interest in preventing commercial harms justifies more intensive regulation." *Cincinnati v. Discovery Network*, 507 U.S. 410, 426 n.21 (1993). And "when

'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *United States v. O'Brien*, 391 U.S. 367, 376 (1968).

So too for the free exercise of religion, where intermediate scrutiny applies to laws that ban "overt acts" that "pose[] some substantial threat to public safety, peace or order." *Sherbert v. Verner*, 374 U.S. 398, 403 (1963). And an individual's right to use private property for economic gain, protected under the Fifth Amendment, is subject to regulation to ensure it is not "injurious to the health, morals, or safety of the community." *Keystone Bituminous Coal v. DeBenedictis*, 480 U.S. 470, 489 (1987). These restrictions are "properly treated as part of the burden of common citizenship"—"[w]hile each of us is burdened somewhat by such restrictions, we, in turn, benefit greatly from the restrictions that are placed on others." *Id.* at 491.

The government has an even greater interest in regulating conduct that involves carrying a deadly weapon in a populated public place. Just as there is a "'common-sense' distinction" between commercial and noncommercial speech, *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 455-56 (1978), and between religious beliefs and overt acts, *Sherbert*, 374 U.S. at 403, there is a common-sense distinction between carrying a handgun in one's home or business and carrying a

handgun on the crowded streets of the nation's capital. The increased risk from a handgun in the home is largely borne by those who live in or visit that home. Not so for public carrying, with its higher potential for carnage.

Public carrying also creates new potential for armed conflict, increasing the chances that "[i]ncidents such as bar fights and road rage" will "take on deadly implications," criminals will target carriers "*precisely because* they possess handguns," or "an additional person bearing a gun" will cause confusion during a police operation. *Woollard*, 712 F.3d at 779-80 (citing experts). "Were [courts] to require strict scrutiny" for firearm restrictions outside the home, they "'would likely foreclose an extraordinary number of regulatory measures, thus handcuffing lawmakers' ability to 'prevent[] armed mayhem' in public places," *Masciandaro*, 638 F.3d at 471, and "depriving them of 'a variety of tools for combating that problem,'" *id.* (quoting *Heller I*, 554 U.S. at 636).

Judge Kollar-Kotelly was therefore right to find that "the level of scrutiny for regulations governing public carrying of handguns, including the good reason requirement at issue here, merit no higher level of scrutiny than intermediate scrutiny" "whether or not the ability to carry handguns in public is considered part of the 'core lawful purpose' protected by the Second Amendment." JA391. The Framers were practical statesmen, and the rights they codified were shaped by centuries of practical considerations, including the particular threat to public safety

posed by public carrying in populated areas.  This is not the "freestanding 'interest-balancing' approach" rejected in *Heller I*, 554 U.S. at 634.  Rather, the Second Amendment "is the very *product* of an interest balancing by the people." *Id.* at 635.  The people recognized the need for—or at minimum the permissibility of—strict regulation of public carrying in cities because that is where it poses the greatest safety risk.  This interest-balancing was codified in the Second Amendment and provides meaning to the words "bear arms."

4.    The "good reason" standard survives intermediate scrutiny.

*Heller II* adopted the intermediate-scrutiny test articulated in *Turner Broadcasting System v. FCC*, 512 U.S. 622 (1994) ("*Turner I*"), and 520 U.S. 180 (1997) ("*Turner II*").  670 F.3d at 1257-59.  This Court applied this same test in *Schrader*.  Both decisions recognized that, under intermediate scrutiny, the "fit" between the challenged law and the important governmental interest "[need only] be reasonable, not perfect." *Schrader*, 704 F.3d at 990.  It "is satisfied so long as the regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation, and the means chosen are not substantially broader than necessary to achieve that interest." *Heller II*, 670 F.3d at 1258.

In assessing whether a law is "substantially related to an important governmental objective," *id.*, this Court "afford[s] 'substantial deference to the predictive judgments of [the legislature],'" *Schrader*, 704 F.3d at 990.  It defers

38

both "as to the harm to be avoided" and "the remedial measures adopted for that end," *Turner II*, 520 U.S. at 196, because the legislature is "'far better equipped than the judiciary' to make sensitive public policy judgments … concerning the dangers in carrying firearms and the manner to combat those risks," *Schrader*, 704 F.3d at 990. The courts' role is to "'assure that, in formulating its judgments, [the legislature] has drawn reasonable inferences based on substantial evidence.'" *Heller II*, 670 F.3d at 1259.

This Court also should defer to the Council's predictive judgments relating to "fit"—whether the "good reason" standard is not substantially broader than necessary. *Turner II* deferred to Congress's assessment of "fit" when it rejected an alternative proposed by the litigants, finding that Congress had considered the option but made "a deliberate congressional choice to adopt the present levels of protection, to which this Court must defer." 520 U.S. at 219 (citing legislative history); *see id.* at 220-21 (similar). And in *Humanitarian Law Project*, the Supreme Court again deferred to Congress on whether a law was necessary, upholding a ban on the provision of "material support" to foreign terrorist organizations when it precluded pure speech that advanced only legitimate activities. 561 U.S. at 28-29, 33.

This analysis often involves "empirical question[s]," such as how effective the regulation will be in comparison to less-burdensome alternatives. *Id.*; *see*

*Turner II*, 520 U.S. at 219-24. And "when it comes to collecting evidence and drawing factual inferences in this area, 'the lack of competence on the part of the courts is marked,'" and "respect for the [Council's] conclusions is appropriate." *Humanitarian Law Project*, 561 U.S. at 34; *see Heller II*, 670 F.3d at 1259. The Council answered such an "empirical question" when it found that the only alternative plaintiffs suggest—eliminating the "good reason" standard altogether—would lead to "substantially higher rates of aggravated assault, rape, robbery and murder." JA66.

Deference therefore is due. If the Council is better equipped to determine "the degree to which" laws should promote public safety, *see Turner II*, 520 U.S. at 193, and whether a firearm regulation will likely do so, *see Heller II*, 670 F.3d at 1269, it is also better equipped to determine whether the regulation is necessary to accomplish that goal. Indeed, these factors often are so intertwined they are treated as one. *See*, *e.g.*, *Turner II*, 520 U.S. at 211 (considering whether the challenged law was "necessary to prevent … significant financial hardship"); *Schrader*, 704 F.3d at 990 (considering whether "to accomplish the goal of preventing gun violence 'firearms must be kept away from … those convicted of serious crimes'"). And the Council's expertise in policy matters "is not the sum of the matter"—courts "owe … an additional measure of deference out of respect for its authority to exercise the legislative power." *Turner II*, 520 U.S. at 196; *cf. Gonzalez*, 550

U.S. at 163 ("The Court has given state and federal legislatures wide discretion to pass legislation in areas where there is medical and scientific uncertainty.") (citing cases); *Baze v. Rees*, 553 U.S. 35, 90 (2008) (Scalia, J., concurring) ("It is simply not our place to choose one set of responsible empirical studies over another in interpreting the Constitution.  Nor is it our place to demand that state legislatures support their criminal sanctions with foolproof empirical studies, rather than commonsense predictions about human behavior.").

The "good reason" requirement is likely to survive intermediate scrutiny. The government can "justify … restrictions by reference to studies and anecdotes pertaining to different locales altogether," or "history, consensus, and 'simple common sense.'"  *Lorillard Tobacco v. Reilly*, 533 U.S. 525, 555 (2001).  The Council based its findings on considerable evidence, and the District will introduce even more on a full record.

a.	The Council's evidence.

The Council substantiated its finding that the "good reason" standard will help prevent crime and promote public safety.  It primarily relied on a 2014 Stanford University study led by Professor John Donohue III, an economist, legal scholar, and leading empirical researcher, who explained that "[t]he totality of the evidence based on educated judgments about the best statistical models suggests that right-to-carry laws are associated with substantially higher rates of aggravated

assault, rape, robbery and murder." JA66 (Committee Report); *see* JA182-289 (Donohue, *et al.*, *The Impact of Right to Carry Laws and the NRC Report* (2014)). He and Yale Law School Professor Ian Ayres found the "more guns, less crime" claim of a controversial 1997 study impossible to replicate. *See* JA 186-88; Ayres & Donohue, *Shooting Down the "More Guns, Less Crime" Hypothesis*, 55 Stan. L. Rev. 1193 (2003) ("Ayres 2003"); Donohue, *Guns, Crime, and the Impact of State Right-to-Carry Laws*, 73 Fordham L. Rev. 623 (2004).

In 2004, the National Research Council convened a panel of researchers who extended the study to 2000; they too found no credible statistical evidence to support the claim. JA196-202 (citing Nat'l Research Council, *Firearms and Violence: A Critical Review* (2004)). Over the next ten years, Ayres and Donohue tested the models from these earlier studies—correcting for errors they uncovered, gathering more reliable crime data, and extending the study up to 2010. JA202-56. After all this research, in 2014, Donohue concluded that right-to-carry laws were likely to result in "substantially higher rates" of violent crime. JA153-54.

Plucking a statement from Donohue's study out of context, plaintiffs argue that "it is not possible to determine that there is a causal link between the passage of right-to-carry laws and crime rates." Pl.Br.62. In the next sentence, however, Donohue explained that he used the word "determine" to describe "the level of certainty one strives for in academic work," and that an inability to achieve

42

scientific certainty "does not mean that one cannot offer conclusions at some lower level of certainty such as 'more probable than not.'" JA261. "Since policymakers need to act, it is more useful to offer guidance as to which evidence is likely to be most reliable than to simply reject all evidence until the highest level of certainty has been attained." JA261. And, Donohue reported, for each of the seven crime categories studied, at least one of the most-favored models demonstrated a substantial increase in crime after right-to-carry laws were enacted. JA261. One model "suggest[ed] that [right-to-carry] laws increased every crime category [except murder] by at least 8 percent," and this "likely … understate[s] the true increases in aggravated assault caused by [right-to-carry] law." JA 330-32.

The Council also relied on the predictive judgments of the legislatures of New York, New Jersey, and Maryland, all of which have found the "good reason" standard necessary to prevent crime (and had those findings upheld). *See* JA51, 58 & n.39. This evidence applies with even greater force here. Unlike those states, the District has no rural or unpopulated areas—it "is completely contained in a dense urban setting," with correspondingly "higher rates of violent crime than suburbs and rural areas." JA53, 56. And "as the seat of the federal government, with its multitude of critical official and symbolic buildings, monuments, and events, and high-profile public officials," the District is "filled with sensitive places from a public safety perspective." JA54. As a result, "the likelihood of

attack is higher" than in any other city, "and the challenges … are greater." JA55. The Council predicted that a significant increase in public carrying would force federal law enforcement to step up protection of thousands of high-risk targets, which could interfere with daily life and exercise of other rights through, for instance, political protest in public spaces. JA56.

Plaintiffs note that local gun regulations "don't change" when the President visits other cities. Pl.Br.55. But there "streets are cleared of automobiles, essentially closed off, … while in the District the President travels so frequently and on so many different routes that, while traffic may be stopped … , the streets are not cleared." JA 54. The Council enacted the "good reason" standard to avoid the frequent occurrence of this and other types of protective measures—"such as shutting down areas around hotels and using full motorcade security"—because "[a]t some point the presence of law enforcement crosses a psychological line between providing public safety and infringing upon … freedom of expression, [and] freedom of movement." JA55-56.

The Council also relied on expert testimony from Chief Lanier and information from the Secret Service and Capitol Police explaining the District's special security concerns. *See* JA138, 141-42. It relied on how "much of the District's violent crime is the result of gang members carrying guns" and how, regardless of the illegality of the practice, "the fact that [gang members] are

carrying provokes gun violence, rather than lessens it." JA67. And it relied on common sense, finding it "undeniable" that "introducing a gun into any conflict can escalate a limited danger into a lethal situation" and that, "[w]hen the deadly force being used is a gun, the danger extends to bystanders and the public at large." JA67.

        b.    The evidence the District will introduce in the district court.

In this preliminary-injunction appeal, the Court should also consider evidence the District likely will present on a full record. *See Turner I*, 512 U.S. at 667-68 (remanding for additional factual development); *Heller II*, 670 F.3d at 1259-60 (same). As Judge Kollar-Kotelly explained, the "evidentiary record assembled by the parties" will determine whether the "good reason" standard contributes to an important government interest "'in a direct and material way,' whether in one of the ways anticipated by the D.C. Council or otherwise.'" JA399 (quoting *Heller v. District of Columbia*, 801 F.3d 264, 275 (D.C. Cir. 2015) ("*Heller III*")).

"An impressive body of empirical evidence now shows that state laws making it easier to carry concealed weapons in public … have had the net effect of making those states more dangerous." Henigan, *supra*, at 1201. For example, in 1998, economist Jens Ludwig tested the "more guns, less crime" theory, using juveniles (who cannot qualify for public-carry permits) as a control group, and

concluded that the failure of the theory's proponents to "control[] adequately for omitted variables" such as crack cocaine, gang activity, and poverty "bias[ed]" their results. JA303-04 (Ludwig, *Concealed-Gun-Carrying Laws and Violent Crime*, 18 Int'l L. Rev. L. & Econ. 239, 240 (1998)). Ludwig's study concluded that "shall-issue laws have resulted, if anything, in an *increase* in adult homicide rates." JA290. Another 1998 study applied corrected models to the "more guns, less crime" data and found that, "[f]or robbery, many states experience increases in crime" after enacting right-to-carry laws. JA311 (Dezhbakhsh & Rubin, *Lives Saved or Lives Lost? The Effects of Concealed-Handgun Laws on Crime*, 88 Am. Econ. Rev. 468 (1998)).

Many of the risks of public carrying have nothing to do with the conduct of the law-abiding carrier. A 2009 study of Philadelphia residents found that those who possessed a gun during an assault were 4.46 times more likely to be shot, increasing to 5.45 when the victim had an opportunity to resist. JA326 (Branas, *et al.*, *Investigating the Link Between Gun Possession and Gun Assault*, 99 Amer. J. Pub. Health 2034 (2009)). Handguns are often stolen and used against the carrier or used to commit a host of other crimes—indeed, "criminals often target victims '*precisely because* they possess handguns.'" *Woollard*, 712 F.3d at 879 (quoting former Baltimore Police Commissioner); *see* Ayres 2003, *supra*, at 1205 ("[S]ome estimates suggest[] that as many as one million or more guns are stolen each

year."). And an upswing in public carrying may well encourage criminals to "shift toward greater lethality." JA321 (Cook & Ludwig, *The Social Costs of Gun Ownership*, 90 J. Pub. Econ. 379 (2006)); *see* Cook, *et al.*, *Gun Control After Heller: Threats and Sideshows from a Social Welfare Perspective*, 56 UCLA L. Rev. 1041, 1081 (2009).

Public carrying also complicates the relationship between police officers and the law-abiding public. Law enforcement experts in *Woollard* testified that the presence of a third person with a handgun in a confrontation between an officer and a suspect can "cause confusion as to which side … the person is on, which could lead to hesitation by the police officer," with "potentially tragic consequences." 712 F.3d at 879-80. Moreover, "[i]f the number of legal handguns on the streets increased significantly, [police] officers would have no choice but to take extra precautions before engaging citizens, effectively treating encounters … that now are routine, friendly, and trusting, as high-risk stops." *Id.* at 880.

And sometimes licensed carriers with previously clean records *do* misuse their weapons. "Sadly, those incidents are not anomalies." *Peruta*, 2016 WL 3194315, *18 (Graber, J., concurring). "Nationwide, since May 2007, concealed-carry permit holders have shot and killed at least 17 law enforcement officers and more than 800 private citizens." *Id.* (citing *Concealed Carry Killers*, Violence Policy Center, www.concealedcarrykillers.org). They have been responsible for 30

mass shootings, including the 2013 attack at the District's Navy Yard and the June 2016 attack at an Orlando nightclub. "[E]ven if we assume that each and every one of those tragedies was less likely to occur because of the shooter's prior status as a 'law-abiding citizen,' that does not mean that [the 'good reason' standard] fails to address the problem in a reasonable way." *Id.* After all, "lawmakers are entitled to weigh the severity of the risk as well as the likelihood of its occurrence." *Id.* And, to the extent a judgment must be made on uncertain data, it is the Council's judgment that is entitled to deference, not plaintiffs'. *Heller II*, 670 F.3d at 1269.

> c. The Council's tailoring of the "good reason" standard to accomplish its objectives.

This Court should also defer to the Council's conclusion that the "good reason" standard is not substantially more burdensome than necessary to accomplish its objectives. Intermediate scrutiny requires that "the fit … be reasonable, not perfect." *Schrader*, 704 F.3d at 990. And the District offered ample evidence of reasonable fit. The Council relied on empirical evidence that public-carry laws significantly increase violent crime. JA251-358. It relied on the persuasive judgment of legislatures in New York, New Jersey, and Maryland, all of which found the "good reason" standard reasonably tailored to prevent an increase in gun violence. JA51, 58 & n.39. And it heard lay and expert witness testimony describing the District's unique security concerns. *See* JA138, 141-42.

48

The Council's conclusion that the "good reason" standard is reasonably tailored flows naturally from this evidence. *See* JA68. If an upswing in public carrying is likely to increase the quantity and lethality of violent crime, escalate conflicts that would otherwise dissipate, and increase the chances that innocent bystanders will be shot, it is reasonable to conclude that limiting public carrying to those with a specific self-defense need will reduce these harms. And if law enforcement agencies are likely to respond to a substantial increase in public carrying by taking protective measures that interfere with the public's right to travel freely, it is reasonable to conclude that limiting public carrying to those with a specific self-defense need will reduce the need for such measures.

Plaintiffs complain that the "good reason" standard is "not directed at dangerous people." Pl.Br.52. But this misunderstands its purpose. The Council recognized that, beyond obvious suitability standards that look to criminal and mental-health records, it is difficult to predict whether a seemingly responsible person will misuse his handgun. Every citizen is law-abiding until he breaks the law, and the government cannot know in advance who will do so. *See* JA334, (Cook, *et al.*, *Criminal Records of Homicide Offenders*, 294 JAMA 598, 599 (2005) (noting that fewer than half of adults arrested for criminal homicide have prior felony convictions)). Gangs, for instance, could travel with arms carried by members who have not acquired criminal records (or they could recruit such

49

members).  *See* JA343.  Public carrying also "may create or exacerbate accidents or deadly encounters, as the longstanding bans on private firearms in airports and courthouses illustrate."  *Bonidy*, 790 F.3d at 1126; *see Woollard*, 712 F.3d at 879 (noting firearm-based escalation of "bar fights and road rage").  Indeed, "the mere act of wielding a firearm raises the likelihood that nonthreatening objects will be perceived as threats."  Brockmole & Witt, *Action Alters Object Identification*, 38 J. Experimental Psychology 1159, 1167 (2012).  Thus, "examples abound of 'law-abiding citizens' … who place the public safety in jeopardy."  *Peruta*, 2016 WL 3194315, *18 (Graber, J., concurring).

The Council properly concluded that the issuance of *any* public-carry permit, regardless of whether it is based on "good reason," increases the likelihood of public harm.  At the same time, the Council understood that some individuals do have particularized needs to carry handguns for self-defense.  It then engaged in tailoring that is entirely appropriate under the circumstances, and that three circuits have upheld—accepting some additional public risk, but only for individuals with these special self-defense needs.  *See Kachalsky*, 701 F.3d at 97 n.22; *Drake*, 724 F.3d at 437; *Woollard*, 712 F.3d at 881.  Thus, the Council adopted the "good reason" standard, not because those who meet this standard pose less risk, but because the standard makes the law *less burdensome* to the "inherent right of self-defense."  *Heller I*, 554 U.S. at 628.

Plaintiffs have suggested no alternative that would prevent the increase in crime associated with "shall-issue" laws. *Cf. Turner II*, 520 U.S. at 222. They do not challenge the validity of the District's evidence, or seriously argue that the "good reason" standard would fail under intermediate scrutiny. *See* Pl.Br.50-53. Indeed, they forfeited this argument by failing to make it in the district court. *See United States v. Layeni*, 90 F.3d 514, 522 (1996).

Instead, plaintiffs ask this Court to hold the law categorically unconstitutional, "even if effective." Pl.Br.54. They claim that "laws that focus on the alleged dangerousness inherent in the right's existence, rather than on some particular abuse or manifestation of that right, cannot pass intermediate scrutiny." Pl.Br.52. But this is both ahistorical and incorrect. For centuries, governments have regulated firearms *precisely* because they are dangerous. *See* p.13-26. That continues to this day. *See Bonidy*, 790 F.3d at 1126 ("The risk inherent in firearms … distinguishes the Second Amendment right from other fundamental rights … , which can be exercised without creating a direct risk to others."); *Kachalsky*, 701 F.3d at 99 ("[A]s the Supreme Court has implicitly recognized, regulating firearms because of the dangers posed by exercising the right is entirely consistent with the Second Amendment."); *Masciandaro*, 638 F.3d at 470 ("[O]utside the home, firearm rights have always been more limited, because public safety interests often outweigh individual interests in self-defense.").

In any event, the District's law *does* focus on a "particular …
manifestation": carrying handguns on crowded city streets regardless of reason.
Courts routinely uphold laws that focus on the inherent dangerousness of
exercising a right, even when the actor means no harm. *Humanitarian Law Project*
upheld a content-based ban on *humanitarian* speech because it would incidentally
benefit terrorist organizations and thus thwart public-safety efforts. 561 U.S. at 29.
*Heller II* upheld a ban on assault weapons even though it did not distinguish
between those who would or would not misuse them. 670 F.3d at 1262-64. The
District's law focuses on the specific dangers associated with public carrying in an
entirely urban jurisdiction, which this Court has acknowledged threatens public
safety even when the carrier is not "dangerous." *Heller III*, 801 F.3d at 277
(finding requirement that firearm registrant bring weapon to police station "more
likely" to "threat[en]" "public safety" due to "risk that the gun may be stolen" or
that would-be registrant would be "arrested or even shot by a police officer seeing
a 'man with a gun'" (brackets omitted)).

Plaintiffs also improperly analogize the "good reason" standard to the one-
pistol-per-month law struck in *Heller III*. Pl.Br.53 (citing 801 F.3d at 280). But,
as Judge Kollar-Kotelly explained, *Heller III* based its findings on the District's
failure to provide evidence of "fit" and "does not support the conclusion that it
would be impossible to justify the monthly cap on the basis of different evidence."

JA396-97 & n.11 (citing *Heller v. District of Columbia*, No. 14-7071, 2016 WL 760940, at *1 (D.C. Cir. 2016) (Millett, J., concurring in denial of rehearing en banc based on "shortcomings in the record")). "[T]he one-pistol-per-month limit was not unconstitutional because *any* limitation on the rate at which people could purchase guns would necessarily be unconstitutional," but "because the evidence presented did not support the fit of that rule with the ends identified by the District." JA397. Plaintiffs have not even challenged the District's evidence.

"Moreover," Judge Kollar-Kotelly noted, "a right for a single individual to possess multiple weapons at home is fundamentally different from" the "good reason" standard. JA397 n.11. The standard imposes no limit on the number of concealed-carry licenses that may be issued, nor does it burden the "core" right to keep arms in the home. *Heller III* therefore "addresses a completely different regulatory scheme … and does not demonstrate that the regulations at issue here constitute an unlawful rationing scheme." JA397 n.11.

### 5. Prior restraint doctrine is inapplicable.

Plaintiffs also wrongly suggest that the "good reason" standard is an unlawful "prior restraint." Pl.Br.55-59. This doctrine "is specific to the First Amendment." *Hightower v. City of Boston*, 693 F.3d 61, 80-81 (1st Cir. 2012). While an abuse of free speech can be remedied through post-hoc penalties, firearm abuse can cause an "unspeakably tragic act of mayhem." *Masciandaro*, 638 F.3d

at 475-76. Thus, every court to consider the issue has refused to apply the prior restraint doctrine to the Second Amendment. *See, e.g.*, *Drake*, 724 F.3d at 435; *Woollard*, 712 F.3d at 883 n.11; *Kachalsky*, 701 F.3d at 91-92.

Moreover, the doctrine cannot apply to the District's law because it does not give Chief Lanier "unbridled discretion." Pl.Br.57; *see Hightower*, 693 F.3d at 80. D.C. Code § 7-2509.11(1) requires rulemaking to "establish criteria" for "good reason" and "suitability." These regulations provide the standards to apply and guarantee substantive administrative and judicial review. 24 DCMR §§ 1202, 1221.6, 2333.1-.4. "Plaintiffs' complaint is not that the proper cause requirement is *standardless*; rather, they simply do not like the *standard*." *Kachalsky*, 701 F.3d at 92.

## II. The District Court Properly Balanced The Equities In The District's Favor.

A preliminary injunction serves "to preserve the relative positions of the parties until a trial on the merits." *CFGC v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). An injunction that "goes well beyond simply maintaining the status quo … is particularly disfavored." *Stanley v. USC*, 13 F.3d 1313, 1320 (9th Cir. 1994). It is a "judicially inflicted injury," and many circuits therefore make the movant's already high burden even "more stringent." *O Centro Espirita Beneficente Uniao do Vegetal v. Ashcroft*, 389 F.3d 973, 978 (10th Cir. 2004) (citing cases). The requested preliminary injunction would have changed the status quo by barring the

54

District from enforcing the "good reason" standard at the outset of litigation. Plaintiffs should therefore be held to an especially high standard. The district court was well within its discretion to conclude that their equitable showing falls short.

## A.   Plaintiffs have not shown that they will suffer irreparable harm if the "good reason" standard is enforced while litigation is pending.

"This [C]ourt has set a high standard for irreparable injury"—it "must be both certain and great," "actual and not theoretical." *CFGC v. Navy*, 534 F.3d 756, 766 (D.C. Cir. 2008). The movant "must show that 'the injury complained of [is] of such *imminence* that there is a "clear and present" need for equitable relief to prevent irreparable harm.'" *Wisc. Gas v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). Plaintiffs, however, cannot claim any "clear and present" need to carry a handgun; indeed, they premise their standing on their claim that they *cannot* demonstrate any particularized reason to fear harm and therefore cannot satisfy the "good reason" standard. JA28-33; *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (requiring "concrete and particularized" injury).

Judge Kollar-Kotelly found that plaintiffs' allegation "that [their] constitutional rights were violated" itself "satisfied the irreparable harm prong." JA405. But this Court has not applied this principle to Second Amendment rights, nor should it. Some constitutional rights are so intrinsically valuable that "the irreparable nature of the harm may be presumed." *CFGC*, 454 F.3d at 301 (free exercise of religion); *see Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C.

55

Cir. 2009) (freedom to travel without unreasonable seizure). But the right to keep and bear arms has no intrinsic value—it is not an end in itself. *See McDonald*, 561 U.S. at 787 (acknowledging right as "instrumental" rather than "intrinsic"). Instead, as *Heller I* explains, it is "the inherent right of self-defense" that is "central to the Second Amendment." 554 U.S. at 628. Firearms are *tools* used to preserve this right, but they can serve this purpose only if a threat arises. If no self-defense occasion arises, the absence of a handgun cannot cause harm. On appeal, plaintiffs claim that the law irreparably harms their "sense of security." Pl.Br.60. But *Heller I* did not identify such an interest as central to the Second Amendment, and this Court should not assume one here.[5]

At minimum, as Judge Kollar-Kotelly found, a claim of intangible harm flowing from an alleged constitutional violation does "not … in any way lessen[] the burden for" the moving party—"[i]t merely focuses greater attention on the three other factors that indisputably enter into the preliminary injunction determination." JA406 (quoting *CFGC*, 454 F.3d at 304). "In other words, an alleged constitutional violation may be enough to satisfy the irreparable injury prong," but "is not

---

[5]     Judge Kollar-Kotelly found it "unclear" whether plaintiffs had "ever purported to rely on any direct injury," but "[i]n any event, … their sense of security … , standing alone, is not 'a tangible injury'" and their "likelihood of being harmed as crime victims … is purely speculative." JA403 n.14.

determinative of the [c]ourt's assessment of the balance of the equities or of the impact on the public interest." JA406.

**B.    A preliminary injunction will irreparably harm the District and the public.**

The District will be irreparably harmed, and the public interest obstructed, if it cannot enforce the "good reason" standard while litigation is pending. *Cf. Nken v. Holder*, 556 U.S. 418, 435 (2009) (recognizing that "[t]hese factors merge when the Government" is opposing a stay). Judge Kollar-Kotelly properly found that the District and the public have a "strong interest" in promoting public safety and preventing crime, and that the "public carrying of operable handguns … poses a potential risk to others—carriers and non-carriers alike—far greater than the risk of possessing a handgun within the home." JA406-07. And, "[b]ecause the entirety of the District of Columbia is an urban area, the carrying of operable handguns in public may further tip this factor in Defendants' favor." JA407; *see* JA407 n.16 (taking judicial notice of the District's population density of 9,856.5 people per square mile, where the states range from 1.2 to 1,195.5). These findings are entitled to deference. *FET v. Heckler*, 756 F.2d 143, 151-52 (D.C. Cir. 1985).

Plaintiffs argue that "enforcement of an unconstitutional law is always contrary to the public interest." Pl.Br.64. But the "good reason" standard is not unconstitutional. Three circuits have upheld it, and none holds otherwise. A colorable constitutional claim does not automatically align a moving party's

interests with the public.  Instead, courts honor the "public interest in using laws enacted through the democratic process, until the laws' validity has been finally determined."  *Frank v. Walker*, 769 F.3d 494, 496 (7th Cir. 2014).  As Chief Justice Roberts explained when he stayed a decision striking a public safety law as unconstitutional, "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.'"  *Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers).

Plaintiffs claim that enjoining the "good reason" standard would "not harm [the District] at all."  Pl.Br.60.  They point to an FBI spreadsheet showing that, in 2012-2013, states with right-to-carry laws experienced less violent crime than states without such laws.  Pl.Br.61.  But this generalized information is uninformative because of the myriad factors that affect crime levels in different states.  *See* JA292-94 (1998 study criticizing "more guns, less crime" study for failure to account for variables such as crack usage, gang activity, and poverty).  As plaintiffs conceded below, "*raw* numbers" are uninformative because "correlation is not causation."  RD10, at 22, 23.

They also argue that, because "shall-issue" states have revoked only a small percentage of public-carry licenses, "law-abiding individuals" do not pose a "meaningful public safety hazard."  Pl.Br.62.  But this data is too compromised by unknown variables to even hint as much.  Three of the four cited low-revocation

states "have poorly administered, ineffective permitting systems that routinely let ineligible people slip through the cracks" in *obtaining* permits; it is unlikely they diligently pursue revocation. *See Federally Mandated Concealed Carry Reciprocity*, Everytown for Gun Safety 13 (2015), http://everytown.org/documents/2015/02/federally-mandated-concealed-carry-reciprocity.pdf. States, moreover, can take these measures only when perpetrators are identified. Nationwide, only 46.8 percent of violent crimes were cleared in 2012. *Crime in the United States*, FBI (2012), https://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2012/crime-in-the-u.s.-2012/offenses-known-to-law-enforcement/clearances.

District policymakers needed to act. This country is awash with gun violence, and the District shares this burden. The Council studied the problem and found, based on substantial evidence like Donohue's studies, that a marked increase in public carrying was likely to "significantly increase rape, murder, and aggravated assault." JA56. This finding stands largely unrefuted here, and in any event is entitled to deference. Plaintiffs ask "so what?," Pl.Br.53, but these are life-and-death matters. Judge Kollar-Kotelly was right to conclude that plaintiffs' intangible harms could not outweigh the District's very real ones, and did not justify a preliminary injunction while the District is still compiling a full record to defend its law.

The review of public-carrying laws is "serious business"; courts "do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of [their] judicial chambers [they] miscalculated as to Second Amendment rights." *Masciandaro*, 638 F.3d at 475 (Wilkinson, J., concurring). "It is not far-fetched to think the *Heller* Court wished to leave open the possibility that such a danger would rise exponentially as one moved the right from the home to the public square. If ever there was an occasion for restraint, this would seem to be it." *Id.* at 475-76.

# CONCLUSION

The order denying a preliminary injunction should be affirmed.

Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

TODD S. KIM
Solicitor General

LOREN L. ALIKHAN
Deputy Solicitor General

/s/ Holly M. Johnson
HOLLY M. JOHNSON
Assistant Attorney General
Bar Number 476331
Office of the Solicitor General

Office of the Attorney General
441 4th Street, NW, Suite 600S
Washington, D.C. 20001
(202) 442-9890
(202) 715-7713 (fax)
July 2016                              holly.johnson@dc.gov

## CERTIFICATE OF SERVICE

I certify that on July 13, 2016, this brief was served through the Court's ECF system to:

Alan Gura, Esq.
Gura & Possessky, PLLC
916 Prince Street, Suite 107
Alexandria, VA 22314

/s/ Holly M. Johnson
HOLLY M. JOHNSON

## CERTIFICATE OF COMPLIANCE

I further certify that this brief complies with the type-volume limitation in Federal Rule of Appellate Procedure 32(a)(7)(B) because the brief contains 13,999 words, excluding exempted parts. This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14 point.

/s/ Holly M. Johnson
HOLLY M. JOHNSON