# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

BRIAN WRENN, JOSHUA AKERY, TYLER WHIDBY, and
SECOND AMENDMENT FOUNDATION, INC.,

*Plaintiffs-Appellants*,

*v.*

DISTRICT OF COLUMBIA and CATHY LANIER,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Columbia, No. 1:15-cv-00162-CKK
Before the Honorable Judge Colleen Kollar-Kotelly

**BRIEF FOR AMICI CURIAE DC APPLESEED CENTER FOR LAW &
JUSTICE, DC FOR DEMOCRACY, DC VOTE, THE LEAGUE OF WOMEN
VOTERS OF THE DISTRICT OF COLUMBIA, FORMER MAYOR
ANTHONY A. WILLIAMS, AND FORMER MAYOR VINCENT C. GRAY IN
SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE**

WALTER A. SMITH, JR.
KEVIN HILGERS
DC APPLESEED CENTER FOR LAW & JUSTICE
1111 Fourteenth Street, NW
Washington, DC 20005
(202) 289-8007

PAUL R.Q. WOLFSON
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6000

ALLISON TRZOP*
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8000

*Admitted to practice only in
Massachusetts. Supervised by
members of the firm who are admitted
to practice in New York.*

July 20, 2016

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), amici curiae DC Appleseed Center for Law & Justice, DC for Democracy, DC Vote, The League of Women Voters of the District of Columbia, and Former Mayors Vincent C. Gray and Anthony A. Williams certify that:

## A.    Parties And Amici

All parties, intervenors, and amici appearing before the district court and in this Court are listed in the Brief for Appellants, except for the following amici who are also joining this amicus brief:  DC for Democracy, DC Vote, The League of Women Voters of the District of Columbia, and Former Mayors Vincent C. Gray and Anthony A. Williams.  Amici are aware that The Brady Center to Prevent Gun Violence and Everytown for Gun Safety intend to participate as amici in this appeal.

## B.    Rulings Under Review

References to the rulings at issue appear in the Brief for Appellants.

## C.    Related Cases

This case was previously before this Court, No. 15-7057.  A related case is pending before this Court:  *Grace v. District of Columbia*, No. 16-7067.  This case was also related to *Palmer v. District of Columbia*, No. 14-7180.

Dated: July 20, 2016

Respectfully submitted,

/s/  Paul R.Q. Wolfson

PAUL R.Q. WOLFSON
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC  20006
Tel.: (202) 663-6000
Fax: (202) 663-6363
paul.wolfson@wilmerhale.com

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, counsel for amici hereby certifies that:

1.      DC Appleseed Center for Law & Justice is a nonprofit corporation that does not have outstanding shares or debt securities in the hands of the public and does not have a parent company.  No publicly held company has a 10% or greater ownership interest in DC Appleseed Center for Law & Justice.

2.      DC for Democracy is a nonprofit corporation that does not have outstanding shares or debt securities in the hands of the public and does not have a parent company.  No publicly held company has a 10% or greater ownership interest in DC for Democracy.

3.      DC Vote is a nonprofit corporation that does not have outstanding shares or debt securities in the hands of the public and does not have a parent company.  No publicly held company has a 10% or greater ownership interest in DC Vote.

4.      The League of Women Voters of the District of Columbia is a nonprofit corporation that does not have outstanding shares or debt securities in the hands of the public and does not have a parent company.  No publicly held company has a 10% or greater ownership interest in The League of Women Voters of the District of Columbia.

Dated: July 20, 2016

Respectfully submitted,

/s/ Paul R.Q. Wolfson
PAUL R.Q. WOLFSON
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Tel.: (202) 663-6000
Fax: (202) 663-6363
paul.wolfson@wilmerhale.com

## CIRCUIT RULE 29(d) STATEMENT

The amici joining in this brief are filing a separate brief from the briefs for amici Brady Center to Prevent Gun Violence and Everytown for Gun Safety. The amici joining this brief have a distinct perspective—that of local organizations and leaders dedicated to improving the lives of the citizens of the District of Columbia and strongly committed to an effective, accountable local government in the District. Accordingly, a separate brief is necessary to permit the organizations and leaders joining this brief to provide, inter alia, their local perspective on the issues before the Court.

Dated: July 20, 2016

Respectfully submitted,

/s/  Paul R.Q. Wolfson
PAUL R.Q. WOLFSON
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC  20006
Tel.: (202) 663-6000
Fax: (202) 663-6363
paul.wolfson@wilmerhale.com

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .................... i

CORPORATE DISCLOSURE STATEMENT ....................................... iii

CIRCUIT RULE 29(d) STATEMENT ..................................................... v

TABLE OF AUTHORITIES ...................................................... vii

STATEMENT OF INTEREST OF AMICI CURIAE ............................... 1

SUMMARY OF ARGUMENT ................................................... 3

ARGUMENT ................................................................ 5

I. THE DISTRICT REASONABLY ADDRESSED THE PROBLEM OF GUN VIOLENCE BY REGULATING PUBLIC CARRYING OF FIREARMS ........................ 5

    A. The Public Carrying Of Firearms Poses Grave Public Safety Concerns ............................................................. 5

    B. The District Faces Unique And Heightened Public Safety Risks ................................................................ 12

II. THE DISTRICT HAS CONSIDERABLE DISCRETION IN REGULATING THE PUBLIC CARRYING OF FIREARMS BECAUSE SUCH CONDUCT DOES NOT IMPLICATE THE CORE SECOND AMENDMENT RIGHT TO SELF-DEFENSE IN THE HOME ...................................................... 20

    A. The Second Amendment Right Recognized in *Heller* Is, At Core, Only A Right To Self-Defense Within The Home .................... 20

    B. Historical Evidence Confirms That The Public Carrying Of Firearms Lies Outside The Core Second Amendment Right .............. 23

III. IN APPLYING INTERMEDIATE SCRUTINY, THE COURT SHOULD RECOGNIZE THAT LOCAL LEGISLATORS HAVE APPROPRIATE LATITUDE TO ADDRESS THE PROBLEM OF GUN VIOLENCE IN THE DISTRICT'S UNIQUE CIRCUMSTANCES ........................................... 25

CONCLUSION ............................................................. 30

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## CASES

Page

*Adams v. Clinton*,
  90 F. Supp. 2d 35 (D.D.C. 2000).................................................................15

*Bonidy v. United States Postal Service*,
  790 F.3d 1121 (10th Cir. 2015) .......................................................................9

*City of Los Angeles v. Alameda Books, Inc.*,
  535 U.S. 425 (2002)......................................................................................27

*\*District of Columbia v. Heller*,
  554 U.S. 570 (2008)..................................................... 1, 4, 18, 20, 21, 23, 24

*\*Drake v. Filko*,
  724 F.3d 426 (3d Cir. 2013) .........................................................................22

*Grace v. District of Columbia*,
  2016 WL 2908407 (D.D.C. May 17, 2016) ...........................................26, 29

*\*Heller v. District of Columbia*,
  670 F.3d 1244 (D.C. Cir. 2011)................................................25, 26, 27, 28

*\*Heller v. District of Columbia*
  801 F.3d 264 (D.C. Cir. 2015)...............................................12, 19, 26, 27, 29

*Hightower v. City of Boston*,
  693 F.3d 61 (1st Cir. 2012)...........................................................................22

*\*Kachalsky v. County of Westchester*,
  701 F.3d 81 (2d Cir. 2012) .......................................................22, 24, 28, 29

*Little v. United States*,
  989 A.2d 1096 (D.C. 2010) ..........................................................................23

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010)..................................................................5, 20, 21, 27

---

\*      Authorities chiefly relied upon are marked with asterisks.

*Moore v. Madigan*,
    702 F.3d 933 (7th Cir. 2012) ..........................................................................23

*Palmer v. District of Columbia*,
    59 F. Supp. 3d 173 (D.D.C. 2014)..................................................................24

*\*Peruta v. County of San Diego*,
    2016 WL 3194315 (9th Cir. June 9, 2016)......................................23, 24, 26

*\*Schrader v. Holder*,
    704 F.3d 980 (D.C. Cir. 2013)........................................................................29

*Sims v. United States*,
    963 A.2d 147 (D.C. 2008) .......................................................................22, 23

*State v. Mitchell*,
    3 Blackf. 229 (Ind. 1833)................................................................................25

*Terry v. Ohio*,
    392 U.S. 1 (1968)..............................................................................................5

*\*Turner Broadcasting Systems, Inc. v. FCC*,
    520 U.S. 180 (1997)........................................................................................27

*United States v. Masciandaro*,
    638 F.3d 458 (4th Cir. 2011) ....................................................................22, 28

*Williams v. State*,
    10 A.3d 1167 (Md. 2011) ................................................................................22

*\*Woollard v. Gallagher*,
    712 F.3d 865 (4th Cir. 2013) ..............................................................22, 28, 29

*Wrenn v. District of Columbia*,
    2016 WL 912174 (D.D.C. Mar. 7, 2016) ............................................5, 12, 26

## DOCKETED CASES

*Brian Wrenn, et al. v. District of Columbia, et al.*, No. 15-7057
    (D.C. Cir.) ..........................................................................................................2

*Heller v. District of Columbia*, No. 14-7071 (D.C. Cir.)..........................................1

# CONSTITUTIONAL AND STATUTORY PROVISIONS

U.S. Const. art. I, § 8, cl. 17....................................................................15

Act of July 8, 1932, 47 Stat. 650...........................................................24

Act of July 13, 1892, 27 Stat. 116..........................................................24

City Act of Nov. 4, 1857.........................................................................24

City Act of Nov. 18, 1858.......................................................................24

# OTHER AUTHORITIES

Boburg, Shawn & Katherine Shaver, *7-Year-Old In Critical Condition After Shooting That Rattles Her D.C. Neighborhood*, Wash. Post (Apr. 9, 2016), https://www.washingtonpost.com/local/seven-year-old-in-critical-condition-after-shooting-that-rattles-her-dc-neighborhood/2016/04/09/64514cdc-fe72-11e5-9140-e61d062438bb_story.html .............................................................13

Bowling, Kenneth R., *The Creation of Washington, D.C.: The Idea and Location of the American Capital* (1991)...............................................15

Centers for Disease Control and Prevention, *WISQARS Cost of Injury Reports* (2010), https://wisqars.cdc.gov:8443/costT/ (last visited July 11, 2016) ...............................................................14

Centers for Disease Control and Prevention, *WISQARS Fatal Injury Reports, National and Regional, 1999-2014*, http://webappa.cdc.gov/sasweb/ncipc/mortrate10_us.html (last visited July 11, 2016) ...............................................................6

Centers for Disease Control and Prevention, *WISQARS Years of Potential Life Lost*, http://webappa.cdc.gov/sasweb/ncipc/ypll10.html (last visited July 11, 2016) .................................13

Centers for Disease Control and Prevention, *WISQARS Nonfatal Injury Reports, 2001-2014*, http://webappa.cdc.gov/sasweb/ncipc/nfirates2001.html (last visited July 11, 2016)..........................6

Cook, Philip J., et al., *Gun Control After* Heller*: Threats and Sideshows from a Social Welfare Perspective*, 56 UCLA L. Rev. 1041 (2009) ....................................................................8

Cook, Philip J. & Jens Ludwig, *The Social Costs of Gun Ownership*, 90 J. Pub. Econ. 379 (2006)...........................................................9

Cress, Lawrence Delbert, *Whither Columbia?  Congressional Residence and the Politics of the New Nation, 1776 to 1787*, 32 Wm. & Mary Q. 581 (1975)...................................................16

D.C. Council, Committee of the Whole, Report on Bill 20-930 (Dec. 2, 2014), http://lims.dccouncil.us/Download/32576/B20-0930-CommitteeReport2.pdf ................................................................11

D.C. Council, Committee on the Judiciary and Public Safety, Report on Bill 20-930 (Nov. 25, 2014) ......... 5, 6, 7, 9, 10, 14, 15, 16, 17, 18, 20, 24

Donohue, John J., et al., *The Impact of Right to Carry Laws and the NRC Report:  The Latest Lessons for the Empirical Evaluation of Law and Policy*, NBER Working Paper No. 18294 (rev. Nov. 7, 2014), http://www.nber.org/papers/w18294..............................................11

FBI, *A Study of Active Shooter Incidents in the United States Between 2000 and 2013* (2014), https://www.fbi.gov/news/stories/2014/september/fbi-releases-study-on-active-shooter-incidents/pdfs/a-study-of-active-shooter-incidents-in-the-u.s.-between-2000-and-2013 ....................................................................7

FBI Uniform Crime Reports, *Crime in the United States* (2014), https://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2014/crime-in-the-u.s.-2014/tables/table-1 (last visited July 11, 2016) ....................................................................13

FBI Uniform Crime Reports, *Crime in the United States*, tbl. 5 (2014), https://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2014/crime-in-the-u.s.-2014/tables/table-5 (last visited July 11, 2016)................13

FBI Uniform Crime Reports, *Law Enforcement Officers Feloniously Killed*, tbl. 29 (2005-2014), https://www.fbi.gov/about-us/cjis/ucr/leoka/2014/tables/table_29_leos_fk_type_of_weapon_2005-2014.xls (last visited July 11, 2016)......................................6

FBI Uniform Crime Reports, *Law Enforcement Officers Assaulted*, tbl. 76 (2005-2014), https://www.fbi.gov/about-us/ cjis/ucr/leoka/2014/tables/table_76_leos_asltd_type_of_weapon _and_percent_injured_2005-2014.xls (last visited July 11, 2016) ................................................................................6

FBI Uniform Crime Reports, *Robbery by State, Types of Weapons* (2014), https://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/ 2014/crime-in-the-u.s.-2014/tables/table-21 (last visited July 11, 2016) ................................................................................6

Federalist No. 43 (Madison) ...................................................................15

Goldgeier, Dean Jim, *Remembering Matthew C. Shlonsky* (Aug. 17, 2015), http://www.american.edu/sis/news/20150817-In-Remembrance-Matthew-Shlonsky.cfm .......................................14

Howell, Embry M. & Peter Abraham, *The Hospital Costs of Firearm Assaults* 5 (Sept. 2013), http://www.urban.org/sites/default/ files/alfresco/publication-pdfs/412894-The-Hospital-Costs-of-Firearm-Assaults.PDF ...................................................................14

Law Center to Prevent Gun Violence, *2013 State Scorecard: Why Gun Laws Matter*, tbl. (2013), http://smartgunlaws.org/wp-content/uploads/2013/12/SCGLM-Final10-spreads-points.pdf ...................10

Lott, John R., Jr. & David B. Mustard, *Crime, Deterrence, and Right-to-Carry Concealed Handguns*, 26 J. Legal Studies 1 (1997) ......................10

Metropolitan Police Department, *Annual Report 2014*, http://mpdc.dc .gov/sites/default/files/dc/sites/mpdc/publication/attachments/ MPD%20Annual%20Report%202014_lowres_0.pdf...................................13

Metropolitan Police Department, *District Crime Data At A Glance*, http://mpdc.dc.gov/page/district-crime-data-glance (last visited July 11, 2016) ................................................................................13

Metropolitan Police Department, *In Case You Missed It:  Addressing Violent Crime in Washington, DC*, (Aug. 26, 2015), http://mpdc .dc.gov/release/case-you-missed-it-addressing-violent-crime-washington-dc .....................................................................................9

National Gang Center, *National Youth Gang Survey Analysis*, http://www.nationalgangcenter.gov/Survey-Analysis/Measuring-the-Extent-of-Gang-Problems#homicidesnumber ................................................. 7

National Research Council, *Firearms and Violence: A Critical Review* (2004), http://www.nap.edu/catalog/10881/firearms-and-violence-a-critical-review ............................................................ 10

Parker, Clifton B, *Right-To-Carry Gun Laws Linked to Increase in Violent Crime, Stanford Research Shows*, Stanford Report (Nov. 14, 2014), http://news.stanford.edu/news/2014/november/donohue-guns-study-111414.html ................................................. 11

Pomeroy, John Norton, *An Introduction to the Constitutional Law of the United States* (1868) ................................................................ 25

State Education Data Profiles, *National Center for Education Statistics 2013-2014*, https://nces.ed.gov/programs/stateprofiles/sresult.asp?mode=short&s1=11 (last visited July 11, 2016) ......................... 18

Tavernise, Sabrina, *Vivek Murthy, the New Surgeon General, Isn't Afraid to Take a Stand*, N.Y. Times (Dec. 16, 2014), http://www.nytimes.com/2014/12/17/science/a-new-surgeon-general-unafraid-of-taking-a-stand-on-a-divisive-issue.html .................................... 14

U.S. Census Bureau, *State Population – Rank, Percent Change, and Population Density: 1980 to 2009*, http://www2.census.gov/library/publications/2010/compendia/statab/130ed/tables/11s0013.pdf ............................................................................. 10

Vargas, Theresa, *Hundreds of Activists Rally Outside Supreme Court for Key Abortion Case*, Wash. Post (Mar. 2, 2016), https://www.washingtonpost.com/local/hundreds-of-activists-expected-outside-supreme-court-for-key-abortion-case/2016/03/01/a99aa36e-dff6-11e5-846c-10191d1fc4ec_story.html ......................................... 19

Violence Policy Center, *Concealed Carry Killers Background*, http://concealedcarrykillers.org/concealed-carry-killers-background (last visited July 11, 2016) ............................................................... 8

Washington, D.C., *2014 Visitor Statistics*, http://destinationdc.dmp
      local.com/dsc/collateral/2014_Washington_DC_Visitor_
      Statistics.pdf...................................................................................................19

Williams, Pete, *Man Shot by Secret Service at White House:  'I Came
      Here To Shoot People,'* NBC News (June 3, 2016), http://www
      .nbcnews.com/news/us-news/man-shot-secret-service-white-
      house-i-came-here-shoot-n585456 ..............................................................17

## STATEMENT OF INTEREST OF AMICI CURIAE[1]

Amici are a broad and diverse group of organizations dedicated to improving the lives of the citizens of the District of Columbia. Amici represent leaders of the District's legal, business, and nonprofit communities. Amici are strongly committed to an effective, accountable local government in the District, and believe that substantial deference should be paid by the courts to decisions made by locally elected leaders on important local issues. One such issue is gun violence, which has long plagued the District. Amici therefore have a strong interest in this case, which threatens the D.C. Council's balanced efforts to address gun violence while preserving the right to self-defense.

DC Appleseed Center for Law & Justice ("DC Appleseed") is a nonprofit organization dedicated to solving pressing public policy problems facing the District and its metropolitan area, including gun violence. DC Appleseed's efforts have included the filing of amicus briefs with the Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and with this Court in *Heller v. District of Columbia*,

---

[1] No counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than the amici curiae, their members, or their counsel made a monetary contribution to its preparation or submission. The parties have consented to the filing of this brief. Ronald C. Machen, Jr., a partner of Wilmer Cutler Pickering Hale and Dorr LLP and the former United States Attorney for the District of Columbia, has been asked by Appellees to serve, pro bono, as an expert witness in this case. Mr. Machen has played no role in the drafting of this brief.

No. 14-7071, and *Wrenn v. District of Columbia*, No. 15-7057. Several of the amici joining in this brief also signed those briefs.

DC for Democracy is a leading unaligned progressive group of activists, community leaders, and everyday voters in the District of Columbia working for positive changes in our local and federal government and full citizenship rights through statehood for the people of Washington, D.C.

DC Vote is a national organization dedicated to securing voting representation and full equality for the disenfranchised residents of the District.

The League of Women Voters of the District of Columbia is a nonpartisan political organization that encourages informed and active participation of citizens in government.

Vincent C. Gray, the former Mayor of Washington, D.C. (2011-2015), is a native Washingtonian and the Democratic nominee for Ward 7 Member of the Council of the District of Columbia. As Mayor, his administration vigorously defended the District's gun-safety laws in court and crafted and proposed the public-carry regulation challenged in this case. Before his election as Mayor, he was the Chairman and Ward 7 Member of the Council of the District of Columbia.

Anthony A. Williams, the former Mayor of Washington, D.C. (1999-2007), is the current Chief Executive Officer of the Federal City Council, an organization focusing the creative and administrative talents of Washington's business and

professional leaders on major problems and opportunities facing the city. He is widely credited with leading the comeback of Washington, D.C. during his two terms as Mayor, restoring the finances of our Nation's capital, and improving the performance of government agencies, all while lowering taxes and investing in infrastructure and human services. Before his election as Mayor, he was the independent Chief Financial Officer of the District from 1995 to 1998, working with and on behalf of local officials, the D.C. Financial Control Board, and the U.S. Congress.

## SUMMARY OF ARGUMENT

For many residents of the District of Columbia, gun violence is an ever-present and tragic element of life. After several years of progress, gun violence has increased again in the District; in 2015, the Metropolitan Police Department reported 162 homicides, a 54% increase from the previous year. In 2013, a mass shooting at the Washington Navy Yard massacre took twelve lives. This gun violence has inflicted calamitous human and financial costs on District residents. In response, the District's elected representatives and law enforcement officials have attempted, with varying degrees of success, to reduce the level of violence and to mitigate the damage that it causes to the community.

Violence is a complex problem with many causes; across the country, officials, scholars, and citizens have debated the best ways to address it, including

through firearms regulations.  In the face of this debate, the Council of the District of Columbia surely acted responsibly in concluding that a significant increase in the number of firearms publicly carried on the streets of the city—even if carried lawfully and with a permit—would worsen the problem of gun violence, and certainly would not reduce the threat of violence, as some proponents of broad public-carry rights urge.  In reaching that conclusion, it was reasonable for the Council to take into account the distinctive characteristics of the District—an entirely urban jurisdiction that, as the Nation's capital, has special responsibility for the safety of public officials and visiting dignitaries.

This responsible approach works no damage to the right of self-defense recognized in *District of Columbia v. Heller*, 554 U.S. 570 (2008).  Under the District's firearms laws, law-abiding persons may possess, at home, the firearms necessary to protect themselves, their families, and their property from violent incursion, as the Second Amendment, construed in *Heller*, requires.  That zone of protection within the home accords with the special status accorded the home under other constitutional provisions.  But by long tradition in the Anglo-American legal system, the government has broader discretion to regulate activity outside the home, including the carrying of firearms.  And the District has reasonably concluded that, by permitting only those who can show an imminent and concrete threat to their personal safety on the city's streets to carry firearms, it has respected the central

meaning of the Second Amendment while also protecting the rights of its residents, visitors, and public officials to traverse those streets safely and securely.

## ARGUMENT

I. **THE DISTRICT REASONABLY ADDRESSED THE PROBLEM OF GUN VIOLENCE BY REGULATING PUBLIC CARRYING OF FIREARMS**

### A. The Public Carrying Of Firearms Poses Grave Public Safety Concerns

The public carrying of firearms "poses a potential risk to others—carriers and non-carriers alike—far greater than the risk of possessing a handgun within the home." *Wrenn v. District of Columbia*, 2016 WL 912174, at *13 (D.D.C. Mar. 7, 2016). When firearms are confined to the home, their misuse—although tragic—affects a limited number of people. In contrast, when guns are fired in public places, "the danger extends to bystanders and the public at large," JA67 (Committee on the Judiciary and Public Safety, D.C. Council, Report on Bill 20-930, at 18 (Nov. 25, 2014) ("D.C. Council November Report")). As Justice Harlan observed, "[c]oncealed weapons create an immediate and severe danger to the public." *Terry v. Ohio*, 392 U.S. 1, 31-32 (1968) (Harlan, J., concurring); *see also McDonald v. City of Chicago*, 561 U.S. 742, 887 (2010) (Stevens, J. dissenting) ("The State generally has a lesser basis for regulating private as compared to public acts, and firearms kept inside the home generally pose a lesser threat to public welfare as compared to firearms taken outside.").

The District acted reasonably in concluding that regulation of public carrying of firearms was necessary to address dangers to the public including "public safety and crime prevention." JA67 (D.C. Council November Report, at 18). Gun violence causes more than 30,000 deaths and 80,000 nonfatal injuries in the United States every year.[2] Although not all of those incidents occur in public, many do. Law enforcement officers suffered more than 20,000 firearms assaults and 466 firearms-related fatalities between 2005 and 2014,[3] making firearms by far the greatest threat to law enforcement. Of the fifty-one officers killed in 2014, handguns were responsible for more deaths than all other types of weapons combined.[4] In 2014, nearly 3,500 robberies took place in the District; more than a third of those involved firearms.[5] And the Department of Justice's 2012 estimate

---

[2] Centers for Disease Control and Prevention ("CDC"), *WISQARS Nonfatal Injury Reports, 2001-2014*, http://webappa.cdc.gov/sasweb/ncipc/nfirates2001 .html ("All Intents" and "Firearm" and "2014"); CDC, *WISQARS Fatal Injury Reports, National and Regional, 1999-2014*, http://webappa.cdc.gov/sasweb/ncipc/ mortrate10_us.html ("All Intents" and "Firearm" and "2014").

[3] FBI Uniform Crime Reports, tbl. 76 (*Law Enforcement Officers Assaulted, 2005-2014*), https://www.fbi.gov/about-us/cjis/ucr/leoka/2014/tables/table_76_ leos_asltd_type_of_weapon_and_percent_injured_2005-2014.xls; *id.* at tbl. 29 (*Law Enforcement Officers Feloniously Killed, Type of Weapon, 2005-2014*), https://www.fbi.gov/about-us/cjis/ucr/leoka/2014/tables/table_29_leos_fk _type_of_weapon_2005-2014.xls.

[4] FBI Uniform Crime Reports, tbl. 29.

[5] FBI Uniform Crime Reports, tbl. 21 (*Robbery by State, Types of Weapons, 2014*), https://www.fbi.gov/about-us/cjis/ucr/crime-in-the.u.s/2014/crime-in-the-u.s.-2014/tables/table-21.

that gang-related homicides increased 23.6% over prior years[6] holds special

salience in the District, where "gang members carrying guns" is a frequent source

of violence.  JA67 (D.C. Council November Report, at 18).

For the 2000-2013 period, the FBI reported 160 "active shooter" incidents

targeting random civilians, resulting in 486 deaths and 557 injuries.[7]  Contrary to

the speculation of some, there appears to be little support for the proposition that

more firearms among the general public would prevent mass shootings from

occurring or limit their carnage—or at least the District could reasonably have so

concluded.  Even though some states currently have expansive "right to carry"

laws, only one of those "active shooters" was stopped by a private citizen with a

valid firearm permit before police arrived, compared to twenty-one incidents

"ended after unarmed citizens safely and successfully restrained the shooter."[8]

Another study reports that, since 2007, holders of concealed-handgun permits have

been responsible for at least 29 mass shootings—casting doubt on the notion that

---

[6]     National Gang Center, *National Youth Gang Survey Analysis*, http://www
.nationalgangcenter.gov/Survey-Analysis/Measuring-the-Extent-of-Gang-Problems
#homicidesnumber.  While the study includes all gang-related homicides, a large
percentage of gang-related homicides involve firearms.

[7]     FBI, *A Study of Active Shooter Incidents in the United States Between 2000
and 2013*, at 6 (2014), https://www.fbi.gov/news/stories/2014/september/fbi-
releases-study-on-active-shooter-incidents/pdfs/a-study-of-active-shooter-
incidents-in-the-u.s.-between-2000-and-2013.  The report excludes gang- and
drug-related shootings, contained residential disputes, and conflicts arising from
self-defense, among others.  *Id.* at 44.

[8]     *Id.* at 11, 14; *see also id.* at 30.

only law-abiding persons will apply for weapons permits.[9]  The same study finds that, since 2007, there have been at least 696 incidents of non-self-defense killings involving private citizens with concealed-carry permits, resulting in 885 deaths.[10]

These statistics lend support to the Council's predictive judgment that a broader dissemination of weapons on the District's streets will increase gun violence—and certainly will not diminish it.    For criminals, handguns are the weapon of choice because their relatively small size and weight makes them easily concealable, providing the criminal with a valuable element of surprise vis-à-vis his victims and law enforcement.  It was surely reasonable for the Council to conclude that, far from leading to more effective self-defense, widespread carrying of firearms will lead to more frequent use of guns *by criminals*, who will be more heavily armed (and quick to use their firearms) if they believe their victim may be armed.[11]

The public carrying of guns also has the potential to transform what would otherwise be arguments or non-fatal assaults into armed affrays likely to cause

---

[9]     Violence Policy Center, *Concealed Carry Killers Background*, http:// concealedcarrykillers.org/concealed-carry-killers-background (data through June 2016).

[10]     *Id.*

[11]     *See* Cook et al., *Gun Control After* Heller*:  Threats and Sideshows from a Social Welfare Perspective*, 56 UCLA L. Rev. 1041, 1081 (2009) (survey showing that the higher likelihood that the victim is armed, the higher the likelihood the assailant will use a gun).

grievous harm or death.  Both researchers and courts have recognized that "an increase in gun prevalence causes an *intensification* of criminal violence—a shift toward greater lethality, and hence greater harm to the community."[12]  Indeed, Metropolitan Police Department Chief Cathy Lanier has said that a "common theme" in homicide motives is that "individuals are choosing to settle arguments or disputes through extremely violent means."[13]  The D.C. Council itself emphasized this point as it considered the legislation now under review.  JA67 (D.C. Council November Report, at 18) ("It is undeniable that introducing a gun into any conflict can escalate a limited danger into a lethal situation.").  And it reasonably concluded that this "escal[ation]" risk is particularly grave in a "densely populated city" like the District, where congestion increases the risk of daily, unavoidable friction.  *Id.*

The reasonableness of the Council's judgment is confirmed by comparative analyses across jurisdictions, which show a correlation between restrictions on public carry and lower gun-related death rates.  As of 2013, nine of the ten states with the lowest gun death rates had enacted rigorous laws restricting public

---

[12]  Cook & Ludwig, *The Social Costs of Gun Ownership*, 90 J. Pub. Econ. 379, 387 (2006); *see also, e.g.*, *Bonidy v. United States Postal Serv.*, 790 F.3d 1121, 1126 (10th Cir. 2015) ("Firearms may create or exacerbate accidents or deadly encounters[.]"), *cert. denied*, 136 S. Ct. 1486 (2016).

[13]  Metropolitan Police Department, *In Case You Missed It:  Addressing Violent Crime in Washington, DC* (Aug. 26, 2015), http://mpdc.dc.gov/release/case-you-missed-it-addressing-violent-crime-washington-dc.

carrying.[14]  The only state among those ten that does not restrict public carrying is

Maine, which is the least densely populated state in the eastern United States.[15]  At

the other end of the spectrum, nine of the ten states with the highest gun death rates

lack meaningful restrictions on public carry.[16]

Econometric analysis, which the D.C. Council also cited, further supports its

predictive judgment that a more expansive "right to carry" would lead to increased

gun violence.  The Council considered and rejected the notion—articulated in a

1997 paper by economists John Lott and David Mustard—that "allowing citizens

to carry concealed weapons deters violent crimes."  JA66 (D.C. Council November

Report, at 17).[17]  The Council first observed that a 2004 study by the National

Research Council—which reflected the work of 16 leading academic experts—had

concluded that "there was no credible statistical evidence that right-to-carry laws

reduced crime."  *Id.*[18]  It then credited 2014 research conducted by Professor John

---

[14]  Law Center to Prevent Gun Violence, *2013 State Scorecard:  Why Gun Laws Matter*, tbl. (2013) ("*2013 State Scorecard*"), http://smartgunlaws.org/wp-content/uploads/2013/12/SCGLM-Final10-spreads-points.pdf.

[15]  U.S. Census Bureau, *State Population – Rank, Percent Change, and Population Density:  1980 to 2009*, http://www2.census.gov/library/publications/2010/compendia/statab/130ed/tables/11s0013.pdf.

[16]  *2013 State Scorecard.*

[17]  Lott & Mustard, *Crime, Deterrence, and Right-to-Carry Concealed Handguns*, 26 J. Legal Studies 1 (1997).

[18]  *See* National Research Council, *Firearms and Violence:  A Critical Review* 7 (2004), http://www.nap.edu/catalog/10881/firearms-and-violence-a-critical-review.

Donohue of Stanford Law School, which found that "[t]he totality of the evidence based on educated judgments about the best statistical models suggests that right-to-carry laws are associated with substantially *higher* rates of aggravated assault, rape, robbery and murder." *Id.* (emphasis added).[19]

Professor Daniel Webster, of the Johns Hopkins University School of Public Health, confirmed the soundness of the Council's conclusions in a separate letter. D.C. Council, Committee of the Whole, Report on Bill 20-930, attach. 3, at 2 (Nov. 25, 2014), http://lims.dccouncil.us/Download/32576/B20-0930-CommitteeReport2.pdf. Professor Webster concluded that Professor Donohue's papers were the "most scientifically rigorous studies" on the subject. *Id.* He endorsed Professor Donohue's findings that estimated "a nearly 33 percent increase in assaults with firearms associated with [right-to-carry] laws." *Id.* In Professor Webster's opinion, "there is convincing evidence that [right-to-carry] laws increase violence committed with firearms" and that "laws giving law enforcement discretion in issuing permits to carry concealed firearms protect against gun violence." *Id.*

---

[19]    *See* Parker, *Right-To-Carry Gun Laws Linked to Increase in Violent Crime, Stanford Research Shows*, Stanford Report (Nov. 14, 2014) (quoting Prof. Donohue), http://news.stanford.edu/news/2014/november/donohue-guns-study-111414.html; Donohue et al., *The Impact of Right to Carry Laws and the NRC Report: The Latest Lessons for the Empirical Evaluation of Law and Policy*, NBER Working Paper No. 18294 (rev. Nov. 7, 2014), http://www.nber.org/papers/w18294.

The analyses of the National Research Council, Professor Donohue, and Professor Webster cited by the D.C. Council significantly undermine the "more guns, less crime" hypothesis. But even if reasonable minds could disagree about the issue, those studies at a minimum permitted the legislature to conclude, in its judgment, that more guns on the District's streets would lead to *more* violent crime, and that it was therefore appropriate to limit their proliferation while also respecting the right to self-defense.

**B.    The District Faces Unique And Heightened Public Safety Risks**

Although the District is not alone in regulating public carrying, only the District faces "the unique security risks presented by a city full of high-level government officials, diplomats, monuments, parades, protests and demonstrations [plus] countless government buildings." *Heller v. District of Columbia*, 801 F.3d 264, 283 (D.C. Cir. 2015) (*Heller III*) (Henderson, J., concurring in part and dissenting in part). In addition, "the entirety of the District of Columbia is an urban area," and so its residents have a particularly "strong interest in public safety and crime prevention." *Wrenn*, 2016 WL 912174, at *13-14; *id.* at *14 n.16 (taking judicial notice of the "notably higher" population density of the District compared to every other State).

1. The District continues to suffer from the Nation's highest rate of violent crime—a rate more than three times the national violent crime rate.[20]  In 2014, the Metropolitan Police Department reported 105 homicides, 72 of which were committed with a firearm, meaning that firearm-related homicides resulted in 2,439 years of potential life lost in the District in 2014 alone.[21]  Last year was even worse, with 162 homicides taking place in the District in 2015, a near-doubling of the total number of homicides from just three years prior.[22]  And every year, innocent bystanders become the victims of shootings on the District's streets; in April 2016, a seven-year-old girl was critically wounded by random handgun fire while walking home with her parents.[23]  Months prior, a recent American

---

[20]  *Compare* 1,244.4 violent crimes per 100,000 inhabitants in the District, FBI Uniform Crime Reports, tbl. 5 (*Crime in the United States, 2014*), https://www .fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2014/crime-in-the-u.s.-2014/tables/ table-5, *with* national violent crime rate of 365.5 per 100,000 inhabitants, FBI Uniform Crime Reports (*Crime in the United States, 2014*), https://www.fbi .gov/about-us/cjis/ucr/crime-in-the-u.s/2014/crime-in-the-u.s.-2014/tables/table-1/table-1-overview.pdf.

[21]  Metropolitan Police Department, *Annual Report 2014*, at 23, http://mpdc.dc .gov/sites/default/files/dc/sites/mpdc/publication/attachments/MPD%20Annual%2 0Report%202014_lowres_0.pdf; CDC, *WISQARS Years of Potential Life Lost* ("District of Columbia," "Violence-Related Injury Deaths," "Homicide," "Firearm," and "2014"), http://webappa.cdc.gov/sasweb/ncipc/ypll10.html.

[22]  Metropolitan Police Department, *District Crime Data at a Glance*, http:// mpdc.dc.gov/page/district-crime-data-glance (recording 88 homicides in 2012).

[23]  Boburg & Shaver, *7-Year-Old In Critical Condition After Shooting That Rattles Her D.C. Neighborhood*, Wash. Post (Apr. 9, 2016), https://www .washingtonpost.com/local/seven-year-old-in-critical-condition-after-shooting-that-

University graduate and former Senate intern was killed by a stray bullet near the Shaw-Howard University Metro station.[24]

Firearms-related violence also imposes enormous financial burdens on the District. In 2010, deaths from firearms resulted in $150 million in work-loss cost for the District.[25] Nationwide, the Surgeon General has observed, "guns are a health care issue."[26] Associated medical costs in the District averaged about $20,000 per death, most of it borne by taxpayers.[27]

These and similar statistics set the gun violence problem afflicting the District apart from the experience of "'rural Oklahoma,'" "'open-sky Montana,'" or "'every-kid-grows-up-hunting Kentucky.'" JA54 (D.C. Council November Report, at 5). The relevant comparison is, if any, with other densely populated

rattles-her-dc-neighborhood/2016/04/09/64514cdc-fe72-11e5-9140-e61d062438 bb_story.html.

[24] Goldgeier, *Remembering Matthew C. Shlonsky* (Aug. 17, 2015), http:// www.american.edu/sis/news/20150817-In-Remembrance-Matthew-Shlonsky.cfm.

[25] CDC, *WISQARS Cost of Injury Reports* (2010) ("Fatal Injuries," "Both Sexes," "All Ages," "District of Columbia"), https://wisqars.cdc.gov:8443/costT/.

[26] Tavernise, *Vivek Murthy, the New Surgeon General, Isn't Afraid to Take a Stand*, N.Y. Times (Dec. 16, 2014), http://www.nytimes.com/2014/12/17/science/ a-new-surgeon-general-unafraid-of-taking-a-stand-on-a-divisive-issue.html.

[27] CDC, *WISQARS Cost of Injury Reports* (2010); Howell & Abraham, *The Hospital Costs of Firearm Assaults* 5 (Sept. 2013), http://www.urban.org/sites/ default/files/alfresco/publication-pdfs/412894-The-Hospital-Costs-of-Firearm-Assaults.PDF (52 percent of 2010 hospital costs for firearm assault injuries were paid by publicly-funded insurance (primarily Medicaid), with another 28 percent of hospital costs generated by the uninsured).

areas.  And that is precisely where the Council looked for guidance; it "follow[ed] the models" of New York, New Jersey, and Maryland, JA51 (D.C. Council November Report, at 2)—the laws of which have all been upheld against Second Amendment challenges.

2.    The District's status as the Nation's capital places upon it an additional, unique responsibility to protect the safety of government officials and visitors.

The very existence of the District as a distinct jurisdiction is rooted in a constitutional duty to ensure the safety of government officials and employees, and thus to preserve the continuity of the federal government's operations.  The Framers created the District as a federal enclave to ensure that the operations of the federal government would not be derailed by acts of violence or intimidation.  U.S. Const. art. I, § 8, cl. 17 (conferring exclusive authority to Congress over the District and "like Authority" over federal installations "for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings"); Federalist No. 43 (Madison) ("complete authority at the seat of government" is necessary because, without it, "the public authority might be insulted and its proceedings interrupted").  This decision was a response to the Philadelphia Mutiny of 1783, in which several hundred soldiers of the Continental Army surrounded the Pennsylvania State House, where the Continental Congress was then situated. Bowling, *The Creation of Washington, D.C.* 30-34, 75-77 (1991); *Adams v.*

*Clinton*, 90 F. Supp. 2d 35, 50 n.25 (D.D.C. 2000) (three-judge court; per curiam) (discussing history), *aff'd*, 531 U.S. 941 (2000). When Pennsylvania refused to summon the militia to protect Congress (as requested by the delegates), Congress was forced to leave town. Cress, *Whither Columbia? Congressional Residence and the Politics of the New Nation, 1776 to 1787*, 32 Wm. & Mary Q. 581, 588 (1975). The fact that the Framers created the District in large part to ensure the security of the federal government against the threat of gun-wielding protestors strongly undermines any assertion that the Constitution prohibits Congress (and, by delegation, the District) from restricting the public carrying of guns on the District's streets.

As the seat of the national government, the District is home to thousands of high-profile individuals. This includes not only the President, his Cabinet members, high-level executive officials, and members of Congress, but also "a diplomatic corps more extensive and omnipresent than anywhere else in the country," and officers of multilateral institutions such as the International Monetary Fund and the World Bank. JA54 (D.C. Council November Report, at 5); *see also* JA53, 55. In addition, more than 400 non-resident foreign dignitaries make official visits to the District each year, and another 3,000 spend time here in one capacity or another. JA55.

Although official data on specific threats are not made public, JA53 (D.C. Council November Report, at 4), history shows that the threat is real. As the Council recounted, four sitting Presidents have been assassinated with firearms (two in the District), and five more have been shot at (including President Reagan, who was shot on the streets of the District). *Id.* In 2011, a shooter opened fire on the White House, hitting an outside wall. JA55. On a May afternoon in 2016, District security forces put the White House on lockdown as the Secret Service had to shoot a man armed with a handgun to stop him from approaching a guard booth outside.[28] Congress and its Members have also been targeted, and threats to the diplomatic corps are likewise a "constancy." JA54. Actual, attempted, and planned political assassinations of notable foreign visitors to the District are not unknown—including a plot to assassinate the Saudi ambassador in Georgetown in 2011.

Protecting these high-profile individuals presents a constant challenge for law enforcement. The numerous law enforcement agencies operating in the District must coordinate their efforts as they protect high-level officials whose motorcades crisscross the District daily, while at the same time ensuring that the Nation's capital remains open for business and functional for its residents—quite unlike other cities, which can "clear the streets" in unusual instances like a

---

[28] Williams, *Man Shot by Secret Service at White House: 'I Came Here To Shoot People,'* NBC News (June 3, 2016), http://www.nbcnews.com/news/us-news/man-shot-secret-white-house-i-came-here-shoot-n585456.

Presidential visit.  JA54 (D.C. Council November Report, at 5).  The difficulty of this task would be compounded if public carrying of firearms were commonplace; responsible law enforcement officers would be required to investigate many more incidents of weapons possession as potential threats.  Publicly carried weapons could be (or at least appear) menacing to dignitaries, requiring much more extensive security sweeps to ensure their safety.

The District is also the location of numerous sensitive buildings and other places.  The Supreme Court has recognized the long history of prohibitions on gun possession in the proximity of such places.  *See Heller*, 554 U.S. at 626 ("[N]othing in our opinion should be taken to cast doubt on … laws forbidding the carrying of firearms in sensitive places such as schools and government buildings.").  There are hundreds of elementary and secondary schools in the District.[29]  Moreover, the District is home to the Nation's most prominent courts and several military installations, as well as numerous colleges and universities.  And the District is dotted with landmarks that are visited by millions of people each year.  In 2014 alone, the District welcomed a record 20.2 million visitors, and

---

[29]    State Education Data Profiles, *National Center for Education Statistics 2013-2014*, https://nces.ed.gov/programs/stateprofiles/sresult.asp?mode=short&s1=11.

sites such as the National Mall and the Lincoln Memorial have been the theater of the Nation's most high-profile demonstrations.[30]

Adherents of opposing causes often confront each other on the sidewalks and streets of the District. For example, in March 2016, just off the Supreme Court plaza; hundreds gathered outside, holding banners and chanting, as the Justices heard argument about Texas's regulations on abortion clinics.[31] Widespread public carrying of firearms would risk turning these heated—but constitutionally protected—exchanges into armed confrontations, robbing the public of its ability to rely upon the District's sites as platforms for broader discourse in the marketplace of ideas. Further, as this Court has recognized, "common sense" suggests that the risks of carrying a gun in public include "that the gun may be stolen en route or that the [carrier] may be arrested or even shot by a police officer seeing a man with a gun." *Heller III*, 801 F.3d at 277.

At a minimum, more guns on the District's streets would result in more reports of gun sightings, which would in turn require an increased police presence. But as the Council observed, flooding the streets with police is itself problematic,

---

[30]    Washington, D.C., *2014 Visitor Statistics*, http://destinationdc.dmplocal .com/dsc/collateral/2014_Washington_DC_Visitor_Statistics.pdf.

[31]    Vargas, *Hundreds of Activists Rally Outside Supreme Court for Key Abortion Case*, Wash. Post (Mar. 2, 2016), https://www.washingtonpost.com/ local/hundreds-of-activists-expected-outside-supreme-court-for-key-abortion- case/2016/03/01/a99aa36e-dff6-11e5-846c-10191d1fc4ec_story.html.

because "[a]t some point the presence of law enforcement crosses a psychological line between providing public safety and infringing upon a sense of freedom." JA56 (D.C. Council November Report, at 7). The District was entitled to take into consideration such "local needs and values" when crafting responsible firearms regulations. *See McDonald*, 561 U.S. at 785 (plurality).

## II. THE DISTRICT HAS CONSIDERABLE DISCRETION IN REGULATING THE PUBLIC CARRYING OF FIREARMS BECAUSE SUCH CONDUCT DOES NOT IMPLICATE THE CORE SECOND AMENDMENT RIGHT TO SELF-DEFENSE IN THE HOME

### A. The Second Amendment Right Recognized in *Heller* Is, At Core, Only A Right To Self-Defense Within The Home

*District of Columbia v. Heller*, 554 U.S. 570 (2008), recognized self-defense within the home as the core of the individual right secured by the Second Amendment. From its first sentence, the *Heller* Court made plain that the question presented did not extend beyond the home: "We consider whether a … prohibition on the possession of usable handguns *in the home* violates the Second Amendment to the Constitution." 554 U.S. at 573 (emphasis added). In analyzing the District's prohibition on firearm possession, the Court faulted the prohibition primarily because it "extend[ed] … to the home, where the need for defense of self, family, and property is most acute." *Id.* at 628. Then, when it summed up its holding, the Court emphasized that it was deciding the case on the narrowest grounds: "[W]e hold that the District's ban on handgun possession *in the home* violates the Second

Amendment, as does its prohibition against rendering any lawful firearm *in the home* operable for the purpose of immediate self-defense. … [T]he District must permit [Heller] to register his handgun and must issue him a license to carry it *in the home*." *Id.* at 635 (emphasis added).[32]

Several additional qualifications in *Heller* confirm that the Supreme Court intended to establish no more than the right to self-defense within the home. In a clear signal that *Heller* was not intended to upset the heartland of firearms regulations, the Court emphasized that it was not casting doubt upon certain "longstanding prohibitions on the possession of firearms[.]" 554 U.S. at 626-627. And the Court explained that, although the Second Amendment is an individual right, it is "not unlimited" and may be restricted with appropriate justification. *Id.* at 626; *see also id.* at 595 (same). Given the Court's repeated emphasis on the home and disclaimers of a broader holding, *Heller* should not be read to suggest a Second Amendment right extending beyond the right to self-defense in the home.

Overwhelmingly, appellate courts have understood *Heller* precisely this way. The First, Second, Third, and Fourth Circuits have all explained that, even if the Second Amendment right to bear arms applies at all outside the home—a question some of those courts declined to decide—regulation of public carrying of

---

[32] *McDonald v. City of Chicago* reiterated that *Heller*'s holding was limited to "the right to possess a handgun in the home for the purpose of self-defense." 561 U.S. 742, 791 (2010) (plurality).

firearms implicates that right at most to a modest, and tolerable, degree.  *See Woollard v. Gallagher*, 712 F.3d 865, 876 (4th Cir. 2013); *Kachalsky v. County of Westchester*, 701 F.3d 81, 84 (2d Cir. 2012); *Hightower v. City of Boston*, 693 F.3d 61, 72 & n.8, 74 (1st Cir. 2012); *United States v. Masciandaro*, 638 F.3d 458, 475 (4th Cir. 2011) (Wilkinson, J.).  The Third Circuit has also declined to resolve that question, making clear, however, that to the extent the right existed outside the home it would "most certainly operate[] in a different manner."  *Drake v. Filko*, 724 F.3d 426, 430-431 & n.5 (3d Cir. 2013).

The Ninth Circuit, the Maryland Court of Appeals, and the D.C. Court of Appeals have also recognized the narrowness of the ruling in *Heller*.  Most recently, the Ninth Circuit—in upholding California's own "good cause" licensing regime—"conclude[d] that the Second Amendment right to keep and bear arms does not include, in any degree, the right of a member of the general public to carry concealed firearms in public."  *Peruta v. County of San Diego*, 2016 WL 3194315, at *15 (9th Cir. June 9, 2016) (en banc).  In *Williams v. State*, 10 A.3d 1167 (Md. 2011), the Court of Appeals of Maryland held that a prohibition on the possession of handguns outside the home without a permit was "outside … the scope of the Second Amendment" because it "permitted [home] possession," *id.* at 1178. Similarly, in *Sims v. United States*, the D.C. Court of Appeals rejected a Second Amendment defense to a criminal indictment for carrying a pistol without a license,

holding, on plain error review, that it "assuredly is not 'clear' and 'obvious' from [*Heller*] … that it dictates an understanding of the Second Amendment which would compel the District to license a resident to carry and possess a handgun outside the confines of his home, however broadly defined."  963 A.2d 147, 150 (D.C. 2008); *see also Little v. United States*, 989 A.2d 1096, 1101 (D.C. 2010).

Although the Seventh Circuit has indicated that the Second Amendment right applies outside the home, its decision casts no doubt on the District's regulations challenged here.  *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012), invalidated a "uniquely sweeping ban" on public carry—not a "good reason" licensing framework such as the District's.  *See id*. at 934, 942.  Moreover, the Seventh Circuit did not confront the unique public safety challenges facing the District on a daily basis.  The great weight of appellate authority, therefore, confirms that the District's regulation of public carrying of firearms does not infringe the Second Amendment right to self-defense, whether or not that right sweeps outside the home.

**B.      Historical Evidence Confirms That The Public Carrying Of Firearms Lies Outside The Core Second Amendment Right**

*Heller* recognized that "longstanding prohibitions" on the use and carrying of firearms are "presumptively lawful."  554 U.S. at 626-627 & n.26.  The District's regulation of public carrying fits the bill and is consistent with the experience of other jurisdictions.

Almost 160 years ago, the City of Washington made it illegal to publicly carry "deadly or dangerous weapons, such as … pistol[s]." City Act of Nov. 4, 1857; *see also* City Act of Nov. 18, 1858. In 1892, Congress prohibited the concealed carrying of pistols in the District without a license, which required good reason. Act of July 13, 1892, 27 Stat. 116; *see also* Act of July 8, 1932, § 4, 47 Stat. 650, 651. Thus, although the challenged provisions of the D.C. Code were enacted in response to the district court's decision in *Palmer v. District of Columbia*, 59 F. Supp. 3d 173 (D.D.C. 2014), JA51 (D.C. Council November Report, at 2), they stem from a longstanding District policy that strictly controls the public carrying of handguns within the Nation's capital and is presumptively lawful. *Heller*, 554 U.S. at 627 n.26.

The District's history is consistent with that of many states, where restrictions on public carry date back more than a century. As the Supreme Court has noted, "the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment." *Heller*, 554 U.S. at 626. In the 1800s, the majority of states banned the carrying of concealed weapons, and several states "went even further … bann[ing] *concealable* weapons (subject to certain exceptions) altogether whether carried openly or concealed." *Kachalsky*, 701 F.3d at 96 (emphasis added); *see also id.* at 90 (collecting statutes); *Peruta*, 2016 WL 3194315, at *10-15 (same;

concluding that the "historical materials" "are remarkably consistent").  When criminal defendants challenged the constitutionality of prohibitions on carrying concealed weapons, the courts turned those challenges aside, and held that the right to self-defense did not encompass an unlimited right to carry publicly.  *See, e.g.*, *State v. Mitchell*, 3 Blackf. 229 (Ind. 1833) ("[T]he statute of 1831, prohibiting all persons, except travelers, from wearing or carrying concealed weapons, is not unconstitutional.").  Contemporary legal commentators similarly explained that the general right to self-defense "is certainly not violated by laws forbidding persons to carry dangerous or concealed weapons."  Pomeroy, *An Introduction to the Constitutional Law of the United States* 157 (1868).  The District's current law is fully in accord with such longstanding prohibitions.

## III.  IN APPLYING INTERMEDIATE SCRUTINY, THE COURT SHOULD RECOGNIZE THAT LOCAL LEGISLATORS HAVE APPROPRIATE LATITUDE TO ADDRESS THE PROBLEM OF GUN VIOLENCE IN THE DISTRICT'S UNIQUE CIRCUMSTANCES

This Court has set out a two-step approach for evaluating Second Amendment challenges:  First, it asks whether the challenged statute "impinges upon a right protected by the Second Amendment"; second, it determines "whether the provision passes muster under the appropriate level of constitutional scrutiny." *Heller v. District of Columbia*, 670 F.3d 1244, 1252 (D.C. Cir. 2011) (*Heller II*). In that analysis, the Court determines the level of scrutiny based on "the nature of the conduct being regulated and the degree to which the challenged law burdens

the right." *Id.* at 1257. Strict scrutiny will apply to severe burdens on the "core" Second Amendment right, *id.*, namely "self-defense in the home," *id.* at 1255. By contrast, registration regulations that "'do not severely limit the possession of firearms'" are analyzed under intermediate scrutiny. *Id.* at 1257 (alteration omitted); *see also Heller III*, 801 F.3d at 274 (applying intermediate scrutiny). Under intermediate scrutiny, the District must show "there is a substantial relationship or reasonable 'fit' between" the District's regulations and "its governmental interests." *Heller II*, 670 F.3d at 1258, 1262.

Because the challenged sections of the D.C. Code apply only outside the home, no "core" Second Amendment rights are implicated, and the regulations are subject to, at most, intermediate scrutiny. *Peruta*, 2016 WL 3194315, at *17 ("Even if we assume that the Second Amendment applies, [the] regulation … survives intermediate scrutiny[.]"); *Wrenn*, 2016 WL 912174, at *7 (concluding that D.C. Circuit precedent lends "strong support" to applying intermediate scrutiny to regulations governing public carrying of handguns); *but see Grace v. District of Columbia*, 2016 WL 2908407, at *11 n.21 (D.D.C. May 17, 2016) (applying strict scrutiny while "recogniz[ing] that several Courts of Appeals" found no core right implicated in "similar" analyses).

In applying intermediate scrutiny, this Court should recognize that the District's regulations represent the legislature's predictive judgments about what

measures will work to prevent and diminish gun violence—a problem that defies simple solutions, warrants close attention to local conditions, requires creativity and flexibility, and has challenged legislators in every jurisdiction for decades. In facing such "a grave and complex task," *Heller III*, 801 F.3d at 281 (Henderson, J., concurring in part and dissenting in part), the local legislature is best situated to hear and sift evidence about the effectiveness of firearms regulations. *See Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 196 (1997) ("This principle [of deference] has special significance in cases, like this one, involving congressional judgments concerning regulatory schemes of inherent complexity and assessments about the likely interaction of industries[.]"); *see also McDonald*, 561 U.S. at 783 (plurality) (recognizing that "conditions and problems differ from locality to locality and that citizens in different jurisdictions have divergent views on the issue of gun control"); *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 440 (2002) (plurality) (local legislatures are "in a better position than the Judiciary to gather and evaluate data on local problems").

*Heller II*'s analysis of the District's ban on assault weapons is illustrative. The District's ban on semi-automatic rifles prohibited all possession of weapons "in common use," including any use of those weapons in the home for self-defense. *Heller II*, 670 F.3d at 1261. Even though the Court assumed that those firearms were used primarily for self-defense, it held that intermediate scrutiny was

appropriate because the prohibition "d[id] not impose a substantial burden" upon "the core right protected by the Second Amendment." *Id.* at 1262. Analogous reasoning applies here. The District's regulation of public carrying does not affect the core of the Second Amendment right, *supra* pp. 20-25, but does promote the public's interests at large, *supra* pp. 5-12; responds to the unique security concerns of the District, *supra* pp. 12-20; and reasonably fits the District's legitimate interests.

The decisions of other courts of appeals confirm that, under intermediate scrutiny, reviewing courts should accord the legislature significant latitude to address the vexing problem of gun violence. In *Kachalsky*, the Second Circuit held that intermediate scrutiny was warranted for a law that "places substantial limits on the ability of law-abiding citizens to possess firearms for self-defense in public." 701 F.3d at 93. But the court declined to apply strict scrutiny to review this "substantial limit[]" because it does not burden the "'core'" of the Second Amendment right. *Id.* at 93 & n.17 (collecting cases). Likewise, the Fourth Circuit in *Woollard* confirmed that intermediate scrutiny applies "'to laws that burden [any] right to keep and bear arms outside of the home.'" 712 F.3d at 876 (quoting *Masciandaro*, 638 F.3d at 470-471). To pass intermediate scrutiny, the government need only show a "'reasonable, not perfect'" fit between its interests and the imposed restriction. *Id.* at 878.

As *Woollard* and *Kachalsky* recognize, intermediate scrutiny affords a significant measure of deference to the local legislature's superior position to assess the public risks of firearm possession outside the home and the measures necessary to mitigate those risks. *See Woollard*, 712 F.3d at 881 ("'[I]t is the legislature's job, not ours, to weigh conflicting evidence and make policy judgments.'" (quoting *Kachalsky*, 701 F.3d at 99)). This Court has similarly concluded that it should defer to legislative judgments where public safety and firearms are concerned. *Schrader v. Holder*, 704 F.3d 980, 990 (D.C. Cir. 2013) (discussing *Kachalsky*); *see also Heller III*, 801 F.3d at 282 (Henderson, J., concurring in part and dissenting in part). This approach is eminently sensible given the unique challenges of assessing the complex interactions of factors that affect public safety. *See Grace*, 2016 WL 2908407, at *12 (acknowledging that "a jurisdiction's unique characteristics could be relevant in the means-end analysis"). And it is particularly critical in light of the unique needs present in the District. To the extent the Court finds the Second Amendment implicated at all, this Court should adhere to *Schrader* and review the Council's regulation of public carry through a properly deferential lens, as the Second Circuit and several other courts have done under analogous circumstances. *E.g.*, *Kachalsky*, 701 F.3d at 97 (collecting authorities).

The problem of gun violence in the Nation's Capital is grave, and does not lend itself to easy solutions. The District's Council, Mayor, and police officials have addressed the problem in a thoughtful, thorough way that reasonably and sensibly protects public safety and national security interests, while also guarding the right of self-defense. Amici urge this Court to defer to the responsible determinations of these local officials.

## CONCLUSION

The order of the district court denying a preliminary injunction should be affirmed.

Dated: July 20, 2016

Respectfully submitted,

/s/ Paul R.Q. Wolfson

WALTER A. SMITH, JR.
KEVIN HILGERS
DC APPLESEED CENTER FOR LAW & JUSTICE
1111 Fourteenth Street, NW
Washington, DC 20005
(202) 289-8007

PAUL R.Q. WOLFSON
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6000

ALLISON TRZOP*
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8000

*Admitted to practice only in Massachusetts. Supervised by members of the firm who are admitted to practice in New York.*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B).

1.     Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(a)(7)(B), the brief contains 6,819 words.

2.     The brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font.  As permitted by Fed. R. App. P. 32(a)(7)(C), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ Paul R.Q. Wolfson
PAUL R.Q. WOLFSON
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC  20006
Tel.: (202) 663-6000
Fax: (202) 663-6363
paul.wolfson@wilmerhale.com

July 20, 2016

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of July, 2016, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system.  Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

<div style="margin-left: 50%;">

/s/ Paul R.Q. Wolfson

PAUL R.Q. WOLFSON
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC  20006
Tel.: (202) 663-6000
Fax: (202) 663-6363
paul.wolfson@wilmerhale.com

</div>

July 20, 2016