IN THE

# United States Court of Appeals
# For the District of Columbia Circuit

————————————————

BRIAN WRENN, *et al.*,

Plaintiffs-Appellants,

v.

DISTRICT OF COLUMBIA and CATHY L. LANIER,

Defendants-Appellees.

————————————————

On Appeal Of An Order Of The United States District Court
For The District Of Columbia, Supporting Affirmance
Case No. 1:15-cv-00162-CKK
Judge Colleen Kollar-Kotelly

---

**AMICUS CURIAE BRIEF OF BRADY CENTER TO PREVENT GUN
VIOLENCE IN SUPPORT OF APPELLEES
DISTRICT OF COLUMBIA AND CATHY L. LANIER**

---

BRADY CENTER TO PREVENT
GUN VIOLENCE
Jonathan Lowy
Alla Lefkowitz
Avery Gardiner
Kelly Sampson
840 First Street, N.E. Suite 400
Washington, D.C. 20002
(202) 370-8104
jlowy@bradymail.org

HOGAN LOVELLS US LLP
Adam K. Levin
Anna M. Kelly
Evan W. Guimond
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
adam.levin@hoganlovells.com
anna.kelly@hoganlovells.com

*Counsel for Amicus Curiae*

Dated: July 20, 2016

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to D.C. Circuit Rule 28(a)(1), amicus curiae Brady Center to Prevent Gun Violence certifies that:

**A.     Parties and Amici.**

1.     All parties, intervenors, and amici appearing before the district court and in this court are listed in the Brief for the Appellants.

2.     Amicus curiae The Brady Center to Prevent Gun Violence makes the following disclosures pursuant to D.C. Circuit Rules 26.1(a)-(b) and 28(a)(1)(A) and Federal Rules of Appellate Procedure 26.1 and 29(c)(4):

The Brady Center to Prevent Gun Violence has no parent company, nor does any publicly-held company have a 10% or greater ownership interest (such as stock or partnership shares) in the Center.

The Brady Center to Prevent Gun Violence is the nation's largest non-partisan, non-profit organization dedicated to reducing gun violence through education, research, and legal advocacy.  Through its Legal Action Project, it has filed numerous amicus curiae briefs in cases involving firearms regulations in the Supreme Court of the United States and in federal Courts of Appeals, including *McDonald v. City of Chicago*, 561 U.S. 742, 870 n.13, 887 n.30, 891 n.34 (2010) (Stevens, J., dissenting) (citing Brady Center brief), *United States v. Hayes*, 555 U.S. 415, 427 (2009) (citing Brady Center brief), *District of Columbia v. Heller*,

554 U.S. 570 (2008), and *Peruta v. City of San Diego*, No. 10-56971, 2016 WL

3194315 (9th Cir. June 9, 2016).

**B.      Ruling Under Review.**

References to the rulings at issue appear in the Brief for the Appellant.

**C.      Related Cases.**

There is one related case of which undersigned counsel is aware:

1. *Grace, et al. v. District of Columbia, et al.*, No. 16-7067 (DC Cir.).

Following the district court's grant of plaintiffs' motion for preliminary injunction

entered on May 17, 2016, defendants filed an appeal in the United States Court of

Appeals for the District of Columbia Circuit on May 26, 2016.  That appeal is

scheduled for oral argument on September 20, 2016.

## D.C. CIRCUIT RULE 29(d) STATEMENT

Pursuant to D.C. Circuit Rule 29(d), undersigned counsel certifies that this separate brief is necessary because The Brady Center to Prevent Gun Violence has unique expertise in Second Amendment law and firearms policy issues, including a combined 26 years in gun litigation and analyses of concealed firearms laws and other gun policies.

/s/ Adam Levin
Adam K. Levin

HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004
(202) 637-5600
adam.levin@hoganlovells.com

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

D.C. CIRCUIT RULE 29(d) STATEMENT ........................................................ iii

TABLE OF AUTHORITIES ........................................................................... v

INTRODUCTION ......................................................................................... 1

STATUTES AND REGULATIONS ................................................................. 4

STATEMENT OF IDENTITY, INTEREST IN CASE,
AND SOURCE OF AUTHORITY TO FILE ..................................................... 4

ARGUMENT ................................................................................................. 5

   I.    THE SECOND AMENDMENT DOES NOT PROTECT
        THE RIGHT OF A MEMBER OF THE GENERAL
        PUBLIC TO CARRY A CONCEALED GUN IN PUBLIC .................... 5

   II.   EVEN IF THE SECOND AMENDMENT APPLIES,
        INTERMEDIATE SCRUTINY IS THE APPROPRIATE
        STANDARD .......................................................................................... 8

   III.  THE DISTRICT'S CONCEALED CARRY REGIME
        WITHSTANDS INTERMEDIATE SCRUTINY. ................................. 10

        A.    The District's Concealed Carry Regime Conforms
              with "May Issue" Regimes Upheld by Other Circuits
              as Constitutional Under Intermediate Scrutiny ............................ 10

        B.    Social Science Confirms that the District's "Good
              Reason/Proper Reason" Requirement Furthers
              Government's Important Interest in Public Safety,
              Satisfying Intermediate Scrutiny .................................................. 13

CONCLUSION ............................................................................................. 22

# TABLE OF AUTHORITIES

**Page(s)**

CASES:

*Commonwealth v. Robinson*,
    600 A.2d 957 (Pa. Super. Ct. 1991) ..................................................20

*Commonwealth v. Williams*,
    No. 09-P-813, 2011 WL 3299022 (Mass. App. Ct. Aug. 3, 2011)......................6

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)..................................................................7, 8, 9

*\*Drake v. Filko*,
    724 F.3d 426 (3d Cir. 2013)........................................................9, 11

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011)............................................................7

*Heller v. District of Columbia*,
    670 F.3d 1244 (D.C. Cir. 2011) ..................................................8, 13

*\*Kachalsky v. Cty. of Westchester*,
    701 F.3d 81 (2d Cir. 2012).........................................................9, 12

*Moore v. Madigan*,
    702 F.3d 933 (7th Cir. 2012)............................................................7

*People v. Aguilar*,
    2 N.E.2d 321 (Ill. 2013) ...........................................................6, 7

*People v. Dawson*,
    934 N.E.2d 598 (Ill. App. Ct. 2010)..................................................6

*Peterson v. Martinez*,
    707 F.3d 1197 (10th Cir. 2013).......................................................6

*Authorities upon which we chiefly rely are marked with asterisks.

*Peruta v. Cty. of San Diego,
   No. 10-56971, 2016 WL 3194315 (9th Cir. June 9, 2016) ............ 6, 7, 9, 11, 12

Robertson v. Baldwin,
   165 U.S. 275 (1897).................................................................................7

Singleton v. United States,
   998 A.2d 295 (D.C. 2010).......................................................................20

United States v. Masciandaro,
   638 F.3d 458 (4th Cir. 2011)..................................................................9, 13

Williams v. State,
   10 A.3d 1167 (Md. 2011)........................................................................6

*Woollard v. Gallagher,
   712 F.3d 865 (4th Cir. 2013)...................................................................9, 11

**STATUTES:**

Cal. Penal Code §§ 26150-26225.......................................................................10

Conn. Gen. Stat. §§ 29-28 – 29-30.....................................................................10

Conn. Gen. Stat. § 29-32..................................................................................10

Conn. Gen. Stat. § 29-32b................................................................................10

Conn. Gen. Stat. § 29-35..................................................................................10

Conn. Gen. Stat. § 29-37..................................................................................10

D.C. Code § 22-4506(a).....................................................................................3

Del. Code Ann. tit. 11, § 1441 .........................................................................10

Del. Code Ann. tit. 11, § 1442 .........................................................................10

Haw. Rev. Stat. Ann. § 134-9 ..........................................................................10

Ind. Code Ann. § 35-47-2-3(e)..........................................................................11

Mass. Gen. Laws ch. 140 § 131 .......................................................................10

Mass. Gen. Laws ch. 140 § 131C......................................................................10

Mass. Gen. Laws ch. 140 § 131P ............................................................10

Mass. Gen. Laws ch. 269 § 10 ...............................................................10

Md. Code Ann., Pub. Safety §§ 5-301 – 5-314.....................................10

N.H. Rev. Stat. Ann. § 159:6(I)(b) ........................................................11

N.J. Stat. Ann. § 2C:39-5 .......................................................................10

N.J. Stat. Ann. § 2C:58-3 .......................................................................10

N.J. Stat. Ann. § 2C:58-4 .......................................................................10

N.Y. Penal Law § 400.00........................................................................10

R.I. Gen. Laws § 11-47-8 –11-47-18 ....................................................10

LEGISLATIVE MATERIALS:

*Council of the District of Columbia, Committee of the Whole, Committee
    Report on Bill 20-930, "License to Carry a Pistol Amendment Act of
    2014" (Dec. 2, 2014)..................................................................13, 16

*Council of the District of Columbia, Committee on the Judiciary & Public
    Safety, Committee Report on Bill 20-930, "License to Carry a Pistol
    Amendment Act of 2014" (Nov. 25, 2014)........................................12

OTHER AUTHORITIES:

*Abhay Aneja, John J. Donohue III, & Alexandria Zhang, *The Impact of
    Right to Carry Laws and the NRC Report: The Latest Lessons for the
    Empirical Evaluation of Law and Policy*, Nat'l Bureau of Econ. Research
    Working Paper No. 18294 (Nov. 2014) ............................................16

Ian Ayres & John J. Donohue III, *More Guns, Less Crime Fails Again: The
    Latest Evidence from 1977-2006*, 6 Econ. J. Watch 218 (May 2009) ..............17

Ian Ayres & John J. Donohue III, *Yet Another Refutation of the More Guns,
    Less Crime Hypothesis—With Some Help From Moody and Marvell*,
    6 Econ J. Watch 35 (Jan. 2009)........................................................17

Steve Birr, *Officials 'Horrified' After Bloody Monday In DC Leaves Five
    Shot, Two Dead*, The Daily Cavalier (May 17, 2016).........................................2

Charles C. Branas, *et al.*, *Investigating the link between gun possession and gun assault*, 99 Am. J. Pub. Health 2034 (2009) ..............................................19

Philip Cook & Jens Ludwig, *Principles for Effective Gun Policy*, 73 Fordham L. Rev. 589 (2004)............................................................... 14, 18, 19

*District Crime Data at a Glance*, Metropolitan Police Department (Jan. 14, 2016) ........................................................................................................1

John J. Donohue III & Ian Ayres, *Shooting Down the "More Guns, Less Crime" Hypothesis*, 55 Stanford L. Rev. 1193 (Aug. 2003)............................18

*Foreign Travel Advice, USA*, Gov't of the United Kingdom ................................15

Nick Gass, *Murphy: Gun control filibuster 'made a difference' with GOP*, Politico (June 16, 2016) ......................................................................................3

*General Methodology*, Gun Violence Archive ........................................................3

Richard Gonzales, *Gun Violence 'A Public Health Crisis,' American Medical Association Says*, NPR.org (June 14, 2016)..........................................3

Will Greenberg, *Police chiefs from around the country meet in D.C. to discuss violent summer*, The Washington Post (Aug. 3, 2015) ..........................1

Vincent C. Gray, *Ward 7's crime cannot be ignored*, The Washington Post (June 2, 2016) .....................................................................................................1

Amanda Gutterman, *States With Most Gun Deaths Have High Gun Ownership And Weak Gun Laws, Report Shows*, The Huffington Post (Jan. 29, 2015) ...................................................................................................21

David Hemenway, *et al.*, *Gun use in the United States: results from two national surveys*, 6 Injury Prevention 263 (2000).......................................19, 20

David Hemenway, *Survey Research and Self-Defense Gun Use: An Explanation of Extreme Overestimates*, 87 J. of Crim. L. and Criminology 1430 (1997)...............................................................................20

Peter Hermann & Clarence Williams, *'It's crazy out here,' resident says of violence in one D.C. area*, The Washington Post (May 21, 2016).................1, 2

Lisa M. Hepburn & David Hemenway, *Firearm Availability and Homicide: A Review of the Literature*, 9 Aggression & Violent Behav. 417 (2004) ..........17

Spencer Hsu & Rachel Weiner, *Federal appeals court lets new D.C. gun law stand, pending final ruling*, The Washington Post (June 29, 2015) .................14

Nora Kelly *et al.*, *A Sit-In on the House Floor Over Gun Control*, The Atlantic (June 22, 2016).....................................................................................3

Mary Ellen Klas, *Florida leaders raise questions about Orlando shooter's access to guns*, Miami Herald (June 12, 2016)...................................................2

Law Ctr. to Prevent Gun Violence, *2015 Gun Law State Scorecard* (Dec. 2015) ...............................................................................................................18

Law Ctr. to Prevent Gun Violence, *Concealed Weapons Permitting* ...........2, 10, 19

Colin Loftin, *et al.*, *Effects of Restrictive Licensing Of Handguns On Homicide And Suicide In The District Of Columbia*, 325 New Eng. J. Med. 1615 (Dec. 5,1991) .......................................................19

David McDowall, *et al.*, *Easing Concealed Firearms Laws*, 86 Crim. L. & Criminology 193 (1995) ...........................................................18

*Mass Shootings-2016*, Gun Violence Archive...........................................................2

Matthew Miller, *et al.*, *Firearm Availability and Unintentional Firearm Deaths*, 33 Accident Analysis & Prevention 477 (Jul. 2000)............................17

Matthew Miller *et al.*, *Rates of Household Firearm Ownership and Homicide Across US Regions and States*, *1988–1997*, 92 Am. J. Pub. Health 1988 (Dec. 2002)...........................................................17

Clifton B. Parker, *Right-to-carry gun laws linked to increase in violent crime, Stanford research shows*, Stanford News (Nov. 14, 2014) ...................16

Kara E. Rudolph, *et al.*, *Association Between Connecticut's Permit-to-Purchase Handgun Law and Homicides*, 105 Am. J. of Pub. Health 49 (2015) ...............................................................................................................18

*QuickFacts: District of Columbia*, U.S. Census Bureau.......................................15

David I. Swedler, *et al.*, *Firearm Prevalence and Homicides of Law Enforcement Officers in the United States*, 105 Am. J. of Pub. Health 2042 (Oct. 2015) .......................................................................21, 22

Hayley Tsukayama *et al.*, *Gunman who killed 49 in Orlando nightclub had pledged allegiance to ISIS*, The Washington Post (June 13, 2016) .....................2

*United States of America*, Australian Gov't, Dep't of Foreign Affairs and Trade ...........................................................................................15

*United States*, Gov't of Canada ...........................................................................15

Violence Policy Ctr., *Concealed Carry Killers* .....................................................15

*Washington, DC 2013 Visitor Statistics*, Destination DC (2013) ...........................15

## INTRODUCTION

"We are in crisis."[1] These are the words chosen by former D.C. Mayor

Vincent Gray to describe the District of Columbia's continuing problem with gun

violence. *Id.* From 2014 to 2015, the homicide rate in the District increased 54%,[2]

with Chief of Police Cathy L. Lanier commenting that "[w]e have not seen what

we're seeing right now in decades."[3] Yet the District may meet or surpass that

tragic record in 2016.[4] In one D.C. area—Ward 7—homicides have tripled so far

this year.[5] Describing the mood in Ward 7 following what one news outlet

---

[1] Vincent C. Gray, *Ward 7's crime cannot be ignored*, The Washington Post (June 2, 2016), *available at* https://www.washingtonpost.com/blogs/all-opinions-are-local/wp/2016/06/02/ward-7s-crime-cannot-be-ignored/.

[2] *District Crime Data at a Glance*, Metropolitan Police Department (Jan. 14, 2016), *available at* http://mpdc.dc.gov/page/district-crime-data-glance (last visited July 6, 2016). Combatting rising murder rates is even more difficult without strong concealed-carry regulations. *See* Section III.B, *infra* at 20.

[3] Will Greenberg, *Police chiefs from around the country meet in D.C. to discuss violent summer*, The Washington Post (Aug. 3, 2015), *available at* http://www.washingtonpost.com/local/crime/police-chiefs-from-around-the-country-meet-in-dc-to-discuss-violent-summer/2015/08/03/e2ec8a9c-3a06-11e5-8e98-115a3cf7d7ae_story.html.

[4] *District Crime Data at a Glance*, *supra* n. 2.

[5] *See* Peter Hermann & Clarence Williams, *'It's crazy out here,' resident says of violence in one D.C. area*, The Washington Post (May 21, 2016)*, available at* https://www.washingtonpost.com/local/public-safety/its-crazy-out-here-resident-says-of-violence-in-one-dc-area/2016/05/21/81db1816-1dba-11e6-8c7b-6931e66333e7_story.html.

described as "Bloody Monday,"[6] one D.C. resident stated: "I don't ask []

questions. I don't want to get shot."[7]

This is not only a problem in the nation's capital; gun violence is a

nationwide crisis. In June 2016, forty-nine individuals were killed and fifty-three

were injured in the worst mass shooting in American history.[8] In fact, since the

trial court denied plaintiffs' motion for a preliminary injunction on March 7, 2016,

there have been 152 mass shootings in the United States.[9]

---

[6]      Steve Birr, *Officials 'Horrified' After Bloody Monday In DC Leaves Five Shot, Two Dead*, The Daily Cavalier (May 17, 2016), http://dailycaller.com/2016/05/17/officials-horrified-after-bloody-monday-in-dc-leaves-five-shot-two-dead/.

[7]      Hermann & Williams, *supra* n. 5.

[8]      Hayley Tsukayama *et al.*, *Gunman who killed 49 in Orlando nightclub had pledged allegiance to ISIS*, The Washington Post (June 13, 2016), *available at* https://www.washingtonpost.com/news/post-nation/wp/2016/06/12/orlando-nightclub-shooting-about-20-dead-in-domestic-terror-incident-at-gay-club/?utm_term=.2cc4d42ab972. Notably, the shooter in Orlando had a concealed-carry license. Mary Ellen Klas, *Florida leaders raise questions about Orlando shooter's access to guns*, Miami Herald (June 12, 2016), *available at* http://www.miamiherald.com/news/politics-government/state-politics/article83359697.html. The license was issued under Florida's "shall issue" permitting scheme, similar to that advocated by the Appellants. *See generally* Law Ctr. to Prevent Gun Violence, *Concealed Weapons Permitting*, http://smartgunlaws.org/concealed-weapons-permitting-policy-summary/#footnote_26_5701 (last visited July 6, 2016) ("Concealed Weapons Permitting Policy Summary").

[9]      *Mass Shootings-2016*, Gun Violence Archive, *available at* http://www.gunviolencearchive.org/reports/mass-shooting (last visited July 20, 2016). Mass shootings are defined here as four or more shot and/or killed (not including the shooter) in a single event and at the same general time and location.

As a result, the call for more responsible gun laws is at an all-time high. In June 2016, Senators filibustered for nearly 15 hours to secure a vote on gun violence prevention legislation.[10] Members of Congress held a sit-in on the House floor, demanding that the Speaker hold votes on similar measures.[11] And the American Medical Association declared that gun violence is "a public health crisis."[12]

Against this background, the District of Columbia is fighting to simply maintain one of the principal tools it has to combat gun violence—its current concealed carry permitting process, which limits the concealed carry of firearms to those individuals with a "good reason" / "proper reason" to do so. *See* D.C. Code § 22-4506(a). The District's process is modeled after statutes held constitutional by four different federal Courts of Appeals[13] and is based on sound social science

---

*General Methodology*, Gun Violence Archive, *available at* http://www.gunviolencearchive.org/methodology (last visited July 6, 2016).
[10] Nick Gass, *Murphy: Gun control filibuster 'made a difference' with GOP*, Politico (June 16, 2016), *available at* http://www.politico.com/story/2016/06/chris-murphy-filibuster-guns-224412.
[11] Nora Kelly *et al.*, *A Sit-In on the House Floor Over Gun Control*, The Atlantic (June 22, 2016), http://www.theatlantic.com/politics/archive/2016/06/house-democrats-gun-control-sit-in/488264/?utm_source=atlfb.
[12] Richard Gonzales, *Gun Violence 'A Public Health Crisis,' American Medical Association Says*, NPR.org (June 14, 2016), http://www.npr.org/sections/thetwo-way/2016/06/14/482041613/gun-violence-a-public-health-crisis-says-ama.
[13] *See infra* Section III.A.

evidence.[14]  In denying the plaintiffs' motion for a preliminary injunction, the trial court properly recognized that the District's concealed carry regime is an important tool in advancing the substantial government interests of preventing crime and promoting public safety.  *See* Mem. Op. at 21-22, *Wrenn*, No. 1:15-cv-00162-CKK (D.D.C. March 7, 2016), ECF No. 54. ("Mem. Op."); JA 399-400.

For the reasons discussed in Appellee's brief and below, the trial court reached the correct conclusion.  This Court should therefore affirm and declare the District's concealed carry permitting process fully constitutional.  Now is not the time to decrease gun regulation in the nation's capital—the public interest demands that the preliminary injunction be denied.  Lives depend on it.

## STATUTES AND REGULATIONS

All applicable statutes, regulations, and similar materials are contained in the Brief for the Appellant.

## STATEMENT OF IDENTITY, INTEREST IN CASE, AND SOURCE OF AUTHORITY TO FILE

Pursuant to Rule 29(a) and 29(c)(4) of the Federal Rules of Appellate Procedure, amicus curiae received consent from all parties to file this brief.  The

---

[14]  *See infra* Section III.B.

4

interest of amicus curiae in this case is set forth in the disclosures required by D.C. Circuit Rule 26.1(b). *See* Section A, *supra*, at i-ii.[15]

**ARGUMENT**

This amicus curiae brief advances three arguments. First, the Second Amendment does not protect the right of a member of the general public to carry a concealed gun in public on the streets of the nation's capital. Second, even if the Second Amendment applies to the carrying of concealed guns in public by members of the general public, the District's concealed carry regime should be reviewed under intermediate scrutiny. Third, other Circuit Courts of Appeals have concluded that this type of "good cause" concealed carry licensing regime withstands intermediate scrutiny, and social science confirms that restricting concealed carry furthers an important government interest in public safety.

**I. THE SECOND AMENDMENT DOES NOT PROTECT THE RIGHT OF A MEMBER OF THE GENERAL PUBLIC TO CARRY A CONCEALED GUN IN PUBLIC**

Although the district court's order assumed without deciding that the District's permitting regime implicates the Second Amendment, this Court should take the opportunity to correctly hold that the Second Amendment does not reach

---

[15] Pursuant to Rule 29(c)(5) of the Federal Rules of Appellate Procedure, no party or party's counsel authored this brief in whole or in part. No party, party's counsel, or person other than amicus, its members, or its counsel, contributed money intended to fund preparation and submission of this brief.

the District's reasonable concealed-carry permitting process. The Second

Amendment does not extend beyond one's home, and the Supreme Court has never

held that members of the general public have a right to carry concealed guns on

their person on the streets of the nation's capital.

In *Heller*, the Supreme Court did not address the scope of the Second

Amendment outside the home, and this Court need not answer that question today.

Instead, the question presented by this case can be resolved (as it was recently by

the *en banc* Ninth Circuit) by concluding that "the protection of the Second

Amendment—whatever the scope of that protection may be—simply does not

extend to carrying of concealed firearms in public by members of the general

public." *Peruta v. Cty. of San Diego*, No. 10-56971, 2016 WL 3194315, at *5 (9th

Cir. June 9, 2016); *see also Peterson v. Martinez*, 707 F.3d 1197, 1212 (10th Cir.

2013) ("[W]e conclude that the concealed carrying of firearms falls outside the

scope of the Second Amendment's guarantee[.]").[16] The Ninth Circuit relied on

---

[16] Likewise, state courts have refused to expand the scope of the Second
Amendment beyond the home. *See Williams v. State*, 10 A.3d 1167, 1177 (Md.
2011) ("If the Supreme Court . . . meant its holding to extend beyond home
possession, it will need to say so more plainly."); *People v. Dawson*, 934 N.E.2d
598, 605-06 (Ill. App. Ct. 2010), *abrogated by People v. Aguilar*, 2 N.E.2d 321
(Ill. 2013) ("*Heller* specifically limited its ruling to interpreting the amendment's
protection of the right to possess handguns in the home . . . . The *McDonald* Court
refused to expand on this right . . . .") (internal citations omitted); *Commonwealth
v. Williams*, No. 09-P-813, 2011 WL 3299022, at *3 (Mass. App. Ct. Aug. 3, 2011)
("The Second amendment does not protect [defendant] in this case because he was

the "remarkably consistent" historical materials surrounding the adoption of the Second and Fourteenth Amendments, all of which pointed towards a blanket prohibition on the carrying of concealed weapons. *Peruta*, 2016 WL 3194315, at *15. The *Peruta* opinion also recognized an emerging consensus among the Circuit Courts of Appeals that states have the authority to "prohibit entirely or to limit substantially the carrying of concealed or concealable firearms." *Id*. There is no reason for this Court to depart from that consensus.[17]

Furthermore, in *District of Columbia v. Heller*, the Supreme Court found that prohibitions on concealed carrying are in line with permissible gun laws, 554 U.S. 570, 625 (2008), and did not disturb the Court's ruling from over a century ago that "the right of the people to keep and bear arms (article 2) is not infringed by laws prohibiting the carrying of concealed weapons." *Robertson v. Baldwin*, 165 U.S. 275, 281-82 (1897). If this Court were to reach the opposite conclusion,

---

in possession of the firearm outside of his home.") (internal citation omitted); *People v. Aguilar*, 944 N.E.2d at 823 (*Heller* and *McDonald* limit "the right to possess handguns in the home, not the right to possess handguns outside the home.").

[17] The one Circuit Court of Appeals to embrace a broader right to carry firearms in public struck down a *total ban* on carrying—it did not address a scheme, like the District's, which simply requires a showing of "good reason" to obtain a permit. *See Moore v. Madigan*, 702 F.3d 933, 940 (7th Cir. 2012) (finding total ban on carrying guns in public unconstitutional); *see also Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) (remanding with instructions to enter a preliminary injunction against enforcement of city ordinance requiring firing range training as prerequisite to lawful gun ownership, but banning all firing ranges).

it would be the first Court of Appeals to do so—a result that is neither warranted nor necessary.  The Second Amendment simply does not extend to the District's reasonable and lawful permitting process at issue in this case.

## II.  EVEN IF THE SECOND AMENDMENT APPLIES, INTERMEDIATE SCRUTINY IS THE APPROPRIATE STANDARD

Even if this Court were to reach the opposite conclusion from its sister courts and find that the District's concealed-carry permitting regime implicates activity protected by the Second Amendment, the proper level of review, correctly identified by the district court,[18] is some form of intermediate scrutiny. Intermediate scrutiny is appropriate for review of firearm regulations that do not infringe on the right of the individual to:  "keep a firearm . . . for the purpose of self-defense *in the home*—the 'core lawful purpose' protected by the Second Amendment."  *Heller v. District of Columbia*, 670 F.3d 1244, 1255-58 (D.C. Cir. 2011) ("*Heller II*") (citing *Heller*, 554 U.S. at 630) (emphasis added).  Like the gun registration requirements at issue in *Heller II*, the District's "good reason" / "proper reason" requirement does not infringe on the "core" of the Second Amendment, and therefore, intermediate scrutiny is appropriate in this case.  The district court's application of intermediate scrutiny also comports with the Supreme Court's recognition in *Heller* that the Constitution provides legislatures

---

[18]     *See* Mem. Op. at 12; JA 390.

with "a variety of tools for combating" the "problem of handgun violence . . . ." 554 U.S. at 636. There, the Supreme Court listed as examples a host of "presumptively lawful" existing firearms regulations without subjecting those laws to any analysis, much less strict scrutiny. *Id.* at 626-27 & n. 26.

In fact, *every* other Circuit Court of Appeals to consider the constitutionality of "good cause" licensing regimes has concluded that intermediate scrutiny is the appropriate standard. *See Drake v. Filko*, 724 F.3d 426, 435 (3d Cir. 2013) (applying intermediate scrutiny to New Jersey's "justifiable need" requirement); *Woollard v. Gallagher*, 712 F.3d 865, 876 (4th Cir. 2013) (applying intermediate scrutiny to Maryland's "good and substantial reason" requirement for obtaining a handgun); *Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 96-97 (2d Cir. 2012) (applying intermediate scrutiny to New York's "proper cause" requirement); *see also United States v. Masciandaro*, 638 F.3d 458, 471 (4th Cir. 2011) (holding that only intermediate scrutiny "is necessary with respect to laws that burden the right to keep and bear arms outside the home"). And although the *en banc* Ninth Circuit did not reach this issue in *Peruta*, the majority noted in dicta that intermediate scrutiny was the proper constitutional standard. *See Peruta*, 2016 WL 3194315, at *17. Thus, even if this Court were to find that the District's permitting process implicates Second Amendment activity, it is well-settled that intermediate scrutiny would be the appropriate level of review.

9

## III.  THE DISTRICT'S CONCEALED CARRY REGIME WITHSTANDS INTERMEDIATE SCRUTINY

### A.  The District's Concealed Carry Regime Conforms with "May Issue" Regimes Upheld by Other Circuits as Constitutional Under Intermediate Scrutiny

States regulate the carrying of concealed weapons in one of three ways:  (1) the enactment of "may issue" laws; (2) the enactment of "shall issue" laws; or (3) imposing no permit requirement.[19]  The District joins nine "may issue" states.[20]  In these jurisdictions, law enforcement officials are vested with the authority to determine whether to issue a concealed carry permit, but are guided by certain statutory criteria.  Of the remaining states, only eight fall into the "no permit" category, with the remainder subject to "shall issue" laws, where a state will issue a permit if an applicant meets certain criteria.  In seventeen of these so-called "shall issue" states, however, officials still retain discretion to evaluate an application based on qualitative criteria.[21]  Thus, officials in twenty-six states and

---

[19]      *See generally* Concealed Weapons Permitting Policy Summary, *supra* note 2.

[20]      The "may issue" states are as follows: California, Connecticut, Delaware, Hawaii, Maryland, Massachusetts, New Jersey, New York, and Rhode Island.  *See* Cal. Penal Code §§ 26150-26225; Conn. Gen. Stat. §§ 29-28 – 29-30, 29-32, 29-32b, 29-35, 29-37; Del. Code Ann. tit. 11, §§ 1441, 1442; Haw. Rev. Stat. Ann. § 134-9; Md. Code Ann., Pub. Safety §§ 5-301 – 5-314; Mass. Gen. Laws ch. 140, §§ 131, 131C, 131P; ch. 269 § 10; N.J. Stat. Ann. §§ 2C:58-3, 2C:58-4, 2C:39-5; N.Y. Penal Law § 400.00; R.I. Gen. Laws §§ 11-47-8 – 11-47-18.

[21]      For example, just as in the District of Columbia, two "shall issue" states, Indiana and North Dakota, require applicants to demonstrate a "proper purpose"

the District retain authority to make determinations regarding who may carry a concealed weapon in public spaces. In other words, the District's "good cause" / "proper reason" standard represents the considered judgment of the majority of state legislatures that limiting the number of concealed weapons on the streets furthers public safety.

Importantly, these "good cause" / "proper reason" requirements have been upheld as constitutional in every state in which the laws have been challenged. Most recently, the Ninth Circuit concluded that "[b]ecause the Second Amendment does not protect in any degree the right to carry concealed firearms in public, any prohibition or restriction a state may choose to impose on concealed carry— including a requirement of 'good cause,' however defined—is necessarily allowed by the Amendment." *Peruta*, 2016 WL 3194315, at *15. In so ruling, the Ninth Circuit joined a chorus of circuits that have upheld similar restrictions on concealed carry permits under intermediate scrutiny. *See Woollard*, 712 F.3d at 882 (Maryland's "good and substantial reason" requirement to obtain concealed carry permit is constitutional under intermediate scrutiny); *Drake*, 724 F.3d at 429–30, 440 (New Jersey's "justifiable need" restriction "does not burden conduct within the scope of the Second Amendment's guarantee" and, even if it did,

---

for requiring a concealed carry permit. Ind. Code Ann. § 35-47-2-3(e); N.H. Rev. Stat. Ann. § 159:6(I)(b).

withstands intermediate scrutiny); *Kachalsky*, 701 F.3d at 99-100 (applying

intermediate scrutiny, New York's "proper cause" restriction on concealed carry

does not violate Second Amendment).[22]

Relying on these constitutionally-approved regimes, D.C. explicitly

"follow[ed] the models of . . . New York, New Jersey, and Maryland" in crafting

its own legislation.  Council of the District of Columbia, Comm. on the Judiciary

& Pub. Safety, Report on Bill 20-930, "License to Carry a Pistol Amendment Act

of 2014" 2 (Nov. 25, 2014) ("Judiciary & Pub. Safety Comm. Report"); J.A. 51.[23]

The district court noted that "[a]lthough not dispositive of the issues before this

Court . . . [t]he consistency of [the] results [in the Second, Third, and Fourth

Circuits] emphasizes the steep hill that Plaintiffs have to climb at the preliminary

injunction stage." Mem. Op. at 22; JA 400. While "Defendants have identified

what appears to be substantial evidence of connections between public carrying of

guns—and associated regulations on public carrying—and impacts on crime and

public safety[,]" the district court concluded that "Plaintiffs' conclusory argument

---

[22]    Although the majority in *Peruta* reached its conclusion without applying
intermediate scrutiny, the court indicated that California's regulation of the
carrying of concealed weapons in public would survive that constitutional test
because it "promotes a substantial government interest that would be achieved less
effectively absent the regulation." *Peruta*, 2016 WL 3194315, at *17 (internal
citation omitted).
[23]    *Available at* http://lims.dccouncil.us/Download/32576/B20-0930-
CommitteeReport1.pdf.

is insufficient to meet their burden." *Id.* Reversing the district court's order and disregarding the reasoned judgment of the District's elected representatives is no small act—dire consequences could result. *See Masciandaro*, 638 F.3d at 475 ("We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights.").

### B. Social Science Confirms that the District's "Good Reason/Proper Reason" Requirement Furthers Government's Important Interest in Public Safety, Satisfying Intermediate Scrutiny

Under *Heller II*, the intermediate scrutiny test "is satisfied so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation," and "the means chosen are not substantially broader than necessary to achieve [the government's] interest." 670 F.3d at 1258 (citation omitted). To satisfy this standard, the District need only present "some meaningful evidence" that the concealed-carry regulations "can reasonably be expected to promote" an important government interest. *Id.* at 1259. Here, the District of Columbia's stated interest in enacting its "good reason" / "proper reason" requirement—"to protect the public safety"[24]—conforms with the most up-

---

[24]   Council of the District of Columbia, Comm. of the Whole, Report on Bill 20-930, "License to Carry a Pistol Amendment Act of 2014" 2 (Dec. 2, 2014) ("Comm. of the Whole Report"), *available at* http://lims.dccouncil.us/Download/32576/B20-0930-CommitteeReport2.pdf.

13

to-date social science research demonstrating that more guns in public lead to increased violence. The presence of firearms in the public sphere augments the risk associated with gun violence in at least three ways.

*First*, guns create unique dangers in the public sphere. *See* Philip J. Cook & Jens Ludwig, *Principles for Effective Gun Policy*, 73 Fordham L. Rev. 589, 590 (2004) ("Relative to other types of readily available weapons, guns are intrinsically more lethal, providing the assailant with the power to kill quickly, at a distance, and with little effort or sustained intent."). These dangers will multiply if the District is enjoined from enforcing the "good reason" / "proper reason" requirement. *See* Spencer S. Hsu & Rachel Weiner, *Federal appeals court lets new D.C. gun law stand, pending final ruling*, The Washington Post (June 29, 2015) ("After the order [granting the preliminary injunction], D.C. police reported receiving a surge of new applicants—96 in less than four weeks, compared with 109 over the previous seven months the law was in effect.").[25] Should this Court prevent the District from enforcing its concealed-carry regime, more guns will enter public spaces, meaning that more people will be within range of a lethal firearm.

_____

[25] *Available at* http://www.washingtonpost.com/local/crime/federal-appeals-court-lets-new-dc-gun-law-stand-pending-final-ruling/2015/06/29/3aa1bd2a-1e78-11e5-bf41-c23f5d3face1_story.html.

In fact, since 2007, at least 885 people have been killed by individuals with concealed carry permits. *See* Violence Policy Ctr., *Concealed Carry Killers*.[26] This number includes 17 law enforcement officers. *Id.* Importantly, a significant number of these 885 deaths occurred during 29 mass shootings committed by individuals with concealed carry permits. *Id.* The fact that more guns in public threaten public safety may seem obvious, but it cannot be overstated, particularly in D.C. which, apart from its over 650,000 residents, attracts over 19 million tourists each year.[27]

*Second*, public carrying increases violent crime. Critically, the most up-to-date research in this area has concluded that:

---

[26]    *Available at* http://concealedcarrykillers.org/ (last updated June 16, 2016).

[27]    *QuickFacts: District of Columbia*, U.S. Census Bureau, https://www.census.gov/quickfacts/table/PST045215/11 (last visited July 6, 2016); *Washington, DC 2013 Visitor Statistics*, Destination DC (2013), *available at* http://destinationdc.dmplocal.com/dsc/collateral/Washington_DC_2013_Visitor_St atistics_updated3-18-15.pdf (last visited July 22, 2015). Notably, the United Kingdom, Canada, and Australia all warn their citizens traveling to the United States to use caution because of the prevalence of gun violence in America. *United States*, Gov't of Canada, *available at* https://travel.gc.ca/destinations/united-states (last visited July 11, 2016); *United States of America*, Australian Gov't, Dep't of Foreign Affairs and Trade, *available at* http://smartraveller.gov.au/Countries/americas/north/Pages/united_states_of_ameri ca.aspx (last visited July 11, 2016); *Foreign Travel Advice, USA*, Gov't of the United Kingdom, *available at* https://www.gov.uk/foreign-travel-advice/usa/safety-and-security (last visited July 11, 2016).

> [t]he totality of the evidence based on educated judgments about the best statistical models suggests that right-to-carry laws[28] are associated with substantially higher rates of aggravated assault, rape, robbery and murder.

Parker, *supra* note 28(internal quotation omitted); *see also* Abhay Aneja, John J. Donohue III, & Alexandria Zhang, *The Impact of Right to Carry Laws and the NRC Report: The Latest Lessons for the Empirical Evaluation of Law and Policy*, Nat'l Bureau of Econ. Research Working Paper No. 18294 80-81 (Nov. 2014) (suggesting that "RTC laws *increased every crime category* by at least 8 percent, except murder (in that model, murder rose 3 percent but it is not statistically significant).") (emphasis added).[29]  Daniel Webster, a professor at Johns Hopkins Bloomberg School of Public Health, concluded that Aneja, Donohue, and Zhang's research is the "most scientifically rigorous" to date, and reiterated that the research "suggests that laws giving law enforcement discretion in issuing permits

---

[28]  "Right to Carry" or "RTC" laws (also known as "shall issue" laws) describe laws pursuant to which citizens carry concealed firearms either without a permit or after obtaining a permit from local government or law enforcement.  Clifton B. Parker, *Right-to-carry gun laws linked to increase in violent crime, Stanford research shows*, Stanford News (Nov. 14, 2014) *available at* http://news.stanford.edu/news/2014/november/donohue-guns-study-111414.html (last visited July 22, 2015).

[29]  *Available at* http://www.nber.org/papers/w18294.pdf. Professor Donohue *et al.* further explained that "if anything our 8 percent estimate . . . is likely to understate the true increases in aggravated assault caused by the RTC law."  *Id.* at 82.  Some statistical models "generated an estimate of a nearly 33 percent increase in assaults with firearms associated with RTC laws."  Comm. of the Whole Report, 69 (Letter from Daniel Webster to Phil Mendelson, Chairman of the D.C. Council (Nov. 25, 2004)).

to carry concealed firearms ["may issue" laws] protect against gun violence."

Comm. of the Whole Report 69.[30]

    These latest findings confirm earlier research that has repeatedly

demonstrated that RTC laws lead to increased crime rates. *See e.g.*, Ian Ayres &

John J. Donohue III, *Yet Another Refutation of the More Guns, Less Crime*

*Hypothesis—With Some Help From Moody and Marvell*, 6 Econ J. Watch 35, 41

(Jan. 2009) ("[T]he vast bulk of the estimated effects . . . were suggestive of crime

*increases* caused by RTC laws for seven of the nine FBI Index I crime

categories.") (emphasis in original); Ian Ayres & John J. Donohue III, *More Guns,*

*Less Crime Fails Again: The Latest Evidence from 1977-2006*, 6 Econ. J. Watch

218, 229 (May 2009) ("The one consistent finding that is statistically significant

. . . is that RTC laws increase aggravated assault."); Matthew Miller, *et al.*,

*Firearm Availability and Unintentional Firearm Deaths*, 33 Accident Analysis &

---

[30]     Notably, even within the home, gun possession has been linked to increased violence. *See e.g.*, Lisa M. Hepburn & David Hemenway, *Firearm Availability and Homicide: A Review of the Literature*, 9 Aggression & Violent Behav. 417 (2004) ("[H]ouseholds with firearms are at higher risk for homicide, and there is no net beneficial effect of firearm ownership."); Matthew Miller, *et al.*, *Rates of Household Firearm Ownership and Homicide Across US Regions and States, 1988–1997*, 92 Am. J. Pub. Health 1988, 1988 (Dec. 2002) ("[I]n areas where household firearm ownership rates were higher, a disproportionately large number of people died from homicide."). An increase of guns on the streets is also logically likely to lead to an increase in guns in D.C. homes.

Prevention 477, 477 (Jul. 2000) ("A statistically significant and robust association exists between gun availability and unintentional firearm deaths.").

It is now at the very least clear that "[n]o longer can any plausible case be made on statistical grounds that shall-issue laws are likely to reduce crime for all or even most states." John J. Donohue III & Ian Ayres, *Shooting Down the "More Guns, Less Crime" Hypothesis*, 55 Stan. L. Rev. 1193, 1296 (Aug. 2003). Instead, the majority of relevant research demonstrates that "policies to *discourage* firearms in public may help prevent violence." David McDowall, *et al.*, *Easing Concealed Firearms Laws: Effects On Homicide In Three States*, 86 Crim. L. & Criminology 193, 203 (1995) (emphasis in original); *see also* Kara E. Rudolph, *et al.*, *Association Between Connecticut's Permit-to-Purchase Handgun Law and Homicides*, 105 Am. J. of Pub. Health 49, 49 (Aug. 2015) (concluding that Connecticut's permit-to-purchase law "was associated with a 40% reduction in Connecticut's firearm homicides rates during the first 10 years that the law was in place"); Cook & Ludwig at 592 ("[E]vidence suggests that… separat[ing] guns from violence would sharply reduce the number of victims killed in domestic violence, robberies, and routine altercations.").[31]

---

[31]    Data on gun deaths in each state supports this conclusion. *See* Law Ctr. to Prevent Gun Violence, *2015 Gun Law State Scorecard* (Dec. 2015) http://gunlawscorecard.org/ ("2015 Scorecard"). The states with the five highest gun death rates (MT, LA, MS, AK, and AL) are states with either no concealed

This conclusion has specifically been borne out in the District of Columbia: "[r]estrictive licensing of handguns was associated with a prompt decline in homicides and suicides by firearms in the District of Columbia . . . [N]o decline was seen in adjacent metropolitan areas where restrictive licensing did not apply." Colin Loftin, *et al.*, *Effects of Restrictive Licensing Of Handguns On Homicide And Suicide In The District Of Columbia*, 325 New Eng. J. Med. 1615, 1615 (Dec. 5, 1991).[32]

Importantly, "guns did not seem to protect [even] those who possessed them from being shot in an assault." Charles C. Branas, *et al.*, *Investigating the link between gun possession and gun assault*, 99 Am. J. Pub. Health 2034, 2037 (2009); *see also* David Hemenway, *et al.*, *Gun use in the United States: results from two national surveys*, 6 Injury Prevention 263, 266 (2000) ("The possibility of using a gun in a socially useful manner—against a criminal during the

---

carry permitting requirement at all (AK) or weak permitting requirements (LA, AL, MT, MS). *Id*.; Concealed Weapons Permitting Policy Summary, *supra* note 2. The five states with the *lowest* gun death rates (MA, HI, RI, NY, and CT) are "may issue" states, similar to the District. *Id.*
[32]    *Available at* http://www.nejm.org/doi/pdf/10.1056/NEJM199112053252305; *see also* Cook & Ludwig at 608 (2004) ("[T]he data do suggest a reduction in gun use in criminal violence in the early years following [the implementation of stricter handgun regulations in Washington D.C.].").

commission of a crime—will rarely, if ever, occur for the average gun owner.").[33]

Instead, "[g]uns are used to threaten and intimidate far more often than they are

used for self-defense." *Id.* at 263.

     *Third*, law enforcement's ability to protect themselves and the public could

be greatly restricted if officers were required to presume that a person carrying a

firearm in public was doing so lawfully. When the carrying of guns in public is

restricted, "possession of a concealed firearm by an individual in public is

sufficient to create a reasonable suspicion that the individual may be dangerous,

such that an officer can approach the individual and briefly detain him in order to

investigate whether the person is properly licensed." *Commonwealth v. Robinson*,

600 A.2d 957, 959 (Pa. Super. Ct. 1991); *accord Singleton v. United States*, 998

A.2d 295, 302 (D.C. 2010) (holding that the officer "had a reasonable articulable

suspicion that appellant was carrying a firearm, which permitted the officer to

temporarily stop and frisk appellant"). By contrast, under a highly permissive

concealed carry regime, an officer might not be deemed to have cause to arrest,

search, or stop a person seen carrying a loaded gun, even though far less risky

---

[33]    *Available at*
http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1730664/pdf/v006p00263.pdf; *see
also* David Hemenway, *Survey Research and Self-Defense Gun Use: An
Explanation of Extreme Overestimates*, 87 J. of Crim. L. and Criminology 1430,
1443-44 (1997) (concluding that self-reported survey results claiming incidents of
gun use for self-defense are "huge overestimates").

behavior could justify police intervention. Law enforcement should not have to wait for a gun to be fired before protecting the public.

As recent events in Dallas and Baton Rouge make tragically clear, law enforcement cannot ensure public safety where their own safety is at risk. It is no surprise that weak gun laws equal high rates of gun ownership in a state.[34] And researchers from the Harvard School of Public Health and elsewhere recently concluded that "[o]fficers in the high-gun [ownership] states had *3 times the likelihood* of being killed compared with low-gun [ownership] states." David I. Swedler, *et al.*, *Firearm Prevalence and Homicides of Law Enforcement Officers in the United States*, 105 Am. J. of Pub. Health 2042, 2047 (Oct. 2015).[35] According to the researchers, "[t]he differences were large[,]" and "[s]tates should consider methods for reducing firearm ownership as a way to reduce occupational deaths of [officers]." *Id*. at 2042, 2047. This Court should take heed—now is not the time to weaken the District's gun violence prevention regime. Our lives, and the lives of those who protect us, depend on it.

---

[34]    Amanda Gutterman, *States With Most Gun Deaths Have High Gun Ownership And Weak Gun Laws, Report Shows*, The Huffington Post (Jan. 29, 2015), *available at* http://www.huffingtonpost.com/2015/01/29/weak-gun-laws-and-high-gu_n_6572384.html.
[35]    *Available at* http://ajph.aphapublications.org/doi/pdf/10.2105/AJPH.2015.302749 (emphasis added).

## CONCLUSION

The Court should affirm the district court's order denying the preliminary injunction.


July 20, 2016                                    Respectfully submitted,

                                    /s/ Adam K. Levin
                                    Adam K. Levin
                                    Anna M. Kelly
                                    Evan W. Guimond
                                    HOGAN LOVELLS US LLP
                                    555 Thirteenth Street, N.W.
                                    Washington, DC 20004
                                    (202) 637-5600
                                    adam.levin@hoganlovells.com

                                    Jonathan E. Lowy
                                    Alla Lefkowitz
                                    Avery Gardiner
                                    Kelly Sampson
                                    BRADY CENTER TO PREVENT GUN
                                    VIOLENCE - LEGAL ACTION PROJECT
                                    840 First Street, N.E. Suite 400
                                    Washington, D.C. 20002
                                    (202) 370-8104
                                    jlowy@bradymail.org

**CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the undersigned hereby certifies that this brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.

1.      Exclusive of the exempted portions of the brief, as provided in Rule 32(a)(7)(B)(iii) of the Federal Rules of Appellate Procedure, the brief contains 5,101 words.

2.      The brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font.  As permitted by Rule 32(a)(7)(C)(i) of the Federal Rules of Appellate Procedure, the undersigned has relied upon the word count feature of this word-processing system in preparing this certificate.

/s/ Adam Levin
Adam K. Levin

HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004
(202) 637-5600
adam.levin@hoganlovells.com

Dated:      July 20, 2016

**CERTIFICATE OF SERVICE**

I, Adam K. Levin, hereby certify that on July 20, 2016 electronic copies of

this amicus brief were served through the Court's CM/ECF system to:


Alan Gura, Esq. Gura & Possessky, PLLC
105 Oronoco Street, Suite 305
Alexandria, VA 22314
alan@gurapossessky.com

*Counsel for Appellants*

Loren L. AliKhan
Deputy Solicitor General
Office of the Attorney General, District of Columbia
Office of the Solicitor General
441 4th Street, N.W.
One Judiciary Square, Sixth Floor
Washington, D.C. 20001
Loren.AliKhan@dc.gov

Holly Michelle Johnson
Assistant Attorney General
Office of the Attorney General, District of Columbia
Office of the Solicitor General
441 4th Street, NW
One Judiciary Square, Sixth Floor
Washington, DC 20001-2714
holly.johnson@dc.gov

Todd Sunhwae Kim, Solicitor General
Office of the Attorney General, District of Columbia
Office of the Solicitor General
441 4th Street, NW
One Judiciary Square, Sixth Floor
Washington, DC 20001-2714
todd.kim@dc.gov

Richard Stuart Love, Assistant Attorney General
Office of the Attorney General, District of Columbia
Office of the Solicitor General
441 4th Street, NW
One Judiciary Square, Sixth Floor
Washington, DC 20001-2714
Richard.love@dc.gov

*Counsel for Appellees*

Charles Nichols
Firm: 424-634-7381
P.O. Box 1302
Redondo Beach, CA 90278

Paul Reinherz Quitma Wolfson
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006-1420
paul.wolfson@wilmerhale.com
202-663-6000

Deepak Gupta
Gupta Wessler PLLC
1735 20th Street, NW
Washington, DC 20009
Deepak@guptawessler.com
202-888-1741

Herbert W. Titus, Esquire
William J. Olson, PC
Firm: 703-356-5070
370 Maple Avenue West
Suite 4
Vienna, VA 22180-5615
703-356-5070
wjo@mindspring.com

John Stewart Miles, Esquire
William J. Olson, PC
370 Maple Avenue West
Suite 4
Vienna, VA 22180-5615
703-356-5070
Email: johnsmiles@hotmail.com

Jeremiah Lee Morgan
William J. Olson, PC
Firm: 703-356-5070
370 Maple Avenue West
Suite 4
Vienna, VA 22180-5615
703-356-5070
jmorgan@lawandfreedom.com

Robert Jeffrey Olson
William J. Olson, P.C.
Firm: 703-356-5070
370 Maple Avenue West
Suite 4
Vienna, VA 22180
703-356-5070
rob@wjopc.com

William Jeffrey Olson, Esquire
wjo@mindspring.com
William J. Olson, PC
Firm: 703-356-5070
370 Maple Avenue West
Suite 4
Vienna, VA 22180-5615

Counsel for *Amici Curiae*

                                        /s/ Adam Levin
                                        Adam K. Levin
                                        HOGAN LOVELLS US LLP
                                        555 Thirteenth Street, N.W.
                                        Washington, DC 20004
                                        (202) 637-5600
                                        adam.levin@hoganlovells.com

Dated:        July 20, 2016