**No. 16-7025**

# In the United States Court of Appeals for the District of Columbia Circuit

_____

BRIAN WRENN, et al.,
*Plaintiffs-Appellants,*

v.

DISTRICT OF COLUMBIA, et al.,
*Defendants-Appellees.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
CASE NO. 1:15-CV-162-CKK (THE HON. COLLEEN KOLLAR-KOTELLY)

_____

**BRIEF OF *AMICUS CURIAE* EVERYTOWN FOR GUN SAFETY IN
SUPPORT OF APPELLEES AND AFFIRMANCE**

_____

MARK ANTHONY FRASSETTO
EVERYTOWN FOR GUN SAFETY
P.O. Box 4184
New York, NY 10163

DEEPAK GUPTA
JONATHAN E. TAYLOR
NEIL K. SAWHNEY
GUPTA WESSLER PLLC
1735 20th Street, NW
Washington, DC 20009
(202) 888-1741
*deepak@guptawessler.com*

*Counsel for Amicus Curiae
Everytown for Gun Safety*

July 20, 2016

# COMBINED CERTIFICATES

## Certificate as to Parties, Rulings, and Related Cases

*A. Parties and Amici.* All parties, intervenors, and *amici* appearing before the district court and this Court are listed in the Brief for Appellees.

*B. Rulings under Review.* References to the rulings under review appear in the Brief for Appellees.

*C. Related Cases.* This is the second appeal to this Court arising out of this case. *See Wrenn v. District of Columbia*, No. 15-7057. A separate case, raising a virtually identical challenge to the District of Columbia's restriction on the public carry of firearms, *Grace v. District of Columbia*, No. 1:15-cv-2234, was filed after this case, and is now on appeal to this Court (No. 16-7067).

## Certificate of *Amicus Curiae* Under Circuit Rule 29(d)

*Amicus* Everytown for Gun Safety, the nation's largest gun-violence-prevention organization, has devoted substantial resources to researching historical firearms legislation. This *amicus* brief is necessary because it focuses exclusively on the importance of the relevant historical materials—which demonstrate that the District of Columbia statute at issue carries forward a seven-century Anglo-American tradition of restrictions on the public carry of firearms—and rebuts historical arguments made by the challengers. No other *amicus* brief contains this material.

## Corporate Disclosure Statement

Everytown for Gun Safety has no parent corporations. It has no stock, and hence, no publicly held company owns 10% or more of its stock.

/s/ Deepak Gupta
DEEPAK GUPTA
GUPTA WESSLER PLLC
1735 20th Street, NW
Washington, DC 20009
(202) 888-1741

# TABLE OF CONTENTS

Table of authorities.................................................................................... iii

Glossary .............................................................................................ix

Introduction and interest of *amicus curiae* ................................................. 1

Argument.............................................................................................. 2

    A.  The challengers' claim that the Statute of Northampton imposed an evil-intent or threatening-conduct requirement is wrong. ......................... 2

    B.  The challengers' attempts to diminish the robust American tradition of restricting public carry are without historical foundation. ................... 10

    C.  The challengers cherry-pick a handful of cases from the slaveholding South, which took an outlier approach to public carry and exhibited wide variability even within the region. ..................................... 17

    D.  The upshot of the challengers' position is that dozens of state and local laws—enacted both before and after the Fourteenth Amendment's ratification—were unconstitutional. ................................ 23

Conclusion ......................................................................................... 27

# TABLE OF AUTHORITIES*

## Cases

*Andrews v. State*,
50 Tenn. 165 (1871) ...................................................................... 20, 21

*Chune v. Piott*,
80 Eng. Rep. 1161 (K.B. 1615) ...................................................... 5, 7

***District of Columbia v. Heller*,**
554 U.S. 570 (2008) ............................................................... 1, 3, 25

*Edwards v. Aguillard*,
482 U.S. 578 (1987) ...................................................................... 18

*English v. State*,
35 Tex. 473 (1871) .................................................................. 19, 20

*Miller v. Texas*,
153 U.S. 535 (1894) ...................................................................... 20

*Nunn v. State*,
1 Ga. 243 (1846) .......................................................................... 22

***Peruta v. County of San Diego*,**
— F.3d —, 2016 WL 3194315 (9th Cir. June 9, 2016) ..................... 3, 4, 6, 8, 10

*Sir John Knight's Case*,
87 Eng. Rep. 75 (K.B. 1686) ............................................................ 7

*State v. Barnett*,
34 W. Va. 74 (1890) ...................................................................... 20

*State v. Duke*,
42 Tex. 455 (1874) ........................................................................ 19

*State v. Smith*,
*State v. Smith*, 11 La. Ann. 633 (1856) .............................................. 22

---

* Authorities upon which we chiefly rely are marked with asterisks.

*State v. Workman*,
  35 W. Va. 367 (1891) ........................................................ 20

**American statutes**

1686 N.J. Laws 289, ch. 9 ................................................ 10

1694 Mass. Laws 12, no. 6. ............................................. 10

1786 Va. Laws 33, ch. 21 ............................................ 10, 18

1792 N.C. Laws 60, ch. 3 ................................................ 10

1801 Tenn. Laws 710, § 6 ............................................... 10

1821 Me. Laws 285, ch. 76, § 1 ....................................... 10

1836 Mass. Laws 748, ch.134, § 16 ................. 11, 12, 13, 14

1838 Wisc. Laws 381, § 16 .............................................. 11

1841 Me. Laws 709, ch. 169, § 16 .................................... 11

1846 Mich. Laws 690, ch. 162, § 16 ...................... 11, 13, 14

1847 Va. Laws 127, ch. 14, § 16 ............................ 11, 14, 18

1851 Minn. Laws 526, ch. 112, § 18 ....................... 11, 13, 14

1852 Del. Laws 330, ch. 97, § 13 .................................... 10

1853 Or. Laws 218, ch. 16, § 17 ..................................... 11

1854 Ala. Laws 588, § 3272 ........................................... 17

1861 Ga. Laws 859, § 4413 ............................................ 17

1861 Pa. Laws 248, 250, § 6 ........................................... 11

1869 N.M. Laws 312, § 1 ............................................... 23

1870 S.C. Laws 403, no. 288, § 4 ................................... 18

1870 W. Va. Laws 702, ch. 153, § 8 ........................... 11, 19

1871 Tex. Laws 1322, art. 6512 ................................................... 11, 14, 18, 19, 24

1875 Wyo. Laws 352, ch. 52, § 1 ................................................... 23

1889 Ariz. Laws 16, ch. 13, § 1 ...................................................... 23

1889 Idaho Laws 23, § 1 ............................................................... 23

1890 Okla. Laws 495, art. 47 ......................................................... 16

1901 Mich. Laws 687, § 8 .............................................................. 24

1903 Okla. Laws 643, ch. 25, art. 45, § 584 ................................. 16

1909 Ala. Laws 258, no. 215 .......................................................... 15

1909 Tex. Laws 105 ....................................................................... 24

1913 N.Y. Laws 1627 ..................................................................... 15

1913 Haw. Laws 25, act 22, § 1 ..................................................... 15

1923 Cal. Laws 701, ch. 339 .......................................................... 16

1923 Conn. Laws 3707, ch. 252 .................................................... 16

1923 N.D. Laws 379, ch. 266 ......................................................... 16

1923 N.H. Laws 138, ch. 118 ........................................................ 16

1925 Ind. Laws 495, ch. 207 ......................................................... 16

1925 Mich. Laws 473, no. 313 ...................................................... 16

1925 N.J. Laws 185, ch. 64 ........................................................... 16

1925 Or. Laws 468, ch. 260 .......................................................... 16

1925 W.Va. Laws 25 ...................................................................... 16

1927 Mass. Laws 413 .................................................................... 16

## American municipal ordinances

Checotah, Okla., Ordinance no. 11 (1890) ................................... 24

Dallas, Tex., Ordinance (1887) .............................................................. 24

La Crosse, Wis., Ordinance no. 14, § 15 (1880) ................................ 24

Los Angeles, Cal., Ordinance nos. 35-36 (1878) ............................. 24

McKinney, Tex., Ordinance no. 20 (1899) ........................................ 24

Nashville, Tenn., Ordinance ch. 108 (1873) ...................................... 24

Nebraska City, Neb., Ordinance no. 7 (1872) ................................... 24

New Haven, Conn., Ordinances § 192 (1890) .................................. 24

Rawlins, Wyo., Rev. Ordinances art. 7 (1893) .................................. 24

Salina, Kan., Ordinance no. 268 (1879) ............................................. 24

San Antonio, Tex., Ordinance ch. 10 (1899) ..................................... 24

Syracuse, N.Y., Ordinances ch. 27 (1885) ........................................ 24

Washington, D.C., Ordinance ch. 5 (1857) ....................................... 24

Wichita, Kan., Ordinance no. 1641 (1899) ........................................ 24

**English statutes and royal proclamations**

Statute of Northampton, 2 Edw. 3, 258, ch. 3 (1328) ........................... 4

25 Edw. 3, 320, ch. 2, § 13 (1351) .......................................................... 5

**Books, articles, and miscellaneous**

*3rd Report of Commission on Uniform Act to Regulate the Sale & Possession of
    Firearms,* National Conference on Uniform State Laws (1926) ........... 16

Joel Prentiss Bishop, *Commentaries on the Criminal Law* (1865) ................. 11

William Blackstone, *Commentaries on the Laws of England* (1769) ............ 5

John Carpenter & Richard Whitington, *Liber Albus: The White Book of the
    City of London* (1419) (1861 reprint) ................................................ 4, 9

Patrick J. Charles, *The Faces of the Second Amendment Outside the Home*,
60 Clev. St. L. Rev. 1 (2012) .............................................................. 6

Patrick J. Charles, *The Faces of the Second Amendment Outside the Home, Take
Two: How We Got Here and Why It Matters*,
64 Clev. St. L. Rev. 373 (2016) ...................................................... 15

Patrick J. Charles, *The Second Amendment in Historiographical Crisis*,
39 Fordham Urb. L.J. 1727 (2012) ................................................ 4

*City Intelligence*, Boston Courier, Mar. 7, 1853 ...................................... 12

*City Items*, Richmond Whig, Sept. 25, 1860 ............................................ 12

Edward Coke, *The Third Part of the Institutes of the Laws of England*
(1817 reprint) ........................................................................... 5, 9

Saul Cornell, *The Right to Carry Firearms Outside of the Home: Separating
Historical Myths from Historical Realities*,
39 Fordham Urb. L.J. 1695 (2012) ................................................ 14

Clayton E. Cramer, *Concealed Weapon Laws of the Early Republic* (1999) .............. 17

*Crimes of the Year*, Kalamazoo Gazette, Jan. 18, 1889 ............................... 12

James Ewing, *A Treatise on the Office & Duty of a Justice of the Peace* (1805) ............. 11

Mark Frassetto, *The Law and Politics of Firearms Regulation in Reconstruction
Texas*, 4 Tex. A&M L. Rev. __ (2016) (forthcoming) ........................... 20

William Hawkins, *A Treatise of the Pleas of the Crown* (1721) ................... 7, 8

John Haywood, *A Manual of the Laws of North-Carolina* (1814) ................... 11

*Middlesex Sessions: Justices' Working Documents* (1751) ........................ 7, 8

North Riding Record Society, *Quarter Sessions Records* (1884) ................ 6, 7

*Population of the 100 Largest Urban Places: 1880*,
U.S. Census Bureau (June 15, 1998) ............................................ 26

*Recorders Court*, Oregonian, Aug. 6, 1867 ...................................... 12

Eric M. Ruben & Saul A. Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 126 Yale L.J. Forum (Sept. 25, 2015) .................................................................................. 5, 13, 17

*Watch Returns*, Evening Star, Nov. 26, 1856............................................................ 12

*When and Where May a Man Go Armed*, S.F. Bulletin, Oct. 26, 1866......................... 26

# GLOSSARY

**Pl. Br.** — The plaintiffs-appellants' brief in this appeal (Doc. 1618975)

**D.C. Br.** — The District of Columbia's brief in this appeal (Doc. 1624585)

**Everytown *Grace* Br.** — Everytown's *amicus curiae* brief on appeal in *Grace v. District of Columbia* (D.C. Cir., Case No. 16-7067; Doc. 1217834514)

***Grace* Reply** — The plaintiffs' district court reply in *Grace v. District of Columbia* (D.D.C., Case No. 1:15-cv-02234; Dkt. 23)

***Grace* Supp. Br.** — The plaintiffs' district court supplemental brief in *Grace v. District of Columbia* (D.D.C., Case No. 1:15-cv-02234; Dkt. 40)

**NRA Br.** — The National Rifle Association's *amicus curiae* brief in *Grace v. District of Columbia* (D.D.C., Case No. 1:15-cv-02234; Dkt. 15)

**INTRODUCTION AND INTEREST OF *AMICUS CURIAE***

Everytown for Gun Safety is the nation's largest gun-violence-prevention organization. It filed a brief in the companion appeal, *Grace v. District of Columbia*, presenting an account of the seven-century Anglo-American tradition of restricting public carry, which demonstrates that the District of Columbia's good-reason requirement for carrying a firearm in public is more than sufficiently "longstanding" to qualify as constitutional under *District of Columba v. Heller*, 554 U.S. 570 (2008). Everytown has provided a similar account in this case—first in a prior appeal, and then again in the district court—and it did the same in the district court in *Grace*.

Yet neither the plaintiffs nor their *amici*, nor Judge Leon's opinion in *Grace*, meaningfully contend with the wealth of historical evidence supporting the District's public-carry law. Instead, the challengers resort to mischaracterizing the historical record, engaging in unsupported speculation about the contours of historical laws, and selectively relying on certain outlier sources.

In this brief, we respond to the challengers' primary historical arguments. We begin with the English history—the centuries-old prohibition on carrying firearms in populated public places. The challengers seek to alter the meaning of this prohibition, claiming that it contained an unwritten "evil intent" or "menacing conduct" requirement. But the historical materials reveal otherwise. We then turn to America: Contrary to the challengers' telling, the history shows that, from our

nation's founding to its reconstruction, many states and cities enacted laws prohibiting carrying a firearm in populated public places (either generally or without good cause), and that these laws operated as criminal prohibitions. Finally, we discuss the 19th-century American case law. Although the challengers cherry-pick a few selective cases to support their view, those cases emanate exclusively from the slaveholding South—a part of the country that took an outlier approach to public carry, and that included wide variability even within the region.

At the end of the day, the challengers do not deny that their reading of the Second Amendment would render dozens of state and local laws—enacted both before and after the Fourteenth Amendment's ratification—unconstitutional. And yet neither the plaintiffs nor their *amici* have identified a single historical example of a successful challenge to a good-cause requirement like the District's, much less a challenge to a requirement applying exclusively to an area as highly urbanized as modern-day Washington. This case should not become the first. This Court should follow the history and uphold the District's law as a longstanding, constitutional regulation under *Heller*.

## ARGUMENT

### A. The challengers' claim that the Statute of Northampton imposed an evil-intent or threatening-conduct requirement is wrong.

As chronicled in our *Grace* brief (at 3-10), there is a long Anglo-American tradition of broadly restricting public carry in populated areas—a tradition that

reaches back to at least 1328, when England enacted the Statute of Northampton. *See also* D.C. Br. 13-22.[1] The plaintiffs in this appeal barely grapple with the English history, contending instead that the Court "must look to American tradition," because (as they see it) the Second Amendment "reflects the Framers' concept of individual freedom" and "did not ratify the King's understanding." Pl. Br. 31.

But this view contradicts *Heller* itself, which drew on English history in interpreting the right to keep and bear arms and remarked that "it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right." 554 U.S. at 592. As the Ninth Circuit recently observed, "*Heller* held that the Second Amendment, as originally adopted," protects a "right inherited from our English ancestors." *Peruta v. Cnty. of San Diego*, — F.3d —, 2016 WL 3194315, at *6 (9th Cir. June 9, 2016).

To the extent that the challengers endeavor to dispute this history, rather than dismiss or downplay it, they essentially argue that the Statute of Northampton applied only to public carrying when accompanied by "evil intent" or threatening behavior. *See* Pl. Br. 31-35; NRA Br. 18. And that is how Judge Leon interpreted

---

[1] As noted in the glossary, this brief uses the following abbreviations: The plaintiffs' brief in this appeal is cited as "Pl. Br." The District's brief in this appeal is cited as "D.C. Br." Everytown's *amicus* brief on appeal in *Grace* is cited as "Everytown *Grace* Br." The plaintiffs' district court briefs in *Grace* are cited as "*Grace* Reply" and "*Grace* Supp. Br." And the NRA's district court *amicus* brief in *Grace* is cited as "NRA Br."

the law in *Grace*, expressing his belief that the "weight of historical evidence" shows that the statute "forbade only carrying weapons in a terrifying manner that threatened a breach of the peace and not the ordinary carrying of weapons for self defense." *Grace* Op. 22. But that understanding of the statute is wrong. The "weight of the historical evidence" in fact shows that English law—outside of narrowly circumscribed exceptions—prohibited the bare act of carrying arms in public.

Begin with the statute itself. On its face, the Statute of Northampton provided that "no Man great nor small" shall "go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere." 2 Edw. 3, 258, ch. 3 (1328). This broad prohibition was reenacted numerous times over the ensuing decades, and was reflected in England's "first common law treatise," which described the law as mandating that "'no one, of whatever condition he be, go armed in the said city or in the suburbs, or carry arms, by day or by night.'" *Peruta*, 2016 WL 3194315, at \*7 (quoting Carpenter, *Liber Albus: The White Book of the City of London* 335 (Henry Thomas Riley ed., 1861)). There is no reference to an "evil intent" requirement. To the contrary, the law was "strictly enforced as a prohibition on going armed in public," and any violation was punished as "a misdemeanor resulting in forfeiture of arms and up to thirty days imprisonment." Charles, *The Second Amendment in Historiographical Crisis*, 39 Fordham Urb. L.J. 1727, 1804 (2012). A separate statute, by contrast, made it a

felony to carry arms with aggressive or menacing intent. *See* 25 Edw. 3, c. 2 § 13 (1350) (imposing felony penalties on anyone who went armed "against any other"). Neither the plaintiffs nor their *amici* mention this statute, and it is not hard to see why: If Northampton prohibited precisely the same conduct, only with lesser penalties, it would be rendered superfluous.

Historical accounts confirm this plain meaning. Writing several centuries after the law was first enacted, Blackstone explained that "[t]he offence of riding or going armed with dangerous or unusual weapons is a crime against the public peace, *by terrifying the good people of the land*; and is particularly prohibited by the statute of Northampton." 4 Blackstone, *Commentaries on the Laws of England* 148-49 (1769) (emphasis added). Terror, in other words, was considered a *natural consequence* of publicly carrying arms—not a precondition to prosecution under the statute. *See* D.C. Br. 16-18; Ruben & Cornell, *Firearm Regionalism and Public Carry*, 125 Yale L.J. Forum 121, 129-30 (2015) (noting Blackstone's implication that "terrorizing the public was the consequence of going armed"). As one English court put it: "Without all question, the sheriff hath power to commit . . . if contrary to the Statute of Northampton, he sees any one to carry weapons in the high-way, in terrorem populi Regis; he ought to take him, and arrest him, *notwithstanding he doth not break the peace in his presence*." *Chune v. Piott*, 80 Eng. Rep. 1161, 1162 (K.B. 1615) (emphasis added); *see also* Coke, *The Third Part of the Institutes of the Laws of England*

161 (1817 reprint) (recounting the story of a man sentenced to prison because he "went armed under his garments," even though he had not threatened anyone but had been threatened himself). The plaintiffs and their *amici* have no response to this precedent, and they do not bother to give one. The only possible reading of *Chune* is that the phrase "in terrorem populi Regis" described the effect of carrying a firearm in public; it did not create an additional (atextual) requirement of "evil intent," menacing behavior, or any other conduct that would break the peace beyond the bare carrying of firearms in public.

Nor can there be any doubt that the statute covered handguns. Although the challengers try to make something of Blackstone's reference to "dangerous or unusual weapons," *see Grace* Reply 7-8; *Grace* Supp. Br. 4; NRA Br. 18, that phrase was widely understood to include handguns. In 1579, for example, Queen Elizabeth I issued a proclamation emphasizing that the statute prohibited the carrying of "Pistols, and such like, not only in Cities and Towns, [but] in all parts of the Realm in common high[ways]." Charles, *The Faces of the Second Amendment Outside the Home*, 60 Clev. St. L. Rev. 1, 21 (2012) (spelling modernized). Fifteen years later, she reiterated that carrying pistols in public—whether "secretly" or in the "open"—was "to the terrour of all people professing to travel and live peaceably." *Id.*; *see also Peruta*, 2016 WL 3194315, at *8; *Rex v. Harwood*, Quarter Sessions at Malton (Oct. 4-5, 1608), *reprinted in* North Riding Record Society,

Quarter Sessions Records 132 (1884) (man arrested for committing "outragious misdemeanours" by going "armed" with "pistolls[] and other offensive weapons").[2]

Against this long trail of historical evidence, the challengers support their contrary position primarily by (1) isolating and misreading a lone 17th-century English prosecution, and (2) taking selective quotes from English commentators out of context. *See* Pl. Br. 31-34; *Grace* Reply 6-8. Neither comes anywhere near rebutting the full historical record. As to the former: The challengers contend that the prosecution and ultimate acquittal of Sir John Knight in 1686 demonstrates that the statute was interpreted to punish only "people who go armed to terrify the king's subjects" with "malo animo" (or evil intent). Pl. Br. 32 (quoting *Sir John Knight's Case*, 87 Eng. Rep. 75, 76 (K.B. 1686)); *see also Grace* Reply 6-7 (arguing that Knight's acquittal showed the "narrowing" of Northampton). But this description

---

[2] The plaintiffs in this appeal also halfheartedly suggest (at 33) that "arms" might have referred only to (defensive) armor, rather than (offensive) weapons. But not only would that interpretation have made little sense as a policy matter—armor cannot kill someone—it is also flatly contradicted by the case law, and the repeated prosecutions against people for carrying pistols or other offensive weapons. *See Rex v. Harwood, supra* (prosecution for going "armed and weaponed with a lance-staff plated with iron, pistols, and other offensive weapons"); *Rex v. Edward Mullins* (K.B. 1751), *Middlesex Sessions: Justices' Working Documents*, *at* http://bit.ly/1U8OhO7 (conviction for going armed with a cutlass); *see also Chune*, 80 Eng. Rep. at 112 (explaining that the sheriff can arrest "any one to carry weapons in the high-way"). If anything, wearing armor (like "privy coats of mail") in self-defense, at least in some situations, was not construed to fall within the prohibition because armor, unlike handguns, did not have the capacity to harm others, and thus did not naturally "terrify the people." 1 Hawkins, *A Treatise of the Pleas of the Crown* 489, 798 (1721).

of the case distorts its meaning: As the Ninth Circuit recently explained, Knight was acquitted because, "as a government official, he was exempt from the statute's prohibition," *Peruta*, 2016 WL 3194315, at *8—not because the statute had been narrowed or "gone into desuetude." And the challengers do not deny that there is clear evidence that the statute continued to be enforced long after Knight's acquittal. *See, e.g.*, *Rex v. Mullins*, *Middlesex Sessions* (reporting conviction in 1751).

As to the latter: The plaintiffs pounce on language from the Hawkins treatise saying that "no wearing of arms is within the meaning of this Statute, unless it be accompanied by circumstances as are apt to terrify the People." Pl. Br. 32. But Hawkins goes on to explain that this language, as we noted in our *Grace* brief (at 8-9), referred to the customary practice of allowing high-ranking nobles to wear ceremonial armor or swords in the "common fashion," for that would not naturally terrify the people. 1 Hawkins, *A Treatise of the Pleas of the Crown*, ch. 63, § 9 (1716). The plaintiffs fail to mention this part of his treatise, just as they fail to mention the part—right before the sentence they quote—where Hawkins provided the blanket rule that one could not carry arms in public, and made clear that this general rule could not be evaded by claiming that one faced a threat. He wrote: "a man cannot excuse the wearing such armor in public, by alleging that such a one threatened him, and that he wears for the safety of his person from his assault." *Id.* § 8. Thus, far from establishing a separate "terror" or "evil intent" requirement, the language

that the plaintiffs cite indicates that, aside from the exceptions delineated, wearing arms in public *itself* constituted "circumstances as are apt to terrify the People"—the same understanding of the statute that Blackstone had.

More generally, the challengers' reading of the Statute of Northampton is at odds with its structure. The statute expressly exempted the King's officers, as well as those assisting law enforcement, and (as just explained) implicitly exempted the carrying of swords by nobles for ceremonial purposes. *See* Carpenter, *Liber Albus*, at 335 (explaining that "no one" could "carry arms, by day or by night, except the vadlets of the great lord of the land, carrying the swords of their masters in their presence, and the serjeants-at-arms [of the royal family]," as well as those responsible for "saving and maintaining the peace"); Coke, *Institutes* 161-62; *see also* Everytown *Grace* Br. 7-9. If the statute prohibited public carry only when accompanied by menacing conduct, as the challengers contend, these exceptions would be entirely unnecessary. *See* D.C. Br. 15-16.

The plaintiffs in this appeal do not even attempt to engage with these exceptions. And the *Grace* plaintiffs have managed to muster only the convoluted argument that the exceptions can be "read as applying to [the statute's] specific prohibitions" against bearing arms "before the King's justices," and not to its general prohibition on public carry. *Grace* Supp. Br. 4-5. But there is no support for

that strange reading, and Sir John Knight's acquittal suggests the opposite: that the exceptions applied to the general prohibition on the bare public carrying of arms.

In short, all available historical materials—the statutory text, structure, case law, and contemporaneous accounts—point in the same direction: For centuries before America's founding, England broadly prohibited carrying guns in populated places, regardless of whether accompanied by a threat or other menacing conduct.

**B.      The challengers' attempts to diminish the robust American tradition of restricting public carry are without historical foundation.**

**1. Early American Northampton-style laws.** Turning to American history, the plaintiffs in this appeal do not dispute that, as documented in our *Grace* brief (at 10-14), numerous states and colonies enacted laws mirroring the Statute of Northampton both before and after ratification of the Constitution. *See, e.g.*, 1686 N.J. Laws 289, 289-90, ch. 9; 1694 Mass. Laws 12, no. 6; 1786 Va. Laws 33, ch. 21; 1792 N.C. Laws 60, 61, ch. 3; 1801 Tenn. Laws 710, § 6; 1821 Me. Laws 285, ch. 76, § 1; 1852 Del. Laws 330, 333, ch. 97, § 13. Nor do they dispute that many other states and colonies, as the Ninth Circuit recently observed, simply "adopted verbatim, or almost verbatim, English law." *Peruta*, 2016 WL 3194315, at *9.

Instead, the challengers' argument with respect to these early American laws boils down to the same one they make with respect to Northampton: that they imposed a heightened intent or menace requirement. But here, too, history proves

otherwise. These American laws, like their English predecessor, broadly prohibited carrying a firearm in public, commanding constables to "arrest all such persons as in your sight shall ride or go armed." Haywood, *A Manual of the Laws of North-Carolina* pt. 2 at 40 (1814) (N.C. constable oath). And, as in England, prosecution under these laws did not require the defendant to have "threaten[ed] any person" or "committed any particular act of violence." Ewing, *A Treatise on the Office & Duty of a Justice of the Peace* 546 (1805). There was no requirement, in other words, that the "peace must actually be broken, to lay the foundation for a criminal proceeding." Bishop, *Commentaries on the Criminal Law* 550 (1865).

That numerous English and American laws prohibited public carry in populated areas for centuries—prohibitions that were far *broader* than the District's regulation at issue here—is reason enough for this Court to conclude that the regulation is longstanding, and hence constitutional under *Heller*.

**2. Good-cause (or "Massachusetts model") laws.** But those laws are not the only historical precedents for the District's good-reason requirement. In the early- and mid-19th century, many states, starting with Massachusetts, enacted a variant of the Statute of Northampton that allowed individuals who had "reasonable cause to fear an assault" to publicly carry. 1836 Mass. Laws 748, 750 ch. 134, § 16; *see* 1838 Wisc. Laws 381, § 16; 1841 Me. Laws 709, ch. 169, § 16; 1846 Mich. Laws 690, 692, ch. 162, § 16; 1847 Va. Laws 127, 129, ch. 14, § 16;

1851 Minn. Laws 526, 528, ch. 112, § 18; 1853 Or. Laws 218, 220, ch. 16, § 17; 1861 Pa. Laws 248, 250, § 6; 1870 W. Va. Laws 702, 703, ch. 153, § 8; 1871 Tex. Laws 1322, art. 6512. These statutes generally provided that, absent such "reasonable cause," no person could "go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon." 1836 Mass. Laws 748, 750 ch. 134, § 16. And, like the Northampton-style laws, there was no requirement that a person engage in additional threatening conduct beyond bare public carry. [3] These "reasonable cause" laws are further evidence that the District's regulation falls outside the historical scope of the Second Amendment. *See* D.C. Br. 24-25.

The plaintiffs barely address these laws on appeal, devoting only a single sentence of their brief to them. *See* Pl. Br. 40. They appear to echo the *Grace* plaintiffs' assertion below that the Massachusetts-model "surety-style laws . . . are worlds away from the flat ban the District now imposes," because "these laws were

---

[3] Newspaper articles from the 19th century describe criminal prosecutions under these laws even when the person was carrying a *concealed* weapon—a form of public carry that, by itself, does not indicate any menacing conduct beyond bare carry. *See, e.g.*, *City Intelligence*, Boston Courier (Boston, Mass.), Mar. 7, 1853, at 4 (reporting arrest and charge against person for "carrying a concealed weapon," a "loaded pistol"); *Watch Returns*, Evening Star (Washington, D.C.), Nov. 26, 1856, at 3 (describing multiple arrests for "[c]arrying [c]oncealed [w]eapons"); *City Items*, Richmond Whig (Richmond, Va.), Sept. 25, 1860, at 3 (reporting that person was "arraigned" for "carrying a concealed weapon" and "required [to] give security"); *Recorders Court*, Oregonian (Portland, Or.), Aug. 6, 1867, at 4 (reporting conviction for "carrying a concealed weapon," resulting in two-day imprisonment); *Crimes of the Year*, Kalamazoo Gazette (Kalamazoo, Mich.), Jan. 18, 1889, at 2 (describing conviction for "[c]arrying concealed weapon," resulting in 30-day prison sentence).

triggered only when some person who reasonably felt threatened by someone bearing arms in public lodged a complaint." *Grace* Supp. Br. 5. But the fact that some of these laws used surety bonds and triggered penalties with a citizen-complaint mechanism does not mean that the laws were not criminal.[4] Instead, as we now explain, historical evidence indicates that these laws, like the District's similar good-reason requirement, operated as criminal restrictions, and thus reinforces the conclusion that the District's law is "longstanding" under *Heller*.

To begin, contrary to Judge Leon's view that "the consequence imposed by the surety law was merely the payment of a bond," *Grace* Op. 25, sureties were a kind of criminal punishment. "At common law, sureties were similar to present-day guarantors in the bail context: members of the community who would pledge responsibility for the defendant and risk losing their bond if the defendant failed to 'keep the peace.'" Ruben & Cornell, 125 Yale L.J. Forum at 131. What's more, the failure to pay sureties for violating the statute could result in imprisonment. *See, e.g.*, 1836 Mass. Laws 748, 749 ch. 134, § 6 ("If the person, so ordered to recognize, shall refuse or neglect to comply with such order, the magistrate shall commit him to the county jail."); 1846 Mich. Laws 690, 691, ch. 162, § 6 (same); 1851 Minn. Laws 526, 527, ch. 112, § 8 (same).

---

[4] Other states, however, like Virginia, West Virginia, and Texas, did not use a citizen-complaint enforcement mechanism. *See* Everytown *Grace* Br. 16, 18.

And these laws were specifically characterized by the legislatures as criminal laws. The Massachusetts legislature, to take one example, placed its restriction in Title II of the Code entitled "Of Proceedings in Criminal Cases," and expressly cited the state's previous enactment of Northampton. 1836 Mass. Laws 748, 750, ch. 134, § 16. To take another example, the Minnesota legislature titled the relevant section "Persons carrying offensive weapons, how punished." 1851 Minn. Laws at 527-28, §§ 2, 17, 18. Many of the other laws were likewise contained in acts or chapters explicitly referencing criminal arrests and proceedings. *See*, *e.g.*, 1846 Mich. Laws 690, ch. 162 § 16 ("Of Proceedings in Criminal Cases"); 1847 Va. Laws 127, ch. 14, § 16 (same); 1871 Tex. Laws 1322, art. 6512 ("Criminal Code").

Finally, although there is an absence of detailed historical commentary or case law, contemporaneous evidence also indicates that these laws were enforced as criminal prohibitions on public carry without reasonable cause. For example, Peter Oxenbridge Thacher, a state judge, commented on Massachusetts's law in a grand jury charge that "drew praise in the contemporary press," explaining that "no person may go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to apprehend an assault or violence to his person, family, or property." Cornell, *The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities*, 39 Fordham Urb. L.J. 1695,

1720 (2012); *see id.* at 1721 (noting that Judge Thacher's account "unambiguously interprets this law as a broad ban on the use of arms in public").

Other accounts show the same. In 1878, a man was convicted of "going armed with a revolver" in Milwaukee, Wisconsin. Charles, *The Faces of the Second Amendment Outside the Home, Take Two: How We Got Here and Why It Matters*, 64 Clev. St. L. Rev. 373, 404 (2016). Although he "defended himself on the grounds that he had no intent to use the weapon and therefore was not a danger to the public," the judge "informed the jury that the statute only provided a defense for those that were 'carrying weapons on the apprehension of violence.'" *Id.* (quoting *Dear Pistol Practice*, Milwaukee Daily Sentinel, Oct. 23, 1878, at 8). And, as explained earlier (in footnote 3), contemporaneous newspaper accounts reported a number of criminal arrests and prosecutions involving defendants who had violated these state prohibitions on publicly carrying.

And this is to say nothing of the many early-20th-century laws, which we did not have the space to discuss in our *Grace* brief. To mention just a few here: In 1909, Alabama made it a crime for anyone "to carry a pistol about his person on premises not his own or under his control," but allowed a defendant to "give evidence that at the time of carrying the pistol he had good reason to apprehend an attack," which the jury could consider as mitigation or justification. 1909 Ala. Laws 258, no. 215, §§ 2, 4. In 1913, New York prohibited all public carry without a

permit, which required a showing of "proper cause," and Hawaii prohibited public carry without "good cause." 1913 N.Y. Laws 1627; 1913 Haw. Laws 25, act 22, § 1. A decade later, in 1923, the U.S. Revolver Association published a model law, which several states adopted, requiring a person to demonstrate a "good reason to fear an injury to his person or property" before they could obtain a permit to carry a concealed firearm in public.[5] The NRA's future president, Karl T. Frederick, was "one of the draftsmen" of this law. *3rd Report of Comm. on Uniform Act to Regulate the Sale & Possession of Firearms*, Nat'l Conf. on Uniform State Laws 573 (1926). West Virginia and Massachusetts also enacted public-carry licensing laws around this time, prohibiting all carry absent a showing of good cause. *See* 1927 Mass Laws 413; 1925 W.Va. Laws 25 (Extraordinary Session). And other states went further, prohibiting all public carry with no exception for good cause. *See, e.g.*, 1890 Okla. Laws 495, art. 47, §§ 2, 5 (making it a crime for anyone "to carry upon or about his person any pistol, revolver," or "other offensive or defensive weapon," except for carrying "shot-guns or rifles for the purpose of hunting, having them repaired, or for killing animals," or for using them in "military drills, or while travelling or removing from one place to another"); 1903 Okla. Laws 643, ch. 25, art. 45, § 584.

---

[5] *See* 1923 Cal. Laws 701, ch. 339; 1923 Conn. Laws 3707, ch. 252; 1923 N.D. Laws 379, ch. 266; 1923 N.H. Laws 138, ch. 118; 1925 Mich. Laws 473, no. 313; 1925 N.J. Laws 185, ch. 64; 1925 Ind. Laws 495, ch. 207; 1925 Or. Laws 468, ch. 260.

In sum, a long tradition of American law makes clear that prohibitions on public carry—with or without a good-cause exception—were historically understood to be outside the scope of the Second Amendment. The District's law, requiring good cause before a person may carry a firearm on the crowded streets of Washington, fits squarely within this tradition, and is therefore constitutional.

**C.    The challengers cherry-pick a handful of cases from the slaveholding South, which took an outlier approach to public carry and exhibited wide variability even within the region.**

Seeking to overcome the centuries-old tradition of restricting public carry in populated areas, the challengers seize on a smattering of state-court decisions from the slaveholding South. But these antebellum cases demonstrate only that some Southerners took a more permissive view of public carry than the rest of the nation; they do not stand for the proposition that public-carry restrictions throughout the country—from West Virginia to Wyoming, Massachusetts to Kansas, and a slew of cities in between—were widely understood to contravene the right to bear arms.

As we explained in our *Grace* brief (at 16-18), many states in the South adopted a more permissive approach to public carry than the rest of the country, generally allowing white citizens to carry firearms in public so long as the firearms were not concealed. *See, e.g.*, 1854 Ala. Laws 588, § 3272; 1861 Ga. Laws 859, § 4413; *see generally* Cramer, *Concealed Weapon Laws of the Early Republic* (1999). This alternative (and minority) tradition owes itself to the South's peculiar history and

the prominent institution of slavery. *See generally* Ruben & Cornell, 125 Yale L.J. Forum 121. It reflects "a time, place, and culture where slavery, honor, violence, and the public carrying of weapons were intertwined," *id.* at 125—a divergent set of societal norms that shaped cases and legislation alike.

So it is no retort to say, as the challengers do, that the District's law is not a longstanding, constitutional regulation because a few Southern state courts suggested otherwise in the middle of the 19th century. But even if this Court were to focus on just the South, and to ignore the rest of the country, it would see that courts and legislatures throughout the region took varying stances toward public carry.

Virginia, for example, "home of many of the Founding Fathers," *Edwards v. Aguillard*, 482 U.S. 578, 605 (1987) (Powell, J., concurring), indisputably prohibited public carry (with an exception for good cause) before ratification of the Fourteenth Amendment, after enacting a Northampton-style prohibition at the Founding. 1847 Va. Laws at 129, § 16 (making it illegal for any person to "go armed with any offensive or dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property"); 1786 Va. Laws 33, ch. 21. South Carolina enacted a Northampton-style law during Reconstruction. 1870 S.C. Laws 403, no. 288, § 4. Around the same time, Texas prohibited public carry with an exception for good cause—a prohibition enforced with possible jail

time, and accompanied by narrow exceptions that confirmed the law's breadth. 1871 Tex. Laws 1322, art. 6512 (prohibiting public carry absent an "immediate and pressing" need for self-defense, while exempting travelers "carrying arms with their baggage" and people carrying guns on their "own premises" and "place of business"). And West Virginia, added to the Union during the Civil War, similarly allowed public carry only upon a showing of good cause. 1870 W. Va. Laws 702, 703, ch. 153, § 8. Neither the plaintiffs nor their *amici* meaningfully respond to these laws.

Southern case law, too, reveals a lack of uniformity. Although a few pre-Civil-War decisions interpreted state constitutions in a way that can be read to support a right to carry openly, even in populated public places without good cause, several post-War cases held the opposite. The Texas Supreme Court, for instance, twice upheld that state's good-cause requirement. *English v. State*, 35 Tex. 473 (1871); *State v. Duke*, 42 Tex. 455 (1874). The court remarked that the law—which prohibited carrying "any pistol" in public without good cause, 1871 Tex. Laws 1322, art. 6512—"is nothing more than a legitimate and highly proper regulation" that "undertakes to regulate the place where, and the circumstances under which, a pistol may be carried; and in doing so, it appears to have respected the right to carry a pistol openly when needed for self-defense or in the public service, and the right to have one at the home or place of business," *Duke*, 42 Tex. at 459. The

court explained that the law thus made "all necessary exceptions," and noted that it would be "little short of ridiculous" for a citizen to "claim the right to carry" a pistol in "place[s] where ladies and gentlemen are congregated together." *English*, 35 Tex. at 477-79. Further, the court observed, the good-cause requirement was "not peculiar to our own state," for nearly "every one of the states of this Union ha[d] a similar law upon their statute books," and many had laws that were "more rigorous than the act under consideration." *Id.* at 479; *see also* Frassetto, *The Law and Politics of Firearms Regulation in Reconstruction Texas*, 4 Tex. A&M L. Rev. ___ (2016) (forthcoming), *available at* http://bit.ly/29MMHMO.

When the U.S. Supreme Court considered Texas's law in 1894, it took a similar view. After noting that the law "forbid[s] the carrying of weapons" absent good cause and "authoriz[es] the arrest without warrant of any person violating [it]," the Court determined that a person arrested under the law is not "denied the benefit" of the right to bear arms. *Miller v. Texas*, 153 U.S. 535, 538 (1894). Other courts upheld similar good-cause laws against constitutional attacks. *See, e.g.*, *State v. Workman*, 35 W. Va. 367, 367 (1891) (upholding West Virginia's good-cause requirement, which the court had previously interpreted, in *State v. Barnett*, 34 W. Va. 74 (1890), to require specific, credible evidence of an actual threat of violence, and not an "idle threat"). And even when a law wasn't directly challenged as unconstitutional, like in Virginia, courts "administered the law, and consequently,

by implication at least, affirmed its constitutionality." *Id.* (referring to Virginia and West Virginia courts).

By contrast, the challengers have identified no historical case (Southern or otherwise) striking down a good-cause requirement as unconstitutional, let alone a law applying exclusively to urban areas. Even *Andrews v. State*, 50 Tenn. 165 (1871), a case on which the challengers heavily rely, does not go so far. The Tennessee Supreme Court in that case invalidated a law that "in effect [was] an absolute prohibition" on carrying a weapon "for any and all purposes," whether "publicly *or privately*, without regard to time or place, or circumstances." *Id.* at 187 (emphasis added). "Under this statute," the court explained, "if a man should carry such a weapon about his own home, or on his own premises, or should take it from his home to a gunsmith to be repaired, or return with it, should take it from his room into the street to shoot a rabid dog that threatened his child, he would be subjected to the severe penalties of fine and imprisonment prescribed in the statute." *Id.*

In striking down that broad prohibition, the court did not cast doubt on the constitutionality of a law like the District's, which does not prohibit carrying a firearm in all places, but requires only that a person show good cause to carry a firearm *publicly*, in an entirely urban area. If anything, the Tennessee Supreme Court did the opposite: It reaffirmed that the legislature "may by a proper law regulate the carrying of this weapon publicly, or abroad, in such a manner as may

be deemed most conducive to the public peace, and the protection and safety of the community from lawless violence." *Id.* at 187-88. And although the court suggested that, under Tennessee law, the right to bear arms might protect public carry in the narrow circumstance "where it was clearly shown that [the arms] were worn *bona fide* to ward off or meet imminent and threatened danger to life or limb, or great bodily harm," *id.* at 192, the District's good-cause requirement allows for just that.

In the end, the challengers' reliance on the Southern case law rests almost entirely on just a couple of cases that, in the course of upholding concealed-carry prohibitions, expressed the view that the right to bear arms protects the right, under some circumstances, to openly carry a weapon in public. *See Nunn v. State*, 1 Ga. 243 (1846) (striking down a broad, statewide prohibition on openly carrying weapons based on the erroneous view that the Second Amendment applied to the states before 1868).[6] But even within the South, open carry was rare: The Louisiana Supreme Court, for example, referred to "the extremely unusual case of the carrying of such weapon in full open view." *State v. Smith*, 11 La. Ann. 633, 634 (1856). And the District's law, of course, does not go nearly as far as the one struck

---

[6] Some of the plaintiffs' supporters have taken the position that even cases like *Nunn* were wrongly decided because they upheld the state's authority to regulate the manner of public carry (open versus concealed). The NRA recently advanced the extreme position that the Second Amendment "guarantees a right to carry openly," as well as concealed, such that even a *shall*-issue concealed-carry regime, like Florida's, is unconstitutional because it does not also allow for open carry—a position that is utterly devoid of any historical support. *See* NRA Br. in *Norman v. State*, No. SC15-650 (Fla.), at 2, at http://bit.ly/2a0gzI6.

down in *Nunn*, which prohibited *all* public carry, and banned most handguns. The District's law, by sharp contrast, *allows* for public carry if a person demonstrates good cause, and applies only in a narrow, highly urbanized area that is thoroughly dotted with diplomatic housing and government buildings.

At any rate, isolated snippets from a few state-court decisions issued decades after the Framing cannot trump the considered judgments of countless courts and legislatures throughout our nation's history. Indeed, so far as we are aware, no constitutional challenge to a good-cause requirement has ever succeeded in this country. And many legislators, spanning across centuries, have enacted such a requirement without courts casting doubt on its constitutionality.

**D.    The upshot of the challengers' position is that dozens of state and local laws—enacted both before and after the Fourteenth Amendment's ratification—were unconstitutional.**

Finally, the plaintiffs do not deny the upshot of their position: that *dozens* of state and local laws—passed both before and after ratification of the Fourteenth Amendment—were unconstitutional.

Indeed, during and after Reconstruction, several legislatures enacted criminal prohibitions on public carry in cities and other populated areas. *See, e.g.*, 1869 N.M. Laws 312, *Deadly Weapons Act of 1869*, § 1 (making it "unlawful for any person to carry deadly weapons . . . within any of the settlements of this Territory"); 1875 Wyo. Laws 352, ch. 52, § 1 (prohibiting the carrying of firearms

"within the limits of any city, town or village"); 1889 Idaho Laws 23, § 1 (making it unlawful "to carry, exhibit or flourish any . . . pistol, gun or other-deadly weapons, within the limits or confines of any city, town or village"); 1889 Ariz. Laws 16, ch. 13, § 1 (prohibiting "any person within any settlement, town, village or city within this Territory" from "carry[ing] . . . any pistol"). Soon thereafter, Texas and Michigan enacted laws giving cities the authority to "regulate, restrain or prohibit the . . . carrying and using of firearms." 1901 Mich. Laws 687, § 8; *see* 1909 Tex. Laws 105 (granting cities the "[p]ower . . . to prohibit and restrain the carrying of pistols").[7]

Likewise, as we explained in our *Grace* brief, numerous cities enacted local ordinances prohibiting the public carrying of guns within city limits, ranging from Washington, D.C. itself, to New Haven, San Antonio, and Los Angeles. *See* Everytown *Grace* Br. 20-21 & n.13 (citing Washington, D.C., Ordinance ch. 5 (1857); Nebraska City, Neb., Ordinance no. 7 (1872); Nashville, Tenn., Ordinance ch. 108 (1873); Los Angeles, Cal., Ordinance nos. 35-36 (1878); Salina, Kan., Ordinance no. 268 (1879); La Crosse, Wis., Ordinance no. 14, § 15 (1880); Syracuse, N.Y., Ordinances ch. 27 (1885); Dallas, Tex., Ordinance (1887); New Haven, Conn., Ordinances § 192 (1890); Checotah, Okla., Ordinance no. 11 (1890); Rawlins, Wyo., Ordinances art. 7 (1893); Wichita, Kan., Ordinance no.

---

[7] Texas's Massachusetts-model law, discussed above, was also enacted right after the Fourteenth Amendment's ratification. *See* 1871 Tex. Laws 1322, art. 6512.

1641 (1899); McKinney, Tex., Ordinance no. 20 (1899); San Antonio, Tex., Ordinance ch. 10 (1899)).

In *Heller*, the Supreme Court instructed courts to look at "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century," by "examin[ing] a variety of legal and other sources to determine the public understanding of [the] legal text." 554 U.S. at 605; *see id.* at 610-19 (analyzing "Pre-Civil War Case Law," "Post-Civil War Legislation," and "Post-Civil War Commentators"). That dozens of states and cities enacted laws prohibiting or sharply limiting public carry during the period identified in *Heller* strongly indicates that the Second Amendment was not understood to preclude such laws. And then there are the earlier American laws prohibiting or otherwise restricting public carry, such as the Northampton-style prohibitions and the Massachusetts-model laws already described.

The plaintiffs do not even attempt to engage with these 19th-century laws, vaguely claiming only that "not every historical arms-bearing restriction or regulation was tested in court," and that "one can always find an ancient law that conflicts with how a fundamental right is understood today." Pl. Br. 41. But that is no response to *Heller*'s clear historical command.

Nor are these laws merely an "odd assortment" of "scattered, outlier laws," as the *Grace* plaintiffs asserted below. *Grace* Supp. Br. 7-8. Adding up the

Northampton-style, Massachusetts-model, and post-Fourteenth-Amendment laws, 20 states and territories had enacted public-carry laws by the turn of the century that were at least as restrictive as the District's law here. And several more did so in the early part of the 20th century. The challengers, by contrast, have thus far identified only a handful of Southern states that allowed for public carry in populated places, regardless of whether a person had a good reason. Moreover, as explained above, numerous cities across the nation—from the Wild West to the Northeast—had enacted ordinances broadly prohibiting public carry, including four of the 40 most populous cities in 1880 (Washington, D.C., New Haven, Syracuse, and Nashville).[8]

That we do not have clear historical evidence from even more cities does not mean—as the *Grace* plaintiffs have baselessly asserted—that "[t]he other 96 most populous cities . . . allowed public arms bearing of at least some kind during this period." *Grace* Supp. Br. 8. First, some of the nation's largest cities at that time— such as Philadelphia (the second most populous) and Boston (the fifth most populous)—are located in states that had *statewide* prohibitions on public carry. Thus, no separate municipal prohibition would have been necessary. Second, contemporaneous press accounts indicate that other large cities at the time, like San Francisco (the ninth most populous), had similar prohibitions. *See When and*

---

[8] *Population of the 100 Largest Urban Places: 1880*, U.S. Census Bureau (June 15, 1998), http://bit.ly/29OZTUP.

*Where May a Man Go Armed*, S.F. Bulletin, Oct. 26, 1866, at 5 ("The law ordains that no person can carry deadly weapons."). Finally, the challengers themselves have yet to point to *any* historical evidence supporting their claims that public carry was widely permitted in populous cities. And even if they could marshal some historical support for their claims, that would show only that different cities took different approaches, as one would expect in our federalist system.

What the challengers cannot deny is that *all* of these well-recognized 19th-century laws—both state and local—would have been unconstitutional under their reading of the Second Amendment. This Court should reject that untenable position, and instead uphold the District's law as a longstanding, constitutional regulation under *Heller*.

## CONCLUSION

The judgment of the district court should be affirmed.

Respectfully submitted,

*/s/ Deepak Gupta*
DEEPAK GUPTA
JONATHAN E. TAYLOR
NEIL K. SAWHNEY
GUPTA WESSLER PLLC
1735 20th Street, NW
Washington, DC 20009
(202) 888-1741

MARK ANTHONY FRASSETTO
EVERYTOWN FOR GUN SAFETY
P.O. Box 4184

New York, NY 10163

July 20, 2016

*Counsel for Amicus Curiae*
*Everytown for Gun Safety*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)

I hereby certify that my word processing program, Microsoft Word, counted 6,989 words in the foregoing brief, exclusive of the portions excluded by Rule 32(a)(7)(B)(iii).

/s/ Deepak Gupta
Deepak Gupta

## CERTIFICATE OF SERVICE

I hereby certify that on July 20, 2016, I electronically filed the foregoing Corrected Brief of *Amicus Curiae* Everytown for Gun Safety in Support of Appellants with the Clerk of the Court of the U.S. Court of Appeals for the D.C. Circuit by using the Appellate CM/ECF system. All participants are registered CM/ECF users, and will be served by the Appellate CM/ECF system.

/s/ Deepak Gupta
Deepak Gupta