SCHEDULED FOR ORAL ARGUMENT ON SEPTEMBER 20, 2016

No. 16-7025

# In the United States Court of Appeals for the District of Columbia Circuit

━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

BRIAN WRENN, JOSHUA AKERY, TYLER WHIDBY,
AND SECOND AMENDMENT FOUNDATION, INC.,

Plaintiffs-Appellants,

v.

DISTRICT OF COLUMBIA AND CATHY LANIER,

Defendants-Appellees.

━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

Appeal from an Order of the
United States District Court for the District of Columbia
The Hon. Colleen Kollar-Kotelly,District Judge
(Dist. Ct. No. 1:15-cv-162-CKK)

───────────────────────

APPELLANTS' REPLY BRIEF

───────────────────────

Alan Gura
GURA PLLC
916 Prince Street
Suite 107
Alexandria, VA 22314
703.835.9085/703.997.7665

July 27, 2016                     Counsel for Appellants

CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

A.    PARTIES AND AMICI

Plaintiffs below were Brian Wrenn, Joshua Akery, Tyler Whidby, and Second Amendment Foundation, Inc. All plaintiffs are Appellants before this Court.

Defendants below were Cathy Lanier and the District of Columbia. All Defendants are Appellees before this Court.

Amici for Plaintiffs-Appellants before this Court are Gun Owners of America, Inc., Gun Owners Foundation, U.S. Justice Foundation, Conservative Legal Defense and Education Fund, and Heller Foundation. Amici for Defendants-Appellees before this Court are DC Appleseed Center for Law & Justice, DC for Democracy, DC Vote, The League of Women Voters of the District of Columbia,Vincent C. Gray, Anthony A. Williams, Brady Center to Prevent Gun Violence, Maryland, California, Connecticut, Hawaii, Illinois, Iowa, Massachusetts, New York, Oregon, Washington, and Everytown for Gun Safety.

Amici in the District Court were Everytown for Gun Safety and Brady Center to Prevent Gun Violence.

## B. RULINGS UNDER REVIEW

The ruling under review is the Memorandum Decision and Order of the United States District Court for the District of Columbia, per the Hon. Colleen Kollar-Kotelly, Dist. Ct. Dkt. 54, entered March 7, 2016, denying Plaintiffs-Appellants' motion for preliminary injunction. The decision is not yet reported, but is available at 2016 U.S. Dist. LEXIS 28362. The ruling under review is printed at Joint Appendix ("JA") 379.

## C. RELATED CASES

This case has been before this Court, No. 15-7057. A related case is pending in the District Court, and before this Court: *Grace* v. *District of Columbia*, D.D.C. No. 15-CV-2234-RJL, D.C. Cir. No. 16-7067.

This case was also related to *Palmer* v. *District of Columbia*, U.S. Dist. Ct., D.D.C. No. 09-1482-FJS. In *Palmer*, which involved the same Defendants, Plaintiff SAF, and Plaintiff SAF's members, the District Court held that individuals have a Second Amendment right to carry handguns in public, in Washington, D.C., for self-defense. *Palmer* v.

*District of Columbia*, 59 F. Supp. 3d 173 (D.D.C. 2014). The District Court enjoined the City's handgun carrying prohibition pending adoption of a constitutional licensing system. Defendants appealed from that judgment to this Court, No. 14-7180, but dismissed their appeal.

# CORPORATE DISCLOSURE STATEMENT

Plaintiff-Appellant Second Amendment Foundation, Inc., ("SAF") has no parent corporations. No publicly traded company owns 10% or more of its stock.

SAF, a tax-exempt organization under § 501(c)(3) of the Internal Revenue Code, is a non-profit educational foundation incorporated in 1974 under the laws of the State of Washington. SAF seeks to preserve the effectiveness of the Second Amendment through educational and legal action programs. SAF has over 650,000 members and supporters residing throughout the United States.

# TABLE OF CONTENTS

Certificate as to Parties, Rulings, and Related Cases. . . . . . . . . . . . . . i

Corporate Disclosure Statement.. . . . . . . . . . . . . . . . . . . . . . . . . . . iv

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

Table of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

Glossary. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xii

Summary of Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    I.      The City Has Exceeded the Number of Times That
           It May Litigate the Same Issue. . . . . . . . . . . . . . . . . . . . . 4

    II.     "Mandatory" Injunction Standards Are Inapplicable. . . . . 11

    III.    If "Bear Arms" Does Not Mean What the Supreme Court
           Has Held It Means, What Does it Mean?. . . . . . . . . . . . . . 13

    IV.    Defendants' Historical Revisionism Is Unavailing. . . . . . . 16

    V.     Policy Arguments Concerning the Merits of a Right,
           Even if Disguised as "Scrutiny" or "Science,"
           Cannot Be Considered. . . . . . . . . . . . . . . . . . . . . . . . . . 25

    VI.    Plaintiffs' Irreparable Harm, the Equitable Balance,
           and the Public Interest All Counsel Entry of a
           Preliminary Injunction. . . . . . . . . . . . . . . . . . . . . . . . . . 30

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

TABLE OF AUTHORITIES

Cases

*Andrews* v. *State*,
  50 Tenn. 165 (1871). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Apotex, Inc.* v. *FDA*,
  393 F.3d 210 (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Canonsburg Gen. Hosp.* v. *Sebelius*,
  989 F. Supp. 2d 8 (D.D.C. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Caplin & Drysdale* v. *United States*,
  491 U.S. 617 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*College Sports Council* v. *Dep't of Educ.*,
  465 F.3d 20 (D.C. Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Columbia Hosp. for Women Found.* v. *Bank of Tokyo-Mitsubishi*, No. 97-7225,
  1998 U.S. App. LEXIS 7871 (D.C. Cir. Apr. 17, 1998). . . . . . . . . . . 11

*Davis* v. *Billington*,
  76 F. Supp. 3d 59 (D.D.C. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . 11

*District of Columbia* v. *Heller*,
  554 U.S. 570 (2008). . . . . . . . . . . . . . . . . . . . . 14, 15, 19, 29, 31

*Drake* v. *Cappelle*, No. 05-5199,
  2006 U.S. App. LEXIS 20167 (D.C. Cir. Aug. 3, 2006). . . . . . . . . . . . 7

*Dred Scott* v. *Sandford*,
  60 U.S. (19 How.) 393 (1857) . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Authorities upon which we chiefly rely are marked with asterisks.

vi

*Friends for All Children, Inc.* v. *Lockheed Aircraft Corp.*,
    746 F.2d 816 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*\*Gordon* v. *Holder*,
    721 F.3d 638 (D.C. Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Grace* v. *District of Columbia*, No. 15-2234,
    2016 U.S. Dist. LEXIS 64681 (D.D.C. May 17, 2016) . . . . . . 5, 16, 18

*Heller* v. *District of Columbia*,
    670 F.3d 1244 (D.C. Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*\*Heller* v. *District of Columbia*,
    801 F.3d 264 (D.C. Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Kent* v. *Dulles*,
    357 U.S. 116 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*King* v. *Dewhurst*,
    1 St. Tr. 529 (Lancaster Assize 1820) . . . . . . . . . . . . . . . . . . . . . . . . 22

*League of Women Voters* v. *Newby*, No. 16-236,
    2016 U.S. Dist. LEXIS 84727 (D.D.C. June 29, 2016). . . . . . . . . . . 11

*\*McDonald* v. *City of Chicago*,
    561 U.S. 742 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 29

*\*Milton S. Kronheim & Co.* v. *District of Columbia*,
    91 F.3d 193 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*\*Moore* v. *Madigan*,
    702 F.3d 933 (7th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*New Hampshire* v. *Maine*,
    532 U.S. 742 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Nunn* v. *State*,
    1 Ga. 243 (1846). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Owen* v. *State*,
    31 Ala. 387 (1858). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

\*Palmer* v. *District of Columbia*,
    59 F. Supp. 3d 173 (D.D.C. 2014). . . . . . . . . . . . . . 1, 2, 7, 8, 10, 12, 13

*Parker* v. *District of Columbia*,
    478 F.3d 370 (D.C. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Peruta* v. *Cnt'y of San Diego*,
    742 F.3d 1144 (9th Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Pharm. Care Mgmt. Ass'n* v. *District of Columbia*,
    522 F.3d 443 (D.C. Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Rex* v. *Harwood*, Quarter Sessions at Malton (Oct. 4-5, 1608),
    reprinted in North Riding Record Society,
    Quarter Sess. Recs. 132 (1884). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Rose* v. *United States*, No. 09-5127,
    2009 U.S. App. LEXIS 23416 (D.C. Cir. Oct. 16, 2009) . . . . . . . . . . . 7

*Silveira* v. *Lockyer*,
    328 F.3d 567 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Simpson* v. *State*,
    13 Tenn. 356 (1833). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*State* v. *Chandler*,
    5 La. Ann. 489 (1850). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*State* v. *Reid*,
    1 Ala. 612 (1840). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Staub v. City of Baxley*,
   355 U.S. 313 (1958). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Taylor* v. *Sturgell*,
   553 U.S. 880 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Turner Broadcasting System, Inc.* v. *FCC*,
   520 U.S. 180 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

*United States* v. *Cruikshank*,
   92 U.S. 542 (1876). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States* v. *Mendoza*,
   464 U.S. 154 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States* v. *Stauffer Chemical Co.*,
   464 U.S. 165 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 9

*Valley Forge Christian Coll.* v. *Ams. United for Separation of Church and State, Inc.*,
   454 U.S. 464 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Wilson* v. *State*,
   33 Ark. 557 (1878). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Wrenn* v. *District of Columbia*,
   808 F.3d 81 (D.C. Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Constitutional Provisions

U.S. Const. amend. II. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Statutes and Rules

Licensing of the Press Act of 1662, 14 Car. II c. 33 . . . . . . . . . . . . . . 22

Other Authorities

BLACKSTONE COMMENTARIES (Christian ed., 1794). . . . . . . . . . . . . . . 22

BLACKSTONE COMMENTARIES (St. George Tucker ed., 1803). . . . . . . . . 18

Brief for Petitioners, *District of Columbia* v. *Heller*,
U.S. Supreme Ct. No. 07-290. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Charles Humphreys, A COMPENDIUM OF THE COMMON LAW
IN FORCE IN KENTUCKY (1822).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Coke, THE THIRD PART OF THE INSTITUTES OF THE
LAWS OF ENGLAND  (1817 reprint) . . . . . . . . . . . . . . . . . . . . . . . . . . 20

COLONIAL RECORDS OF THE STATE OF GEORGIA, Part I (1911) . . . . . . . 17

Jerry L. Mashow, *Administrative Due Process As Social Cost
Accounting*,
9 Hofstra L. Rev. 1423 (1981).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

LETTERS OF JOHN ANDREWS, ESQ., OF BOSTON, 1772-1776
(Winthrop Sargent ed., 1866). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Michael D. Cicchini, *An Economics Perspective on the Exclusionary Rule
and Deterrence*, 75 Mo. L. Rev. 459 (2010). . . . . . . . . . . . . . . . . . . 28

*Opinion on the Legality of the London Military Foot
Association*, William Blizzard, DESULTORY
REFLECTIONS ON POLICE (1785) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Peter F. Nardulli, *The Societal Cost of the Exclusionary Rule: An
Empirical Assessment*, 8 Am. Bar Found. Research J. 585 (1983)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Restatement (Second) of Judgments § 28, comment b (1982). . . . . . . . 9

Richard A. Posner, *Free Speech In An Economic Perspective*,
20 Suffolk U. L. Rev. 1 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

THE TRIAL OF WILLIAM WEMMS, ET AL. (T. Evans 1771). . . . . . . . . . . . . 16

Tonja Jacobi, *The Law and Economics of the Exclusionary Rule*,
87 Notre Dame L. Rev. 585 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . 28

# GLOSSARY

PSA  —  Plaintiffs' Supplemental Addendum

SAF  —  Second Amendment Foundation, Inc.

## SUMMARY OF ARGUMENT

The difficulty of resolving this case is inversely proportional to the number of words the city and its amici expend (38,202) in denying this one simple constitutional fact: there exists a fundamental *right* to bear arms for self defense in Washington. What the city and its allies think of that right is unimportant.

The Supreme Court held precisely that when it rejected the city's historical assault on the meaning of "bear arms," and held irrelevant any concern that the Framers lacked foresight or exercised bad judgment in ratifying the constitutional text. The district court confirmed these holdings when it held that Defendants could not violate the right of ordinary people to carry handguns for self-defense. *Palmer* v. *District of Columbia*, 59 F. Supp. 3d 173 (D.D.C. 2014).

If this dispute wasn't over in 2008, surely it was over last year when Defendants dismissed their appeal in *Palmer*. Defendants devote a single page to cursorily denying it, but there persists this nagging truth: the same parties fully and conclusively litigated the central issue here, through an appeal to this Court, just last year.

Defendants' forgetfulness with respect to *Palmer* extends beyond the decision's precedential and preclusive effects. As though *Palmer* never happened, Defendants urge this Court to alter its preliminary injunction standards by adopting a heightened test for allegedly mandatory injunctions, premised on the false assertion that Plaintiffs seek action altering the status quo ante. But the "good reason" law was itself a reaction to *Palmer*. The freedom to carry handguns was the status quo ante that *Defendants* altered with their "good reason" law. In any event, Plaintiffs' requested injunction—to enjoin the operation of a licensing requirement—is prohibitive, not mandatory.

As a matter of settled precedent and of res judicata, this dispute is over. And yet the city continues its argument with the Constitution, relying on dubious historical revisionism that denies the plain, Supreme Court-defined meaning of a constitutional term without offering an alternative. Indeed, Defendants attack the very notion that the this Court has any authority to transmit constitutional constraints against the city's conduct.

Even assuming that there is a right to bear arms (and there is), Defendants claim that they get to "prove" that the right is too

dangerous to allow, and that their arbitrary rationing of that right is entitled to absolute deference.[1] For reasons that remain unclear, Defendants assert that discovery, experts, and perhaps a trial showing just how awful it would be to allow the carrying of handguns for self-defense would prove the law's constitutionality.

But such "labored effort to smother the Second Amendment by sheer body weight has all the grace of a sumo wrestler trying to kill a rattlesnake by sitting on it—and is just as likely to succeed." *Silveira* v. *Lockyer*, 328 F.3d 567, 570 (9th Cir. 2003) (Kozinski, J., dissenting from denial of rehearing en banc). It simply does not matter what

---

[1]Defendants like to throw around the term "absolutist" to describe Plaintiffs' invocation of their right to bear arms. Defendants' Br. at 7 & 12. It is unclear how Defendants would distinguish between an "absolute right" that must have the status of a "right" precisely because the authorities would suppress it, and a "non-absolute," fake "right" that people enjoy only so long as it pleases the police. If Defendants mean to suggest that Plaintiffs assert a right free from all regulation, they should read more carefully. *See, e.g.*, Plaintiffs' Br. at 3 ("Defendants retain the power to regulate the carrying of handguns in the interest of public safety"); *id.* at 29 n.11 (Plaintiffs "do not challenge the city's ability to license the right"); *id.* at 41 ("Plaintiffs do not challenge the concept of regulation."). But "absolutist" aptly describes regimes where "rights" exist only at the police's discretion, and whose courts engage in "heightened scrutiny" for the defense of "fundamental rights" by deferring to the police's view of what is constitutional.

Defendants might "prove" about the desirability or efficacy of their rights-rationing scheme. The only question is how much of everyone's time and resources—of the taxpayers, of the Plaintiffs, and of the various courts—will be wasted arguing about a constitutional right's value, before the courts finally enforce it in a meaningful way.

The time for enforcement has arrived.

ARGUMENT

I.   THE CITY HAS EXCEEDED THE NUMBER OF TIMES THAT IT MAY LITIGATE THE SAME ISSUE.

Plaintiffs have invested a great deal of time, resources, and effort in obtaining their judgment in *Palmer*. They object to the worthlessness thus far ascribed to that judgment, especially considering the excessive delays in obtaining it. Respectfully, the issue is more profound than the Second Amendment's meaning or the constitutionality of the District's "good reason" law. It strikes at the heart of the federal courts' ability to render effective justice to individuals claiming a violation of their civil rights. *Palmer* could have been decided in days. Cases of that sort are ordinarily resolved in months. Yet for no reason, it took an astonishing *five years*, and immediately the judgment was treated as worthless.

Why?

As Judge Leon noted, the city's position here "flies in the face of prior litigation." *Grace* v. *District of Columbia*, No. 15-2234, 2016 U.S. Dist. LEXIS 64681, at *30 (D.D.C. May 17, 2016). Plaintiffs have shown that the question of whether there is a right to carry handguns for self-defense in Washington easily satisfies all res judicata elements: the exact issue was contested earlier by the parties, submitted and necessarily decided by a competent court, and preclusion is not unfair to the city. Plaintiffs' Br. at 14-15.

At the outset, Defendants err in claiming that "Plaintiffs do not invoke nonmutual issue preclusion." Defendants' Br. at 27. Plaintiffs have noted that there is mutuality between all parties—the circumstance under which claim preclusion ought to be more likely given the fundamental unfairness of denying parties the benefit of their hard-won judgment—but their claim is simply for issue preclusion, which applies regardless of mutuality in this context.

Mutual collateral estoppel is a feature of federal practice. *United States* v. *Stauffer Chemical Co.*, 464 U.S. 165, 171 (1984). To be sure, *non*mutual offensive collateral estoppel does not apply against the *federal* government, for at least some claims. Such estoppel "would

deprive [the Supreme] Court of the benefit it receives from permitting several courts of appeals to explore a difficult question before [it] grants certiorari," and the Solicitor General would be forced "to appeal every adverse decision in order to avoid foreclosing further review." *United States* v. *Mendoza*, 464 U.S. 154, 160-61 (1984). But the District of Columbia does not face those concerns, and it is subject to nonmutual, as well as mutual, offensive collateral estoppel. *See Milton S. Kronheim & Co.* v. *District of Columbia*, 91 F.3d 193 (D.C. Cir. 1996).[2]

As *Kronheim* implied in considering nonmutual offensive collateral estoppel against the District, and as other decisions of this Court confirm, the doctrine bars vexatious relitigation of constitutional issues. *See, e.g., College Sports Council* v. *Dep't of Educ.*, 465 F.3d 20

---

[2]In *Kronheim*, this Court applied the issue preclusion factors Plaintiffs here identified in a case seeking nonmutual offensive collateral estoppel against the District of Columbia. Preclusion was not applied only because this Court found it was unclear whether the issue was necessarily determined. *Kronheim*, 91 F.3d at 197-98. Judge Silberman separately suggested that *Mendoza* should be extended to the District in an appropriate case, *id.* at 205 (Silberman, J., concurring), while Judge Henderson opined that "*Mendoza*'s rationale is inapplicable to the District" and "[n]o legitimate public policy would be served by immunizing the District from nonmutual offensive collateral estoppel here," *id.* at 209 (Henderson, J., dissenting).

(D.C. Cir. 2006); *Rose* v. *United States*, No. 09-5127, 2009 U.S. App.

LEXIS 23416, at *2 (D.C. Cir. Oct. 16, 2009) ("res judicata barred

appellant's constitutional claim against the District of Columbia");

*Drake* v. *Cappelle*, No. 05-5199, 2006 U.S. App. LEXIS 20167 (D.C. Cir.

Aug. 3, 2006).

> If there is any "public policy" exception to res judicata, it applies only in very limited circumstances, e.g., in cases implicating significant questions of constitutional law *where there has been a change in controlling legal principles.*

*Apotex, Inc.* v. *FDA*, 393 F.3d 210, 219 (D.C. Cir. 2004) (emphasis

added) (citation omitted). No controlling legal principles have changed

since Defendants dismissed their appeal in *Palmer*.

Defendants' first attempted response fundamentally errs in failing to

comprehend the difference between *claim* and *issue* preclusion. "*Palmer*

dealt with a 'total ban,' not a licensing scheme. The district court there

thus did not . . . determine the 'identical' issue of whether the District's

'good reason' law implicates the right (let alone its core)." Defendants'

Br. at 27.

Of course *Palmer* is not res judicata with respect to the "claim"—the

ultimate question as to whether the "good reason" law is

constitutionally defective. *Palmer* is, however, res judicata with respect to the *issue* of whether there exists a right to carry handguns in Washington, D.C. As Plaintiffs noted, issue preclusion "bars successive litigation . . . even if the issue recurs in the context of a different claim." Plaintiffs' Br. at 14 (quoting *Canonsburg Gen. Hosp.* v. *Sebelius*, 989 F. Supp. 2d 8, 16 (D.D.C. 2013)); *Taylor* v. *Sturgell*, 553 U.S. 880, 892 & n.5 (2008). The question is whether "an issue of fact or law actually litigated and resolved in a valid court determination [was] essential to the prior judgment, whether or not the issue arises on the same or a different claim." *New Hampshire* v. *Maine*, 532 U.S. 742, 748-49 (2001) (citation omitted).

*Palmer* struck down the District of Columbia's ban on the carrying of handguns, as the court found that there exists a right to carry handguns in Washington, D.C. Whether the "good reason" law *also* violates that right seems an easy question—of course it does—but at least technically, that is a different claim. The underlying *issue* of the right's existence here was fully litigated.

Undaunted, Defendants argue that an exception to res judicata arises "if the issue is one of law and the facts of the cases are

substantially unrelated." Defendants' Br. at 27 (quoting *Pharm. Care Mgmt. Ass'n* v. *District of Columbia*, 522 F.3d 443, 446 (D.C. Cir. 2008)). Defendants overstate matters, presenting the exception as a hard rule where in reality, this Court offered that the exception "continues to have force," "[a]lthough the Supreme Court has acknowledged that the purpose and application of this exception are not entirely clear." *Id.* (citing *Stauffer*, 464 U.S. at 171-72).

But after acknowledging this uncertainty, the Supreme Court was at least comfortable describing one circumstance where the exception does not apply:

> [when] the claims in two separate actions between the same parties are the same or are closely related . . . it is not ordinarily necessary to characterize an issue as one of fact or of law for purposes of issue preclusion. . . . In such a case, it is unfair to the winning party and an unnecessary burden on the courts to allow repeated litigation of the same issue in what is essentially the same controversy, even if the issue is regarded as one of "law".

*Stauffer*, 464 U.S. at 171 (quoting Restatement (Second) of Judgments § 28, comment b (1982)) (footnote omitted).

And the Supreme Court has "had no trouble finding [the exception] inapplicable" where there was "close alignment in both time and subject matter between the [two cases]." *Id.* at 170 (citation omitted).

The cases are plainly related. *Cf. Wrenn* v. *District of Columbia*, 808 F.3d 81, 83 (D.C. Cir. 2015) ("quite understandable" that the district court's calendar committee would "deem the case[s] related"). The essential adjudicative fact, in both cases, is simply that SAF members would carry handguns for self-defense in the District of Columbia. As both cases concern the same essential activity, Defendants' objections are likewise identical. Just because the District addressed the same facts and concerns differently—in *Palmer*, with a total prohibition; here, with a "good reason" law accomplishing essentially the same thing—that does not render the cases unrelated. The closeness-in-time factor likewise weighs against any exception.

Respectfully, five years to determine whether individuals enjoy a right to carry handguns in the District of Columbia are enough. The gross inefficiencies plaguing this dispute have worked a fundamental unfairness against the Plaintiffs, and against the public at large. By all means, let the Defendants argue that their "good reason" law is somehow constitutional (it is not). But the dispute as to whether individuals in Washington enjoy a right to carry handguns ended with Defendants' dismissal of their appeal in *Palmer* on April 2, 2015.

II.    "MANDATORY" INJUNCTION STANDARDS ARE INAPPLICABLE.

Defendants argue that Plaintiffs seek "radical change in the status quo," Defendants' Br. at 7, and that such an injunction "is particularly disfavored" and thus subject to a "more stringent standard," *id.* at 54 (quotations omitted). But support for this proposition hails from other circuits. "In this circuit, however, no case seems to squarely require a heightened showing." *Friends for All Children, Inc.* v. *Lockheed Aircraft Corp.*, 746 F.2d 816, 834 n.31 (D.C. Cir. 1984); *Columbia Hosp. for Women Found.* v. *Bank of Tokyo-Mitsubishi*, No. 97-7225, 1998 U.S. App. LEXIS 7871, at *2 (D.C. Cir. Apr. 17, 1998); *League of Women Voters* v. *Newby*, No. 16-236, 2016 U.S. Dist. LEXIS 84727, at *20 n.13 (D.D.C. June 29, 2016); *Davis* v. *Billington*, 76 F. Supp. 3d 59, 69 n.15 (D.D.C. 2014).

This case is not an appropriate vehicle in which to adopt the rule. Whatever its merit, the standard for so-called "mandatory" injunctions (as opposed to "prohibitory" ones) requires first identifying the status quo ante. But from what point in time is the status quo measured when plaintiffs seek to enjoin a new legislative enactment? Legislation is inherently reactive, and Defendants fail to explain why this Court must

assume that the "status quo" began with the challenged provisions' enactment. Were that the case, all actions seeking to enjoin a law would be subject to more restrictive preliminary injunction standards.

Previous authorization for gun carry licenses having long fallen into desuetude, the city repealed Defendant Lanier's authority to issue handgun carry licenses in 2009. Consequently, for a brief time in *Palmer*'s wake, Americans were free to carry handguns throughout Washington, D.C., without proving a special reason for doing so or even bothering with a license. Many did.

An injunction would not change the status quo ante—*Defendants* changed the status quo when they adopted the challenged regulations, and Plaintiffs sued immediately upon those regulations' implementation. Indeed, it is Defendants who claim that this case is wholly unrelated to *Palmer*, in that the cases allegedly relate to altogether different circumstances. The requested injunction would restore the status quo ante, barring the new practice. For purposes of considering whether to apply a "mandatory" standard, the "status quo" clock, if it is set at all, ought to be set at the state of affairs that preceded the city's initiation of the instant controversy.

In any event, the requested injunction here is prohibitive, not mandatory. Plaintiffs seek only to bar use of the post-*Palmer* "good"/ "proper" reason requirement, leaving Defendants free to add, remove, or otherwise amend their licensing criteria and carrying regulations as they see fit (so long as any new regulations are constitutional). Plaintiffs seek no change at all from July 24, 2014.

III.   IF "BEAR ARMS" DOES NOT MEAN WHAT THE SUPREME COURT HAS HELD IT MEANS, WHAT DOES IT MEAN?

Defendants' heading I.A. tells us "that the 'good reason' standard does not implicate the right codified in the Second Amendment." Defendants' Br. at 12. This begs the question: what is "the right codified in the Second Amendment," as Defendants see it? Plaintiffs assert the right to "bear arms," U.S. Const. amend. II, and so presumably, in responding to the claim, this is the right Defendants reference. If so, how would Defendants define it?

Last the city litigated the meaning of "bear arms," it argued that "'bear Arms' refers idiomatically to using weapons in a military context. This was the only sense in which the young Congress and its predecessors ever used the phrase." Brief for Petitioners, *District of Columbia* v. *Heller*, U.S. Supreme Ct. No. 07-290, at 16. Alas, the

Supreme Court rejected this view, holding instead that "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'" *District of Columbia* v. *Heller*, 554 U.S. 570, 584 (2008) (citations omitted).

> [T]he natural meaning of 'bear arms'" as used in the Second Amendment is to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person.

*Id.* (quotation omitted).

So what is Defendants' proposed definition of this critical term now? Perhaps hoping to take another run at *Heller*, Defendants don't say. The most that they offer is "[t]he District does not challenge [the] assumption" that "the right to 'bear arms' 'would make no sense were [it] confined to one's home.'" Defendants' Br. at 26 (quoting Plaintiffs' Br. at 26). Yet they also claim that "there is no broad, categorical 'right' to carry any time a gun is desired for self-defense" (not exactly Plaintiffs' claim, see supra n.1), because felons and the mentally ill may be barred from carrying guns. *Id.*

Did *Heller*'s exception for felons and the mentally ill swallow its rule? Perhaps the District should try to ban handguns again, because felons and the mentally ill cannot keep guns at home, either.

Defendants do concede that "[a]ny person could, at some point in time, find himself particularly threatened." *Id.* at 30. But "[w]hen that happens, the District's law" does *not* merely "allow[] him to apply for a carry license." *Id.* The District's law allows him, or her (as the case may be and often is), to use handguns in self-defense. *Gillis* v. *United States*, 400 A.2d 311, 313 (D.C.1979). The Second Amendment guarantees the right to be "armed and ready" for that purpose, *Heller*, 554 U.S. at 584—armed with a gun, not with Chief Lanier's application.

Of course, in any event, this Court is bound by *Heller*'s definition, which says nothing about urban areas or "good reason." Confrontations occur in urban as well as in rural settings, and there is no history of a prior restraint on the right to bear arms based on "good reason" or anything like it until the twentieth century. Were the right to bear arms so cramped, perhaps John Adams would not have told a Boston jury that because "every private person is authorized to arm himself"—without any reference to a good, police-approved reason—"the inhabitants"—of Boston, as urban an area of late eighteenth century America as there was—"had a right to arm themselves at that time"—in the middle of Boston—"for their defence."

John Adams, Esq., in THE TRIAL OF WILLIAM WEMMS, ET AL., 155 (T. Evans 1771); *Grace*, at \*25. Adams's clients were mostly acquitted. With Northampton's progeny still on many books, the Supreme Court nearly a century later referenced Americans' constitutional right to "carry arms wherever they went," *Dred Scott* v. *Sandford*, 60 U.S. (19 How.) 393, 417 (1857), an odd locution if meant to exclude urban areas.

As shown in Plaintiffs' opening brief, in the companion litigation, and as addressed below, Defendants' claim "that most Framing-era citizens were prohibited, in populated areas, from publicly carrying firearms for self-defense," Defendants' Br. at 12, is plainly nonsense. If there exists some Framing Era source for the proposition that the Second Amendment right to "bear arms" was understood as "the right to carry arms in rural areas or, with a rare police dispensation in urban areas," or words to that effect, a citation should have been offered.

IV.   DEFENDANTS' HISTORICAL REVISIONISM IS UNAVAILING.

This Court should be "disinclined to engage in another round of historical analysis to determine whether eighteenth-century America understood the Second Amendment to include a right to bear guns outside the home." *Moore* v. *Madigan*, 702 F.3d 933, 942 (7th Cir.

2012). After all, the Supreme Court has held that the Second Amendment guarantees a right to carry guns, every federal appellate court to have examined the matter has assumed or held as much, and Defendants only last year were reluctant to seek this Court's view of a now-final judgment barring the city from violating the individual right to carry a gun for self-defense.

To be sure, the tradition of carrying of guns (and other arms) for self-defense in our country long predates the Second Amendment. On occasion, the carrying of guns has been *required*. *See, e.g.*, 19 COLONIAL RECORDS OF THE STATE OF GEORGIA, Part I, 138 (1911) (churchgoer "shall carry with him a gun, or a pair of pistols, in good order and fit for service, with at least six charges of gun-powder and ball, and shall take the said gun or pistols with him to the pew or seat"). The Boston Tea Party's "Indians" were "each arm'd with a hatchet or axe, and pair pistols." LETTERS OF JOHN ANDREWS, ESQ., OF BOSTON, 1772-1776, 13 (Winthrop Sargent ed., 1866). And as Judge Leon noted, history is replete with "multiple instances of our Founding Fathers carrying or advocating for carrying of firearms—including in populated areas."

*Grace*, at \*24; *see generally id.* at \*24-\*25 (discussing George Washington, Patrick Henry, Thomas Jefferson, and John Adams).

"In many parts of the United States, a man no more thinks, of going out of his house on any occasion, without his rifle or musket in his hand, than an European fine gentleman without his sword by his side." 5 BLACKSTONE COMMENTARIES App. n.B, at 19 (St. George Tucker ed., 1803). Congress could not "pass a law prohibiting any person from bearing arms." *Id.* App. n.D, at 289.

When states passed laws restricting the right to arms, courts were unafraid to point out the constitutional limitations imposed by the Second Amendment and its state analogs, and when necessary, to strike down laws infringing upon the right to carry arms. *See, e.g.*, *Wilson* v. *State*, 33 Ark. 557, 560 (1878); *Andrews* v. *State*, 50 Tenn. 165 (1871); *Owen* v. *State*, 31 Ala. 387, 388 (1858); *State* v. *Chandler*, 5 La. Ann. 489, 490 (1850); *Nunn* v. *State*, 1 Ga. 243 (1846); *State* v. *Reid*, 1 Ala. 612 (1840).

What no American authority apparently did was refute the existence of a *right* to carry arms, owing to the Statute of Northampton or for any other reason. To the contrary, sources the Supreme Court cited in

*Heller* <u>rejected</u> not only Defendants and their amici's reading of Northampton, but the notion that Northampton somehow informs a limitation on the right to arms.

Notwithstanding their herculean efforts at reviving the dead-for-four-centuries Statute of Northampton, Defendants and their amici have *ignored* the early American, Supreme Court-endorsed authorities debunking the Northampton theory. These bear revisiting. Upon reciting Northampton, Charles Humphreys added,

> But here it should be remembered, that in this country the constitution guarranties [sic] to all persons the right to bear arms; then it can only be a crime to exercise this right in such a manner, as to terrify the people unnecessarily.

Charles Humphreys, A COMPENDIUM OF THE COMMON LAW IN FORCE IN KENTUCKY 482 (1822) (emphasis added); *Heller*, 554 U.S. at 588 n.10 (quoting same). Tennessee's Supreme Court rejected Defendants' theory directly: "[S]uppose it to be assumed on any ground, that our ancestors adopted and brought over with them, this English statute [Northampton], or portion of the common law, our constitution has completely abrogated it." *Simpson* v. *State*, 13 Tenn. 356, 359-60 (1833).

This is not to concede that Defendants and their amici correctly describe Northampton. They do not. For example, Everytown's quotation of the indictment in *Rex* v. *Harwood*, Quarter Sessions at Malton (Oct. 4-5, 1608), reprinted in North Riding Record Society, Quarter Sess. Recs. 132 (1884), is selective. Everytown informs that Harwood was indicted for carrying "offensive weapons," but Everytown omits the words that follow immediately: "to the great terrour."

Everytown cites Coke, THE THIRD PART OF THE INSTITUTES OF THE LAWS OF ENGLAND 161 (1817 reprint) for "the story of a man sentenced to prison because he 'went armed under his garments,' even though he had not threatened anyone but had been threatened himself." Everytown Br. at 5-6. That description, too, is incomplete. The cited text provides: "Sir Thomas Figett knight went armed under his garments, *as well as in the palace, as before the justice of the kings bench: for both which upon complaint made*, he was arrested by sir William Shardshill chiefe justice of the kings bench . . . ."

And another case that Everytown claims involved the mere carrying of a cutlass, Everytown Br. at 7 n.2, also involved a conviction for assault. *See* Historians Br., *Wrenn* v. *District of Columbia*, No. 15-7057,

at 9. Indeed, the understanding of menacing conduct as an element of affray under Northampton survived in English courts into the nineteenth and twentieth centuries. *Id.* at 9-10.

Not surprisingly, English authorities much closer in time to Northampton's adoption came to a very different view of the subject than have Defendants and Everytown. "[T]he Recorder of London, who was the foremost legal advisor to the city as well as the chief judge of the Old Bailey, gave the following opinion . . .

> all the subjects of the realm, who are able to bear arms, are bound to be ready, at all times, to be ready, at all times, to assist the sheriff, and other civil magistrates, in the execution of the laws and the preservation of the public peace. *And that right which every Protestant most unquestionably possesses, individually*, may, and in many cases must, be exercised collectively . . . .

*Parker* v. *District of Columbia*, 478 F.3d 370, 382 n.8 (D.C. Cir. 2007) (quoting *Opinion on the Legality of the London Military Foot Association*, reprinted in William Blizzard, DESULTORY REFLECTIONS ON POLICE 59-60 (1785) (emphasis added)). Three years after the Second Amendment's ratification, Cambridge law professor Edward Christian summed up English law this way: "every one is at liberty to keep or carry a gun, if he does not use it for the destruction of game." 2

BLACKSTONE COMMENTARIES *411-12 n.2 (Christian ed., 1794). As one English court would soon declare, "[a] man has a clear right to protect himself when he is going singly or in a small party upon the road where he is traveling or going for the ordinary purposes of business," though there is "no right to carry arms to a public meeting, if the number of arms which are so carried are *calculated to produce terror and alarm . . . .*" *King* v. *Dewhurst*, 1 St. Tr. 529, 601–02 (Lancaster Assize 1820) (emphasis added).

Of course, as Plaintiffs showed in some detail in their opening brief, Northampton's progeny in America were reconciled to the right to arms because affray required menacing conduct. Do ancient English abuses normally limit our understanding of the American Bill of Rights today? In the early parts of the 17th century, when Northampton's limitations might have been less clear in England, the King was also licensing the printing press. Would Defendants and their amici come before this Court to defend press licensing by citing to obscure cases brought under the Licensing of the Press Act of 1662, 14 Car. II c. 33?

Plaintiffs agree that modern technological tools enabling the unearthing of legal arcana are interesting. Who knew that early Ohio

laws punished "any person" fourteen or older who "shall profanely curse or damn, or profanely swear by the name of God, Jesus Christ or the Holy Ghost;" PSA 2, as well as anyone who "shall exhibit any puppet show, wire dancing or tumbling, jugling [sic] or slight of hand, and shall ask or receive any money or other property for exhibiting the same . . . ." *Id.* at 3. Manchester, New Hampshire commanded that "[n]o person shall sing or repeat, or cause to be sung or repeated, any lewd, obscene, or profane songs, or shall repeat any lewd, obscene, or profane word, or write or mark in any manner" such word "or obscene or lascivious figure or representation, on any . . . thing whatever." *Id.* at 5. But these laws prove only that some legislators do not share constitutional values, not that today, there is no First Amendment right to "profanely" invoke God, exhibit puppet shows, sing crude songs or render lascivious figures.

There is likewise no point in continuing the debate over the legal history of this country's approach to firearm regulation. Defendants' mischaracterizations on this score begin at page 1, with their assertion that "[f]or much of [the District's existence], some carrying was allowed under a licensing scheme." Defendants' Br. at 1-2 (citations omitted).

Actually, for a majority of the time—and until 1943—at least some carrying was allowed without any sort of license. Plaintiffs' Br. at 4-5.

Laws allowing individuals to carry the burden of proving that someone is a danger with firearms, resulting in the imposition of a temporary surety, are a far cry from laws disarming the population wholesale subject to rare police dispensation. Nor does it prove much to cite the inevitable anomalies, never tested in court, mostly enacted by states and localities that understood they were unbound by the Second Amendment per *United States* v. *Cruikshank*, 92 U.S. 542 (1876).

But more to the point, under this Court's precedent, the alleged longstanding-ness of a regulatory practice is irrelevant where a regulation has "more than a de minimis effect upon [one's] right." *Heller* v. *District of Columbia*, 670 F.3d 1244, 1253 (D.C. Cir. 2011) ("*Heller II*"). Defendants respond that there is no right to carry guns, Defendants' Br. at 26, but that is a non-sequitor. The argument that there is no right to carry a gun for self-defense (again, it is unclear what Defendants believe the Second Amendment right to be), appears different from the claim that, the right notwithstanding, the regulation is presumptively lawful owing to its allegedly longstanding nature.

If there is a right to carry a handgun for self-defense—and there is—then even the alleged longstanding nature of a law completely forbidding handgun carrying at all times and places absent a special and rare police dispensation that is by definition unavailable to the community at large imposes more than a "de minimus" burden on that right.

V.  POLICY ARGUMENTS CONCERNING THE MERITS OF A RIGHT, EVEN IF DISGUISED AS "SCRUTINY" OR "SCIENCE," CANNOT BE CONSIDERED.

Defendants continue to insist that "intermediate scrutiny," if that is the standard to be applied, is merely an exercise in deferring to their view of what is constitutional. But the measuring of constitutional fit is a judicial, not legislative function. Deference is only owed to "traditional legislative authority to make predictive judgments." *Turner Broadcasting System, Inc.* v. *FCC*, 520 U.S. 180, 196 (1997) ("*Turner II*"). No decision of this Court holds that "intermediate scrutiny" is fancy legalese for "rubber stamp."

> In Part II.A. of *Turner*, the Court applied deference to the legislature's judgment regarding the first portion of the intermediate scrutiny analysis: whether there was a "real harm" amounting to an important government interest and "whether [the statutory provisions at issue] will alleviate it in a material way." *Turner*, 520 U.S. at 195. But in Part II.B, when assessing "the fit between the

asserted interests and the means chosen to advance them," the Court applied no such deference. *Id.* at 213. Instead, it required the government to prove that the statute did not burden the right "substantially more . . . than is necessary to further [the government's legitimate] interests." *Id.* at 214.

*Peruta* v. *Cnt'y of San Diego*, 742 F.3d 1144, 1177 (9th Cir. 2014), *vacated*, 781 F.3d 1106 (9th Cir. 2015), 742 F.3d at 1177 (quotation omitted).

Defendants invoke language in Part II.B referring to "a deliberate congressional choice to adopt the present levels of protection, to which this Court must defer," Defendants' Br. at 39 (quoting *Turner II*, 520 U.S. at 219), and from this glean that deference is owed to any ultimate legislative choice. Not so. The "choice" here was "the degree to which [the Government's] interests should be promoted." *Turner II*, 520 U.S. at 219 (quotation omitted). The city retains the discretion as to how much it wishes to protect its interests—but that choice is liable to be judicially tested for constitutionality.

And whatever role means-ends scrutiny plays in cases dealing with the regulation of rights, where a defined *and accepted* right is balanced against some regulatory interest, the Court cannot balance anew the interests that would inform whether the right ought to exist in the first

place. There can *never* be a legitimate, self-contained government interest in suppressing a right as means of reducing harm.

Accordingly, the facts, the criminology, and the policy arguments as to whether or how carrying guns is good or bad for society—are all completely irrelevant. The Second Amendment does not "require judges to assess the costs and benefits of firearms restrictions and thus to make difficult empirical judgments in an area in which they lack expertise." *McDonald* v. *City of Chicago*, 561 U.S. 742, 790-91 (2010).

In another forum, Plaintiffs would more vigorously contest Defendants' ideas regarding, as one of their authorities entitles it, "[t]he Social Costs of Gun Ownership." Plaintiffs would concede that gun ownership, and gun carrying, have "social costs," but dispute those costs' extent, and point out that those costs are outweighed by social and individual benefits. The debate is a familiar one, and it is a perfectly legitimate debate worth having. But this Court is not the proper forum in which to resolve a policy dispute over the wisdom of gun rights or gun control, in whatever respective measure.

While Defendants spill much ink attacking the "more guns, less crime" theory, Plaintiffs have never invoked it, and their claims do not

turn on the theory's merit. Plaintiffs do not ask the Court to decide whether carrying guns for self-defense is a good idea. As far as their argument is concerned, it might well be a terrible idea—as bad as Defendants claim or even worse. Plaintiffs renew their offer to save everyone a great deal of time (were that goal universally desired) by stipulating, for the sake of argument, that their victory would prove a public policy disaster, with widespread chaos and mayhem overtaking today's bucolic order.[3] Let the Court assume that eliminating the city's "good reason" requirement is at least as bad a policy idea as the city claims it to be.

So what? While the Second Amendment might be a new feature of applied constitutional law, the notion that constitutional rights carry "social costs" is established.[4]

---

[3]To be sure, Washington's pre-1943 experience, when unlicensed handgun carrying was allowed, and that of much larger urban centers where the right to bear arms is respected today, does not resemble this description.

[4]*See, e.g.*, Tonja Jacobi, *The Law and Economics of the Exclusionary Rule*, 87 Notre Dame L. Rev. 585 (2011); Michael D. Cicchini, *An Economics Perspective on the Exclusionary Rule and Deterrence*, 75 Mo. L. Rev. 459 (2010); Richard A. Posner, *Free Speech In An Economic Perspective*, 20 Suffolk U. L. Rev. 1 (1986); Peter F. Nardulli, *The Societal Cost of the Exclusionary Rule: An Empirical*

The right to keep and bear arms . . . is not the only constitutional right that has controversial public safety implications. All of the constitutional provisions that impose restrictions on law enforcement and on the prosecution of crimes fall into the same category.

*McDonald*, 561 U.S. at 783.

"The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Heller*, 554 U.S. at 634. That illicit power is exactly what Defendants hope to constitutionalize here.

At bottom, this remains a rationing case, indistinguishable from *Heller* v. *District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015) ("Heller III"). Defendants hope to introduce mountains of data and "expert" testimony tending to show that a constitutional right—here, the right to bear arms—is inherently harmful, and should accordingly be suppressed. That is not "intermediate scrutiny," it is lawlessness.

Were this case to turn on the weight of empirical evidence, it would turn on nothing more than the courts' personal legislative judgment.

---

*Assessment*, 8 Am. Bar Found. Research J. 585 (1983); Jerry L. Mashow, *Administrative Due Process As Social Cost Accounting*, 9 Hofstra L. Rev. 1423 (1981).

Plaintiffs cannot establish any particular likelihood of winning such a case, as they can only guess at judges' political views of this contentious topic regardless of what evidence the parties submit. Yet Plaintiffs should prevail under any possible approach to adjudicating this dispute as a matter of constitutional law—because Defendants are destroying the right, subjecting the right to an improper prior restraint, or addressing perceived social harms by targeting the right itself.[5]

## VI. PLAINTIFFS' IRREPARABLE HARM, THE EQUITABLE BALANCE, AND THE PUBLIC INTEREST ALL COUNSEL ENTRY OF A PRELIMINARY INJUNCTION.

The notion that Plaintiffs' injuries are speculative, because they have not established an immediate need for carrying a gun, is frivolous. Plaintiffs need show no "proof of any injury other than the threatened constitutional deprivation itself." *Gordon* v. *Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (quotation omitted). Again, it bears repeating that the

---

[5]Defendants err in suggesting that the prior restraint doctrine is limited to the First Amendment. It is not. The Supreme Court speaks of the doctrine as securing "freedoms which the Constitution guarantees." *Staub v. City of Baxley*, 355 U.S. 313, 322 (1958); *see, e.g.*, *Kent* v. *Dulles*, 357 U.S. 116, 129 (1958) (no "unbridled discretion to grant or withhold" passport implicating Fifth Amendment travel right). That no court has yet to apply the doctrine in the Second Amendment context is not surprising, given the novelty of Second Amendment litigation.

right to bear arms is the right to be "armed and ready" should a confrontation arise. *Heller*, 554 U.S. at 584. Plaintiffs' readiness to fill out Defendant Lanier's forms is irrelevant. Defendants' revealing attack on the Second Amendment being less "intrinsically valuable" than other rights, Defendants' Br. at 55, only underscores their hostility to this right. But the Supreme Court has rejected the notion that rights have hierarchical value. *Caplin & Drysdale* v. *United States*, 491 U.S. 617, 628 (1989). No constitutional right is "in some way less 'fundamental' than" others. *Valley Forge Christian Coll.* v. *Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 484 (1982). And the unavoidable fact that "enforcement of an unconstitutional law is always contrary to the public interest," *Gordon*, 721 F.3d at 653, forecloses arguments that equity or the public interest allow for the wholesale suppression of Plaintiffs' fundamental right to bear arms.

CONCLUSION

The District Court's order should be reversed, and the case remanded with instructions to grant Plaintiffs the preliminary injunction to which they are entitled.

Dated:   July 27, 2016          Respectfully submitted,

                                 /s/ Alan Gura
                                Alan Gura
                                GURA PLLC
                                916 Prince Street, Suite 107
                                Alexandria, VA 22314
                                703.835.9085/703.997.7665

                                Counsel for Appellants

CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 6,496 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Corel Wordperfect in 14-point Century Schoolbook font.

/s/ Alan Gura
Alan Gura

I certify that on this 27th day of July, 2016, I filed the foregoing Brief electronically with the Clerk of the Court using the CM/ECF System. I further certify that I will submit the required paper copies to the Court. I further certify that counsel for Defendant-Appellees is a registered CM/ECF user and will be served via the CM/ECF system.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this the 27th day of July, 2016.


/s/ Alan Gura
Alan Gura

Counsel for Appellants

# Addendum

# ACTS

OF

*A GENERAL NATURE,*

Enacted, revised and ordered to be re-printed,

AT THE FIRST SESSION

OF THE

## Twenty-Second General Assembly

OF THE

# STATE OF OHIO,

BEGUN AND HELD IN THE TOWN OF COLUMBUS,

## DECEMBER 1, 1823,

AND IN THE TWENTY-SECOND YEAR OF SAID STATE.

STANFORD LIBRARY

VOL. XXII.

———————●———————

PUBLISHED BY AUTHORITY.

———————●———————

## COLUMBUS:

PRINTED BY P. H. OLMSTED.

1824.

Addendum 1

Digitized by Google

rant legally issued or by the order of some civil officer within the county on view or hearing; and shall be fined in a sum not exceeding twenty dollars; and any judge of the court of common pleas or justice of the peace within the proper county, be, and they are hereby empowered, authorized and required to proceed against and punish every person offending against the provisions of this act; and upon view, or hearing, may, or on information given on oath or affirmation, shall, if need be, issue his warrant to bring the body of the accused before him, and shall, in a summary way, inquire into the truth of the accusation; and if guilty, shall enforce the penalty of this act annexed to the offence: and said offender (if the said judge or justice should think necessary,) may be detained in custody and committed until sentence be performed: *Proviso,* That this section shall not be so construed as to deprive any religious society of the right of laying hands upon the person or persons who may be disturbing the congregation, and turning him or them out of their church or place of worship.

Proviso.

Sec. 4. That if any person of the age of fourteen years or upwards, shall profanely curse or damn, or profanely swear by the name of God, Jesus Christ or the Holy Ghost, each and every person so offending, shall be fined in a sum not exceeding one dollar, nor less than twenty-five cents for every such offence.

Profane swearing.

Sec. 5. That if any person or persons shall be found making or exciting any contention or disturbance at any tavern, court, election or other meeting of the citizens for the purpose of transacting or doing any business appertaining to or enjoined on them, the person or persons so offending, shall be fined in a sum not exceeding five dollars, nor less than fifty cents each, and if necessary, imprisoned until such meeting shall be ready to disperse: *Provided,* The time for which such person or persons may be confined, shall not exceed six hours.

Exciting disturbance at court, &c.

Proviso.

Sec. 6. That if any person or persons shall play bullets along or across any street in any town or village within this state, or if any person or persons shall run any horse or horses within the limits of any such town or village, every person or persons so offending, shall be fined in a sum not exceeding five dollars nor less than fifty cents.

Bullets and horse racing in streets.

Sec. 7. That if any keeper of a public house or retailer of spiritous liquors in this state, shall establish, keep, or permit to be kept upon his or their lots or premises, any nine pin alley, or shall in whole or in part be interested in any nine pin alley, upon the lot or premises of another, he or they shall, upon conviction thereof forfeit and pay to, and for the use of the proper township, not less than twenty-five, nor more than one hundred dollars: And this section

Nine pin alley

shall be construed to extend to any alley denominated a nine pin alley whether such alley is used for playing therein, a greater or less number than nine pins.

**Puppet shows and wire dancing for money.** Sec. 8. That if any person or persons shall exhibit any puppet show, wire dancing or tumbling, jugling or slight of hand within this state, and shall ask or receive any money or other property for exhibiting the same, every such person so offending, shall forfeit and pay for every such offence the sum of ten dollars.

**Destroying advertisements set up, &c.** Sec. 9. That if any person shall intentionally deface, obliterate, tear down or destroy in whole or in part any copy or transcript of or extract from any law or act of the United States or of this state, or any proclamation, publication, advertisement of notification, whatsoever, set up in any public place within this state, for the public information of any citizen, by the authority of any law or act of this state, such person shall, on conviction thereof, before any court having jurisdiction of the same, be fined in any sum not exceeding ten dollars, and may be committed to jail for a time not exceeding twenty four hours, at the discretion of the court.

**Selling spirits, &c. at or near religious assemblies.** Sec. 10. That if any person shall expose or offer for sale at any place where any religious society of people are collecting or collected together, for the purpose of religious worship, or within one mile thereof any spirituous liquor, cider or beer, such person may be arrested and detained in custody not exceeding six hours at any one time and shall be fined in a sum not exceeding twenty dollars: *Provided,* **Proviso.** That nothing in this act shall affect merchants, licensed tavern keepers, inkeepers, distillers or manufacturers of cider or beer, selling ardent spirits, cider or beer at their usual place of vending the same or at their residence.

**Fines how collected and paid.** Sec. 11. That all fines accruing under the provisions of this act shall be collected in the name of the state of Ohio, as in other cases of a breach of the peace, and be paid into the township treasury for the use of the townships in which the offence shall have been committed within twenty days after collected; and if any officer fail to pay over such fine by him collected agreeably to the provisions of this act, **Penalty for neglect.** such officer shall for any such neglect forfeit and pay into the township treasury double the amount of any fine or fines by him collected, to be recovered in a summary way before any justice of the peace having cognizance of the same at the suit of the township treasurer: *Provided,* That all **Proviso.** prosecutions under the provisions of this act shall be commenced within ten days after the offence shall have been committed, except prosecutions against justices for not paying over any fine or fines as aforesaid.

Sec. 12. That the act entitled "an act for the prevention of certain immoral practices," passed the third day of January, one thousand eight hundred and sixteen; and the act a-

Digitized by Google

Addendum 3

# THE

# CHARTER

#### WITH ITS

## AMENDMENTS

#### AND THE

# REVISED ORDINANCES,

#### OF THE

## CITY OF MANCHESTER, *N.H.*

PUBLISHED UNDER THE AUTHORITY OF THE CITY COUNCIL.



MANCHESTER, N. H.,

HENRY A. GAGE & Co., PRINTERS.

1859.

Digitized by Google

Addendum 4

and to prosecute any person offending against any of its provisions.

SEC. 17. No person shall make any brawls or tumults, or, in any street, lane or alley, or public place, be guilty of any rude, indecent or disorderly conduct, or shall insult or wantonly impede any person passing thereon, or shall throw any stones, bricks, snowballs, or dirt, or play at ball or at any game at which ball is used.

SEC. 18. No person shall sing or repeat, or cause to be sung or repeated any lewd, obscene, or profane songs, or shall repeat any lewd, obscene, or profane words, or write or mark in any manner any obscene or profane word, or obscene or lascivious figure or representation, on any building, fence, wall, post or other thing whatever.

SEC. 19. No person shall wantonly injure or deface any building, fence, wall, post, sign-board, or sign, or any lamp-post, or lamp or lantern thereon, or shall wantonly cut or injure any tree standing in any street, highway or public place, or shall rob any garden or field of fruit or vegetables, or shall wantonly injure any trees, shrubs, or bushes growing in any street, common or square, garden, field, or yard, or shall, without lawful permission, climb on or over any fence of any garden or yard.

SEC. 20. No person shall, within the compact part of the city, fire or discharge any cannon, gun, pistol, or other fire-arms, or fire or discharge any rockets, squibs, crackers, or any preparation of gun-powder, (except by permission of the Mayor and Aldermen in writing,) or shall make any bonfire, or improperly use or expose any friction matches, or knowingly raise or repeat any false cry of fire.

SEC. 21. No person shall, within the view of any dwelling house, or of any public road or street, in the day time, bathe or swim without necessity, or expose his person indecently in dressing or undressing for the purpose of swimming or bathing or otherwise, without necessity.

Addendum 5

Digitized by Google

District of Columbia. Laws, statutes, etc. 19

Just 8 — Codes

# THE

# REVISED CODE ᶜᵗ

OF THE

## DISTRICT OF COLUMBIA,

PREPARED

## UNDER THE AUTHORITY OF THE ACT OF CONGRESS,

ENTITLED

"AN ACT TO IMPROVE THE LAWS OF THE DISTRICT OF COLUMBIA,
AND TO CODIFY THE SAME," APPROVED MARCH 3, 1855.

———————

S
US/DI
253
E5 ;

**WASHINGTON:**

A. O. P. NICHOLSON, PUBLIC PRINTER.

**1857.**

Addendum 6

Digitized by Google

567

SEC. 2. On the trial of every indictment, the party accused shall be allowed to be heard by counsel, and he may defend himself, and he shall have a right to produce witnesses and proofs in his favor, and to be confronted with the witnesses who are produced against him.

SEC. 3. No person indicted for an offence shall be convicted thereof, unless by confession of his guilt in open court, or by admitting the truth of the charge against him by his plea or demurrer, or by the verdict of a jury, accepted and recorded by the court.

SEC. 4. No person shall be held to answer on a second indictment for any offence of which he has been acquitted by the jury, upon the facts and merits, on a former trial; but such acquittal may be pleaded by him in bar of any subsequent prosecution for the same offence, notwithstanding any defect in the form or in the substance of the indictment on which he was acquitted.

SEC. 5. No person who is charged with any offence against the law, shall be punished for such offence, unless he shall have been duly and legally convicted thereof in a court having competent jurisdiction of the cause and of the person.

# CHAPTER 141.

## OF PROCEEDINGS TO PREVENT AND DETECT THE COMMISSION OF CRIMES.

SECTION

1. Officers authorized to keep the peace.
2. Complaint; how made.
3. Arrest.
4. Trial; recognizance to keep the peace.
5. Party; when to be discharged.
6. Refusing to recognise, to be committed.
7. Party, when discharged; and complainant, when to pay costs.
8. Payment of costs in other cases.
9. Appeal allowed.
10. On appeal, witnesses to recognise.
11. Proceedings upon an appeal.
12. Recognizance; when to remain in force.
13. Persons committed for not recognising; how discharged.
14. Recognizances to be transmitted to the court.

SECTION

15. Recognizances; when to be required on view of the court or magistrate.
16. Persons who go armed may be required to find sureties for the peace, &c.
17. Proceedings when person is suspected of selling liquor contrary to law.
18. Surety may surrender his principal, who may recognise anew.

SEARCH WARRANTS.

19. Search warrants for property stolen.
20. In what other cases to be issued.
21. } Warrant; to whom directed, and when
22. }   and how executed.
23. Property seized may be kept as evidence, and then restored to owner or destroyed.

Addendum 7

Digitized by Google

discharge the appellant, or may require the appellant to enter into a new recognizance, with sufficient sureties, in such sum and for such time as the court shall think proper, and may also make such order in relation to the costs of prosecution as may be deemed just and reasonable.

SEC. 12. If any party appealing shall fail to prosecute his appeal, his recognizance shall remain in full force and effect, as to any breach of the condition, without an affirmation of the judgment or order of the magistrate, and shall also stand as a security for any costs which shall be ordered by the court appealed to, to be paid by the appellant.

SEC. 13. Any person committed for not finding sureties, or refusing to recognise, as required by the court or magistrate, may be discharged by any judge or justice of the peace on giving such security as was required.

SEC. 14. Every recognizance taken pursuant to the foregoing provisions shall be transmitted by the magistrate to the criminal court on or before the first day of the next term, and shall be there filed by the clerk.

SEC. 15. Every person who shall, in the presence of any officer mentioned in the first section of this chapter, make an affray, or threaten to kill or beat another, or to commit any violence or outrage against his person or property, and every person who, in the presence of such officer, shall contend with hot and angry words, to the disturbance of the peace, may be ordered, without process or any other proof, to recognise for keeping the peace, or being of good behavior, for a term not exceeding one year, and in case of refusal may be committed as before directed.

SEC. 16. If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace for a term not exceeding six months, with the right of appealing as before provided.

SEC. 17. If any justice of the peace suspect any person of selling, by retail, wine or ardent spirits, or a mixture thereof, contrary to law, he shall summon the person and such witnesses as he may think

Digitized by Google